**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| COUNTY OF COOK, ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No : 14-cv-9548 |
| | ) | |
| WELLS FARGO & CO., | ) | |
| WELLS FARGO FINANCIAL, INC ., | ) | |
| WELLS FARGO Bank, N.A., | ) | **COMPLAINT** |
| and WELLS FARGO "John Doe" CORPS 1-375, | ) | |
| | ) | |
| Defendants. | ) | |

ANITA ALVAREZ,
STATE'S ATTORNEY FOR COOK COUNTY

| | |
|---|---|
| JAMES D. MONTGOMERY, SR. | JAMES M. EVANGELISTA (pending *pro hac vice*) |
| JAMES D. MONTGOMERY, JR. | JEFFREY R. HARRIS (pending *pro hac vice*) |
| MICHELLE M. MONTGOMERY | DARREN W. PENN (pending *pro hac vice*) |
| JOHN K. KENNEDY | DAVID J. WORLEY (pending *pro hac vice*) |
| DANIEL A. DAILEY | LESLIE G. TORAN (pending *pro hac vice*) |
| | |
| **JAMES D. MONTGOMERY &** | **HARRIS PENN LOWRY, LLP** |
| **ASSOCIATES LTD.** | 400 Colony Square, Suite 900 |
| One North LaSalle Suite 2450 | 1201 Peachtree Street, NE |
| Chicago, IL 60602 | Atlanta, GA 30361 |
| Phone: (312) 977-0200 | Phone: (404) 961-7650 |
| Fax: (312) 977- 0209 | Fax: (404)961-7651 |
| ddailey@jdmlaw.com | jim@hpllegal.com |

*Special Assistant State's Attorneys*

**Table of Contents**

I.   Introduction................................................................................................................4

II.  Jurisdiction & Venue .............................................................................................9

III. Parties.........................................................................................................................9

IV.  Background Facts....................................................................................................13

   A. The Federal Government Has Found That Discrimination Was Pervasive
   In Subprime Mortgage Lending During 2003 Through Early 2008 ..........................................13

   B.  Congress Has Found That Predatory and Discriminatory Lending Caused
   The Foreclosure Crisis ................................................................................................19

   C.  The Predatory, Non-Prime, Mortgage Lending and Securitization Activities
   of Defendants and Other Industry Participants Caused the U.S. Financial
   Crisis, and the Subsequent Housing and Foreclosure Crisis......................................25

   D.  The Foreclosure Crisis Has Disparately Impacted Minorities Nationwide ........................29

V.   Defendants' Discriminatory Actions and Other Wrongful Conduct .....................................32

   A. Wells Fargo's Financial Motivations To Engage In Their Predatory &
   Discriminatory Conduct ...............................................................................................39

   B.  Wachovia's Financial Motivations To Engage In Their Predatory &
   Discriminatory Conduct ...............................................................................................48

   C.  Defendants Knew, Or Were Grossly Negligent or Reckless In
   Not Knowing, Of The Predatory And Discriminatory Nature Of Their Conduct ...................51

   D.  Defendants Focused Their Discriminatory Conduct on Ethnic Minorities
   For Non-Prime Mortgage Loans Because They Provided The Easiest Target ......................65

   E.  Wells Fargo Directly Targeted Minorities For Non-Prime Mortgage
   Loan Originations, And Incentivized That Conduct Through Its Employee
   Compensation Scheme and Quotas ..............................................................................67

   F.  Wachovia Targeted its Pick-A-Pay Loan Originations to FHA
   Protected Minority Borrowers ......................................................................................79

   G.  Defendants' Discretionary Pricing Policies Enabled And Incentivized
   Predatory Non-prime Mortgage Lending on a Discriminatory Basis Through

Their Wholesale Lending & Broker Channels ...........................................................................83

H.  Defendants Lowered or Circumvented Their Underwriting Standards,
Enabling Predatory Non-Prime Mortgage Loans to Be Made on a Discriminatory Basis .......89

I.  Defendants' Mortgage Servicing & Foreclosure Practices  Are
Predatory  &  Discriminatory .....................................................................................................99

J.  Empirical Data Evidences Defendants' Targeting of, And The Discriminatory
Impact on, Minority Borrowers in Plaintiff's Communities ....................................................108

K.  The Full Extent of Defendants' Discriminatory Housing Practices are
Concealed Through Defendants' Underreporting of Minority Status In HMDA
Data And Through MERS  .......................................................................................................129

VI.  Defendants' Predatory & Discriminatory Mortgage Lending, Servicing And
Foreclosure  Practices  Have Harmed Plaintiff ............................................................................135

VII. Wells Fargo Is Liable For The Acts Of Wachovia As A Result Of Its Merger
With Wachovia ..............................................................................................................................146

VIII. Cause Of Action ...................................................................................................................147

IX.  Demand For Jury Trial ...........................................................................................................150

X.  Prayer For Relief .....................................................................................................................150

## I.    INTRODUCTION

1.      Plaintiff County of Cook, Illinois, which embodies all the communities, neighborhoods and residents it collectively represents, brings this action as an "aggrieved person" pursuant to the Fair Housing Act, 42 U.S.C. §3601 et seq. ("FHA").  The FHA prohibits discrimination in the terms and conditions of residential real-estate related transactions, including mortgage loan transactions.

2.      The FHA has a broad remedial purpose and defines an "aggrieved person" as "any person" who "claims to have been injured" or "believes . . . will be injured by a discriminatory housing practice that is about to occur."  To effectuate its broad remedial purpose the FHA provides a broad range of remedies including injunctive relief, actual damages and punitive damages when a court finds that an aggrieved person has been injured by a discriminatory housing practice that has "occurred or is about to occur."

3.      The ongoing foreclosure crisis in Plaintiff's communities (and across the nation) was the foreseeable and inevitable result of Defendants' (and other industry participants') ongoing discriminatory housing practice of "equity stripping," involving Defendants' interrelated predatory and discriminatory mortgage lending, mortgage securitization, mortgage loan servicing and foreclosure activities.  As used herein, the term "predatory lending" collectively describes this conduct and is not limited to just loan making activities.  Equity stripping is an abusive form of "asset based lending" that maximizes lender profits based on the value of the underlying asset and onerous loan terms, while in disregard for a borrower's ability to repay.  This ongoing activity has enabled Defendants to continue to earn enormous financial rewards primarily at the expense of Plaintiff's FHA protected minority communities.

4.     Defendants began their discriminatory housing practice of equity stripping by directly targeting FHA protected minority mortgage borrowers in Plaintiff's communities and neighborhoods, particularly African American and Latino homeowners including African American women,[1] in order to maximize the income and assets Defendants could generate by originating or acquiring as many  "high cost," higher cost, near prime, "subprime," ALT-A and certain other conforming and non-conforming first and second lien home purchase and refinance mortgage loans (hereafter, collectively described as "non-prime") as possible.  Such non-prime mortgage loans included higher costs, predatory loan terms and/or have been underwritten in a predatory or discriminatory manner.

5.      This occurs through several of Defendants' individual mortgage banking operational policies and practices (but is tremendously enhanced by the combination of such policies and practices) of offering mortgage loans despite the borrower's inability to repay such loans; granting employees, brokers and managers the discretion to both steer minority borrowers into more costly loans and the discretion and direction to set loan pricing above published rate sheets (in order to maximize yield spreads); specifically compensating employees and brokers to do so; and functionally enabling the approval of such loans by systematically lowering or waiving published underwriting standards and guidelines.

6.     Defendants' discriminatory behavior maximized Defendants' revenue and income through loan origination and prepayment fees and higher interest rate yield spreads, securitization and sales of mortgage loans into residential mortgage backed securities, and the creation and retention of mortgage servicing rights assets to generate continuing and future

---

[1] The term "minority" as used hereafter includes racial/ethnic minorities and women.

income from Defendants' predatory and discriminatory mortgage servicing and foreclosure activities. Defendants intentionally engaged in this conduct notwithstanding their knowledge of its illegality and the financial risks it posed to all. Indeed, Defendants' equity stripping activities have been, and continue to discriminatorily target minority homeowners, and are discriminatorily impacting such borrowers, including through Defendants' mortgage servicing and foreclosure activities that are themselves being conducted on a discriminatory basis.

7.      By its very nature, Defendants' equity stripping involves interrelated predatory and discriminatory loan making, loan servicing and foreclosure activities that occur over the entire life of each mortgage loan, continuing until the loan is either paid off (or refinanced with a non-predatory loan) or until the borrower defaults and the underlying asset is foreclosed upon. These processes strip equity from the borrowers' home:

- at loan origination (when Defendants impose higher interest rates, higher origination costs and improper fees);

- upon each monthly payment when Defendants service the loan because a borrower makes a higher payment due to an inflated interest rate;

- upon payment of a pre-payment penalty when a borrower attempts to refinance or pay off the loan;

- following and during default because Defendants subject the borrower to additional improper fees and costs; and

- upon foreclosure when Defendants take away the borrower's home, thereby removing any remaining equity and eliminating the borrower's ability to generate future equity through home value appreciation or loan principal pay down.

8.      Defendants' activities have established and/or perpetuate unfair terms and/or conditions in residential real-estate related finance transactions and have made housing unavailable to FHA protected minorities in Plaintiff's communities. Such activities stripped and

continue to strip borrower home equity, increasing the risk of default and foreclosure, and actually resulting in foreclosure on minority borrowers' homes.

9.      The Defendants' continuing actions of servicing each of the predatory and discriminatory mortgage loans they made, perpetuates equity stripping.  The act of foreclosure is the ultimate denial of housing, and is the final activity in Defendants' discriminatory housing practice of equity stripping.  Thus, Defendants' FHA violations continue to this very day and have not terminated because Defendants continue to service and foreclose on the discriminatory loans for which they are responsible.  This is heightened by the discriminatory manner of Defendants' foreclosure activity on minority borrowers' homes and Defendants' loss mitigation activities.

10.      Plaintiff seeks injunctive relief as a remedial measure, and monetary damages for, Defendants' discriminatory housing practices that have resulted in - and will continue to cause in the future - unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies, many of which are concentrated in Plaintiff's communities and neighborhoods with increased percentages of racial/ethnic minority home-owners.

11.      Defendants' actions have caused, and will continue to cause: (1) a reduction in the rate of minority homeownership in Plaintiff's communities and neighborhoods, robbing those communities of their integrated racial character and injuring Plaintiff through the ***segregative effect*** of Defendants' actions leading to urban blight; (2) ***organizational harm*** to Plaintiff's departments and authorities because Defendants' conduct forced and continues to force reallocation of Plaintiff's limited financial and human resources to address the harms Defendants' actions have caused; and (3) ***direct and indirect financial harm*** to Plaintiff. This financial harm includes the erosion of Plaintiff's tax base, the loss of property tax revenue, out-

of-pocket costs relating to abandoned or vacant properties, the loss of certain intangible property recording fee income and other financial harm due to urban blight.

12.     Because of the deliberate, egregious and widespread nature of Defendants' predatory and discriminatory mortgage lending and servicing practices and policies Plaintiff also seeks imposition of punitive and/or exemplary damages. In addition, Defendants' efforts to obfuscate their liability, and Defendants' callous disregard for the impact of such actions on Plaintiff's communities, neighborhoods and residents require Plaintiff to seek punitive and/or exemplary damages.

13.     As Plaintiff further alleges below, Defendants have been sued by, and settled with, a wide variety of other plaintiffs, including federal and municipal governmental entities and individuals, for similar predatory and discriminatory conduct as alleged herein.  For instance, Wells Fargo was sued by, and settled with the United States Department of Justice ("DOJ"), the City of Baltimore, the City of Memphis and Shelby County, Tennessee, for FHA violations similar to those at issue here.  Indeed, the DOJ concluded, that Defendants discriminatorily steered tens of thousands of ethnic minority borrowers across the country into higher cost and subprime mortgage loans that charged higher fees and interest rates than loans made to white borrowers who posed the same credit risk. Wells Fargo employees referred to loans to minorities as "ghetto loans."

14.     Wells Fargo also has entered into a variety of consent orders and settlements with its federal banking regulators, the Department of Justice, and various State Attorneys General regarding Defendants' predatory and unfair servicing and foreclosure practices but, to this day, Defendants' discriminatory conduct still continues.

## II.    JURISDICTION & VENUE

15.    This is an action for violation of 42 U.S.C. § 3601 et seq. (Fair Housing Act). This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

16.    Venue is proper in this district under 28 U.S.C. § 1391 because each Defendant is a corporation subject to personal jurisdiction in this district, has transacted business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## III.    PARTIES

17.    Plaintiff, County of Cook, including its affiliated departments, is a governmental entity within the State of Illinois organized pursuant to the Illinois Constitution.  Cook County is the nation's second most populous county and the largest county in Illinois, with more than 5.2 million residents constituting 41% of the entire Illinois population.  Cook County consists of 129 municipalities and unincorporated areas encompassing various communities and neighborhoods, including the City of Chicago.  Cook County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

18.    Defendant Wells Fargo & Co. ("Wells Fargo") is a nationwide, diversified financial holding company and bank holding company incorporated in the State of Delaware with its principal place of business in San Francisco, California. Wells Fargo provides banking, insurance, investment, and mortgage and consumer finance services through storefronts, the Internet, and other distribution channels across the United States and internationally.  It is the parent company of Wells Fargo Bank, N.A.  As a bank holding company, Wells Fargo is subject

to the regulatory authority of the Board of Governors of the Federal Reserve System, among other federal regulators.

19.     Defendant Wells Fargo Financial, Inc. ("Wells Fargo Financial") is a subsidiary of Wells Fargo and is a bank holding company with its principal place of business in Des Moines, IA.  Prior to September 2008, Wells Fargo Financial conducted home mortgage lending through nonbank subsidiaries located throughout the United States, including Wells Fargo Financial Illinois, Inc.  As used here, and unless otherwise indicated, "Wells Fargo Financial" includes its subsidiary Wells Fargo Financial Illinois, Inc.  By September 2008, Wells Fargo transferred the lending operations of Wells Fargo Financial to Defendant Wells Fargo Bank, N.A. as part of its reorganization.

20.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo Bank") is organized as a national banking association under the laws of the United States, with its corporate headquarters in San Francisco, California.  As a federally insured banking entity, Wells Fargo Bank is subject to the regulatory authority of the Office of the Comptroller of the Currency, among other federal regulators, and, as of July 21, 2011 became subject to the regulatory authority of the Consumer Financial Protection Bureau ("CFPB"). Wells Fargo Bank is one of the nation's largest residential mortgage originators and servicers.  It offers residential mortgage loans to consumers through its Wells Fargo Home Mortgage division, which at one time operated as a separately owned subsidiary of Wells Fargo, but which was merged into Wells Fargo Bank in 2004.  Wells Fargo Bank maintains multiple offices in the State of Illinois and within Cook County and its municipalities for the purposes of soliciting applications for and making residential mortgages loans, among other banking activities. It has transacted business in this district.

10

21.     On December 31, 2008, in a stock purchase transaction Wells Fargo acquired Wachovia Corporation, then the country's fourth largest diversified financial services and bank holding companies, based in Charlotte, North Carolina. As a bank holding company, Wachovia Corporation was subject to the regulatory authority of the Federal Reserve, among other federal regulators.   In connection with its acquisition of Wachovia Corporation, Wells Fargo also acquired Wachovia Mortgage and all of the assets of Wachovia Bank, N.A., a national banking association, which totaled $635 billion at December 31, 2008. As a federally insured banking entity, Wachovia Bank was subject to the regulatory authority of the Office of the Comptroller of the Currency.

22.     Prior to the purchase by Wells Fargo, Wachovia itself expanded through a merger with First Union Corp. in 2001, and in 2006 had purchased troubled subprime lender Golden West Financial, which owned World Savings Bank, FSB, then the second largest savings and loan in the United States. In addition, Wachovia owned American Mortgage Network and its related entities.   Wachovia Corporation, Wachovia Bank and their subsidiaries, including World Savings Bank and American Mortgage Network are hereafter referred to collectively as ("Wachovia").

23.     Defendant Wells Fargo & Co., as the corporate parent of Wells Fargo Bank and its subsidiaries, as well as the corporate parent of its other subsidiaries involved in the wrongful activities alleged herein, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of interrelated, interdependent, centralized and/or coordinated functions, practices and policies involved in their entire mortgage banking operation, particularly retail and wholesale higher cost, subprime, ALT-A or other non-conforming loan origination, funding, purchase, securitization and servicing activities.  As such,

Defendants Wells Fargo & Co, Wells Fargo Financial, Wells Fargo Bank, and any of their subsidiaries or acquisitions involved in the matters alleged herein, are collectively referred to hereafter as "Wells Fargo."

24.     Wells Fargo is legally responsible for, either directly or as a successor in interest to, Wachovia as a result of Wells Fargo's all stock purchase-acquisition of Wachovia in October 2008. Upon its acquisition by Wells Fargo, Wachovia became part of Wells Fargo's common enterprise involving the unlawful acts and practices alleged below.  Wachovia's operations were eventually merged into Wells Fargo's operations.

25.     Wells Fargo and Wachovia have engaged in "residential real estate-related transactions" within the meaning of section 805 of the FHA, 42 U.S.C. § 3605.  Accordingly, at all relevant times Wells Fargo, including Wachovia, have been subject to federal laws governing fair lending, including the FHA, and the fair housing regulations of the Department of Housing and Urban Development ("HUD"), 24 C.F.R. § 100.1, *et seq.*

26.     The term "Defendants" as generally used throughout this Complaint refers to Wells Fargo, Wachovia and their respectively acquired or controlled subsidiaries and affiliates.

27.     Defendants Wells Fargo Corps. 1-375 are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein.  Defendants established and/or maintained some 378 subsidiary and affiliate correspondent lenders throughout the United States as reflected in publicly available data reported pursuant to the Home Mortgage Disclosure Act. Such parties are named in "John Doe" capacity pending discovery in this case.

## IV.     BACKGROUND FACTS

**A.** **The Federal Government Has Found That Discrimination Was Pervasive In Subprime Mortgage Lending During 2003 Through Early 2008**

28.     In 1975 Congress passed the Home Mortgage Disclosure Act ("HMDA"), implemented under the Federal Reserve Board's Regulation C, requiring all mortgage lenders, including the Defendants here, to compile by census tract and report to the Federal Reserve certain mortgage loan origination and purchase information, which includes borrower race, ethnicity and gender.  One of the primary purposes of HMDA reporting is to enable federal regulators to identify discriminatory lending patterns, such as those that violate the Fair Housing Act.  HMDA data is the only readily available information, absent review of Defendants' actual loan level mortgage lending data, from which to demonstrate (using statistical data) Defendants' discriminatory housing practices.

29.     Concerned with potential discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, in 2004 the Federal Reserve began requiring lenders to identify loans originated as "high cost" or "rate spread" loans where the annual percentage rate cost of borrowing on such loans, including up-front points and fees, exceeded certain threshold percentage points levels above reported yields for U.S Treasury securities of comparable maturities. At that time, mortgage lending industry groups successfully thwarted efforts by consumer lending groups to require lenders also to include borrower credit score and other objective credit risk information in their HMDA reporting.  Regardless, Defendants and other industry participants still collect and maintain borrower credit score and other objective credit risk information for each mortgage loan in connection with Defendants' internal and external

13

operations, including for analytical and risk evaluation purposes, the sale and securitization of such mortgage loans, and loan servicing operations.

30.     Based on its own review of all HMDA data the Federal Reserve Board confirmed that on a national basis African-American and Latino borrowers were more likely to pay higher prices for mortgage loans than Caucasian borrowers during the excessive mortgage lending and refinance activity at issue here.  For example, the Federal Reserve's analysis of 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely ... to have received higher-priced loans than non-Hispanic whites .... [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006).  The Federal Deposit Insurance Corporation echoed such findings.  Martin J. Gruenberg, then-FDIC Vice Chairman and now FDIC Chairman, observed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders." Martin J. Gruenberg, *Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S.* (Oct. 18, 2006).

31.     Even after accounting for the differences in borrowers' income, credit scores, property location, and loan amounts in the 2004 HMDA data, a Federal Reserve report found that on average African-American borrowers were 3.1 times more likely than Caucasian borrowers to receive a higher-rate home loan and Latino borrowers were 1.9 times more likely to receive a higher rate loan than Caucasian borrowers. *See* Congressional Testimony of Keith S. Ernst, Senior Policy Counsel, Center for Responsible Lending, before the Subcommittee on Financial Institutions and Consumer Credit (June 13, 2006) at 2.  Reporting on the Center for

Responsible Lending's study of the HMDA data (the Center is a non-profit research organization) Ernst testified:

> Our findings were striking. We found that race and ethnicity—two factors that should play no role in pricing—are significant predictors of whether a subprime loan falls into the higher-rate portion of the market. Race and ethnicity remained significant predictors even after we accounted for the major factors that lenders list on rate sheets to determine loan pricing.

> In other words, even after controlling for legitimate loan risk factors, including borrowers' credit score, loan-to-value ratio, and ability to document income, race and ethnicity matter. African American and Latino borrowers continue to face a much greater likelihood of receiving the most expensive subprime loans—even with the same loan type and the same qualifications as their white counterparts. Across a variety of different loan types, African American and Latino borrowers were commonly 30% more likely to receive a higher-rate loan than white borrowers.

*Id* at 3.

32.     Similarly, HMDA data for 2005 evidences that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159. Similar average discriminatory patterns exist on loan refinancing for the same period, where African-Americans were 28.3 percent more likely than similarly situated Caucasians to receive higher priced loans. *See Id.* at A124, A159.  Indeed, a study commissioned by the Wall Street Journal found that in 2005 and 2006 55% and 61% respectively by of borrowers who received subprime mortgages could have qualified for traditional mortgages at the lower rates offered to prime borrowers.  "*Subprime Debacle Traps Even Very Creditworthy*," *Wall Street Journal*, December 3, 2007.

33.     The U.S. Department of Housing and Urban Development (HUD) found that in neighborhoods where at least 80% of the population is African American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a subprime lender and

even higher-income borrowers living in predominantly African American neighborhoods were twice as likely as lower-income Caucasian borrowers to have subprime loans. *See* U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions" (2002).

34.     In 2006 the Center for Responsible Lending uncovered "large and statistically significant" differences between the rates of mortgage loans offered to African Americans and Caucasians, even when income and credit risk were taken into consideration. Compared to their otherwise similarly-situated Caucasian counterparts, African Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans." Gruenstein, Bocian, Ernst and Li, "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages" (May 31, 2006).

35.     Similarly, in December 2006 the Consumer Federation of America ("CFA") revealed the results of its extensive study of gender disparity in subprime lending, their conclusions evident from the title of their report. *See* Allen J. Fishbein & Patrick Woodall, "Women are Prime Targets for Subprime Lending: Women are Disproportionately Represented in High-Cost Mortgage Market," (December 2006) (hereafter, "Women are Prime Targets").[2] As the CFA found:

> Women are more likely to receive subprime mortgages than men. These gender disparities exist across mortgage product lines. Women with the highest incomes have the highest disparities relative to men with similar incomes than women at lower income levels. The gap is especially pronounced for women of color. African American and

---

[2]     A copy of this report is publicly available at http://www.consumerfed.org/pdfs/WomenPrimeTargetsStudy120606.pdf

Latino women have the highest rates of subprime lending. Moreover, African American and Latino women with the highest incomes have much higher rates of subprime lending than white men with similar incomes. The Consumer Federation of America (CFA) study found these patterns of subprime gender disparity exist for home purchase, refinance and home improvement lending.

Thus, the CFA concluded, among other things, that "[t]he prevalence of subprime loans among women borrowers diminishes their ability to fully utilize homeownership as a pathway to build wealth." *Id.* at 3.

36. The CFA's key findings, which findings Plaintiff specifically incorporates and alleges here, include:

- Women are more likely to receive subprime and higher-cost mortgages: About a third (32.0 percent) of women borrowers receive subprime mortgage loans of all types compared to about a quarter (24.2 percent) of male borrowers – making women 32 percent more likely to receive subprime mortgages than men. More than one in ten (10.9 percent) women received high-cost subprime mortgages compared to about one in thirteen (7.7 percent) men – making women 41 percent more likely to receive higher-cost subprime loans with interest rates more than 5 percentage points higher than comparable Treasury notes.

- Women are significantly over-represented in the pool of subprime mortgages. Although women make up 30.0 percent of borrowers for mortgages of all types, they make up 38.8 percent of subprime borrowers – a 29.1 percent over-representation. This over-representation of women in the subprime mortgage pool exists for all types of mortgages but is especially true of refinance and home improvement loans which are more likely to be subprime and predatory mortgages.

- Women are more likely to receive subprime mortgages of all types regardless of income, and disparity between men and women increases as incomes rise. For purchase mortgages, women earning double the median income are 46.4 percent more likely to receive subprime mortgages than men with similar incomes. In contrast, women earning below the area median income are 3.3 percent more likely to receive subprime mortgages. Women earning between the median and twice the median income are 28.1 percent more likely to receive subprime purchase mortgages than men.

- Women of color are the most likely to receive subprime loans and white men are the least likely to receive subprime loans at every income level and the gap grows with income. African American women earning below the area median income are nearly two and a half times more likely to receive a subprime purchase mortgage than white

men and Latino women earning below the area median are nearly twice as likely to receive subprime purchase mortgages as white men. The gap is much higher at incomes above twice the area median income. Upper income African American women are nearly five times more likely to receive subprime purchase mortgages than upper income white men and upper income Latino women are nearly four times more likely to receive subprime loans than upper income white men.

- Women are more likely to receive subprime mortgages than men of the same race and women of color are much more likely to receive subprime mortgages than white men. For purchase mortgages, African American women were 5.7 percent more likely than African American men to receive subprime mortgages; Latino women were 12.7 percent more likely than Latino men to receive subprime mortgages; and white women were 25.8 percent more likely to receive subprime purchase mortgages than white men. African American women were 256.1 percent more likely to receive subprime purchase mortgages than white men and Latino women were 177.4 percent more likely to receive subprime mortgages than white men.

37.     As Plaintiff further alleges below, and consistent with the generalized findings of the federal government and industry watch-dog groups, the HMDA data that Defendants here reported to the federal government reveal profound loan pricing disparities between FHA protected minority borrowers and similarly-situated non-minority borrowers, even after controlling for borrowers' gender, income, credit scores, property location, and loan amount. Thus, Defendants' own reported HMDA data provides evidence of discrimination in their mortgage lending activity among minority borrowers who reside in Plaintiff's communities and neighborhoods.   This data evidences that Defendants have preyed upon and illegally steered minority borrowers into nonconforming or conforming "high cost," higher cost, "subprime" and nonprime loans (collectively, "non-prime loans"), as well as improperly approved minority borrowers for loans or approved such borrowers for inflated loan amounts, all of which increase the likelihood of loan delinquencies, defaults, home vacancies, and eventual foreclosures.

**B. Congress Has Found That Predatory and Discriminatory Lending Caused The Foreclosure Crisis**

38.     According to Congressional findings, the foreclosure crisis throughout the United States, and within Plaintiff's neighborhoods and communities leading up to the current period, resulted from the predatory lending activities of the mortgage industry, particularly including the predatory and discriminatory lending activities of Defendants that Plaintiff alleges here. *Report to Congress on the Root Causes of the Foreclosure Crisis,* Report of Department of Housing and Urban Development (January 2010) (hereafter, the "*Root Causes Report*").

39.     As explained in the *Root Causes Report*, housing prices escalated after 2003 and "lenders began offering new mortgage products intended to stretch borrowers' ability to afford ever more expensive homes as a means of keeping loan origination volumes high." *Root Causes Report, Executive Summary* at ix.

40.     "The leading cause of the problem was the characteristics of the market and mortgage products sold, rather than the characteristics of the borrowers who received those products." Congressional Testimony of Keith S. Ernst, Center for Responsible Lending, "Current Trends in Foreclosure and What More Can be Done to Prevent Them" at 2 (July 28, 2009) ("*Ernst Testimony*") (Joint Congressional Economic Committee).[3]

41.     The foreclosure crisis was "driven by the very design of the loans at issue. The loan products at the heart of the crisis were structured in a way that made widespread failure virtually inevitable." E. Harnick, *The Crisis In Housing and Housing Finance: What Caused It? What Didn't? What's Next?,* 31 Western New England L. Rev. 625, 628 (2009).

---

[3] Available at http://www.jec.senate.gov/public/?a=Files.Serve&File_id= 36d87b93-a0a6-47b4-96ad-1475c70dc9ce).

42.     Nationwide, between 2001 and 2006:

- Adjustable rate mortgages as a share of total subprime loans originated increased from about 73 percent to more than 91 percent;

- The share of loans originated for borrowers unable to verify information about employment, income or other credit-related information ("low-documentation" or "no-documentation" loans) jumped from more than 28 percent to more than 50 percent; and

- The share of ARM originations on which borrowers paid interest only, with nothing going to repay principal, increased from zero to more than 22 percent.

See, *Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, Report & Recommendations by Majority Staff of Joint Economic Committee (October 25, 2007).

43.     The Government Accountability Office ("GAO") has reported that "[m]ortgages originated from 2004 through 2007 accounted for the majority of troubled loans." Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, "*HOME MORTGAGES Recent Performance of Nonprime Loans Highlights the Potential for Additional Foreclosures*" at 5, GAO-09-922T (July 28, 2009):

Of the active subprime loans originated from 2000 through 2007, 92 percent of those that were seriously delinquent as of March 31, 2009, were from those four cohorts [year-groups]. Furthermore, loans from those cohorts made up 71 percent of the subprime mortgages that had completed the foreclosure process. This pattern was even more pronounced in the Alt-A market. Among active Alt-A loans, almost all (98 percent) of the loans that were seriously delinquent as of March 31, 2009, were from the 2004 through 2007 cohorts. Likewise, 93 percent of the loans that had completed the foreclosure process as of that date were from those cohorts.

Cumulative foreclosure rates show that the percentage of mortgages completing the foreclosure process increased for each successive loan cohort (see fig. 3). Within 2 years of loan origination, 2 percent of the subprime loans originated in 2004 had completed the foreclosure process, compared with 3 percent of the 2005 cohort, 6 percent of the 2006 cohort, and 8 percent of the 2007 cohort. Within 3 years of loan origination, 5 percent of

20

the 2004 cohort had completed the foreclosure process, compared with 8 percent and 16 percent of the 2005 and 2006 cohorts, respectively. The trend was similar for Alt-A loans, although Alt-A loans foreclosed at a slower rate than subprime loans. For example, within 3 years of origination, 1 percent of Alt-A loans originated in 2004 had completed the foreclosure process, compared with 2 percent of the loans originated in 2005, and 8 percent of the loans originated in 2006.

44.      The Office of the Comptroller of the Currency ("OCC") reported that as of June 30, 2011, nationwide 28.1% of subprime and higher cost loans were seriously delinquent or in foreclosure as compared to only 5.5% of prime loans.  Thus, these loans were more than 5 times more likely to be seriously delinquent or in foreclosure than prime loans.  The OCC subsequently reported in June 2013 that while only 2.5% of prime mortgages were considered seriously delinquent, 8.9% and 15.4% of ALT-A and subprime mortgages loans, respectively, are considered seriously delinquent, reflecting a continuing, massive disparity in such delinquency rates.

45.      Defendants were some of the largest originators and/or purchasers, funders and securitizers of ARM loans and other predatory non-prime and higher cost mortgage loan products in the United States.

46.      The foreclosure crisis was known (or at least foreseeable) to Defendants due to the increased risk of default inherent in non-prime mortgage loan products they originated, funded, securitized and/or serviced.  *See Ernst Testimony*.  In particular, these products included the "high cost," higher cost, subprime, and other non-prime loan products that Defendants discriminatorily sold to minority borrowers and that are at issue here.  Indeed, Defendants further increased the likelihood of delinquencies, defaults, vacancies and eventual foreclosures by steering borrowers to "low-doc" or "no-doc" loans (no verification of employment, income or

other credit-related information) and "interest only" ARM products, which eventually accounted for more than 50% and 22%, respectively, of all subprime ARM originations by 2006.

47.     Defendant Wachovia also created and marketed to minorities a particularly toxic product known as the Pic-A-Pay loan, that provided a variety of payment options at the borrower's choice, including a negatively amortizing minimum monthly payment option that caused the outstanding loan balance, and therefore accrued interest, to ***increase*** over time, further stripping out borrower equity at an even faster rate than other subprime loan products.

48.     The intentional predatory, equity stripping lending activity at issue -- targeting minority borrowers and/or steering them into higher cost loans, approving minority borrowers for loans that they are not otherwise qualified to obtain, inflating the loan costs and amounts to minority borrowers, and the application of willfully lax underwriting standards – in and of itself dramatically increased the likelihood of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies because those factors undermined the ability of the borrower to repay the loan in the first place, creating a self-destructive lending cycle concentrated in Plaintiff's minority communities.

49.     As noted in one recent study issued by the Center for Responsible Lending of mortgage loan originations between 2004 and 2008, "*Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures*," D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia (November 2011) (hereafter the "*Lost Ground Report*"), "[l]oan characteristics and foreclosures are strongly linked. . . . Loans originated by brokers, hybrid adjustable-rate mortgages ("ARMs," such as 2/28s), option ARMs, loans with prepayment penalties, and loans with high interest rates (a proxy for subprime mortgages) all have much higher rates of completed foreclosures and are more likely to be seriously delinquent." Congress has determined that "the incidence of early

22

payment defaults among these loans suggests that much of their poor performance may be related to lax underwriting that allowed borrowers to take on monthly payments that were unaffordable even before interest rate resets occurred." *Root Causes Report* at 9.

50.     Defendants and other industry participants knew full well of the likely outcome of their predatory lending activity, particularly as a result of the terms of their loan products combined with lax underwriting.   During the 2004-2006 period when more than 8 million adjustable rate mortgage loans ("ARMs") were originated, the subprime mortgage industry (including Defendants) knew that "[t]ypical subprime borrower had a housing-payment-to-gross-income ratio of 40 percent" and upon initial reset of the ARM, 39% of borrowers would face a payment increase of between 25 and 50 percent, 10% of borrowers would face a payment increase of 51 to 99 percent, and15% of borrowers would face a payment increase of 100 percent or more.  *See Root Causes Report* at 29.  Defendants also knew that upon the initial interest rate adjustment in the ARM products, many typical borrowers would face payment shock and be unable to make their mortgage payments.

51.     Congress also has found that the foreclosure crisis was "unusual in that general economic weakness did not play a significant role in producing delinquencies and foreclosures in most market areas—at least not initially." *Root Causes Report* at 29.  Instead, as further alleged below, it was the predatory lending practices of Defendants and other industry participants – combined with the related credit risk, deteriorating performance, and lack of transparency in these mortgage loan assets pooled in mortgage backed securities - that de-stabilized U.S. and global credit markets and, in turn, brought down the economy and increased unemployment. This in turn led to more mortgage loan delinquencies, defaults, foreclosures and vacancies, all as a result of Defendants' predatory and discriminatory lending practices to begin with.

23

52.     Economists at the University of Michigan and elsewhere have found that the high rates of early delinquency and default, which led to the housing market crash, were caused by a deterioration in Defendants' and other lenders' credit characteristics.

53.     Nor did borrower behavior or CRA lending cause the foreclosure crisis.   As explained in a study of mortgage loans originated between 2004 and 2008 issued by the Center for Responsible Lending, "*Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures*," D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia at 6 (November 2011) (hereafter the "*Lost Ground Report*"):

> Our study provides further support for the key role played by loan products in driving foreclosures. Specific populations that received higher-risk products—regardless of income and credit status—were more likely to lose their homes. While some blame the subprime disaster on policies designed to expand access to mortgage credit, such as the Community Reinvestment Act (CRA) and the affordable housing goals of Fannie Mae and Freddie Mac (the government-sponsored enterprises, or GSEs), the facts undercut these claims. Rather, dangerous products, aggressive marketing, and poor loan underwriting were major drivers of foreclosures in the subprime market.

54.     Simply put, mortgage loans made to minorities pursuant to the CRA and the affordable housing goals of Fannie Mae and Freddie Mac were not a cause of the foreclosure crisis. *See Lost Ground Report*.  However, concentrations of the type of higher cost and subprime loans at issue in this litigation that were disproportionately made in minority communities by Defendants (among other industry participants) have been found to be the cause of the foreclosure crisis with the highest correlation to foreclosures among the other two major contributing factors such as the drop in real estate prices and economic collapse, *see* Jacob S. Rugh and Douglas S. Massey, *Racial Segregation and the America Foreclosure Crisis*, 75(5)

24

Amer. Sociol. Rev. 629 (2010),[4] both of which Plaintiff alleges below were caused in the first place by Defendants' and other industry participants' discriminatory and predatory equity stripping practices (including loan making, securitization, servicing and foreclosure activity).

C. **The Predatory, Non-Prime, Mortgage Lending and Securitization Activities of Defendants and Other Industry Participants Caused the U.S. Financial Crisis, and the Subsequent Housing and Foreclosure Crisis**

55. The predatory nature of the terms of the higher cost and subprime mortgage loans themselves, the concealment of the associated and known risk of default on those loan products, and the passing of that risk through the securitization process, in which these Defendants engaged (along with certain other industry participants), caused the U.S. liquidity crisis, the U.S. financial crisis and the subsequent economic crisis that has further exacerbated the housing and foreclosure crisis Defendants' predatory and discriminatory mortgage loan products caused in the first instance.

56. Although previously known to, or reasonably foreseen by, Defendants, the default risk inherent in the non-prime mortgage loan products originated and/or funded by Defendants (and other industry participants) began to materialize in the first half of 2006 when delinquency rates on such mortgage loan products began increasing rapidly, particularly for borrowers of adjustable rate products (the overwhelming majority of mortgage loan products at issue here that were originated during the relevant time period) who began facing "payment shock" due to higher monthly payments as the interest rates adjusted pursuant to the loan terms. At this point in time, U.S. unemployment rates were low and home values were near their highest levels.

---

[4] A copy is available at http://www.asanet.org/images/journals/docs/pdf/asr/Oct10ASRFeature.pdf.

57.     As loan portfolio delinquencies escalated, third party residential mortgage backed securities ("RMBS") investors began demanding that non-performing subprime and higher cost mortgage loans be repurchased by the financial institutions, like Defendants here, that pooled, securitized and sold them.   Between the first and third quarters of 2006, demands for loan repurchases tripled within the industry, including the demands that Defendants repurchase the non-performing loans they securitized.   Rapidly increasing loan delinquency rates, repurchase demands and the associated risk at financial institutions, including Defendants, set in motion the financial crisis.

58.     By February 2007, industry-wide increases in subprime defaults had become widely known and the cost of insuring pools of mortgages – particularly home equity loans - began increasing.   Through the second quarter of 2007, delinquency rates were exploding beyond anything the mortgage lending industry had ever experienced in its history, causing the demand for securitizations and related structured finance products to dry up.   Simultaneously, unfavorable news of large losses, margin calls, and downgrades at financial institutions related to subprime and higher cost lending occurred.

59.     By the summer of 2007, banking regulators and investors understood that the risk in residential mortgage backed securities and other structured finance products relating to subprime and higher cost loan products issued by Defendants (and other industry participants) was far greater than the market had previously been led to believe. This directly led to three distinct illiquidity waves – i.e. the underlying cause of the financial crisis and the resulting economic crisis.

60.     The first illiquidity wave began on August 9, 2007 when LIBOR rates spiked, as liquidity plummeted and default risk of financial institutions rose because of concerns over large

financial institutions' exposure to both counterparty credit risk and their own lending risk due to both their securitizations and the high risk mortgage loans underlying them.

61.     Throughout this period mortgage delinquency rates continued to increase rapidly as funding for mortgage lending activity dried up and shut down, driving home prices lower. As home prices fell, much of the remaining equity borrowers had was eliminated when loan amounts exceeded actual home values. These elements – which Defendants' created with their predatory and discriminatory activities in the first place -- continued to combine to create a downward spiral in home prices and a more rapid increase in loan delinquencies.

62.     In January and February 2008, large financial institutions reported numerous asset write-downs relating to their subprime losses incurred during 2007. Throughout the spring and summer of 2008, the mounting losses at financial institutions led to a full blown liquidity crisis in which financial institutions would not lend funds to each other for fear of the unknown levels of loss exposure with any counterparties.

63.     In the fall of 2008 the U.S. and global credit markets froze – leading to a much greater financial crisis - when regulators, investors and other market participants realized that the full extent of the credit losses, counterparty risk and default risk on subprime and higher cost mortgage loans underlying RMBS and other securitized debt instruments was unknown and that such unknown levels of risk had infected a wide swath of other investment market segments and U.S and global financial institutions.

64.     It was not until June of 2008 that unemployment levels in the U.S. first began to rise as foreclosure rates began to explode. Consequently, an increase in unemployment rates did not cause the foreclosure crisis. Instead, increasing unemployment occurred because of the financial and economic crisis, which the predatory and discriminatory lending and securitization

activities of Defendants (and other industry participants) caused. That economic crisis, and the increase in unemployment, further exacerbated the foreclosure crisis that had resulted from the predatory and higher cost terms of the mortgage loan products themselves and the willfully shoddy manner in which they were underwritten.

65. The Senate Permanent Subcommittee on Investigations ("SPSI") found that financial institutions like Defendants "were not the victims of the financial crisis." *Wall Street And The Financial Crisis: Anatomy of a Financial Collapse*, Majority and Minority Staff Report (April 13, 2011) at 4. Instead, the "billions of dollars in high risk, poor quality home loans" that they originated, sold, and securitized and their "unacceptable lending and securitization practices" were "the fuel that ignited the financial crisis." *Id.*

66. According to a recent report from the Financial Crisis Inquiry Commission ("FCIC"), "[s]ecuritization and subprime originations grew hand in hand" as "[t]he nonprime mortgage securitization process created a pipeline through which risky mortgages were conveyed and sold throughout the financial system. This pipeline was essential to the origination of the burgeoning numbers of high-risk mortgages." The Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011) ("FCIC Report") at 70, 125.[5] The FCIC concluded that: "[F]irms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. … These problems appear to have been significant. " (FCIC Report, at 187.)

--------

[5] A copy of the FCIC Report is publicly available at http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

67.     In sum, Defendants' predatory subprime mortgage lending (as well as the predatory lending of other industry participants), along with their attempt to conceal and shift the risk of their activities, ultimately caused the financial crisis, economic downturn and increased unemployment rates, all further exacerbating the foreclosure crisis resulting from their original predatory lending activities and thereby exacerbating the injuries to Plaintiff.  Thus, Defendants cannot rely on general claims of economic downturn or borrower job losses as intervening causes of the defaults and foreclosures occurring in Plaintiff's communities on predatory and discriminatory mortgage loans for which Defendants are responsible.

**D.   The Foreclosure Crisis Has Disparately Impacted Minorities Nationwide**

68.     As the direct result of the terms of the mortgage loan products Defendants and other industry participants disproportionately sold to them, minority borrowers nationwide (and those who reside in Plaintiff's communities and neighborhoods) paid materially higher monthly mortgage payments, on higher loan balances, than similarly situated Caucasian borrowers, and face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies on loans for which Defendants are responsible.  For example, minority borrowers (both racial/ethnic and women) steered into or receiving a higher cost loan may pay hundreds of dollars more each month in mortgage payments than a similarly situated borrower who has obtained a conforming loan at market interest rates.  Thus, minority borrowers also face higher foreclosure rates. *See Lost Ground Report*.  As also found in the *Lost Ground Report*, which findings Plaintiff specifically incorporates and alleges herein:

- "African-American and Latino borrowers are almost twice as likely to have been impacted by the crisis. Approximately one quarter of all Latino and African-American borrowers have lost their home to foreclosure or are seriously delinquent, compared to just under 12 percent for white borrowers."

29

- "Racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example, approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates."

- "Loan type and race and ethnicity are strongly linked. African Americans and Latinos were much more likely to receive high interest rate (subprime) loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs. These disparities were evident even comparing borrowers within the same credit score ranges. In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a FICO score of over 660 (indicating good credit), African Americans and Latinos received a high interest rate loan more than three times as often as white borrowers."

- "Impacts vary by neighborhood. Low- and moderate-income neighborhoods and neighborhoods with high concentrations of minority residents have been hit especially hard by the foreclosure crisis. Nearly 25 percent of loans in low-income neighborhoods and 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities."

- "Foreclosures have ramifications that extend beyond the families who lose their homes. Communities with high concentrations of foreclosures lose tax revenue and incur the financial and non-financial costs of abandoned properties and neighborhood blight. . . ."

- "[L]ow-income neighborhoods in other cities. . . have completed foreclosure rates of over 20 percent. Such high levels of concentrated foreclosures will place a significant burden on these neighborhoods and also the wider communities, which, without substantial interventions, will almost certainly suffer reduced revenues for vital city services, higher rates of crime, and myriad other adverse effects."

69.     Numerous other publicly available studies by reputable industry watchdog groups have found that the foreclosure crisis has hit African-American and Hispanic neighborhoods and home owners across the country disproportionately harder than non-minority Caucasian homeowners and that this is the result of predatory lending activity.  Moreover, the correlation

between high foreclosure rates and communities with higher percentages of minority home-owner borrowers has been empirically demonstrated. *See, e.g., Racial Segregation and the America Foreclosure Crisis*, 75 Amer. Sociol. Rev. 629.

70.     Similarly, other recent studies have found that women have been adversely impacted by the foreclosure crisis as they have received a disproportionate number of subprime loans as compared to men:

> ***Single women, particularly women of color, represent one of the largest groups of homeowners affected by mortgage strain***. Single women experience higher rates of subprime lending than their male peers, even when controlling for risk factors such as credit, income, and neighborhood location.  Despite having higher credit scores, single female homeowners are overrepresented among subprime mortgage holders by 29.1 percent, and African American women in particular are 256 percent more likely to have a subprime mortgage than a white man with the same financial profile. ***The overrepresentation of single women in the subprime lending pool cannot be explained by assets, property location, or market conditions.  Rather, they were targeted.***

Amy Castro Baker, *Eroding the Wealth of Women: Gender and the Subprime Foreclosure Crisis*, 88 Social Service Rev. 1, pp. 59-91 (Chicago Univ. Press, March 2014), (internal citations removed, emphasis added).[6]  The reasons for, and impact of, this discrimination are further explained as follows:

> Several dynamics drove the likeliness that women, particularly women of color, would end up in the subprime pool. First, the overtly racist redlining practices during era I [1930s-1970s] contributed to the development of highly segregated neighborhoods that were entirely locked out of home ownership and upward mobility. This accumulated disadvantage severely inhibited the accrual of assets among people of color, whose households are predominately headed by women. Second, the ***deregulation of markets and the associated development of securitization flipped the profit motivator for brokers, who could shift the risk of a subprime mortgage onto the borrower and into the secondary mortgage market. Since originators no longer held the mortgages and instead acted as middlemen between investors and borrowers, they could legally extract***

---

[6] A copy of the article is publicly available at http://amycastrobaker.files.wordpress.com/2014/01/675391-3.pdf.

*wealth and equity out of borrowers with little to no consequence*. . . . Simultaneously, many middle- and low-income Americans, particularly women, have been relying on debt to finance everyday consumption as incomes have not kept pace with the costs of living. . . . In short, the lending disparities of the past situated women and people of color at risk for dangerous products in the present. Subprime loans were once lauded as a new vehicle for upward mobility among women, people of color, and previously redlined neighborhoods. Instead, they *extracted wealth from vulnerable populations into the secondary mortgage market, benefiting investors at the expense of borrowers and effectively stifling progress toward gender equity*.

*Id*. at 82-83 (emphasis added).

## V.     DEFENDANTS' DISCRIMINATORY ACTIONS AND OTHER WRONGFUL CONDUCT

71.     Through ongoing, vertically integrated, corporate policies, practices, processes and/or procedures further alleged below, the Defendants are engaging in a nationwide, continuing discriminatory housing practice of equity stripping involving a variety of necessarily interrelated business operations that: (i) originate, purchase or otherwise acquire first lien and second lien "high cost," higher cost, subprime, non-prime, ALT-A and other non-conforming or conforming residential home mortgage loans (collectively referred to as "non-prime" loans) to FHA protected borrowers on terms more unfavorable than those offered and made to similarly situated non-minority borrowers; (ii) pool, securitize, sell and retain certain interests in such loans through residential mortgage backed securities; and (iii) service such loans until they default, including foreclosure activity on defaulted loans.

72.     The predatory and discriminatory nature of Defendants' mortgage lending and servicing practices at issue are grounded in Defendants' placement of their own financial interests above the best interests of their borrowers.  This has generated mortgage loans that often are not sustainable by the borrower and are destined to fail.  Defendants have directly engaged in such activities through their loan origination operations and have indirectly engaged

32

in the same activities by providing the funds to their networks of brokers and wholesale lenders to make loans that conform to Defendants' underwriting standards, or by purchasing such loans.

73.     Defendants' respective business models at issue here are unlike the business model of traditional mortgage lenders, such as savings and loan institutions or community banks. Traditional mortgage lenders typically earn income from the difference in their own cost of borrowing the money they lend and the interest paid by the mortgagor (borrower) over the life of the mortgage loan.  Because they hold the mortgage loans they originate until they are repaid over time, traditional mortgage lenders are concerned with proper loan underwriting, supported asset values and borrower ability to repay the loan over the life of the loan.

74.     In contrast, Defendants' non-prime residential mortgage loan business models developed and originated, or funded, riskier and costlier mortgage loan products that generate much more income and enabled Defendants to re-allocate and reuse their capital repeatedly, while passing the risk of loss on such loans to others by pooling, securitizing and selling to investors the riskier loans they made.  To do so, Defendants intentionally placed African-American, Latino and female borrowers into "high cost," higher cost and non-prime mortgage loans to a greater extent than non-minority borrowers with similar credit qualifications. As a result, such minority borrowers disproportionately paid, on average, tens of thousands of dollars more for a loan, and were disproportionately subject to possible pre-payment penalties, increased risk or credit problems, default, and foreclosure at higher rates.

75.     It was Defendants' business practices to allow their mortgage loan originators and mortgage brokers to place minority applicants into higher cost non-prime loans even when those applicants qualified for a prime loan according to Defendants' own underwriting guidelines.

33

76.     Under the securitization model utilized by Defendants, after originating a mortgage loan either directly, through a broker or correspondent lender, or purchased from other third party subprime originators, a tracking number from the Mortgage Electronic Registration Systems ("MERS") may have been assigned and the loan was pooled with other loans, packaged, securitized and sold, with Defendants frequently retaining all of the lucrative servicing rights as additional revenue streams.

77.     Defendants' typical securitization transactions involved the establishment of a special purpose vehicle (SPV) of Variable Interest Entity (VIE) such as a trust. When mortgage loans are made by Defendants, or their brokers or correspondent lenders, the loans become negotiable instruments and when assigned to a trust (or other SPV or VIE), the trust becomes a holder in due course under the Uniform Commercial Code.

78.     This enables the assignee of the loan (e.g. the trust and trustee) to hold the note and enforce it without many of the defenses the borrower would have had against the original lender, effectively cleansing the loan note of direct predatory lending claims and obfuscating who owns the loan.  At the same time, the risk of loss on the underlying mortgage loans passes to the trust -- and ultimately onto its private or public investors who purchase the residential mortgage backed securities ("RMBS") the trust issues.

79.     Because mortgage borrowers effectively lose their rights with the holder in due course to raise the initial act of the loan originator's predatory or discriminatory lending as a defense to foreclosure, Defendants and other industry participants were able to lend with deliberate indifference as to legality or propriety of the underlying loan origination and in fact were incentivized to engage in such misconduct through the securitization process.

34

80.    Moreover, unlike traditional mortgage lenders, Defendants' business model extracts as much value as possible from the equity in the residential real estate asset underlying the mortgage loan over the life of the loan. To generate the most income possible, Defendants' non-prime mortgage lending and funding operations were primarily concerned with making as many purchase money, refinance and home equity loans as possible, at the highest interest rates possible, with the most up front origination fees possible, and at the maximum loan values possible.  On many loans, Defendants also incorporated loan prepayment and early repayment penalties—at an average of $5300 per loan according to the Center for Responsible Lending-- making it prohibitively costly for borrowers to refinance their loans with another lender.

81.    In originating, funding or purchasing, securitizing and servicing predatory "high cost," higher cost, or nonprime mortgage loans, particularly those made on a discriminatory basis, Defendants placed their own financial interests above the best interests of their borrowers.

82.    Defendants' business models and the discriminatory practices and policies have resulted in FHA protected minority borrowers paying higher interest rates, costs and fees, and/or receiving loans on predatory or other more unfavorable terms, such as including prepayment penalties, all resulting in higher loan defaults and foreclosures on such loans to minorities than to similarly situated non-minority borrowers.

83.    While the terms of the non-prime mortgage loan products Defendants directly originated or funded at issue here made those loans predatory in and of themselves, Defendants' (and their correspondent lenders') mortgage pricing, compensation and underwriting practices, policies, and procedures, encouraged employees and brokers to make such loans routinely in a discriminatory and a predatory manner on the basis of the value of the underlying asset, not the borrower's ability to repay the loan over its life, while also making such loans at maximum loan

to value ratios, minimum income to debt ratios, unverified or undocumented income levels, and/or by qualifying adjustable rate loan borrowers based on their ability to make payments based only on the initial teaser interest rates.

84.    For these reasons, Wells Fargo and Wachovia are directly responsible for the loans the originated directly, as well as for the many loans they funded or purchased that were originated through their networks of affiliate and correspondent lenders, including PNC Mortgage LLC, a joint venture Wells Fargo formed with PNC Bank and PNC Mortgage LLC (collectively "PNC") in mid-2005.

85.    Inherently necessary to the fulfillment of Defendants' predatory and discriminatory equity stripping schemes, Wells Fargo (and Wachovia previously)  serviced and continues to service the predatory and discriminatory loans for which it is responsible (including the Wachovia loans) and has done so in a predatory and discriminatory manner.

86.    Equity stripping continues by its very nature, extracting value and perpetuating the scheme at each step in the life of the loan, e.g.: at loan origination (improper costs are imposed); upon each monthly loan payment when the loan is being serviced (borrower pays an inflated interest rate); upon payment of a pre-payment penalty when attempting to refinance or payoff a loan when the loan is being serviced; following default on the loan (when the servicer imposes additional costs); and upon foreclosure when the home is taken away during the course of Defendants' loan servicing and risk mitigation activities, ultimately stripping from the borrower every last bit of equity in the home the borrow may then have, or may earn through future home value appreciation.

87.    In this manner Defendants have continued to strip equity on each outstanding predatory and discriminatory loan at issue here and will continue to do so until the last predatory

and discriminatory mortgage loan Defendants originate, purchase or otherwise acquire, and/or service, has been repaid and closed or has been foreclosed upon. Indeed, Defendants' predatory and discriminatory loans at issue will continue to become delinquent and be defaulted on for at least several more years into the future, leading to further property vacancies and foreclosures. Thus, Defendants' discriminatory housing practices in violation of the FHA continue to this day.

88.     Mortgage loan servicers such as Defendants are responsible for managing loss mitigation when a borrower becomes delinquent (e.g., collection and work out activities) or defaults on a loan Defendants hold on their books (e.g., evictions, foreclosures and management of vacant or foreclosed properties, including property maintenance and repairs). As part of their servicing activities, and because Defendants retained the servicing rights – the MSRs - on the mortgage loans underlying their loan originations and purchases, Defendants are actively involved in the entire mortgage servicing and foreclosure process and have a continuing source of revenue and income from such activities.

89.     As further alleged below, Defendants' assets, revenue and income from such MSRs are very substantial.

90.     Loan servicers, like Defendants, receive a percentage of each mortgage payment a borrower makes as compensation for handling the various administrative aspects of the mortgage loan payment process including, but not limited to, collecting mortgage payments, crediting those payments to the borrowers' loan balance, assessing late charges, establishing escrow accounts for the payment of taxes and insurance, making such payments when due, collecting and making the payments to private mortgage insurance and tax collectors, and making distributions of principal and interest to the special purpose vehicles ("SPVs"), variable interest

entities ("VIEs") or other investors who have purchased interests in such loans through securitizations and/or RMBS.

91.     Although the servicing fees paid on an individual loan are relatively small - typically 0.25% (on prime loans) and 0.5% (on subprime loans) of the outstanding principal balance of each mortgage loan each month - when added across the millions of mortgage loans a servicer typically services, the fee revenue is enormous. Mortgage servicers like Defendants also typically earn interest income on the float of borrower mortgage payments to be remitted, as well as late payment fees and other fees.

92.     For home mortgage loans where Defendants have a financial interest in addition to the servicing rights (e.g. they hold the underlying first lien loan or a secondary loan), Defendants have an incentive not to foreclose when home prices are low to avoid a write down of the asset.  In such circumstances, the borrower may be in default and simply vacate the property, leaving it uncared for, unprotected, and vulnerable to vandalism and/or criminal activity, all of which increase the harm to Plaintiff.  Indeed, when home prices are low, Defendants and other industry participants have become increasingly willing to walk away from foreclosure – refusing to take ownership and possession – where the costs associated with the foreclosure and repair of the property outweigh the financial recovery Defendants can obtain from the foreclosure.  All of this has led to the "shadow inventory" of vacant homes that have not yet been foreclosed upon and which have increased Plaintiff's damages.

93.     Conversely, when home prices rise, Defendants have an incentive to initiate forecloses on defaulted loans, including loans in its shadow inventory, to acquire the asset for a price less than or equal to the loan value and, preferably for Defendants, less that its potential resale value.  In this way, Defendants have utilized their financial leverage and "staying power"

to complete their equity stripping, removing any opportunity for the borrower to gain back lost equity resulting from Defendants' predatory and discriminatory lending practices.

94.     For loans they service but do not hold on their books, loan servicers such as Defendants are either indifferent to borrower delinquencies, defaults, home vacancies or foreclosures, or actually may have a financial incentive to cause borrower delinquencies, defaults, home vacancies or foreclosures because Defendants make more net income in those circumstances from the fees they charge and receive that income the sooner that the foreclosure occurs.  This is because servicers, like Defendants, are reimbursed for their servicing fees before any money passes to investors in securitizations as a result of a foreclosure.

95.     Importantly, loan servicers also are paid significant ancillary fees to provide such loss mitigation services such as foreclosures (as well as late fees on overdue mortgage payments) and, because they typically do not bear the risk of loss on the underlying asset where they have sold it into a securitization, they have a further incentive to maximize their servicing fees, including through the foreclosure process itself, where Defendants have actually added upcharges to borrowers.

**A.      Wells Fargo's Financial Motivations To Engage In Their Predatory & Discriminatory Conduct**

96.     Defendants' continuing discriminatory and predatory practices generate the financial gains from their predatory and discriminatory equity stripping scheme throughout the life of each mortgage loan, and the continuing discriminatory and predatory practices Defendants employed and continue to employ further these gains through each step of their mortgage banking processes, when, *e.g.*:

- originating on a discriminatory basis high cost, higher cost, near-prime, subprime, ALT-A and other non-conforming mortgage loans in a predatory manner or with

39

predatory terms (that are more profitable than prime loans, thereby increasing assets, revenue and income);

- funding, purchasing or acquiring such discriminatory and predatory loans through its wholesale lending and affiliated broker and correspondent lender network (increasing assets, revenue and income);

- pooling and securitizing such originated and acquired loans for sale as residential mortgage backed securities ("RMBS") (also increasing assets, revenue and fee income, but more importantly transferring the credit risk of such loans onto third party RMBS purchasers); and

- creating through originations, retaining from securitizations, and/or purchasing lucrative mortgage servicing rights ("MSRs") on such loans (generating substantial assets); and

- servicing such loans pursuant to its MSRs (generating tremendous revenue and fee income), including initiating and completing forecloses on such loans that have defaulted (generating more income through late charges and ancillary fees, and ultimately stripping any existing equity, as well as the borrower's future equity from home price appreciation, in the foreclosure process).

97. Indeed, as Wells Fargo explained in Note 21 to its 2002 Annual Report to its stockholders, relevant portions of which are publicly filed with the SEC as an exhibit to Wells Fargo's 2002 Form 10-K (such reports hereafter referred to as "Annual Reports"), "[t]he **Company routinely originates, securitizes and sells mortgage loans** and, from time to time, other financial assets. . . into the secondary market. As a result the Company **typically retains the servicing rights** and may retain other beneficial interests from the sales. These securitizations are usually **structured without recourse** to the Company and without restrictions on these retained interests. The retained interests **do not contain significant credit risks**." (Emphasis added). Wells Fargo repeated similar statements in subsequent Annual Reports.

98. Over the relevant period Wells Fargo has originated, funded or purchased virtually every type of non-prime mortgage loan product available in the residential mortgage lending market, including "high cost," higher cost, near-prime, subprime, ALT-A and other non-

conforming residential home mortgage loans. Such mortgage loan products have: (1) loan application requirements, underwriting requirements or repayment terms less restrictive than traditional "prime" loans (e.g., interest-only loan terms, reduced documentation requirements, or balloon payments); (2) terms not permitted in prime loans (e.g., prepayment penalties or forced placed insurance); and/or (3) have higher costs, fees and interests rates than prime loans. As a result of these additional terms, costs and risks, such loan products were expected to, did, and continue to generate greater profits for Wells Fargo than prime loans.

99.     The "Interagency Guidance on Subprime Lending," jointly issued on March 1, 1999 ("*Interagency Guidance*") by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency and the Office of Thrift Supervision (Defendants' federal banking regulators) succinctly states the business rationale for lenders such as Defendants here to engage in subprime and higher cost lending activities:

> Due to their higher risk, subprime loans command higher interest rates and loan fees than those offered to standard risk borrowers. These loans can be profitable, provided the price charged by the lender is sufficient to cover higher loan loss rates and overhead costs related to underwriting, servicing, and collecting the loans. Moreover, the ability to securitize and sell subprime portfolios at a profit while retaining the servicing rights has made subprime lending attractive to a larger number of institutions, further increasing the number of subprime lenders and loans.

100.    To capitalize on this opportunity, by at least 1998 Wells Fargo and its predecessors embarked on a campaign to merge with and acquire other banking institutions to pursue the more profitable, non-prime residential mortgage lending market. Following its merger that year with Norwest Corporation (which itself already had significant subprime lending and servicing operations, including through Norwest's prior acquisition of Directors Acceptance Corporation), the combined entity ranked first in the nation in residential mortgage

loan originations and loan servicing operations. Wells Fargo then endeavored to become a dominant player in the subprime lending industry through two separate channels: Wells Fargo Home Mortgage (f/k/a Directors Acceptance Corporation) and Wells Fargo Financial (f/k/a Norwest Financial). The rebranded Wells Fargo Financial primarily offered higher cost and subprime home refinance mortgages, used for various purposes including debt consolidation, home improvement, and cash needs. The Wells Fargo Home Mortgage division sold higher cost and subprime mortgages through its retail storefronts and sought growth and non-prime market penetration through an affiliated network of mortgage brokers and correspondent lenders that included at least 140 joint ventures with smaller regional and national banks, realty companies, and builders, including PNC that enabled PNC customers to apply for Wells Fargo mortgages through mortgage consultants based in PNC branches, PNC Advisors' offices, and PNC's call center.

101. According to a former area manager for Wells Fargo Home Mortgage identified in a separate complaint in Illinois state court, the subprime division of Wells Fargo Home Mortgage was expected to make sufficient profit to cover the fixed costs of the rest of the bank. Thus, managers informed employees in this division multiple times that this was the goal. To achieve this goal, the company set a quota for the number of subprime mortgages every area had to close. The company kept scorecards for managers that included the number of subprime mortgages coming out of their area.

102. As a result of this growth strategy, between its two subprime lending channels—Wells Fargo Home Mortgage and Wells Fargo Financial—Wells Fargo rapidly grew to become the eighth largest "high cost" and "subprime" mortgage lender in the nation by 2003, with its subprime lending totaling $16.5 billion in subprime originations that year. In 2006, Wells Fargo

42

originated approximately $74.2 billion in subprime loans, more than any other lender in the nation.

103.    Wells Fargo's nonprime lending operations dramatically grew the amount of origination fees and income it received by maximizing the volume of mortgage loans originated, funded or purchased, maximizing the face amount of such loans, maximizing the interest rates and other fees charged on such loans, and maximizing the price that purchasers of RMBS were willing to pay for such securitized loans because they generated higher coupon interest rates.  As reflected in the chart below, over the relevant period Wells Fargo has earned tremendous income from the net gains on its originations and sales of mortgage loans, and from its closing fees and costs earned on such mortgage loans:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income (rounded) $billions | $1.4 | $2.1 | $3.0 | $.5 | $1.1 | $1.1 | $1.3 | $1.2 | $6.2 | $6.4 | $4.6 | $10.2 | $6.8 |

104.    In addition to the income from fees generated by originating such loans or providing wholesale funding to others to originate them, Wells Fargo's securitization activities generated substantial revenue and fee income through the pooling of its originated and acquired mortgage loans and the sale of residential mortgage backed-securities that were securitized with the pools of such loans.  This enabled Wells Fargo to re-employ its capital continually to originate or acquire more loans (and therefore generate more fee income).

105.    Most importantly, however, Wells Fargo retained the lucrative residential mortgage servicing rights ("MSRs") assets on the loans it originated, purchased and securitized, while simultaneously transferring the risk of credit losses on the underlying loans to the purchasers of the RMBS created from the securitizations.

106.     Wells Fargo disclosed in its financial statements publicly filed with the Securities & Exchange Commission ("SEC") (*see, e.g.*, page 30 of its Form 10-Q for the third quarter of 2006 ended September 30, 2006),[7] "[w]e have a sizeable portfolio of MSRs. A mortgage servicing right (MSR) is the right to service a mortgage loan – collect principal, interest, escrow amounts, etc. – for a fee. We acquire MSRs when we keep the servicing rights after we sell or securitize the loans we have originated or when we purchase the servicing rights to mortgage loans originated by other lenders."

107.     Wells Fargo's mortgage loan servicing operations generated and continue to generate substantial assets and massive amounts of revenue and income.  As disclosed in Wells Fargo's Annual Reports over the time period shown in the chart below, although the fair value of Wells Fargo's MSRs are subject to a variety of assumptions (e.g., estimated loan prepayment speeds, loan life and discount interest rate) the growth in the fair value of its MSRs generally corresponds to Wells Fargo's predatory and discriminatory non-prime residential mortgage lending activity at issue here and the resulting financial fallout from that activity (including changing pre-payment speed and loan life estimates):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $7.4 | $6.7 | $8.8 | $9.5 | $13.7 | $12.5 | $16.8 | $14.7 | $16.0 | $14.5 | $12.6 | $11.5 | $15.6 |

108.     This growth in the fair value of Wells Fargo's MSRs corresponds to the growth in the amount of Wells Fargo's annual acquisitions of MSRs from its securitizations of residential

---

[7]  A copy is publicly available at http://www.sec.gov/Archives/edgar/data/72971/ 000095014906000510/ f24614e10vq.htm#123.

mortgage loans over the same period (not including the approximate additional $513 million fair value of MSRs Wells Fargo obtained from Wachovia in 2008):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $1 | $1.5 | $2.1 | $1.4 | $2.7 | $4.1 | $3.7 | $3.5 | $6.2 | $4.1 | $4 | $5.2 | $3.5 |

109.    Similarly, the peak in the growth in the value of Wells Fargo's MSRs also corresponds to the growth in the amount of MSRs Wells Fargo obtained through its origination and purchases of residential mortgage loans over the same time period (also reflecting the general drop off of such activity during the financial crisis to levels not within Wells Fargo's financial reporting materiality threshold) as follows:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $1.9 | $2.4 | $3.5 | $1.8 | $2.7 | $3.9 | $.8 | $.2 | $0 | $0 | $0 |

110.    Over a similar time period Wells Fargo's Annual Reports also reflect the tremendous growth in the size of its managed residential mortgage loan servicing portfolio, peaking in 2008 at over *$2.2 trillion* following the peak in the predatory and discriminatory lending at issue here:

| Year-end | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $trillions | $.6 | $.7 | $.8 | $1.0 | $1.4 | $1.6 | $2.2 | $1.8 | $1.8 | $1.9 | $1.9 | $1.8 |

111.    As the chart below reflects, the growth in Wells Fargo's MSR assets and its managed residential mortgage loan servicing portfolio is consistent with the tremendous annual

income Wells Fargo has received, and continues to receive, from its mortgage servicing operations:

| Year end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income (rounded) $billions | $.7 | $1 | $1.8 | $2.1 | $2.5 | $3.5 | $4.0 | $3.9 | $3.9 | $4.6 | $4.1 | $4.0 | $3.9 |

112.    By 2004 Wells Fargo's income from its mortgage servicing operations (shown in the chart immediately above) began rapidly eclipsing the income Wells Fargo received from the gain on sales of its mortgage originations and closing fees (as shown in the first such chart above), at least until the federal government began purchasing huge numbers of RMBS from Wells Fargo and other subprime lenders in 2009 as part of the financial industry bailout and related economic assistance.

113.    The enormous amount of income Wells Fargo has received and continues to receive from its mortgage servicing operations and RMBS sales reflects both the importance of those operations to Wells Fargo's finances and the continuing nature of its equity stripping scheme at issue here.

114.    The financial information in the above charts also reflects that, although Wells Fargo's nonprime lending activity peaked at the height of the subprime mortgage lending boom and greatly subsided thereafter, Wells Fargo's predatory and discriminatory equity stripping scheme continues.  Thus, while Wells Fargo's focus on "subprime" loan originations and purchases subsided by the end of 2008, Wells Fargo's predatory and discriminatory lending practices have continued through its other nonprime lending, and its mortgage banking and securitization activities, including its sales of RMBS and its mortgage servicing, loan default and mortgage foreclosure related activities.

46

115. Finally, the financial information in the above charts reflect that Wells Fargo's efforts to maximize revenue and profits from its non-prime mortgage lending, securitization, and particularly its mortgage servicing operations were clearly successful and are still ongoing. Indeed, over the four years between 2010 and 2013, Wells Fargo has earned a total of over **$2.6 billion in late charges and ancillary fees** charged to borrowers of mortgage loans for which Wells Fargo holds the MSRs.

116. Wells Fargo's most recent quarterly Form 10-Q public filing, for the second quarter of 2014 ending June 30, 2014, disclosed that it had a total residential mortgage servicing portfolio of approximately **$1.8 trillion in loans**, $341 billion of which were owned by Wells Fargo and $1.45 trillion of which were owned by other entities for which Wells Fargo provides servicing.[8] As Wells Fargo further disclosed in the 10-Q, as of June 30, 2014, Wells Fargo's mortgage servicing activities **generated quarterly net servicing fee income for Wells Fargo in the amount of approximately $1.13 billion**, reflecting annualized net servicing income of approximately **$4.4 billion**.

117. Reflecting the corresponding increases in Wells Fargo's revenues, income and assets over the entire period at issue, the price of Wells Fargo's common stock rose tremendously over the same period, more than doubling from its year-end 1999 adjusted closing price of $13.87 per share to $39.80 per share as of September 19, 2008. Over the past three months, Wells Fargo common stock has been trading in the range of about $50 to $53 per share.

---

[8] A copy is publicly available at http://www.sec.gov/Archives/edgar/data/72971/ 000007297114000518/0000072971-14-000518-index.htm.

118.     Wells Fargo highly rewarded its top executives for the Company's growth during the run-up in its subprime lending activities and the associated asset growth, revenue and income it generated.  Executive compensation at Wells Fargo began to take off just as the company's non-prime lending operations ramped up. In 2001, John Stumpf, then Group Executive Vice President of Community Banking, received total annual compensation of about $1.4 million. Just one year later, Stumpf's annual compensation nearly tripled to over $3.6 million.  In 2005, Stumpf was promoted to President and Chief Operating Officer and collected total annual compensation of nearly $5.4 million.  Tracking the rapid increase in Wells Fargo's revenue, income and asset growth related to its predatory and discriminatory non-prime mortgage lending, securitization and loan servicing operations at issue here, Stumpf's annual compensation skyrocketed to peak at almost $13.8 million in 2008.  The financial benefit Wells Fargo's Chairman, Richard M. Kovacevich, derived in part from Wells Fargo's predatory and discriminatory lending activities was even greater than Stumpf's.  In 2001, Kovacevich earned approximately $4.9 million in total compensation.  Over just one year, that nearly doubled, reaching approximately $9.1 million in 2002.  By 2007, Kovacevich's annual compensation package from Wells Fargo exploded to just under $30 million, nearly six times his 2001 compensation.  Similarly, Mark C. Oman, Wells Fargo's Senior Executive Vice President in charge of Home and Consumer Finance also benefited substantially as he watched his total compensation more than double from $2.8 million in 2001 to over $6.4 million by 2007.

**B.     Wachovia's Financial Motivations To Engage In Their Predatory & Discriminatory Conduct**

119.     Like Wells Fargo, and prior to its acquisition by Wells Fargo, Wachovia and its predecessors also originated "high cost," higher cost, subprime, ALT-A, and other conforming

48

and non-conforming non-prime residential home mortgage loans through both retail and wholesale lending channels, and engaged in related securitization and loan servicing activities. As Wachovia disclosed in Note 5 to its 2005 Annual Statement, attached as exhibit 13 to its 2005 Form 10-K filed with the SEC,"[t]he Company originates, securitizes, sells and services primarily commercial and consumer real estate loans, student loans and auto loans. . . . In connection with certain transactions where the Company securitizes and sells originated or purchased loans with servicing retained, servicing assets or liabilities are recorded based on the relative fair value of the servicing rights on the date the loans are sold. The Company also purchases certain servicing assets."

120.    In 2006 Wachovia acquired Golden West, its subsidiary World Savings Bank, and its portfolio of predatory payment option mortgage loans known as "Pick-a-Payment" loans. Pick-a-Payment loans were non-conforming, higher cost, subprime loans, essentially a "stated income" and "stated asset" mortgage loan product, which included interest-only payment options and negatively amortizing, minimum-payment-only, payment options.   After acquiring Golden West and World Savings Bank, Wachovia continued to originate, indeed push, the Pick-a-Payment loan product on less savvy borrowers.  The product became the focus of Wachovia's mortgage lending operations to such a degree that, by year-end 2007, it accounted for approximately *53% of Wachovia's entire residential mortgage loan portfolio*, with an approximate value of *$120 billion*.

121.    The growth in Wachovia's managed residential mortgage loan portfolio (i.e., its consumer real-estate secured loan portfolio, as disclosed in Financial Table 7 of Wachovia's Annual Reports), is reflected in the chart below:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $72.5 | $79.5 | $80.1 | $97.0 | $110.3 | $240.2 | $250.5 | Consolidated with Wells Fargo |

122.    The chart below reflects Wachovia's income from securitizing its residential mortgage originations (i.e., its proceeds from new securitizations of consumer real-estate, as Wells Fargo disclosed in Note 5 or Note 6 to Wachovia's Annual Reports):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $2.4 | $2.7 | $3 | $3 | $4.3 | $0 | $3.5 | Consolidated with Wells Fargo |

123.    The chart below reflects Wachovia's service fee income from its residential mortgage originations (i.e., its service fees received from consumer real-estate, as Wells Fargo disclosed in Note 5 or Note 6 to Wachovia's Annual Reports):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $millions | $5 | $1 | $9 | $6 | $8 | $0 | $10 | Consolidated with Wells Fargo |

124.    Thus, like Wells Fargo, Wachovia generated substantial assets and income from its mortgage origination, securitization and loan servicing operations, particularly those created from the Pick-A-Payment loan product and Wachovia's associated MSR assets. Thus, Wachovia's efforts to maximize revenue and profits from its non-prime mortgage lending, securitization and mortgage servicing operations also were very successful, as reflected in the tremendous corresponding increase in the price of Wachovia's common stock over the same period.

125.    Also like Wells Fargo, Wachovia highly rewarded its top executives for this growth.  Executive compensation at Wachovia began to take off just as the company's subprime and higher cost lending operations ramped up. For example, Wachovia President, CEO, and Chairman G. Kennedy Thompson saw his total compensation increase from just under $4.9 million in 2001 to over $16.3 million in 2002, a nearly three-fold increase. By 2006, at the peak of the lending activity, Mr. Thompson's annual compensation package peaked at over $23.8 million.

126.    By the time Wells Fargo acquired Wachovia in December 2008, Wachovia's Pick-A-Payment mortgage origination activity had largely subsided, but its related and other predatory and discriminatory mortgage lending practices had not.  Indeed, Wachovia continued to service its sizeable $437 billion residential MSR portfolio (fair value at year end 2007) that included many of the Pick-A-Payment loans it or World Savings Bank had originated and Wells Fargo has since sold RMBS securitized with such loans.

127.    As a result of the merger of Wells Fargo and Wachovia, Defendant Wells Fargo is now responsible for servicing the active residential mortgage loans that both Wells Fargo and Wachovia retained servicing rights to.  In addition to maintaining servicing rights on many of the first lien mortgages Defendants originated or purchased, Defendants also serviced all second lien (e.g., home equity) loans they originated and/or purchased.

## C.    Defendants Knew, Or Were Grossly Negligent or Reckless In Not Knowing, Of The Predatory And Discriminatory Nature Of Their Conduct

128.    At all times relevant the highest levels of the Wells Fargo and Wachovia Defendants' executive management, and their boards of directors, were required to know through Defendants' own risk monitoring and control efforts, and either knew or were reckless in not

knowing, of the nature of the risks, the relative amounts of risk, their ability to control such risks, and their exposure to the risks from their non-prime mortgage lending activities, including Defendants' compliance with federal fair lending laws and the Fair Housing Act.

129.    The *Interagency Guidance,* which each Defendant knew, or was grossly negligent or reckless in not knowing, clearly warns against the predatory lending practices Defendants committed here: "Institutions that originate or purchase subprime loans must take special care to avoid violating fair lending and consumer protection laws and regulations.  Higher fees and interest rates combined with compensation incentives can foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness." Because of the inherent risk to the safety and soundness of regulated banking institutions, the *Interagency Guidance* further explains that:

> Institutions that engage in subprime lending in any significant way should have board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control these additional risks. . . .   If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound.

130.    Thus, at all times relevant, federal banking regulators required Defendants to have "board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control" the risks associated with their subprime and higher cost lending activities, including compliance with fair lending laws and the FHA.  Defendants' holding companies, and their operating subsidiaries, were similarly required to maintain appropriate policies and procedures to ensure that they identified, measured and controlled such risks.

131.    Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that an appropriate risk management program required them to "take special care to avoid violating fair lending and consumer protection laws and regulations"

because "higher fees and interest rates combined with compensation incentives [could] foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness."

132. Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that their U.S. banking regulators, primarily concerned with bank safety and soundness issues, considered the avoidance of predatory and discriminatory lending practices (particularly including violations of the FHA) to be an "essential component of a well-structured risk management program for subprime lenders," such as Defendants here, given the operating, compliance and legal risks involved. Indeed, at that time U.S. banking regulators were focused on the risks of abusive lending practices such as equity stripping, incorporating pricing terms that far exceeded the true risk of the loan, loan flipping, and one-way referral practices within a multi-subsidiary organization.

133. Because Defendants core customers for their non-prime loan products (including Wachovia's Pick-A-Payment loans) are disproportionately the types of customers protected by the FHA—ethnic minority borrowers typically living in urban areas who have less access to traditional credit, limited credit histories, lower incomes, and homes with lower values but greater untapped equity, and single female borrowers lower incomes and higher personal debt to income ratios – Defendants had every reason to ensure that their mortgage lending, funding, purchasing, securitization and servicing practices did not violate the FHA.

134. By virtue of the loan level information they are legally required to collect, maintain in their Loan Application Registry ("LAR"), and report to the federal government pursuant to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §2801 *et seq, and implemented by 12 C.F.R. § 203, et seq.,* all Defendants knew, or were grossly negligent or

reckless in not knowing, that the mortgage loan products they originated or funded, securitized and serviced, contained predatory terms, were underwritten in a predatory manner, and were targeted to and/or disproportionately impacted FHA protected minority borrowers.  Such data includes loan pricing data, location of property (by MSA, State, County and census tract), borrower race and ethnicity, gender, borrower income, borrower credit score, borrower debt to income ratio, loan to value ratio, and various loan terms and features (including interest rates, adjustment periods, index rates, and penalties). In addition, Defendants also are required to collect and maintain other specific and necessary lending and loan underwriting data in their LAR including, but not limited to, borrower name, the specific street-level property addresses and the type of documentation of borrower income provided (e.g., Full Documentation, Low Documentation or No Documentation).

135.    Defendants did collect, and have maintained and reported to their federal regulators on Form FR HMDA-LAR, certain of this and other mortgage loan level information covering all of the mortgage loans Defendants have made during the relevant period at issue here.

136.    As explained in *12 C.F.R. § 203.1, the* purpose of reporting the HMDA information Defendants are required to collect and maintain is "to provide the public with loan data that can be used," among other things "[t]o assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes."

137.    In addition to the HMDA required data, each Defendant creates, electronically maintains, and utilizes other additional information on each mortgage loan applied for and/or which Defendants purchased, sold, securitized into mortgage backed securities, maintained, and/or serviced at any time, all in connection with Defendants' loan application, loan pricing,

54

loan underwriting, and loan servicing activities. This data includes loan payment history, among other things, and is maintained in electronic form in Defendants' system of records, particularly including Defendants' LAR and mortgage servicing platforms.

138.    All of the foregoing loan level and loan servicing data that Defendants (and all other banking institutions) collect and maintain in electronic form is critical to Defendants' day-to-day business operations in recording, tracking, and monitoring each of the mortgage loans they make, fund, purchase, and/or service, the disposition of those loans, and Defendants' monitoring, evaluation, and financial analysis of Defendants' entire mortgage lending and servicing operations including through their respective:

- legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities; and

- analytical decisions, and analytical decision making tools, applications, models and data regarding, among other things

    o mortgage loan marketing (originations and wholesale);
    o credit risk scoring and risk scoring overrides;
    o override monitoring;
    o mortgage loan pricing;
    o mortgage loan underwriting;
    o mortgage loan performance, prepayment, delinquency, and loss severity rates
    o asset valuation;
    o compliance with covenants in securitization transactions; and
    o related management compensation decisions.

139.    Each Defendant created, maintained, and utilized such data in connection with their analytical decision making tools, applications, and models regarding mortgage loan marketing (originations and wholesale), credit risk scoring, credit risk scoring overrides, override monitoring, mortgage loan pricing, mortgage loan underwriting, and related management compensation decisions.

140.    Each Defendant created, maintained, and utilized such data in connection with their mortgage servicing operations.

141.    Each Defendant created, maintained, and utilized such data in connection with their analytical decision making tools, applications, and models regarding mortgage loan performance, prepayment rates, delinquency rates, loss severity rates, asset valuation, compliance with covenants in securitization transactions, and related management compensation decisions.

142.    Each Defendant created, maintained, and utilized such data in connection with their legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities.

143.    For the non-prime mortgage loans Wells Fargo funded, purchased or otherwise acquired from their affiliated brokers and correspondent lenders through their institutional and wholesale business lines, the Pick-A-Payment loans Wachovia originated directly or through its brokers, and any other mortgage loans Defendants purchased, sold, securitized and acquired MSRs, Defendants were provided and have maintained all such loan level and loan servicing data in electronic form.  Like the data Defendants created and maintained through their own mortgage origination activities, the data from wholesale lenders included information about the underlying mortgage loans that had been originated, including loan terms, underwriting characteristics, and borrower race, ethnicity and gender information.

144.    Thus, Defendants knew, or were grossly negligent or reckless in not knowing, of the predatory and discriminatory nature of the non-prime mortgage loans Defendants were purchasing, securitizing and generating MSRs from.  This is particularly the case where such loans followed Defendants' own pricing and underwriting policies and standards.  Indeed, each

of the Defendants created, distributed to, and incentivized their employees and correspondent lenders to follow each of the predatory and discriminatory mortgage pricing, underwriting, and loan servicing policies and practices as further alleged herein. As such, Defendants knew, or were grossly negligent or reckless in not knowing, the predatory and discriminatory contents or those policies and practices, the predatory and discriminatory manner in which they were implemented, and the discriminatory effect they had on FHA protected minority borrowers in Plaintiff's communities.

145. As a result of their federally required risk management and control functions, internal control and compliance functions, corporate policies, and all the data they collected, maintained, utilized, and reported to federal regulators, each of the Defendants knew, or was grossly negligent or reckless in not knowing, that the mortgage loan products they originated, funded, purchased, and/or serviced contained predatory terms, were underwritten in a predatory manner and were targeted to and/or disproportionately made to FHA protected minority borrowers.

146. Notwithstanding Defendants' knowledge regarding the predatory and discriminatory nature of their mortgage loan products and lending practices, the illegality of those practices, the risk to the safety and soundness of their federally insured banking operations, and the regulatory guidance warning against such activity, Defendants nevertheless engaged in their discriminatory equity stripping schemes (through the interrelated predatory and discriminatory mortgage lending, securitization and loan servicing activities alleged herein) for the singular purpose of financial gain, placing their financial interests above the best interests of their borrowers through, among other things, and as further alleged herein:

- targeting marketing of mortgage loans on unfavorable terms to vulnerable borrowers who were unsophisticated or without access to traditional credit sources;

- steering credit worthy minority borrowers to more costly loans;

- incorporating into mortgage loans to minority borrowers unreasonable terms, excessive fees, pre-payment penalties, and/or yield spread premiums to the loan broker (i.e. kick-backs) that are not related to borrower creditworthiness or other objective lending criteria;

- including prepayment penalties in minority borrower mortgage loans that inhibit the borrower's ability to refinance;

- basing loan values on inflated or fraudulent appraisals of minority borrowers' property;

- repeated refinancing of loans to minority borrowers that does not benefit the borrower and often jeopardizes the property (loan flipping);

- lending to minority borrowers based on the value of the real estate asset collateralizing the loan, not the borrowers' ability to repay ("equity-stripping"); and

- inclusion of other loan terms and conditions in loans to minority borrowers that make it difficult or impossible for a borrower to reduce their indebtedness (such as credit life or other forced insurance policies).

147.    Indeed, following lengthy parallel investigations of Wells Fargo's mortgage lending practices by the OCC and the Department of Justice ("DOJ") commencing in 2009, DOJ sued Wells Fargo in July 2012 for violations of the FHA, among other federal statutes, for Wells Fargo's nationwide discriminatory and predatory lending activities.  According to the complaint, DOJ's investigation involved reviewing Wells Fargo's internal documents and non-public loan-level data on more than 2.7 million mortgage loans that Wells Fargo originated between 2004 and 2009.  *See United States of America v. Wells Fargo Bank, NA*, No. 1:12-cv-01150-JDB, filed in the United States District Court for the District of Columbia (hereafter "DOJ Complaint").  A July 12, 2012 press release issued by the DOJ contemporaneously with the DOJ Complaint

announced that the parties had settled the lawsuit for "$184.3 million in compensation for wholesale borrowers who were steered into subprime mortgages or who paid higher fees and rates than white borrowers because of their race or national origin. Wells Fargo will also provide $50 million in direct down payment assistance to borrowers in communities around the country where the [DOJ] identified large numbers of discrimination victims and which were hard hit by the housing crisis."

148.    As the DOJ alleged in its Complaint (emphasis added), which allegations Plaintiff specifically makes herein, senior Wells Fargo executives knew of improper discriminatory steering practices that were occurring within its non-prime mortgage origination operations but did nothing about it:

> From at least 2004 through mid-2008, Wells Fargo frequently originated short-term hybrid adjustable-rate mortgages (ARMs). These subprime loan products typically featured a relatively low nominal interest rate, sometimes called a "teaser" rate, for the first two or three years of the loan, after which the rate adjusted to a higher rate every six or twelve months. The most common types of short-term hybrid ARMS were "2/28" loans, with interest rates resetting after two years. Borrowers with 2/28 ARM loans often faced payment shock when the rate adjusted sharply upward. Wells Fargo was *aware that many of these borrowers with 2/28 ARM loans qualified for more standard loans, such as 30-year fixed rate loans or less risky ARMs with more favorable rates that did not carry pre-payment penalties*.

> Wells Fargo had information about each borrower's race and national origin.

> Wells Fargo also *knew or had reason to know based on its own internal monitoring and reporting that its policies of giving unguided discretion to its loan originators was resulting in discrimination*. For example, Wells Fargo *knew that its lending policies and practices encouraged the improper placement of qualified applicants into subprime rather than prime loan products* and that its A-Paper Filter, an internal system designed to ensure that all prime-eligible borrowers were referred to the Bank's prime division, was ineffective and subject to easy manipulation.

> Wells Fargo's internal documents reveal that *senior officials were aware of the numerous tactics that subprime originators employed to keep loans in the subprime division, and that a significant percentage of borrowers were receiving subprime loans when they could have qualified for prime loans*.

Wells Fargo did not act to adequately compensate borrowers who were victims of discrimination nor did it take effective action to change its policies or practices to eliminate the discrimination.

It was Wells Fargo's business practice to allow its HMCs [loan officers] and mortgage brokers to place an applicant in a subprime loan even when the applicant qualified for a prime loan according to Wells Fargo's underwriting guidelines.

Wells Fargo also gave its HMC's and mortgage brokers originating Wells Fargo loans discretion to request and grant exceptions to underwriting guidelines.

These policies and practices resulted in the placement of African-American and Hispanic borrowers into subprime loans, when similarly-situated white borrowers were placed into prime loans, both on a nationwide basis and in dozens of geographic markets across the country where Wells Fargo originated a large volume of loans.

Wells Fargo's product placement monitoring efforts, while inadequate to remedy discriminatory practices against African-American and Hispanic borrowers through 2008, were sufficient to **put it on notice of widespread product placement disparities based on race and national origin**.

Even when Wells Fargo had reason to know there were disparities based on race and national origin, however, **Wells Fargo did not act to determine the full scope of these product placement disparities, nor did it take prompt and effective action to eliminate those dispariti**es.

[A]t all times relevant to this action, Wells Fargo had in place a system, called the "A-Paper Filter" or the "Enhanced Care Filter," whose stated purpose was ensuring that all prime-eligible borrowers were referred to the Bank's prime division.

**The A-Paper Filter was highly susceptible to manipulation** because individual subprime loan originators were responsible for entering a borrower's information into the Filter.

[I]nternal Wells Fargo documents indicate that **senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan originators to manipulate the data** they entered into the A-Paper Filter in order to keep prime-eligible borrowers within the subprime division. Since at least 2005, **senior Wells Fargo officers were aware that this manipulation was in fact occurring on a systematic basis**, but failed to take appropriate corrective action.

In mortgage lending commission structures, loan officers typically receive commissions in terms of "basis points' with one basis point being equivalent to 0.01% of the loan amount.

[A] subprime HMC lost between 25 and 130 basis points for referring a prime-eligible borrower to the prime division rather than originating the loan as subprime. ***This policy and practice created a financial incentive for HMCs to originate loans as subprime rather than prime***, even when the applicant could have qualified for a prime loan.

Wells Fargo's cap on the amount of total compensation that a mortgage broker could receive on an individual loan also varied, in part, based on whether the loan was a subprime product or a prime product. From 2004 through 2007, total broker compensation for prime loans was capped at 4.5% of the loan amount. However, total ***broker compensation for subprime loans was capped at 5% of the total loan amount, giving brokers a financial incentive to originate a subprime loan where possible***. The higher cap means, for example, that a broker originating a $300,000 loan could make $1,500 more by originating the loan as subprime rather than prime.

***Wells Fargo's compensation structure provided a strong incentive for HMCs and wholesale mortgage brokers to originate a loan as subprime, even if the borrower could qualify for a more favorable prime loan. This compensation structure, combined with the substantial discretion that subprime loan originators had to qualify prime-eligible borrowers for subprime loans, resulted in discrimination on the basis of race and national origin against African-American and Hispanic borrowers.***

***Subprime loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible***, thereby ensuring that the loan would remain in the subprime division. The incorrect information included, but was not limited-to: (1) stating a reduced income in order to make a borrower's debt to income ("DTI") appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and (3) misstating the borrower's length of employment.

***Subprime loan originators could also simply state that a borrower was unable to provide income documentation when a borrower had provided, or would have been able to provide, such documentation***; reduced documentation loans were not required to go through the A-Paper Filter process at all.

***Subprime loan originators were not prohibited from encouraging prime-eligible borrowers to take steps that would disqualify them from receiving prime loans***, including, but not limited to: (1) encouraging borrowers to forego providing income and/or asset documentation; and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the borrower's loan-to-value ratio ("LTV").

Internal Wells Fargo documents indicate that Wells Fargo ***senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.***

149.    Not only did senior Wells Fargo management know of the discriminatory steering practices occurring in its subprime operations and incentivize company loan officers and brokers to do so, but they also then took the incredible step of eliminating the very electronic processes that made it easier for management to monitor such activity in the first place, effectively *concealing* this activity at the height of the subprime lending bubble. As alleged in its Complaint (emphasis added), and as Plaintiff specifically alleges here:

> Until late 2004, the A-Paper Filter was a manual, handwritten checklist that underwriters were required to apply to every loan originally underwritten in the subprime division. Wells Fargo switched to an automated computerized filter for approximately 15 months, *and then returned to the manual checklist format in January 2006*.

150.    Wells Fargo did not limit its improper, and illegal, loan origination activities to its non-prime loan products, but even extended them into its HUD-approved Fair Housing Administration mortgage loans that it originated pursuant to the HUD Direct Endorsement Lending program.  Under HUD's mortgage insurance programs, if a borrower defaults on their loan and the mortgage holder forecloses on the property, HUD pays the mortgage holder the balance of the loan and assumes ownership and possession of the property, covering the expenses in managing, marketing and reselling the foreclosed-upon property. This encourages lenders to make mortgage loans to creditworthy borrowers, who might not otherwise satisfy conventional underwriting criteria, and makes such mortgage loans valuable in the secondary markets for securitizations and RMBS sales because they are secured by the full faith and credit of the United States.

151.    In October 2012 the United States sued Wells Fargo Bank for civil fraud in *United States v Wells Fargo Bank, N.A.*, No. 12-Cv-7527 (hereafter, the "HUD Complaint"),[9] seeking recovery for its losses on the "materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance."   Among other things, the HUD Complaint alleged, which allegations Plaintiff also specifically makes here, that:

> Wells Fargo, the largest HUD-approved Federal Housing Administration ("FHA") residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its retail FHA loans over the course of more than four years, from May 2001 through October 2005, all the while knowing that it would not be responsible when the materially deficient loans went into default. Rather, as explained below, under FHA's Direct Endorsement program, HUD insured the loans that Wells Fargo was originating. During this four and a half year period, Wells Fargo certified to HUD that over 100,000 retail FHA loans met HUD's requirements for proper origination and underwriting, and therefore were eligible for FHA insurance, when the bank knew that a very substantial percentage of those loans - nearly half of the loans in certain months - had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.

> Moreover, the extremely poor quality of Wells Fargo's loans was a function of management's nearly singular focus on increasing the volume of FHA originations (and the bank's profits), rather than on the quality of the loans being originated. Management's actions included hiring temporary staff to churn out and approve an ever-increasing quantity of FHA loans, failing to provide its inexperienced staff with proper training, paying improper bonuses to its underwriters to incentivize them to approve as many FHA loans as possible, and applying pressure on loan officers and underwriters to originate and approve more and more FHA loans as quickly as possible. As a consequence of Wells Fargo's misconduct, FHA was required to pay hundreds of millions of dollars in insurance claims on defaulted loans that the bank had falsely certified met HUD's requirements, and thousands of Americans lost their homes through mortgage foreclosures across the country. Accordingly, the Government seeks recovery for its loss on these materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance.

--------

[9] A copy of the complaint is publicly available at http://www.justice.gov/usao/nys/pressreleases/ October12/WellsFargoLawsuitPR/Wells%20Fargo%20Bank,%20N.A.%20Complaint.pdf.

To compound matters, from January 2002 through December 2010, Wells Fargo purposely violated HUD reporting requirements and kept its materially deficient loans a secret. Wells Fargo was well aware that HUD regulations required it to perform monthly reviews of its FHA loan portfolio and to self-report to HUD any loan that was affected by fraud or other serious violations. This requirement permits HUD to investigate the bad loans and request reimbursement or indemnification, as appropriate. But, although the bank generally performed the monthly loan reviews and internally identified over 6,000 materially deficient loans during this period, including over 3,000 loans that had gone into default within the first six months after origination (known as "Early Payment Defaults" or "EPDs"), it chose not to comply with its self-reporting obligation to HUD.

152.    Perhaps worse, the HUD Complaint alleged, which allegations Plaintiff also specifically makes herein, that Wells Fargo's management actively concealed its knowledge of early payment defaults (a red flag of poor underwriting) on the insured loans Wells Fargo had originated from the government:

Prior to October 2005, Wells Fargo, the largest originator of FHA loans in America, did not self-report a single bad loan to HUD. Instead, the bank concealed its bad loans and shoddy underwriting to protect its enormous profits from the FHA program. And when HUD inquired about Wells Fargo's self-reporting practices in 2005, the bank attempted to cover up its misdeeds by falsely suggesting to HUD that the bank had in fact been reporting bad loans. Thereafter, the bank's self-reporting was woefully and purposefully inadequate, all in an effort to avoid indemnification claims from HUD and pushback from wholesale brokers whose materially deficient loans would be reported to HUD. All told, from January 1, 2002 through December 31, 2010, Wells Fargo internally identified 6,558 loans that it was required to self-report, including 3,142 Early Payment Defaults, but self-reported only 238 loans. As a consequence of Wells Fargo's intentional failure to self-report these ineligible loans to HUD, FHA was required to pay hundreds of millions of dollars in insurance claims when the loans defaulted, with additional losses expected in the future.

153.    In connection with its purchase of Wachovia, Wells Fargo conducted substantial due diligence regarding, and acquired, Wachovia's residential mortgage loan portfolio and related MSR assets.  Wells Fargo had access (and eventually possessed) all of Wachovia's loan level information and reviewed, or should have reviewed, such information precisely to determine the risk exposure in Wachovia's mortgage portfolio and MSR assets to both financial and legal/regulatory risks.  As such, Wells Fargo knew, or was grossly negligent or reckless in

not knowing, of the empirical evidence (which Plaintiff alleges below) of the discriminatory and predatory nature of the Pick-A-Payment loans and the discriminatory way in which both Wachovia Mortgage and World Savings Bank originated such loans.

154.    As purchaser of Wachovia, and as a result of the merger of Wachovia into Wells Fargo, Wells Fargo is responsible for all predatory and discriminatory conduct in which Wachovia engaged. Moreover, Wells Fargo is responsible for the many more loans originated through their affiliate and correspondent lender networks, including the loans PNC originated after mid-2005.

155.    In light of Defendants' knowledge and actions alleged herein, their conduct reflects either a reckless indifference or willful disregard for the consequences of their discriminatory housing practices, or actual intent to cause the harm that Plaintiff, its communities, neighborhoods, and residents have suffered. As such, Plaintiff is entitled to punitive or special damages.

**D.    Defendants Focused Their Discriminatory Conduct on Ethnic Minorities For Non-Prime Mortgage Loans Because They Provided The Easiest Target**

156.    FHA protected ethnic minority mortgage loan borrowers were susceptible to the intentional targeted marketing efforts of the Defendants, as well as predatory subprime and high cost mortgage lenders in each of the Defendants' correspondent and wholesale lending channels. This was because, as generally known to Defendants, such FHA protected minority borrowers traditionally: (a) lacked access to low cost credit; (b) lacked strong relationships with traditional depository institutions; and/or (c) lacked adequate comparative financial information, access to such information and/or financial sophistication, such that they could not adequately evaluate the terms, conditions and risks of the mortgage loan agreements they were entering into.

65

157.    Because historical housing patterns and segregation had created communities and neighborhoods of ethnic minority population concentrations -- borrowers who were typically living in urban areas, who have less access to traditional credit, limited credit histories, lower incomes, lower credit scores and homes with lower values but, relatively untapped home equity -- those communities and neighborhoods provided an efficient means for Defendants to target potential borrowers seeking to refinance their home loans, consolidate consumer loans, or obtain credit for consumer spending by utilizing their existing home equity.

158.    Given the traditional lack of competitive mortgage lending availability, the increased demand for such financing, and the concentration of that demand and untapped home equity, Wells Fargo and Wachovia directly targeted ethnic minorities with more profitable non-prime mortgage loan products because these borrowers provided the quickest and easiest path – i.e., the path of least resistance – for Defendants to originate as many loans as possible as rapidly as possible to borrowers most likely to accept the less favorable terms of Defendants' mortgage loan products.  Thus, in the early 2000s, Defendants increased their marketing and lending penetration into higher ethnic minority concentrated communities across the United States, including in Plaintiff's communities, where home values were relatively lower, home prices had not appreciated as rapidly as in other market segments (such as California), and minority borrower homes had available untapped equity.

159.    Defendants' predatory and discriminatory subprime and higher cost mortgage lending and servicing is not the result of random or non-discriminatory factors.  Rather, it is the direct and intended result of Defendants' respective business models, their intent to maximize corporate profits pursuant to those business models, and the corporate policies and practices they each put in place in order to effectuate those business models and maximize profits under them.

E.    **Wells Fargo Directly Targeted Minorities For Non-Prime Mortgage Loan
      Originations, And Incentivized That Conduct Through Its Employee
      Compensation Scheme and Quotas**

160.    As reflected in the empirical data alleged further below, Wells Fargo targeted
minority borrowers for its predatory non-prime mortgage loan products and such borrowers were
disparately impacted by such products.  This was the result of Wells Fargo's intentional
discriminatory targeting policies and practices, and its discriminatory loan pricing and
underwriting policies and practices also further alleged below.

161.    A former Regional Diverse Segments Manager ("RDSM") employed by Wells
Fargo from 1999 through 2012 ("CW1"), confirmed that during the time period relevant to this
action Wells Fargo maintained a business unit – the "Diverse Segments" unit – "that was
specifically tasked" with increasing the number of purchase money mortgage loans Wells Fargo
made to two customer groups: (1) ethnic minorities, including African American, Latino, and
Asian borrowers, regardless of their income and (2) low to moderate income borrowers (more
typically than not, ethnic minority borrowers). According to CW1, to qualify as low to moderate
income, the prospective borrower had to have income at 80 percent or below of area median
income.

162.    As described by CW1, the role of RDSMs was to support the loan
originator/lenders at Wells Fargo by building relationships with people or organizations that
would refer loans to Wells Fargo.  Thus, RDSMs were "relationship managers and partnership
developers."

163.    CW1 stated that all the RDSMs reported to their local area sales managers but
also had dotted line reporting up to the Wells Fargo National Diverse Segments Manager.
Through this position, Wells Fargo was able to orchestrate its targeting of minority mortgage

borrowers. Indeed, Wells Fargo had RDSMs all over the country, including in Chicago, Atlanta and Palm Beach County, Florida.

164.    To reach minority borrowers, RDSMs had several Wells Fargo tools and resources available to them.   Importantly, the Diverse Segments unit maintained a central Diverse Segments office within Wells Fargo's Silver Spring, Maryland, offices, which produced information for the RDSMs nationally about the minority communities they were to target for potential borrowers. For example, CW1 received from the Wells Fargo Diverse Segments corporate headquarters maps, with color coded census tracts by ethnicity, which showed specific neighborhoods with high concentrations of African American or Latino borrowers.   CW1 confirmed that all of the RDSMs received similar maps, color coded by ethnicity, for their geographic areas of their responsibility.

165.    CW1 explained that the RDSMs, including CW1, "used the maps in a number of different ways."  For example, the maps allowed RDSMs to "see penetration in their markets" as to how many borrowers in the color coded areas had mortgage loans with Wells Fargo.  Then, the RDSMs were able to decide how best to increase the penetration of Wells Fargo's loans within the ethnic minority communities on which they focused.  According to CW1, this included whether Wells Fargo needed to recruit account executives in these markets, advertise in those markets, partner with realtors in those markets, partner with community organizations, or use some combination of each of these options.

166.    Another Wells Fargo RDSM tool that CW1 identified was a database that detailed which local real estate brokers had the largest number of sales in particular ethnic neighborhoods and among targeted minority populations.  The RDSMs could use that data to forge "strategic relationships" with realtors who could then recommend or refer minority borrowers to apply for

mortgage loans from Wells Fargo. While the RDSMs' databases did not include the names of potential borrowers in the neighborhoods they were targeting, the actual Wells Fargo lenders that the RDSMs worked with often had that information. In addition, CW1 stated that the Wells Fargo Area Manager lender who CW1 worked with had a database that showed the equity in the homes within targeted neighborhoods, and used that data to specifically target and market refinance offers to the targeted potential borrowers. Area Managers and account executives were compensated for both refinances and purchase originations. CW1 did not use this database because RDSMs only targeted customers for purchase money loans, not refinances.

167.    Another former Wells Fargo RDSM ("CW2") confirmed these practices. He worked for Wells Fargo in that position from August 2006 through December 2008, and returned to that role from May 2009 until April 2010, after working in Wells Fargo's mortgage loan servicing operations in the interim. CW2 reported to his regional sales manager at Wells Fargo and to a Divisional Diverse Segments manager.

168.    CW2 confirmed that he and the other RDSMs received "color-coded maps" that detailed the concentrations of African American and Latino borrowers in particular neighborhoods and showed the penetration of Wells Fargo loans in those neighborhoods. The maps were available on the computer desktop for RDSMs, and CW2 could access the information when he logged in to his computer at work.

169.    CW2 stated the desktops of RDSMs provided access to "a plethora of demographic information." This included lists of the top five companies that made the most mortgage loans in several categories, including low to and moderate income borrowers, African American borrowers and Latino borrowers. CW2 also confirmed that RDSMs had access to a database that showed which realtors had the highest number of purchases "for demographics we

were after." It showed which realtors had the most purchases for particular minorities, such as African Americans.

170.    CW2 explained that the database of realtors was of particular use to the Wells Fargo lender account executives who actually originated the loans. According to CW2, the account executives used the realtor database to identify "the biggest producers." The account executives would then seek to partner with those "big producers" to gain access to those realtors' clients. Wells Fargo provided tools that account executives could use to build partnerships with realtors or their clients. That included marketing materials and "drip campaign" materials, including trinkets such as calendars, or mugs. CW2 and other RDSMs did less promotional based marketing and instead offered "lunch and learns" with realtors and realtor associations and more direct contacts with realtors, such as taking them to lunch.

171.    CW2 and other RDSMs took a similar approach of direct contacts and educations programs with community groups and faith based groups. Thus, as part of his duties as an RDSM, CW2 established relationships with "non-profits, faith-based organizations and community based organizations" that could provide another source of minority borrower referrals to Wells Fargo. CW1 confirmed this practice, explaining that the RDSMs also created relationships with builders and other community organizations that served the ethnic minority neighborhoods and communities that Wells Fargo wanted to target.

172.    To accomplish this, CW2 and other RDSMs encouraged the non-profits they sought as referral sources, including faith based organizations, to apply for grants from the Wells Fargo Foundation. Referring entities eligible for such grants included non-profits that promoted homebuyer education, worked with third-party groups to provide such education, or that invited RDSMs and Wells Fargo to provide such information. Wells Fargo publishes on its website

(currently at https://www.wellsfargo.com/about/wfhf/contacts) a list of its charitable foundation "managers" who, in many instances, are also RDSMs or hold other positions at Wells Fargo with responsibility for minority lending. According to CW2, after being approved by the Foundation to receive any grants, it was up to the discretion of the RDSM whether to provide a grant, and in what amount, to any particular recipient. To that end, each RDSM was given an annual budget of charitable foundation funds, which amount Wells Fargo varied based on how highly Wells Fargo valued the particular region. According to CW2 RDSMs often had annual grant money budgets of $100,000, although his region only had $65,000 because Wells Fargo did not value his region as highly as others.

173.    CW2 provided grants to churches or other organizations with the expectation that the members of that church or non-profit would apply for mortgage loans from Wells Fargo. These churches included predominantly African American or predominantly Latino congregations and were approached specifically to reach African American or Latino prospective mortgage borrowers.

174.    CW2 stated that RDSMs also provided training presentations and support to local chapters of an association of primarily African American real estate professionals, the National Association of Real Estate Brokers. Similarly, RDSMs forged relationships with local chapters of the National Association of Hispanic Real Estate Professionals.

175.    In addition to the foregoing, CW1 explained that, to achieve their targeting goals, RDSMs also were tasked with recruiting mortgage account executives (i.e., loan originators) for Wells Fargo "based on their community contacts." For potential recruits, their community contacts and the ability to get minority borrowers within those communities to apply for loans with Wells Fargo was important. While CW1 often recruited employees based on a combination

of their mortgage experience and community contacts, she stated that Wells Fargo hired account executives with no previous experience in the mortgage business and based the hiring decision on the prospective employee's connections within a particular ethnic community that Wells Fargo was targeting. Thus, according to CW1, if prospective mortgage account executive recruits could deliver ethnic minority borrowers, Wells Fargo would teach them the mortgage business.

176.    CW2 confirmed the recruiting role of RDSMs, characterizing it as "sourcing" likely candidates and conducting preliminary interviews, with the final decision on hiring left to the appropriate branch or regional managers.  CW2 also sought recruits for Wells Fargo that had relationships in minority communities such that the recruits could supply purchase loans from minority borrowers.  CW2 confirmed that some of these recruits were hired, even though they had no mortgage experience, because their community relationships indicated they could be successful bringing in loans to help meet minority lending goals.

177.    To further maximize originations of mortgage loans to minority borrowers, Wells Fargo imposed on RDSMs, including CW1 and CW2, specific goals regarding the number of mortgage loans to minorities.  Wells Fargo financially incentivized RDSMs to meet those goals. Thus, while RDSMs were paid a salary, they were paid an "override bonus" based entirely on the number of mortgage loans made to low to moderate income borrowers and ethnic minorities.  RDSMs also received bonuses based on how many mortgage loans newly recruited account executives made to low or moderate income borrowers or ethnic minority borrowers in the first year of those new employees' work with Wells Fargo.  In addition to these positive incentives, Wells Fargo also utilized a negative incentive approach.  According to CW1, Wells Fargo published each RDSM's performance within the Diverse Segments group, based on their

achieving loan targets to low and moderate income borrowers and minority borrowers, on "one scorecard for the whole country. Everybody saw everybody's numbers."

178.    Indeed, a July 20, 2011, *Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent*, Docket Nos. 11-094-B-HC1, *et al.* ("FRB Consent Order")[10] that the Federal Reserve Board brought against Wells Fargo and Wells Fargo Financial, confirmed that "[u]nder Financial's sales performance standards and incentive compensation programs, Financial sales personnel, called "team members," were expected to sell (a) a minimum dollar amount of loans to avoid performance improvement plans that could result in loss of their positions with Financial, and (b) a minimum dollar amount of loans to receive incentive compensation payments above their base salary."

179.    While some of the loans Wells Fargo originated through its Diverse Segments division may have qualified as Community Reinvestment Act ("CRA") loans,[11] most of the loans did not. But, in many cases even if they did so qualify, minority borrowers were steered to higher cost, non-prime, or less favorable alternatives, including even conforming FHA and Freddie Mac

---

[10] A copy is publicly available at http://www.federalreserve.gov/newsevents/press/enforcement/ enf20110720a1.pdf.

[11] To help overcome the historical reluctance of traditional lenders to make loans in minority communities (whether because of prejudice or lack of profit incentive) – i.e., "redlining" -- the CRA, 12 U.S.C. § 2901, was enacted by Congress in 1977 to incentivize federally regulated banks and savings and loan institutions to make residential mortgage loans, consumer loans and commercial loans into predominantly minority communities. Because CRA loans are low cost and properly underwritten to avoid, and prevent financial loss to the borrower and the lender due to default, *CRA loans typically have much lower default rates than subprime or higher cost loans and certainly loans that are predatory*. Thus, according to then-Comptroller of the Currency in 2008, John C. Dugan, CRA loans were "not the culprit behind the subprime mortgage lending abuses, or the broader credit quality issues in the marketplace." Indeed, an extensive study of the CRA conducted for the Federal Reserve showed that CRA did not exacerbate the foreclosure crisis in any meaningful way.

mortgage loans that Wells Fargo could securitize and sell. Because CRA loans are low cost, the loan must be carefully underwritten, and must be kept on a lender's books even to qualify as a CRA loan. CRA loans are far less profitable to lenders, they tie up the lender's capital because they cannot be sold or securitized, and although subject to regulatory supervision, regulators do not force lenders to make such loans. Thus, Wells Fargo had a strong financial interest not to make CRA loans and made very few of them.

180.    Other confidential witnesses who were former employees of Wells Fargo, but were cited in a separate complaint filed against Wells Fargo in the United States District Court for the Southern District of Florida, have confirmed that Wells Fargo pushed more expensive FHA and Freddie Mac loans on low-to mid-income borrowers instead of explaining the benefit to a qualifying borrower of a CRA loan.

181.    Those confidential witnesses also detailed, among other things, how Wells Fargo targeted its predatory and discriminatory lending practices toward predominantly African American and Latino neighborhoods. This included Wells Fargo's: (1) community based ethnic minority outreach programs that directly targeted ethnic minority borrowers for non-prime loans at community organization and church gathering; (2) sending only employees of color to make presentations to predominantly African American or black churches; (3) hosting presentations such as a "wealth building" seminar designed to promote non-prime products in 2005; and (4) refusing to allow a specific former employee to appear before a predominantly African American audience because she was "too white."

182.    Perhaps even more shocking, Wells Fargo utilized a computer function that permitted its employees to customize Wells Fargo marketing materials to target African Americans directly by choosing "African American" in a pull-down menu of "language options,"

according to a complaint filed in a separate action brought by the Illinois Attorney General against Wells Fargo in Illinois state court.

183.    According to a former Mortgage Consultant Wells Fargo employed from October 2003 through December 2006, and again in 2008 in another capacity ("CW3"), Wells Fargo trained its employees to "scrub" (*i.e.*, review) internal Wells Fargo mortgage data. "Scrubbing" required CW3 to look for "anyone with a LTV [Loan to Value Ratio] that had enough equity that they could pull cash out."  "Scrubbing" is how CW3 was trained to find potential borrowers for Wells Fargo's non-prime mortgage loans, particularly for cash-out refinance loans.

184.    CW3 stated that "in sub-prime, we needed to find people to refi." Thus, the majority of the sub-prime mortgages that CW3 wrote were for refinancing existing mortgage loans.  To that end, CW3 was trained to search for Wells Fargo Adjustable Rate Mortgages (ARMs) that were set to expire.  CW3 believes that Wells Fargo purchased loan information for mortgages written by other lending institutions in order to scrub that data for potential Wells Fargo subprime mortgage refinance borrowers.  According to CW3, Wells Fargo's subprime loans were "set up to fail" because the loans were for customers with approximately a 580 credit score, with stated income who were seeking 100% financing.

185.    At the time they originated many of the loan products at issue, funded others to make them, and/or purchased such loans to pool and resell into securitizations, Defendants all knew or were reckless in not knowing that borrower "payment shock" -- a large increase in borrowers' monthly mortgage payments – would result from the scheduled increases to the interest rate and, in the case of Pay Option ARMS, were further magnified by negative amortization.

186. Wells Fargo pressed upon FHA protected borrowers a revolving line of credit secured by their homes, in many cases systematically tacking on home-secured credit cards with high interest rates as junior mortgages that were never requested by the borrowers. These loans harm borrowers in a number of ways: (1) the higher interest rates on the credit lines generate high interest payments; (2) the home-secured debts inflate borrowers' loan to value ratios, making it more difficult for them to refinance out of their high-cost loans; and (3) borrowers are often not aware that these loans are secured by their homes.

187. According to former employee of Wells Fargo who provided a confidential witness statement in a separate California action, Wells Fargo loan officers would encourage customers to roll up unsecured debt into adjustable rate mortgages, intentionally misleading the customers about the potential negative effects of turning unsecured debt into a debt secured by the equity in their homes. The loan officers would tell the borrowers, for example, "they'd save on their monthly payment, and that was good, because they'd need extra money to buy some furniture and pay moving expenses, et cetera."

188. As the FRB Consent Order confirmed, "in some cases, contrary to Financial's written policies and procedures, sales personnel marketed these loans to customers by representing that the debt-consolidation home mortgage refinancing loans would improve or repair a consumer's credit."

189. Although Wells Fargo's stated policy was that its credit managers found a "tangible benefit" to refinancing a consumer's mortgage, that policy was not seriously implemented or enforced and Wells Fargo's definition of a "tangible benefit" was so broad as to be meaningless. According to the Center for Responsible Lending, by Wells Fargo's standards, a tangible benefit would exist so long as the refinanced loan reduced a customer's current

monthly debt payments by any amount. For example, based on this permissive definition, Wells Fargo credit managers could charge over $17,000 in fees to refinance $10,000 in 29% interest credit card debt, and still provide a "tangible benefit" to the borrower. Thus, under Wells Fargo's definition, a tangible benefit would include increasing a consumer's mortgage balance to pay off unsecured debts, even though the long term cost of financing such debt over the life of the mortgage could exceed the cost to the borrower of just repaying the unsecured debt down more directly. Wells Fargo also included in its definition of a "tangible benefit," a loan refinance in which the borrower was moved from an adjustable rate mortgage to a fixed rate mortgage, regardless of whether the fixed rate mortgage was less advantageous for the borrower.

190.    Wells Fargo also incentivized the making of non-prime loans through its internal referral systems in its retail operations. In these retail operations, Wells Fargo drew a clear line between the products prime loan officers originated and subprime loan officers within Wells Fargo Home Mortgage's subprime division could originate. Wells Fargo did, however, permit loan officers on either side of the business to refer borrowers to loan officers on the other side. This meant that prime loan officers could refer borrowers to subprime loan officers and vice versa. As Plaintiff describes below, however, Wells Fargo Home Mortgage's policies created stronger incentives to refer borrowers from prime to subprime.

191.    Wells Fargo Home Mortgage's compensation policy for referrals from prime to subprime loan officers provided significant financial incentives to its prime employees to steer borrowers into subprime mortgages, even if the borrowers could have qualified for prime mortgages. This referral compensation policy initially split the commissions for a subprime mortgage resulting from a referral by a prime loan officer to as subprime loan officer 60/40, meaning the subprime loan officer received 60% of the compensation, and the prime loan officer

received 40%. Later Wells Fargo altered this policy to provide the prime loan officer a flat rate of 50 basis points for mortgages referred to subprime loan officers that resulted in the closing and funding of a subprime mortgage. Under both policies, prime loan officers could do little work and still receive significant compensation for referring a borrower to a subprime loan officer as opposed to spending the time and energy needed to originate a typically more document-intensive prime mortgage for the borrower. Employees at Wells Fargo Home Mortgage predictably took advantage of this compensation policy by steering prime borrowers into subprime mortgages. There was never a reciprocal benefit to refer borrowers to prime loan products.

192.    Wells Fargo also compensated subprime loan officers significantly more per loan – a maximum of 325 basis points – than prime loan officers, who received a maximum of just 65 basis points. Subprime loan officers received 25 basis points for referring a loan to a prime loan officer, while prime loan officers received twice that amount – 50 basis points – for referring a loan to a subprime loan officer.

193.    These referral policies provided virtually no incentive for subprime loan officers to refer mortgages to prime loan officers or for prime loan officers to accept the referrals. In fact, according to a former employee cited in a separate Illinois state court action, it was difficult to get a prime loan officer to accept a referral from a subprime loan officer because the prime loan officer would have to give away too much of his or her commission to the referring subprime loan officer.

194.    The Wells Fargo Home Mortgage quota system was another consideration for subprime loan officers in determining whether to refer a mortgage to prime loan officers. The

requirement that subprime loan officers close a certain number of loans per month created a strong disincentive to refer loans to prime loan officers.

195.    Wells Fargo Home Mortgage also structured compensation for subprime loan officers so that there was great incentive to close as many subprime loans as possible, with the inevitable result of severely curtailing referrals to prime mortgage loan officers.  Wells Fargo tiered compensation for these employees so that if the loan officers closed enough mortgages in a month to move to the next tier, the loan officers would receive greater compensation per additional loan.

196.    These practices and policies in combination with Wells Fargo's underwriting and loan servicing policies and practices, as Plaintiff alleges below, resulted in the discriminatory conduct alleged herein.

**F.      Wachovia Targeted its Pick-A-Pay Loan Originations to FHA Protected Minority Borrowers**

197.    The empirical data alleged below reflects that Wachovia targeted minority borrowers for its predatory Pick-A-Payment loan product and that the failure of the loan product itself disparately impacted minority borrowers.

198.    Wachovia's heavy sales focus on its Pick-a-Payment product, discriminatory loan pricing and underwriting policies and practices, and compensation scheme – also further alleged below – all contributed to the discriminatory manner it was targeted to and disparately minority borrowers. According to a former Mortgage Consultant employed by Golden West Financial and Wachovia until Wachovia was acquired by Wells Fargo in December 2008 ("CW4"), Wachovia pushed its employees in "meeting after meeting" to sell "Pick-A-Payment" loans; "[I]t was ringing in our ears every day there."  CW4 stated that Wachovia held state-wide mortgage

consultant conference calls to increase the product originations; "It was the biggest thing flying. They really pushed us to sell it first. We were forced to push the product."

199. CW4 stated that her compensation, as well as other mortgage consultant's compensation, was tied to their sales of the Pick-A-Payment product. CW4 said that Defendants imposed quotas for the number of Pick-A-Payment loans she needed to originate and that she would "get paid a whole lot more" for originating them. Thus, CW4 estimated that at least 30% of all mortgages she closed in the 2007-2008 time frame for Wachovia were Pick-A-Payment loans. CW4, however, "hated selling it. We were forced to sell it to people that didn't understand it – they didn't grasp what it meant." She explained that the product was mostly a refinancing tool, as opposed to a mortgage product for home purchases and that because it had four payment options – three of which created negative amortization, they "made the loan bigger."

200. While CW4 did not market the Pick-A-Payment loan product herself, most of her customers were referred to her by Financial Consultants in the Wells Fargo branches that had been trained by Wells Fargo to send potential Pick-A-Payment borrowers to her. In addition, CW4 and other Wachovia mortgage consultants were trained on selling the product in meetings "a couple of times a month – learning how to pick out the right customers."

201. CW4 and other mortgage consultants were trained to sell the product specifically to customers "with a lot of debt. It was basically for people that were struggling, for people that couldn't make ends' meet. It was packaged as a way for people to use the equity in their homes to wipe out their debt – they could use their homes for it. Most minorities did not have money necessarily for the home purchase, but they had some equity in their home." Thus, "most" of

CW4's customers were African Americans, constituting a significant part of Wachovia's core customer for Pick-A-Payment loans.

202.    CW4 believed that the Pick-A-Payment product was the reason for so many subsequent foreclosures by Wachovia in her geographic area.

203.    A former mortgage processor employed by World Savings Bank in March 2005 and then employed by Wachovia until October 2008 as a mortgage underwriter ("CW5") stated that most of the loans he processed and underwrote were "Pick-A-Payment" loans. During the earlier part of his tenure with World Savings Bank and Wachovia, CW5 stated that the foreclosure rate on World Savings Bank and Wachovia mortgage loans was initially lower than the foreclosure rate on competitors' nonprime loans. Thus, according to CW5, World Savings Bank and Wachovia managers saw that as an opportunity, concluding that they "were leaving good loans out there." In effect, management was pushing to increase, not decrease, the volume of predatory Pick-A-Payment loans even if that meant escalating the respective foreclosure rates on that loan product. Consequently, CW5's managers instructed underwriters and sales staff to approve more Pick-A-Payment loans. And, because sales staff at World Savings Bank and Wachovia were "tight with managers all the way up the line," managers would approve mortgage loans that underwriters "didn't think should be approved."

204.    While the maximum loan to value ("LTV") ratio that World Savings and Wachovia would loan on a Pick-A-Payment loan product was 80 percent, World Savings Bank and Wachovia often offered a home equity line of credit "to go with it" if the borrower needed a higher LTV ratio. Many of the loans that CW5 worked on were refinance and cash out transactions.

205. A Mortgage Consultant employed by Wachovia from June 2006 and thereafter by Wells Fargo until April 2012 ("CW6"), confirmed that both Wachovia and Wells Fargo engaged in predatory mortgage lending and that, in her opinion, it was the result of the loan origination and broker compensation policies Wachovia and Wells Fargo utilized. She believed the yield spread premiums paid to outside mortgage brokers led to the banks issuing mortgage loans that would not be paid back. For example, CW6 confirmed that Wachovia paid mortgage consultants 100% of the origination fees as a commission for originating a Pick-A-Payment loan. In comparison, Wachovia only paid mortgage consultants a 50% commission of origination fees for a fixed rate loan.

206. CW6 confirmed that Wachovia mortgage consultants were "required to make a certain number of these loans." Indeed, CW6, like CW4, also stated that at state-wide mortgage consultant meetings Wachovia "kept preaching to make the loans." CW6 was told at the meeting "if they order steak, you sell them chicken" (meaning steer the borrowers into a higher cost or less beneficial loan product) and commented that "it was the chicken that was the downfall of Wachovia." CW6 reiterated that the "less savvy" borrowers "were getting stuck with this product."

207. These practices and policies in and of themselves, and further in combination with the Wachovia's underwriting and loan servicing policies and practices as alleged below, resulted in the discriminatory conduct alleged herein.

208. In sum, Wells Fargo's and Wachovia's compensation scheme, quotas, and various pressure tactics Defendants used to incentivize their loan officers, managers, brokers, and correspondent lenders to make as many non-prime loans as possible, and to make those loans as profitable as possible, as all alleged above, worked hand in hand with Defendants' discretionary

pricing policies and underwriting practices as Plaintiff further alleges below, resulting in the discriminatory conduct at issue in this complaint.

**G.** **Defendants' Discretionary Pricing Policies Enabled And Incentivized Predatory Non-prime Mortgage Lending on a Discriminatory Basis Through Their Wholesale Lending & Broker Channels**

209. Defendants' discretionary pricing policies expressly authorized and encouraged discretionary non-prime mortgage loan origination and finance charges, including higher interest rates, increased fees at closing, additional or add-on fees, and/or other discretionary charges, all to maximize the profit on each non-prime mortgage loan. These discretionary charges are collected at the time the loans are originated, and continue to be collected during the life of the loans through Defendants' loan servicing activities.

210. Once a mortgage loan applicant provided their credit and financial information to Defendants through a mortgage consultant, loan officer, mortgage broker, or correspondent lender, Defendants performed an initial objective credit analysis. At this point, Defendants evaluated various traditional, objective, risk-related credit variables relating to the prospective borrower, including the borrower's debt-to-income ("DTI") ratio, the borrower's home's loan-to-value ("LTV") ratio,[12] the borrower's credit bureau history, FICO scores, and other credit information such as bankruptcies, automobile repossessions, prior foreclosures, and payment histories, among other things. From these objective factors Defendants derived a risk-based financing rate for each borrower applicant, which is referred to in the mortgage industry as the

––––––––––––––––––––––––––

[12] Loan to value ratio is one of the most important factors in assessing default risk. It is the amount of the loan divided by the value of the home as of the date of the loan origination. The higher the ratio, the less equity borrowers will have, the more likely borrowers will be to default during times of financial hardship.

"par rate" or the "base rate." Defendants then communicated the par or base rate back to the loan officer, branch manager, broker, or correspondent lender seeking to originate the mortgage loan.

211. Via "rate sheets" and other written communications made in conjunction with the par rates, however, Defendants regularly communicated, simultaneously encouraged, and automatically authorized their mortgage consultants, loan officers, branch managers, brokers, and correspondent lenders to mark up the par rate and impose additional discretionary or subjective charges, yield spread premiums, and other fees and costs on non-prime mortgage loans offered to FHA protected minority borrowers that were not based on any particular or appropriate credit risk factor – i.e., "overages."

212. Defendants' internal rate sheets for its mortgage consultants, loan officers, and branch managers informed them of Defendants' retail interest rates (*i.e.*, that already included Defendants' own profit margins) and charges or adjustments for any risk factor or type of loan product other than a prime, conforming 30-year fixed rate mortgage loan, where the borrower's DTI is less than 45%, has a FICO score above 720, and the value of the home and amount of the loan create an LTV at or below 80%.

213. Defendants' external rate sheets for its brokers and correspondent lenders informed them of Defendants' different wholesale interest rates and charges for any risk factor or loan type and the associated profit margins for the broker or correspondent lender, including any additional yield spread premium that they could earn by charging the borrower interest rates higher than the Defendants' wholesale rates to the broker or tacking on additional origination fees and costs.

214. Wells Fargo communicated its nonprime mortgage loan product prices to its brokers through rate sheets available to brokers on a weekly daily basis via email or the "Brokers

First."  According to Wells Fargo's Wholesale Pricing Policy, Wells Fargo's Capital Markets Group initiated price changes as a result of rate movements.  In addition, the Wholesale Pricing Group initiated price changes to adjust profit expectations or alter competitive position.

215.    Wells Fargo and Wachovia benefitted financially from the loans they or their brokers made at interest rates above the par rates set by its rate sheets, and benefitted even more if loans were made at rates above its wholesale rates creating yield spread premiums. For those loans that it sold or securitized, higher interest rates meant sales at prices higher than it otherwise would have obtained.  For loans it retained, higher interest rates meant more interest income over time and, therefore generating greater MSR asset valuations.

216.    Defendants compensated brokers through origination fees and other direct costs charged to the borrower, which Wells Fargo directed its closing agents to pay to brokers out of borrowers' funds at the loan closing.  Defendants also compensated brokers via yield spread premiums, or overages, by increasing the amount of the interest rate on a borrower's loan above the wholesale and par rates Defendants charged.

217.    From approximately 1999 to 2003 Wells Fargo did not cap the amount of fees or the rate its brokers could charge on a non-prime mortgage loan. While this policy was in place, there was no impediment to such brokers charging as much over the rates quoted as they wanted. During the remainder of the subprime lending boom, Wells Fargo imposed a cap on total broker compensation of brokers of 4.5% (450 basis points) of the loan amount on prime loans but allowed a higher cap of 5% (500 basis points) on non-prime loans, further incentivizing brokers to make non-prime loans.

218.    Defendants were fully informed of all broker fees charged with respect to each individual residential loan application presented to them. Indeed, Defendants required brokers to

disclose to the borrower all compensation and all other fees the broker expected to receive in connection with the mortgage loan on the Good Faith Estimate, the HUD-1, and other disclosures as applicable. And, the total fees brokers charged raised the annual percentage rate on a loan above the par and wholesale rates that Defendants provided to such brokers.

219.    Other than these caps, Wells Fargo did not establish any objective criteria, or provide guidelines, instructions, or procedures for brokers and correspondent lenders in its wholesale channels to follow in setting the amount of direct fees they should charge or in determining to charge an interest rate for a loan above that set by its rate sheet, which in turn determined the amount of YSP that Wells Fargo would pay the broker.

220.    While Wells Fargo authorized brokers to inform prospective borrowers of the terms and conditions under which a Wells Fargo residential loan product was available, Wells Fargo did not require the mortgage brokers to inform the prospective borrower of all available loan products for which the borrower qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan products best designed to serve the interests the applicant.  Upon receipt of a completed loan application from a broker, Wells Fargo evaluated the proposed loan using its underwriting guidelines and determined whether to originate and fund the loan.

221.    Defendants' discretionary pricing and related compensation policies therefore monitored, authorized, and provided financial incentives to Defendants' loan officers, branch managers, and correspondent lenders to make subjective price adjustments to the loans they generated.

222.    In addition, Defendants put in place the pre-payment penalties and fees they included in many of their subprime mortgage loan products either to control the borrowers'

refinance of the loan or to generate additional fee income when borrowers refinanced their loans with other lenders.

223.     Defendants' mortgage consultants, loan officers, mortgage brokers, and correspondent lenders exercised the pricing discretion that Defendants gave them on every non-prime mortgage loan applied for by a minority borrower and did so in a discriminatory manner. Indeed, according to a confidential witness statement provided by a former employee of Wells Fargo in a separate action currently pending in California, "[s]teering was rampant," because a higher commission was paid on subprime loans.  Regarding first-time home buying programs, the confidential witness stated that they "were pushed heavy, heavy in lower-income neighborhoods . . . . They steered more into subprime lending."

224.     According to the U.S. Department of Justice's investigation, outlined in its complaint against Wells Fargo, these disparities in total broker fees mean, for example, that in 2007, Wells Fargo charged the average prime wholesale customer borrowing $300,000 about $2,064 more in broker fees not based on borrower risk if she were African-American, and an average of about $1,251 if she were Hispanic, than the average amount charged to a white prime wholesale customer. In specific MSAs, these disparities in total broker fees mean that in 2007 Wells Fargo charged a prime wholesale customer in the Chicago MSA borrowing $300,000 on average about $2,937 more in broker fees not based on borrower risk if she were African-American, and an average of about $2,187 more if she were Hispanic, than the average amount charged to a white prime wholesale customer. These disparities in total broker fees also mean, for example, that in 2005, Wells Fargo charged the average subprime wholesale customer borrowing $300,000 about $1,212 more in broker fees not based on borrower risk if she were African-American than the average amount charged to a white subprime wholesale customer.

225.     Defendants knew, or were grossly negligent or reckless in not knowing, that their mortgage consultants, loan officers, mortgage brokers and correspondent lenders exercised the pricing discretion that Defendants gave them, and did so in a discriminatory manner.  Defendants had in their possession all the information to make that determination.  Defendants had the legal obligation to make that determination and ensure it did not happen. Defendants had incentivized its mortgage consultants, loan officers, mortgage brokers and correspondent lenders to use their discretion in way that made the most non-prime loans as possible and for the highest profit possible. And Defendants' core customers for their non-prime loan products (including Wachovia's Pick-A-Payment loans) are disproportionately FHA protected minority borrowers who are frequently the target of predatory lending activity.

226.     Indeed, Wells Fargo was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Wells Fargo approved and originated.  At the time of originating each loan, Wells Fargo was fully informed of the loan terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

227.     Despite their knowledge that their discretionary pricing and compensation policies were leading to the discriminatory practices Plaintiff complains of here, Defendants did not undertake to stop or prevent this conduct, but instead approved, affirmed, or ratified these discretionary pricing decisions for each non-prime mortgage loan Defendants originated, funded, purchased, or otherwise acquired that were subject to such discretionary pricing practices.

228.     Defendants' predatory, discretionary and discriminatory loan pricing policies - which by design imposed differing finance charges on persons with the same or similar credit profiles – were targeted on and have disparately impacted FHA protected minority borrowers in

88

Plaintiff's communities and neighborhoods. As the empirical data reflecting Defendants' lending patterns further alleged herein (and the HMDA data analyzed by the Federal Reserve) indicates, ethnic/racial minorities – even after controlling for credit risk – have been substantially more likely than similarly situated non-minorities to pay such higher charges that are built into Defendants' "high cost," higher cost, and non-prime mortgage loans.

229.    Because of Defendants' increased fees and costs built into such loans, along with Defendants high loan to value lending practices (particularly in cash out refinance transactions and home equity loans), FHA protected minority borrowers in Plaintiff's communities and neighborhoods often had little equity, no equity, or negative equity in their home upon the closing of Defendants' mortgage loans to them.

### H.    Defendants Lowered or Circumvented Their Underwriting Standards, Enabling Predatory Non-Prime Mortgage Loans to Be Made on a Discriminatory Basis

230.    Underwriting guidelines are designed to enable mortgage lenders like Defendants to determine the risk of offering a loan to a borrower applicant based on the standard "three Cs" of lending: Credit (of the borrower), Capacity (of the borrower to pay the loan), and Collateral (the value of the underlying asset).   Uniform application of underwriting standards minimize the risk of credit losses to the lender, and compliance and legal risks of discriminatory lending practices, among other things.

231.    At all times relevant, Defendants established and maintained uniform written underwriting standards or guidelines that purported to identify the objective criteria that an applicant had to meet to qualify for a particular type of loan product Defendants offered. Defendants made these underwriting guidelines available to their underwriting departments, mortgage consultants, loan officers, and branch managers, as well as their third-party loan

originators (brokers and correspondent lenders) who originated the mortgage loan products that Defendants funded, purchased, or otherwise acquired, and these underwriting departments, mortgage consultants, loan officers, and branch managers, as well as their third-party loan originators (brokers and correspondent lenders) that originated the mortgage loan products that Defendants funded, purchased or otherwise acquired utilized these underwriting guidelines.

232.    As Defendants' demand for more profitable, non-prime or subprime mortgage loans grew in the mid-2000 time period, to feed their mortgage securitization and RMBS activities while home prices increased or remained at historical highs, Defendants lowered their underwriting standards and/or engaged in various practices to circumvent or override them. In this way, Defendants were able to increase their revenue, income, and assets from originating, purchasing, securitizing, and servicing non-prime mortgage loans.

233.    Defendants' relaxed their underwriting policies to authorize and encourage Defendants' underwriters and brokers or correspondent lenders to approve greater numbers of non-prime mortgage loans on riskier terms to under-qualified or unqualified borrowers, steer otherwise prime-eligible borrowers to non-prime loans, or improperly increase loan amounts, interest rates, and other costs. Defendants did this to make as many loans as possible and at the highest profit levels possible.

234.    Defendants knew, or were grossly negligent or reckless in not knowing, that their underwriting standards were declining or being circumvented. Defendants had in their possession all the information to make that determination and had the risk management "safety and soundness" regulatory obligations to make that determination and ensure it did not happen.

235.    In response to public and regulatory criticism of Wells Fargo's steering practices, in 2005 Wells Fargo Financial put in place a system called the "A-Paper Filter" or the "Enhanced

Care Filter," the purposes of which included enhancement of automation in providing borrower information to underwriting (a written checklist was previously used, among other things), to ensure that prime-eligible borrowers were referred to the Bank's prime division, and to provide prime pricing to borrowers that qualified for debt consolidation cash-out refinancing mortgage loans.

236.    If an applied-for transaction "passed" the filter and a further underwriting process, the prospective borrower should have been offered prime pricing from Wells Fargo Financial. In early 2006, however, to increase the number of originated nonprime loans, Wells Fargo modified the A-Paper Filter so that borrower applicants potentially qualifying transactions instead would be referred to Wells Fargo Home Mortgage.  At the same time, and as Plaintiff further alleges above, Wells Fargo Financial revised its performance standards and compensation programs so that it generally was less advantageous to sales personnel to sell a prime loan to the customer than a nonprime loan.

237.    The A-Paper Filter was highly susceptible to manipulation because individual loan originators (subject to compensation incentives and quotas) were responsible for entering a prospective borrower's information into the Filter.  Loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible, thereby ensuring that the loan would remain in the subprime division.  The incorrect information included, but was not limited to: (1) stating a reduced income to make a borrower's debt-to-income ratio appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and (3) misstating the borrower's length of employment.

238.   As the DOJ Complaint confirmed, internal Wells Fargo officers indicated that senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan originators to manipulate the data they entered into the A-Paper Filter to keep prime-eligible borrowers within the subprime division.

239.   Indeed, internal Wells Fargo audits of the A-Paper Filter identified multiple problems.  These audits indicated that data input into the Filter was often inconsistent with the information contained in the loan files and that that many loans were originated as subprime although no subprime qualifiers existed in the loan files.

240.   Moreover, Wells Fargo did not prohibit loan originators from encouraging or upselling prime-eligible borrowers to take steps that would disqualify them from receiving prime loans, including, but not limited to, the following; (1) encouraging borrowers to forego providing income and/or asset documentation; and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the borrower's loan-to-value ratio.  While borrowers received certain disclosures regarding the nonprime rates they were being charged, they were not advised that they may have qualified for prime priced loans or that it was generally more advantageous for the salesperson to sell a nonprime, rather than a prime loan, such that this cost the borrower more.

241.   Another way in which originators could circumvent Wells Fargo's underwriting guidelines—and steer borrowers into costly and inappropriate mortgages -- was to have borrowers apply with "stated income" even if they could document their income, or having borrowers put no money down on a mortgage even when they had the funds available to do so. Either of these tactics could turn what otherwise would have been a prime mortgage into a subprime—and more costly—mortgage.

242.    In addition, if the underwriting department questioned why a mortgage was subprime and not prime, loan officers could simply state that the borrower did not want to provide documentation or that the borrower had no "sourced and seasoned" assets.  With these simple explanations, the underwriter could override guidelines and approve the subprime mortgage.

243.    According to the DOJ Complaint, internal Wells Fargo documents indicate that Wells Fargo senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.

244.    As the FRB Consent Order confirmed, although Wells Fargo Financial had "written policies and procedures," its "internal controls were not adequate to detect and prevent instances when certain of its salespersonnel, in order to meet sales performance standards and receive incentive compensation, altered or falsified income documents and inflated prospective borrowers' incomes to qualify those borrowers for loans that they would not otherwise have been qualified to receive."  Thus, in assessing an $85 million civil penalty, the FRB Consent Order confirmed that Wells Fargo's practices had resulted in unsafe or unsound banking practices, unfair or deceptive acts or practices within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and violations of various state laws pertaining to fraud and false or misleading statements in home mortgage loan-related documents, and to unfair or deceptive acts or practices.

245.    Defendants' improper compensation and quota practices that encouraged the predatory and discriminatory conduct at issue here extended not only to Wells Fargo's loan originators and sales personnel, but to its underwriters as well. As the HUD Complaint alleged, which allegations Plaintiff also specifically makes here:

Wells Fargo paid its underwriters a bonus (in addition to their salaries) based on the number of loans approved, rather than the number of loans reviewed. This improper *de facto* commission incentivized the underwriters to approve as many FHA loans as possible, regardless of the risk of default or the loan's eligibility for FHA insurance. Worse yet, the incentive was tied to the total number of loans approved at a particular underwriting site, thereby fostering a group dynamic whereby individual underwriters felt pressure from their peers at the site to approve loans.

Apart from the incentive system, management applied heavy pressure on loan officers and underwriters to originate, approve, and close loans. And management required underwriters to make decisions on loans on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls.

246. Moreover, as loan originations increased throughout the period, Wells Fargo lacked an adequate number of well-trained underwriters and, accordingly, its underwriting staff was overwhelmed with loan applications, leading to numerous quality control issues. While Wells Fargo's management knew of these issues through reports of its Quality Assurance departments' review of loan files, management did nothing to prevent or remedy them.

247. Indeed, as the HUD Complaint alleged, which allegations Plaintiff also specifically makes here, in 2003 Wells Fargo responded to the shortage of FHA loan underwriters and tremendous material deficiency rates in its loan files by "slash[ing] the number of its FHA underwriters from 919 to 401," while leaving in place "the bank's improper bonus system for underwriters. . . ."

248. Not surprisingly, Wells Fargo also made a practice of making loans to people who clearly could not afford them, but did so using fictitious or manipulated income data. According to a confidential witness statement given by a former Wells Fargo employee in a separate action in California, loan officers would routinely place two to three people on a loan to ensure that there was adequate income to qualify. "I would work with them to get them ready, even if we had to put 2 to 3 people on the loan." According to the witness, Wells Fargo had a

program "called '125' or something like that" that allowed a borrower to document some portion of his income, then state 25% more. "It took into account what they used to call 'mattress money,'" she explained. This allowed "Hispanics or other minorities" to obtain loans based on income they received but could not document.

249. Wells Fargo loan officers encouraged minority borrowers who had family members living in their houses to inflate their income when applying for home equity loans by generating documents that said those family members paid a certain amount in rent. A former Wells Fargo employee who provided a confidential witness statement in the California action stated" Let's say you own a property, and you want to do [a home equity loan]. What they would ask for, let's say you have a family member living in your home. Even though they were not paying rent, you would come up with some sort of paper document saying so-and-so pays me so much. . . . That would be the kind of stuff that I saw that did occur, other than also bringing in additional family members to cosign." Furthermore, according to a confidential witness in the California action, Wells Fargo would often doctor credit histories to qualify a customer for a first time home loan. "There were zillions of loans that should never have been approved according to what was written in [Wells Fargo's] guidelines."

250. Indeed, according to confidential witness statements provided by former employees, Wells Fargo employees would enter fraudulent income data into Wells Fargo's underwriting program to approve a loan: "If a guy told you he made $3000, you'd put in $5000" into the underwriting software program. There was no backstop system at Wells Fargo to prevent this kind of blatant income inflation. Loan officers were "putting people into loans that they didn't qualify for. Obviously, it would put them [the borrowers] into a bad predicament."

251. Also critical to the underwriting process is the establishment of the value of the underlying real estate asset through property appraisals. The appraised home value is required to determine adequate loan to value ratios (LTV).

252. Like their underwriting policies, Defendants' standards for property appraisals became increasingly lax, if not willfully fraudulent, during the relevant period to maximize loan amounts to meet even Wells Fargo's loosened underwriting requirements.

253. Since the early 2000s, and during much of the relevant time period, Wells Fargo controlled the appraisal process (and other settlement processes) through its subsidiary's joint venture ownership of Valuation Information Technologies, LLC, doing business as Rels Valuation ("Rels"). Wells Fargo owns 49.9% of Rels and First American Real Estate Solutions (a subsidiary of First American Financial Corp, the second largest title insurer in the US) owns 50.1% of Rels.

254. In connection with the underwriting process, Wells Fargo required borrowers to use Rels' appraisal services. Rels then provided purportedly independent appraisers with a predetermined figure supporting the desired loan amount (the "Borrower Estimated Value") and supplied predetermined comparable properties to support that value. Rels and Wells Fargo then expected the local independent appraiser to deliver an appraisal report with a property value exceeding the figures supplied by Rels. If the independently appraised value came in below what Rels and Wells Fargo wanted, Rels pressured the appraiser to revalue the property. Rels and Wells Fargo effectively blacklisted appraisers who refused.

255. Following its merger with Wells Fargo, Wachovia also required its mortgage borrowers to utilize Rels' appraisal and other closing services.

256.    Finally, when other avenues to circumvent underwriting standards were unavailable or unsuccessful, Wells Fargo's branch managers and wholesale managers frequently made "business decisions" to override Defendants' underwriters to approve unqualified loans. This was particularly the case in the wholesale channel when such loans originated from brokers and correspondent lenders that were responsible for a significant amount of originations for Wells Fargo or Wells Fargo bulk purchases of originated loans.

257.    Thus, in many instances where a loan applicant still could not meet relaxed underwriting standards, Defendants' branch managers and wholesale managers had discretion to grant "exceptions" to the underwriting guidelines and approve the loans anyway.  Because Defendants' entire mortgage lending compensation system rewarded loan volume (and quotas penalized lack of volume), there was tremendous incentive to grant underwriting exceptions on non-prime loans or circumvent the underwriting system through a variety of mechanisms.

258.    To the extent Defendants would rely on any compliance training for its loan officers, loan processors, underwriters, managers and correspondent lenders, to demonstrate that Defendants' written underwriting or other corporate policies prevented, discouraged or identified the discriminatory and predatory lending practices at issue here, Defendants' corporate culture, training practices, actual operating policies and practices, quota system, and compensation structure all ran counter to any such compliance training that Defendants may have conducted rendering such compliance training irrelevant or perfunctory.

259.    Because of Wells Fargo's extensive involvement in establishing (and abandoning) the underwriting guidelines its correspondent and affiliate lenders were to use in originating residential mortgage loan products, Wells Fargo is responsible for the many loans it funded or

purchased that were originated through its correspondent and affiliate networks, including the loans originated by PNC after mid-2005.

260.    As the direct result of the predatory terms of the mortgage loan products disproportionately sold to them, and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiff's communities and neighborhoods) paid materially higher costs, discretionary fees, materially higher monthly mortgage payments on relatively higher LTV percentage balances, and did so on more unfavorable terms than similarly situated non-minority borrowers.

261.    As the direct result of the predatory terms of the mortgage loan products disproportionately sold to them and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiff's communities and neighborhoods) experienced higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies on loans for which Defendants are responsible.

262.    Also as the direct result of the predatory terms of the mortgage loan products disproportionately sold to them and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiff's communities and neighborhoods) face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies on loans for which Defendants are responsible and have not yet defaulted or been foreclosed upon.

263.    As Plaintiff further alleges below, Plaintiff has been damaged as a direct result of the predatory terms of the mortgage loan products disproportionately sold and/or the predatory and discriminatory manner in which those loans were underwritten to minority borrowers who reside in Plaintiff's communities and neighborhoods.

I. **Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory & Discriminatory**

264.     Wells Fargo is one of the largest mortgage loan servicers in the United States, operating eight mortgage servicing/customer centers and nine specialized loss mitigation centers across the country and headquartered in Des Moines, Iowa.  By virtue of its acquisition and merger with Wachovia, Wells Fargo now holds and services Wachovia's prior servicing pool of mortgage loans and MSRs.

265.     Defendants have engaged in predatory and discriminatory mortgage loan servicing and foreclosure activities that are part and parcel of their predatory and discriminatory equity stripping scheme and which further increased the number of FHA protected minority borrowers' mortgage delinquencies, defaults, and ultimately home vacancies and foreclosures on loans for which Defendants are responsible.

266.     Defendants' interrelated discriminatory and predatory mortgage loan servicing, foreclosure, and loan modification activities are a critical part of Defendants' equity stripping scheme, enabling that scheme to be fulfilled (i.e., continuing to generate income for Defendants) until the last discriminatory and predatory loan is either repaid or foreclosed upon.

267.     The predatory and discriminatory mortgage servicing practices engaged in by Defendants have included, and in a number of instances continue to include (but are not limited to):

- Continuing to service until default, each predatory mortgage loan that was made on a discriminatory basis and that has not been repaid and closed (or modified or refinanced in a non-predatory manner), and then foreclose upon the home securing such loan;

- Failing to properly and/or timely respond to, process, and underwrite borrower efforts to modify or refinance predatory mortgage loans;

- Failing to properly and/or timely notify borrowers of required and/or missing documentation necessary for a requested loan modification and/or failing to provide adequate time for borrowers to submit such documentation before denying a loan modification;

- Failing to adequately notify borrowers of reasons for denial of a modification request and/or the opportunity to demonstrate the request was denied in error;

- Wrongfully denying loan modification applications;

- Failing properly and/or timely respond to, process, or mitigate borrower delinquencies or defaults, including failure to apply payments made by borrowers and failing to maintain accurate account statements in a timely and accurate fashion;

- Providing false or misleading information to borrowers while referring loans to foreclosure during the loan modification application process, while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative Wells Fargo offered, and or while scheduling and conducting foreclosure sales during the loan modification application process and during trial loan modification periods;

- Misrepresenting to borrowers that any loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

- Failing in monthly billing statements to identify accurately unpaid principal loan balances, total payment amounts due, assessed fees and charges, and allocation of payments including whether to a suspense or unapplied funds account ;

- Imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

- Failing to respond in a sufficient and timely manner to the increased level of loss mitigation activities by increasing management and staffing levels to ensure timely, effective, and efficient communication with borrowers with respect to loss mitigation activities and foreclosure activities and full exploration of loss mitigation options or programs prior to completion of foreclosure activities;

- Falsifying or manufacturing, and filing, documents during the mortgage servicing and foreclosure process that falsely or recklessly asserted ownership, amounts due, and fees and expenses chargeable to the borrower

- Charging excessive or improper fees for default-related services and foreclosures, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures;

100

- Failing to notify borrowers of the identity of the foreclosing party in an adequate or timely fashion;

- Preparing, executing, notarizing or presenting (either directly or through third parties and agents) false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments that falsely represented they made pursuant to personal knowledge when they were not (otherwise known as the "robo-signing" scandal), including those activities Wells Fargo conducted pursuant to its internal manual designed to enable Wells Fargo to foreclose on properties quickly; and

- Inappropriately dual-tracking foreclosure and loan modification activity, and failing to communicate with borrowers with respect to foreclosure activities.

268.    The above predatory mortgage servicing and foreclosure practices have been the subject of investigations and civil lawsuits by the Department of Justice, State Attorneys General, and Defendants' federal banking regulators.

269.    For example, on March 14, 2012, the Department of Justice, forty-nine state Attorneys General, and the Attorney General for the District of Columbia sued Wells Fargo (and several other major financial institutions) for, among other things, unfair and deceptive practices in their mortgage origination, loan servicing, loan modification, and loss mitigation (e.g., foreclosure) activities, particularly regarding Federal Housing Administration (FHA) insured mortgage loans ("Robosigning Complaint"). As to its mortgage loan originations, the complaint alleged that Wells Fargo "engaged in a pattern of unfair and deceptive practices" that "caused borrowers in the Plaintiff States to enter into unaffordable mortgage loans that led to increased foreclosures in the States."

270.    The Robosigning Complaint alleged, which allegations Plaintiff specifically incorporates and makes herein, that Wells Fargo unfairly, deceptively and unlawfully discharged its mortgage loan servicing activities by, among other things:

- failing to apply payments made by borrowers and failing to maintain accurate account statements timely and accurately;

- charging excessive or improper fees for default-related services;

- failing to properly third party vendors involved in servicing activities on behalf of the Banks;

- imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

- providing borrowers false or misleading information in response to borrower complaints; and

- failing to maintain appropriate staffing, training, and quality control systems

271.    The Robosigning Complaint also alleged, which allegations Plaintiff specifically incorporates and makes herein, that Wells Fargo unfairly, deceptively and unlawfully failed to "engage in loss-mitigation efforts to avoid the foreclosure of HUD-insured single family residential mortgages . . . where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available." For example, Wells Fargo:

- failed to perform proper loan modification underwriting;

- failed to gather or losing loan modification application documentation and other paper work;

- failed to provide adequate staffing to implement programs;

- failed to adequately train staff responsible for loan modifications;

- failed to establish adequate processes for loan  modifications;

- allowed borrowers to stay in trial modifications for excessive time periods;

- wrongfully denied modification applications;

- failed to respond to borrower inquiries;

- provided false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

- provided false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

- provided false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

- misrepresented to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

- failed to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

- falsely advised borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

- miscalculated borrowers' eligibility for loan modification programs and improperly denied loan modification relief to eligible borrowers;

- misled borrowers by representing that loan modification applications would be handled promptly when it regularly failed to act on loan modifications in a timely manner;

- failed to process borrowers' applications for loan modifications properly, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

- failed to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

- misled borrowers by providing false or deceptive reasons for denial of loan modifications.

272.    The Robosigning Complaint further alleged, which allegations Plaintiff specifically incorporates and makes herein, that Wells Fargo "engaged in a pattern of unfair and deceptive" foreclosure practices including:

- failing to identify the foreclosing party properly;

- charging improper fees related to foreclosures;

- preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

- preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of Wells Fargo, they did so with the knowledge and approval of Wells Fargo;

- executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

- misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

- inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; and

- inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

273.    Perhaps most disturbing, the Robosigning Complaint highlights the duplicity in Wells Fargo's unfair, deceptive, and illegal treatment of borrowers defaulting on its predatory mortgage loan products while in receipt of an investment of tens of billions of dollars of U.S. taxpayer funds to help bail it out of the very same financial disaster it helped create through its predatory subprime mortgage lending activities, including some of those activities at issue here.[13]

_____

[13] On or about October 28, 2008, Wells Fargo received a $25 billion cash investment from the United States Treasury pursuant to the Troubled Asset Relief Program ("TARP").  TARP was created through the Emergency Economic Stabilization Act of 2008 ("EESA") to help prevent a

274.    On April 4, 2012, Wells Fargo entered into a Consent Judgment, agreeing to remediation and restitution of approximately *$5 billion*, and a variety of modifications to its mortgage servicing and foreclosure practices.  In particular, the settlement required Wells Fargo to make direct civil penalty payments to the plaintiff governments of $1,005,233,716; provide mortgage loan consumer relief to distressed borrowers, including principal forgiveness, refinancing, and other forms of relief; and to change its mortgage servicing practices by complying with certain mortgage servicing standards.

275.    Wells Fargo did not timely comply with all of its obligations under the Consent Judgment to implement the servicing standards, failing to comply with the requirement to respond in a timely manner to borrowers regarding missing information or documentation relating to borrower loan modification packages it had received.

276.    Defendants' predatory mortgage servicing and foreclosure practices have occurred both on a direct discriminatory basis and, necessarily, on a disparate impact basis as a result of the relatively greater numbers of predatory and discriminatory mortgage loans Defendants to FHA protected minority homeowners.  Empirical and statistical data, which

---

deepening of the liquidity and financial crisis (which resulted from Wells Fargo's subprime mortgage lending conduct alleged herein and the conduct of other industry participants), to stabilize the housing market, and to assist troubled homeowners.  As alleged in the Robosigning Complaint, that investment was conditioned in part on Wells Fargo's commitment to modify defaulting borrowers' single family residential mortgages pursuant to a variety of federal programs created in conjunction with EESA and TARP, including the Making Home Affordable Program, the Home Affordable Modification Program, The Home Price Decline Protection Incentives initiative, The Principal Reduction Alternative, The Home Affordable Unemployment Program, The Home Affordable Foreclosure Alternatives Program, The Second Lien Modification Program, The FHA-HAMP Program, The Treasury/FHA Second-Lien Program, The FHA Refinance for Borrowers with Negative Equity Program, and the Housing Finance Agency Hardest Hit Fund.

Plaintiff alleges below, evidences that Wells Fargo has initiated mortgage foreclosure proceedings in minority communities to a far greater extent than in non-minority communities.

277. Moreover, in April 2012, the non-profit National Fair Housing Alliance ("NFHA") and four of its member organizations filed a complaint with the Department of Housing and Urban Development against Wells Fargo accusing it discriminating in the maintenance of its bank-owned real estate ("REO"), *i.e.*, the properties it had foreclosed upon on otherwise acquired ownership following borrower default.[14] Plaintiff specifically incorporates and makes the same allegations herein with respect to Wells Fargo's REO properties in its neighborhoods and communities.

278. Based on NFHA's undercover investigation of 218 properties in eight cities (Atlanta, GA; Baltimore, MD; Dallas, TX; Dayton, OH; Miami/Fort Lauderdale, FL; Oakland/Richmond/Concord, CA; Philadelphia, PA; and Washington, DC), there are "stark racial disparities in the maintenance and marketing of REO properties between communities of color and predominantly White communities" where Wells Fargo's has REO properties. Increased maintenance deficiencies with significant differences in communities of color compared to white communities include substantial amounts of trash; dead grass; broken doors, door locks, and windows; damaged roof or physical structures including holes; peeling or chipped paint and damaged siding; missing gutters and water damage.

279. These actions individually and/or collectively with Defendants' other practices alleged herein have further led to disproportionate rates of delinquencies, defaults, home

---

[14] A copy of the complaint is publicly available at http://www.nationalfairhousing.org/Portals/33/ Wells%20Fargo%20Second%20Amended%20Complaint%2006%2027%202012.pdf.

vacancies and/or foreclosures on loans originated, purchased, and/or serviced by Defendants that were made to FHA protected minority borrowers.

280.    As the direct result of the unfair, deceptive and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiff's communities and neighborhoods, those borrowers have experienced higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies than non-minority borrowers.

281.    Also as the direct result of the unfair, deceptive and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiff's communities and neighborhoods, those borrowers will face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies than non-minority borrowers on loans that have not yet defaulted or been foreclosed upon.

282.    As Plaintiff further alleges below, Plaintiff has been damaged and will continue to be damaged in the future as a direct result of the unfair, deceptive and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiff's communities and neighborhoods.

283.    Defendants have continued to strip equity on each outstanding predatory and discriminatory loan at issue here, and will continue to do so until the last predatory and discriminatory mortgage loan Defendants originate, purchase or otherwise acquire, and/or service, has been repaid and closed or has been foreclosed upon.  Defendants' predatory and discriminatory loans at issue will continue to become delinquent and will be defaulted on for at

least several more years into the future, leading to further property vacancies and foreclosures. Thus, Defendants' discriminatory housing practices in violation of the FHA continue, such that the statute of limitations on Defendants' scheme has not yet begun to run.

**J.     Empirical Data Evidences Defendants' Targeting of, And The Discriminatory Impact on, Minority Borrowers in Plaintiff's Communities**

284.    Publicly available loan origination data Defendants themselves collect and report pursuant to HMDA evidences Defendants' intentional targeting of FHA protected minority borrowers in Plaintiff's communities for non-prime mortgage loans, and the discriminatory impact on those borrowers of Defendants' discretionary pricing and underwriting policies and practices.  Additionally, publicly available empirical data regarding the numbers, locations and increased rate of foreclosures in Plaintiff's communities with higher percentages of minority homeownership evidences Defendants' discriminatory loan servicing and foreclosure activities, as well as the discriminatory impact of the predatory loans themselves.

285.    While the publicly available HMDA data Defendants have reported likely underestimates the number of predatory or higher cost non-prime mortgage loans Defendants made and make on a discriminatory basis (because such HMDA data does not parse out predatory loan features) it nevertheless provides an appropriate factual basis for the empirical and statistical allegations below regarding Defendants' discriminatory mortgage lending and servicing patterns at issue and the discriminatory impact of such activity.  Indeed, this is precisely the purpose for which the Home Mortgage Disclosure Act required this data to be collected, maintained and reported.

286.    The loan level data in Defendants' Loan Application Registry (LAR) and the information in Defendants' mortgage servicing platforms, which are not available to Plaintiff

absent discovery, contain the critical detailed information to definitively prove Defendants' discriminatory actions alleged herein. In its simplest form, however, the raw HMDA data Defendants and their correspondent lenders reported clearly demonstrate that Defendants have: (1) targeted FHA protected minorities within Plaintiff's neighborhoods and communities for predatory mortgage loans; (2) created compensation, underwriting and other policies and practices that have encouraged and enabled discriminatory lending of predatory mortgages to FHA protected minorities within Plaintiff's neighborhoods and communities; and (3) serviced its predatory mortgage loans, including its related foreclosure activity, in a discriminator manner against FHA protected minorities within Plaintiff's neighborhoods and communities.

287.    Each of the Defendants made a disproportionately larger number of their total mortgage loans to FHA protected ethnic/racial minority homeowners in Plaintiff's communities and neighborhoods than to non-minorities in light of the key comparative demographic—single family, owner-occupied housing units—in Plaintiff's communities and neighborhoods. This reflects reverse redlining and targeting.

288.    Each of the Defendants also made a disproportionately high number of their "high cost" and higher cost nonprime mortgage loans to FHA protected ethnic/racial minority homeowners in Plaintiff's communities and neighborhoods than to non-minorities in light of the same comparative demographics in Plaintiff's communities and neighborhoods. This also reflects reverse redlining and targeting. As further alleged below, this discriminatory conduct is further evidenced in part by the increased rates and clustering of foreclosures on Defendants' mortgage loans in neighborhoods and communities with high minority homeownership percentages.

289.    U.S. Census owner-occupied housing unit data provides the best measure of Cook County's minority homeownership demographics to compare to Defendants' reported HMDA loan data.  This is because the mortgage loans at issue here were secured on borrowers' single family (1-4 unit) owner-occupied residences.

290.    The increased percentages and numbers of mortgage loans that Defendants made to ethnic/racial minorities in Plaintiff's communities, when compared to the actual demographics of ethnic/minority homeownership in Plaintiff's communities, provides direct evidence of Defendants' targeting, reverse redlining and marketing penetration into minority communities. If Defendants had not targeted minority borrowers for their mortgage lending activity, minorities in Plaintiff's communities would not have received significantly greater numbers and percentages of Defendants' mortgage loan products than the percentages of minority homeownership as reflected in the demographics.

291.    Between just 2004 and 2007, Wells Fargo, Wachovia, and their subsidiaries collectively originated at least 61,524 mortgage loans in Cook County and reported the ethnic/racial minority status of the borrowers.  At least 41% of those loans (25,343) were identified in HMDA data by Defendants as being made to ethnic/racial minority borrowers.  The total percentage of Cook County housing units owned and occupied by ethnic/racial minorities during that time, however, was only approximately 22.6%.  The increased percentage and number of total loans Defendants made to ethnic/racial minorities compared to the lower demographics of ethnic/minority homeownership reflects Defendants targeting of, and tremendous penetration into, ethnic/racial minority communities to a far greater extent that would be expected based on their percentage of minority homeownership had Defendants not targeted those borrowers and communities.

110

292.    Defendants' discriminatory targeting also is evidenced by its "high cost" lending activities. For example, of the 61,524 loans that Wells Fargo/Wachovia made in Cook County and for which they reported ethnic/racial minority status, Defendants also reported that 10,254 of them were "high cost." However, at least 6,547 of those "high cost" loans, approximately 64%, were made to FHA protected ethnic/racial minority borrowers.  Compared to the demographics of just 22.6% minority homeownership, the increased percentage and number of high cost loans Defendants made to ethnic/racial minorities reflects Defendants targeting of, and tremendous penetration into, ethnic/racial minority communities for such high cost loans.

293.    This discriminatory lending pattern is further reflected in the HMDA data reported by or on behalf of the various individual Wells Fargo and Wachovia subsidiaries and affiliates that originated mortgage loans for, or on behalf of, Wells Fargo and Wachovia.  HMDA data from several of these originators with large numbers of loans are set forth below.

294.    For example, Wells Fargo Bank, NA, originated a total of 36,484 mortgages in Cook County between 2004 and 2007 for which it reported minority status.  Of those loans, 12,381 (34%) were to ethnic/racial minority borrowers. Of the total 36,484 loans it originated, 4,544 were designated "high cost" and which minority status had been reported. 3,176 of those "high cost" mortgages (70%) were to ethnic/racial minority borrowers.

295.    Wells Fargo Financial Illinois Inc. originated a total of 4,495 mortgages in Cook County between 2004 and 2007 for which it reported minority status.  2,608 of those loans (58%) were to ethnic/racial minority borrowers. Of the total 4,495 loans it originated, 4,046 were designated "high cost" and which minority status had been reported. 2,416 of those "high cost" mortgages (60%) were to ethnic/racial minority borrowers.

296.     Wells Fargo Funding originated a total of 2,019 mortgages in Cook County between 2004 and 2007 for which it reported minority status.  461 of those loans (23%) were to ethnic/racial minority borrowers. While it only originated 25 loans designated "high cost" and which minority status had been reported, 19 of those loans (76%) were to ethnic/racial minority borrowers.

297.     Wachovia Mortgage originated a total of 1,677 mortgages in Cook County between 2004 and 2007 for which it reported minority status.  678 of those loans (40%) were to ethnic/racial minority borrowers. While it only originated 77 loans designated "high cost" and which minority status had been reported, 52 of those loans (67%) were to ethnic/racial minority borrowers.

298.     Wachovia subsidiary World Savings Bank originated a total of 9,394 mortgages in Cook County between 2004 and 2007 for which it reported minority status.  6,129 of those loans (65%) were to ethnic/racial minority borrowers. Of the total 9,394 loans it originated, 427 were designated "high cost" and which minority status had been reported. 320 of those "high cost" mortgages (75%) were to ethnic/racial minority borrowers.

299.     Wachovia subsidiary American Mortgage Network, Inc. and its affiliate, collectively originated a total of 7,118 mortgages in Cook County between 2004 and 2007 for which it reported minority status.  2,999 of those loans (42%) were to ethnic/racial minority borrowers. Of the total 7,118 loans it originated, 942 were designated "high cost" and which minority status had been reported. 457 of those "high cost" mortgages (49%) were to ethnic/racial minority borrowers.

300.     The foregoing publicly-available empirical data demonstrates that Defendants made substantially greater percentages of their total mortgage loans and of their high-cost

112

mortgage loans to minority borrowers beyond what the racial demographics of Plaintiff's communities and neighborhoods would otherwise indicate was appropriate on a non-discriminatory basis. Differences in borrower credit score or other objective and permissible underwriting criteria do not explain or justify these differences.

301.    Many, if not the majority, of the "high cost" mortgage loans Wells Fargo discriminatorily made to minorities contained predatory terms, by definition had increased interest rates and other costs for minority borrowers, and/or were underwritten in a predatory manner as alleged herein.

302.    On its face, the above empirical data reflects Defendants' discriminatory targeting and discriminatory treatment of FHA protected minority borrowers relating to Defendants' predatory mortgage lending activities, including the discriminatory housing practices of "reverse redlining," i.e., the intentional targeting of FHA protected minorities for the extension of credit on unfavorable terms, and steering minority borrowers into loans with more unfavorable terms. This empirical and statistical information provides direct and *prima facie* evidence of the disparate impact, as well as additional evidence of the targeting and disparate treatment, of Defendants' predatory mortgage lending activities in Plaintiff's communities and neighborhoods.

303.    In addition to the tens of thousands of discriminatory and predatory residential home mortgage loans Defendants originated directly, Wells Fargo also is responsible for the many more predatory and discriminatory residential home mortgage loans it funded or purchased that were originated through its correspondent and affiliate networks, including the loans originated by PNC.

304.    Findings of studies by non-profit organizations further shine a light on Defendants' discriminatory lending patterns evidenced in the above empirical data. For

113

example, based on its review of Wells Fargo's national HMDA data that included 378 distinct Wells Fargo subsidiaries and correspondent affiliates, the non-profit organization National People's Action ("NPA") concluded that "Wells Fargo, and its correspondent lending channels, issued many types of problematic loans that are now at the center of America's home foreclosure crisis." National People's Action Report, "*THE TRUTH ABOUT WELLS FARGO: Racial Disparities in Lending Practices*" (March 2009). Key findings from the NPA Report include:

- Over 37% of all loans made by Wells Fargo to African American borrowers were high cost loans; compared to 12% of loans received by White borrowers.

- 45% of all refinance loans received by African American borrowers were high cost, compared to 19% for White borrowers.

- For low- and moderate-income borrowers, 48% of all Wells Fargo loans to African Americans were high cost loans as compared to 20% of the loans for equivalent White borrowers.

- For middle and upper income African American borrowers, 34% of Wells Fargo loans were high cost loans as compared to 11% for equivalent White borrowers.

- African Americans and Latinos were charged higher interest rates on high cost loans and refinance loans than white borrowers.

- While African American and Latino borrowers together accounted for only of 11% of Wells Fargo's total lending volume, these populations accounted for 25% of Wells Fargo's $47.5 billion high cost refinance lending business.

- Refinance loans accounted for 61% of all the loans Wells Fargo made to African American borrowers and 56% of all the loans made to Latino borrowers. Not only were refinance loans the majority of loans made by Wells Fargo to minority borrowers, African American and Latino borrowers were more likely to pay higher costs for their refinanced debt from Wells Fargo.

305. Similarly, statistical analyses that the United States Department of Justice of loan data conducted for prime and non-prime wholesale loans Wells Fargo from 2004 to 2008 demonstrate that, measured on a nationwide basis, and after controlling for major risk-based factors relevant to determining loan product placement, including credit history, LTV, and DTI,

114

African American and Hispanic borrowers were more likely to receive subprime loans from 2004 to 2008 than similarly situated white borrowers.

306.    For the combined time period of 2004 to 2008, an African American borrower who obtained a wholesale loan from Wells Fargo would receive a subprime loan rather than a prime loan approximately 2.9 times more often a similarly situated white borrower.  For the same time period, an African American borrower who obtained a retail loan from Wells Fargo would receive a subprime loan rather than a prime loan approximately twice as often as a similarly situated white borrower.  During the same time period, Latino borrowers received subprime retail loans rather than prime retail loans approximately 1.3 times as often as a similarly situated white borrower.

307.    The foregoing demonstrates a nationwide pattern of statistically significant differences between African-American and Latino borrowers with respect to their product placement by Wells Fargo, even after accounting for objective credit qualifications, as compared to white borrowers.

308.    Similar discriminatory lending patterns are apparent in the HMDA data regarding Wells Fargo's and Wachovia's 2000 to 2003, and post 2007 mortgage loan originations, particularly including Wells Fargo's mortgage lending during 2012 and 2013.  While much of Defendants' predatory, higher cost and nonprime mortgage loan making practices at issue (through direct originations, funding and purchases through broker and wholesale lending channels) subsided after the Financial Crisis, such lending activity did not end, but in fact has continued, albeit to a lesser degree, including through predatory refinancing of previously made predatory mortgage loans.

309.    In the early 2000s, prior to the height of Defendants' predatory and discriminatory mortgage lending alleged herein, Plaintiff's historical annual foreclosure rates averaged approximately 1% to 2%.  Plaintiff had few, if any "high foreclosure risk" ("HFR") census tract areas as defined and designated by the U.S. Department of Housing & Urban Development ("HUD").  HUD designated HFR areas reflect neighborhood characteristics that HUD estimates to have a high level of risk for foreclosure—e.g., those neighborhoods with a relatively high concentration of higher cost loans, subprime, or highly leveraged loans (high LTV and DTI ratios), among other factors.

310.    Subsequent to, and during the predatory and discriminatory lending and servicing practices of Defendants alleged herein, minority borrowers in Plaintiff's communities received numerous "high cost," higher cost, or non-prime mortgage loans, concentrated in Plaintiff's neighborhoods and communities with high populations of FHA protected minority borrowers. This led to a massive increase in the number of foreclosures, the concentrations of those foreclosures in minority communities and HUD's designation of numerous HFR areas that directly correspond to the census tracts in Plaintiff's communities that have the highest percentages of minority homeowners.

311.    Indeed, the level and severity of the risk of foreclosures across the nation and in Plaintiff's communities and neighborhoods became so great that HUD changed its HFR ranking system from a scale of 1-10 (10 being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas). And, while the historical annual foreclosure rate in the Chicago Metropolitan Statistical Area ("MSA") averaged below approximately 1% prior to the beginning of the boom in subprime lending, HUD estimated foreclosure rates on loans made during the period 2004 through 2007

116

caused foreclosure rates in Plaintiff's communities with the highest percentages of minority borrowers to exceed *twenty percent (20%).*

312.    HUD designated high foreclosure rate census tracts in Cook County coincide directly with high foreclosure rates in such communities and neighborhoods and typically have the highest percentages of FHA protected minority homeowners.  Loans made in such areas serve as a useful proxy to reflect relative numbers of non-prime loans given the far greater percentages on which they have been foreclosed upon, as well as other loans in the same proximity, and given the location and demographics of such census tracts.

313.    Many, if not the majority, of mortgage loans Wells Fargo discriminatorily made to minorities in the highest HUD designated census tracts contained predatory terms, had increased interest rates and other costs for minority borrowers, and/or were underwritten in a predatory manner as alleged herein. Thus, even though many such loans were not strictly "high cost" designated loans, Defendants' discriminatory lending patterns exist throughout Defendants' entire line of non-prime mortgage loan products that Defendants have made since 2000.  As a result, all such loans are at issue in this Complaint and Defendants' loan level data in its LAR will provide the evidentiary matter necessary at trial.

314.    Given that the total percentage of Cook County housing units owned and occupied by ethnic/racial minorities during the bulk of Defendants' non-prime lending activity was only approximately 22.6%, the increased percentages and numbers of mortgage loans alleged below that Defendants made to ethnic/racial minorities in the highest HUD designated HFR census tracts -- compared to loans made in census tracts with a majority of white homeowners – also reflects Defendants targeting of, and tremendous discriminatory penetration into, Plaintiff's most vulnerable ethnic/racial minority communities for predatory loans.

117

315.     For example, of the 61,524 loans that Wells Fargo/Wachovia collectively made in Cook County and for which they reported ethnic/racial minority status, 39,763 of them (65%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Cook County.  Over half of those loans (20,374) were reported as made to ethnic/racial minority borrowers.

316.     This discriminatory lending pattern is further reflected in the HMDA data reported by or on behalf of the various individual Wells Fargo and Wachovia subsidiaries and affiliates that originated mortgage loans for, or on behalf of, Wells Fargo and Wachovia.

317.     Of the 36,484 loans that Wells Fargo Bank made in Cook County and for which they reported ethnic/racial minority status, 22,132 of them (61%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Cook County.  Approximately 45% of those loans (9,953) were made to ethnic/racial minority borrowers.

318.     Of the 4,495 loans that Wells Fargo Financial made in Cook County and for which they reported ethnic/racial minority status, 3,749 of them (83%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Cook County. Approximately 63% of those loans (2,377) were made to ethnic/racial minority borrowers.

319.     Of the 2,019 loans that Wells Fargo Funding made in Cook County and for which they reported ethnic/racial minority status, 958 of them (47%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Cook County.  Approximately 34% of those loans (326) were made to ethnic/racial minority borrowers.

320.     Of the 1,677 loans that Wachovia Mortgage made in Cook County and for which they reported ethnic/racial minority status, 1,106 of them (66%) were made to borrowers within

the highest HUD designated foreclosure risk census tracts in Cook County. Approximately 48% of those loans (534) were made to ethnic/racial minority borrowers.

321. Of the 9,394 loans that World Savings Bank made in Cook County and for which they reported ethnic/racial minority status, 6,820 of them (73%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Cook County. Approximately 71% of those loans (4,817) were made to ethnic/racial minority borrowers.

322. Of the 7,118 loans that American Mortgage made in Cook County and for which they reported ethnic/racial minority status, 4,779 of them (67%) were made to borrowers within the highest HUD designated foreclosure risk census tracts in Cook County. Approximately 48% of those loans (2,292) were made to ethnic/racial minority borrowers.

323. On its face, the above empirical and statistical data provides *prima facie* evidence of Defendants' discriminatory targeting and discriminatory treatment of, and discriminatory impact on, FHA protected ethnic/racial minority borrowers in Plaintiff's communities and neighborhoods.

324. Similar discriminatory lending patterns are apparent from HMDA data regarding Wells Fargo's and Wachovia's 2000 to 2003, and post 2007 mortgage loan originations, including Wells Fargo's mortgage lending during 2012 and 2013. For example, between 2000 and 2003, Wells Fargo, Wachovia and their affiliates originated, funded or purchased 93,984 mortgage loans in which they reported minority status. 25,107 of those loans (approximately 27%) were made to minorities, reflecting a statistically significant increase in the number of loans made to minority borrowers in excess of the Cook County demographics of a 22.6% minority homeownership rate. This reflects that during this period Defendants had already begun to target minority borrowers for higher cost mortgage loans, an activity that Defendants

119

ramped up between 2004 through 2008 as reflected in the HMDA LAR data alleged above. Moreover, of the total 93,984 loans in which minority status was reported, 45,826 of those loans (49%) ended up in the highest foreclosure rate areas and, of the total 45,826 HFR area loans, 18,459 loans (approximately 40%) were made to minorities.

325.    Between 2008 and 2011, Wells Fargo, Wachovia and their affiliates originated, funded or purchased at least 51,580 mortgage loans in Cook County that they reported minority status on. Of the total 51,580 loans in which minority status was reported, 27,329 of those loans (53%) ended up in the highest foreclosure rate areas and, of the total 27,329 HFR area loans, 7,982 loans (approximately 29%) were made to minorities.

326.    Finally, between January 2012 and December 2013, Wells Fargo, Wachovia and their affiliates originated at least 10,507 "high cost" and HFA area loans in Cook County in which they reported minority status on. Of the total 10,202 HFR area loans in which minority status was reported, 3,334 of those loans (approximately 33%) were made to minorities. Of the total 305 "high cost" loans defendants made in Cook County and reported minority status on, 149 (about 49%) were made to minorities. This reflects that to a certain -- albeit lesser – degree, Defendants' discriminatory lending practices continue to this very day in Cook County.

327.    In comparison to Cook County's demographics of 22.6% minority homeownership, Defendants' mortgage loan origination, funding and purchasing activity during the 2000-2003 and the 2008-2013 time periods reflect the discriminatory nature and disparate impact of Defendants' mortgage lending activities on minority borrowers in Cook County in these time periods. Moreover, in comparison to the 2004-2008 time period, they further reflect the heightened discriminatory nature of Defendants' housing practices specifically during the 2004-2008 subprime lending glut.

120

328.     Over the entire period, 2000-2013, Defendants are responsible for over 55,000 suspect discriminatory and predatory mortgage loans to minorities in Cook County that are part of Defendants' continuing nationwide discriminatory housing practice of equity stripping, which is further conducted through, and reflected in, Defendants' related continuing discriminatory mortgage servicing and foreclosure practices. As further alleged below, since January 2000 Defendants have initiated foreclose proceedings on approximately 19,000 loans concentrated in Cook County communities with higher percentages of minority homeowners.

329.     Publicly reported foreclosure data also evidences the impact of Defendants' predatory and discriminatory lending and mortgage servicing practices, in and of themselves and in combination with one another as part of Defendants' equity stripping scheme.  That data reflects that the average foreclosure rates increase among census tracts in Plaintiff's neighborhoods as the percentage of minority population increases. It also reflects that Defendants have discriminatorily serviced and foreclosed upon minority borrower homes secured by defaulted "high cost" and other nonprime Wells Fargo mortgage loans.

330.     In Cook County, the initial foreclosure rates from 2004 through 2006 in census tracts with demographics of less than 40% FHA protected minority homeowners increased from a historical average of about 1% to approximately 8.65%.  The initial foreclosure rates in census tracts with demographics of 40%-59%, 60%-79%, and 80%-100% protected minority homeowners over the same period, however, exceeded 11.6%, 13.23%, and 20.46%, respectively, reflecting nearly a 236% increase in foreclosure rates between census tracts with demographics of less than 40% FHA protected minority homeowners and 80%-100% FHA protected minority homeowners.

331.    On those mortgage loans at issue in this complaint (i.e., the loans with an origination date since January 2000) and for which it is responsible, Wells Fargo initiated a disproportionate number of foreclosure proceedings in Cook County in those census tracts with higher populations of FHA protected borrowers compared to census tracts with lower populations of minority borrowers.  From the period January 1, 2000 to August 30, 2014, at least 18,952 of Wells Fargo's total 26,767 foreclosure filings in Cook County (approximately 71%) were initiated in higher minority census tracts (i.e., where at least 30% of owner-occupied housing units had minority household members) as compared to just the 7,850 foreclosure filings (about 29%) in low minority census tracts (i.e., where less than 30% of the owner-occupied housing units contained minority household members). All but 35 of the total foreclosure filings were on loans with an origination date since January 1, 2000.  In Cook County census tracts with high and increasingly higher minority populations, as reflected in percentages of owner occupied homes of at least 50% that include a minority, the number of Wells Fargo foreclosure filings increase as the percentage of minority homeownership increases. This foreclosure activity, which is particularly striking when considering that less than 23% of Cook County's owner-occupied housing units have minority household members, reflects both the targeting and discriminatory impact of Wells Fargo's foreclosure activity in Cook County's minority neighborhoods.  Wells Fargo's foreclosure filing activity since January 1, 2000 is numerically, geographically and demographically depicted in the following map created by Plaintiff's GIS Department:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



332.    Defendants' discriminatory foreclosure practices continue to this very day. Indeed, of the total Wells Fargo foreclosure filings in Cook County since January 1, 2000, 4,951 of them have occurred between October 1, 2012 and August 30, 2014.  Of that total, 3,416 foreclosure filings (about 69%) were initiated in higher minority Cook County census tracts as compared to just the 1,535 foreclosure filings (about 31%) in low minority census tracts.  And, in Cook County census tracts with high and increasingly higher minority populations, the number of Wells Fargo foreclosure filings increase as the percentage of minority homeownership increases.  Wells Fargo's foreclosure filing activity between October 1, 2012 and August 30, 2014 is numerically, geographically and demographically depicted in the following map created by Plaintiff's GIS Department:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



333.    Clearly, the mortgage loans Defendants originated in Plaintiff's communities to FHA protected borrowers were more likely to result in delinquency, default, and foreclosure than the loans Defendants made to Caucasian borrowers, with many of the loans made with the highest HUD designated HFR foreclosure rate areas.  This empirical and statistical information provides direct and *prima facie* evidence of the disparate impact, as well as additional evidence of the targeting and disparate treatment, of Defendants' predatory mortgage lending activities in Plaintiff's communities and neighborhoods.

334.    While Plaintiff can provide a list of the addresses of each of the approximate 31,600 foreclosure proceedings Defendants have initiated on mortgage loans originated since January 2000 in Cook County, all as reflected in the GIS MAPs above, Defendants know which loans they made to minorities in Cook County or service; know the location of vacant properties where such loans have defaulted; and know the location of all properties they have foreclosed on in Cook County, all because they maintain this information in the ordinary course of their business.

335.    The HMDA data Defendants reported between 2004 through 2007 reflects that Defendants also discriminated against single women, particularly including minority women, in Defendants' predatory "high cost," higher cost and nonprime mortgage lending activity.  In short, Defendants made a disproportionately larger number of their "high cost" and highest HFR area mortgage loans to single women in Plaintiff's communities and neighborhoods than to all other mortgage loans where at least one male was a borrower or co-borrower.

336.    During that period, Wells Fargo, Wachovia and their subsidiaries collectively originated at least 63,776 total mortgage loans in Cook County and reported the gender status of the borrowers. 18,220 of those loans (28.5%) were identified in HMDA data by Defendants as

being made to a female borrower with no co-applicant. In contrast, Defendants collectively made 34.7% of their "high cost" loans to single women (3,693 of 10,629 loans); 30.7% of the loans made in the highest HFR areas were made to single women (12,629 of 41,132 loans), and 35.6% of their "high cost" loans in the highest HFR areas (most likely also to have the highest percentages of minority homeowners) were made to single women (3,217 of 9,033 loans). Differences in borrower credit score or other objective and permissible underwriting criteria do not explain or justify these differences.

337. The HMDA data reported by or on behalf of the various individual Wells Fargo and Wachovia subsidiaries and affiliates that originated mortgage loans for, or on behalf of, Wells Fargo and Wachovia further reflects that women, particularly minority women, were impacted by Defendants' discrimination lending to an even greater extent than non-minority men. HMDA data from several of these originators are set forth below as examples.

338. Wells Fargo Bank originated at least 38,088 total mortgage loans in Cook County and reported the gender status of the borrowers. 10,457 of those loans (27.5%) were identified in HMDA data by Wells Fargo Bank as being made to a female borrower with no co-applicant. In contrast, Wells Fargo Bank made 37.6% of its "high cost" loans to single women (1,785 of 4,753 loans); 30.2% of the loans made in the highest HFR areas were made to single women (6,982 of 23,094 loans), and 38.2% of their "high cost" loans in the highest HFR areas were made to single women (1,579 of 4,154 loans).

339. Similarly, Wells Fargo Funding originated at least 2,089 total mortgage loans in Cook County and reported the gender status of the borrowers. 422 of those loans (20.25%) were identified in HMDA data by Wells Fargo Funding as being made to a female borrower with no co-applicant. In contrast, Wells Fargo Funding made 33.3% of its "high cost" loans to single

127

women (9 of 27 loans); 24% of the loans made in the highest HFR areas were made to single women (234 of 976 loans), and 36% of their "high cost" loans in the highest HFR areas were made to single women (9 of 25 loans).

340.    Wells Fargo Financial Illinois originated at least 4,658 total mortgage loans in Cook County and reported the gender status of the borrowers. 1,439 of those loans (30.9%) were identified in HMDA data by Wells Fargo Financial Illinois as being made to a female borrower with no co-applicant.  In contrast, Wells Fargo Financial Illinois made 31.6% of its "high cost" loans to single women (1,322 of 4,183 loans); 32.2% of the loans made in the highest HFR areas were made to single women (1,246 of 4,052 loans), and 32.8% of their "high cost" loans in the highest HFR areas were made to single women (1,169 of 3,569 loans).

341.    World Savings Bank originated at least 9,637 total mortgage loans in Cook County and reported the gender status of the borrowers. 3,120 of those loans (32.4%) were identified in HMDA data by World Savings Bank as being made to a female borrower with no co-applicant.  In contrast, World Savings Bank made 40.3% of their "high cost" loans to single women (223 of 554 loans); 32.5% of the loans made in the highest HFR areas were made to single women (2,266 of 6,972 loans), and 40.7% of their "high cost" loans in the highest HFR areas were made to single women (174 of 428 loans).

342.    The foregoing publicly-available empirical data demonstrates that Defendants made substantially greater percentages of their "high cost" loans, highest HFR area loans, and "high cost" loans in the highest HFR areas to single women, than all other borrower combinations. On its face, this empirical and statistical data provides *prima facie* evidence of Defendants' discriminatory targeting and discriminatory treatment of, as well as the disparate

impact on, single women for Defendants' predatory "high cost" and nonprime mortgage loan products as part of Defendants' equity stripping scheme alleged herein.

343.    Similar discriminatory lending patterns are apparent in HMDA data regarding Wells Fargo's and Wachovia's 2000 to 2003, and post 2007 mortgage loan originations.

344.    Many, if not the majority, of mortgage loans Defendants discriminatorily made to single women, particularly single women in the highest HUD designated census tracks, contained predatory terms, had increased interest rates and other costs than for all other loans, and/or were underwritten in a predatory manner as alleged herein. Thus, even though many such loans were not strictly "high cost" designated loans, Defendants' gender discriminatory lending patterns exist throughout Defendants' entire line of non-prime mortgage loan products that Defendants have made since 2000.  As a result, all such loans are at issue in this Complaint and Defendants' loan level data in its LAR will provide the evidentiary matter necessary at trial.

345.    But for Defendants' predatory and discriminatory actions alleged herein, the number and concentration of predatory nonprime mortgage loans and the number and concentration of corresponding defaults, vacancies and foreclosures experienced by FHA protected minority borrowers in Plaintiff's communities and neighborhoods would have been far lower and Plaintiff's alleged injuries would not have occurred to the extent they did occur.

**K.    The Full Extent of Defendants' Discriminatory Housing Practices are Concealed Through Defendants' Underreporting of Minority Status In HMDA Data And Through MERS**

346.    Defendants underreported race and ethnicity HMDA data on the mortgage loans they originated and purchased and have concealed their lending and foreclosure activity through Mortgage Electronic Registration Systems, Inc. ("MERS").  This skews the discriminatory effect of Defendants' predatory and discriminatory lending and servicing practices at issue here in

Defendants' favor. Thus, only discovery of Defendants' loan level data and mortgage servicing data will reveal the full extent of Defendants' discriminatory housing practices at issue here and the full extent of Plaintiff's resulting damages.

347. For example, Wells Fargo and Wachovia collectively originated 65,563 mortgage loans between just 2003 and 2007 in Cook County. However, 4,039 of those loans (6%) contained no information, notwithstanding HMDA reporting requirements on the minority status of the borrower. 2,648 of those loans (66%) were "high cost" or made in the highest HUD designated foreclosure rate census tracks, both categories of which were more likely to be made to minority borrowers. Wells Fargo Bank was the worst offender of the Defendants in volume with approximately 2,649 of the loans it originated in Cook County reporting no ethnicity data, 1,715 of which (65%) designated as "high cost" or in the highest HFR areas. Wachovia Mortgage was the worst offender in terms of percentage, with approximately 19% of its originated mortgage loans in Cook County (395 of 2072) reporting no ethnicity data, with 273 of such loans (69%) designated as "high cost" or in the highest HFR areas.

348. Similarly, Defendants have not reported minority data on many of the mortgage loans they funded, purchased or otherwise acquired, including through their affiliate and broker network. For example, Wells Fargo and Wachovia collectively purchased or otherwise acquired 21,814 loans between just 2003 and 2007 in Cook County. However, 4,083 of those loans (19%) contained no minority status information. Wells Fargo Funding was responsible for 14,130 of those loans, but did not report on 823 of them, 450 of which (55%) were in the highest HFR areas. Wells Fargo Bank was responsible for 4,730 of the total acquired loans, but did not report on 308 of them, 149 of which (48%) were in the highest HFR areas. For their part, Wells Fargo Financial IL, Wachovia Bank, Wachovia Mortgage, World Savings Bank, and American

Mortgage Network were collectively responsible for 2,952 of the acquired loans, but reported minority status on only 10 loans, while the vast majority of such loans 1,855 (63%) were originated within the highest HFR areas.

349. By not adequately reporting minority data on their mortgage loan originations and acquisitions, Wells Fargo and Wachovia have skewed the data in their favor and further concealed the full extent of their predatory and discriminatory mortgage lending and servicing activities, further necessitating discovery of all of Defendants' mortgage loan data they created or maintain in connection with their mortgage lending, securitization and servicing activities at issue here..

350. Wells Fargo and its joint venture partner First American Title Insurance Corp were founding members, and remain shareholders, of MERSCORP Holdings, Inc., the parent company of Mortgage Electronic Registration Systems, Inc., which operates the MERS System.

351. As such, Wells Fargo helped fund the development and initial start-up of MERS to act as a nominee for mortgage lenders and lenders' successors and assigns (e.g., securitization trusts) to privately originate, track, assign and/or trade mortgage loans through a confidential computer registry (containing over 70 million mortgage loan records) enabling mortgage lenders to circumvent public lien assignment recording processes.

352. Wells Fargo and First American are both current members of MERS. Wells Fargo Bank's Executive Vice President, Kathy Gray, has been and is a member of the MERSCORP's Board of Directors. First American's Executive Vice President and Vice Chairman, Kurt Pfotenhauer, also is a MERSCORP director and serves as its Chairman of the Board.

353.     MERS previously publicly described itself on its website as "an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold, and tracked.  Created by the real estate finance industry, MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."  MERS has touted that its operations are "a national electronic registry system that tracks the changes in servicing rights and beneficial ownership interests in mortgage loans that are registered on the registry."

354.     According to MERS' prior public website disclosures, it also provides money savings to lenders by eliminating assignment costs, document correction costs, and tracking fees – "Once the loan is assigned to MERS . . . tracking servicing and beneficial rights can occur electronically for all future transfers.  The need for any additional assignments after this point will be eliminated unless the servicing rights are sold to a non-MERS member."  MERS has saved industry participants – and denied public recording systems operated by County governments such as Plaintiff here – a total of over $2 billion in public recording fees.

355.     MERS obscures the extent of Defendants' mortgage loan origination, ownership, assignment, securitization, and servicing activities.  Loans originated, purchased or acquired by Wells Fargo that were originally closed in the name of MERS, or subsequently assigned to MERS, makes it extremely difficult for Plaintiff to determine ownership interests in vacant or abandoned properties that have not yet been foreclosed upon to cure building code deficiencies, ensure compliance with building codes, obtain unpaid taxes and/or utility bills, and/or determine the ownership or lien holders to enable in rem or tax foreclosure sales.

356.     Because Plaintiff does not have access to MERS there was virtually no way for Plaintiff to identify parties – e.g., mortgage note holders or securitization trustees –legally and financially obligated to pay the costs of maintaining abandoned or vacant properties in the

132

MERS System within its jurisdiction. As such, MERS' admittedly deliberate circumvention of the public recording process has damaged, and continues to damage, Plaintiff including by denying Plaintiff of the revenue from recording fees and related taxes that Plaintiff otherwise would have received had the various assignments and other changes in title been properly recorded.

357. More importantly, however, by circumventing public lien holder recording processes by design, MERS obscured Defendants' mortgage foreclosure processes, making it extremely difficult for Plaintiff – and other interested parties – to identify the predatory lenders "whose practices led to the high foreclosure rates that have blighted some neighborhoods." Mike McIntire, *Tracking Loans Through a Firm That Holds Millions*, N.Y. Times (April 24, 2009). It effectively "removes transparency over what's happening to these mortgage obligations and sows confusion, which can only benefit the banks." *Id.*

358. Mortgage loans foreclosed in the name of MERS, as agent or assignee, may conceal the identity of the loan originator, assignees and/or loan servicer, making it extremely difficult for Plaintiff to determine the party responsible for originating or servicing a predatory or discriminatory mortgage loan that has resulted in foreclosure.

359. The majority of foreclosures (estimated at 60% nationwide) are conducted in the name of MERS as designee, assignee, or title holder of Defendants as originator or securitization trustee making it virtually impossible to determine from publicly available data which Defendants hold the mortgages to, are in possession of, and/or are or may be foreclosing on properties in Plaintiff's communities and neighborhoods, further obfuscating the predatory and discriminatory lending practices of Defendants and other industry participants.

360.    Complicating the issue, it has been widely reported, investigated, litigated, and publicly acknowledged that the Defendants' and MERS' electronic mortgage lien and assignment records contain errors.  It also has been widely reported, investigated, litigated, and publicly acknowledged that this has been exacerbated by and/or led to Defendants' "robosigning" and other predatory mortgage servicing and foreclosure practices.

361.    Finally, Defendants also used their bank holding company corporate structure to conceal their discriminatory lending practices by shifting loans and loan applications between their mortgage lending operations at their regulated banking entities and their non-regulated mortgage lending subsidiaries and affiliates. According to confidential witness statements provided by former employees of Wells Fargo and cited in another action against Wells Fargo: "It was common knowledge that, to avoid problems, loans from one office were sent to another office to make both look more balanced.  We needed to put some white loans in that [minority] community and some black loans in this community because [otherwise] we'll get some sh!+ from the Fed."

362.    The only realistically feasible way to precisely determine all the properties possessed by, in the control of, or foreclosed upon at the direction, or for the benefit, of Defendants, is through electronic discovery of Defendants' and MERS' mortgage origination, purchase, assignment, securitization, servicing, and foreclosure data that Defendants specifically collect, track, and utilize for their HMDA reporting obligations and their operational activities.

363.    This discovery is necessary to determine the full extent of the predatory and discriminatory loans Defendants have made at issue here and Defendants' complicity in the continuing predatory and discriminatory equity stripping scheme alleged, including through the continuing servicing of each such predatory and discriminatory loan.

134

## VI.    DEFENDANTS' PREDATORY & DISCRIMINATORY MORTGAGE LENDING, SERVICING AND FORECLOSURE PRACTICES HAVE HARMED PLAINTIFF

364.    Defendants' discriminatory housing practices of equity stripping – conducted through Defendants' interrelated predatory and discriminatory mortgage lending, servicing and foreclosure activities -- have seriously harmed Plaintiff's communities and neighborhoods by effectively diluting -- or completely eliminating -- the equity of minority borrowers' homes. This has placed those borrowers in far greater jeopardy of loan default and foreclosure, has reduced monies available for home upkeep and maintenance, and has dramatically increased the numbers and rates of home vacancies and foreclosures that Plaintiff's communities and neighborhoods are currently experiencing (and will continue to experience into the future).

365.    As further alleged below, this has caused and will continue to cause both extensive non-monetary harm, including an increasing segregative effect on Plaintiff's communities and neighborhoods where Defendants have concentrated their equity stripping activities, and financial damages to Plaintiff.

366.    Home foreclosures disproportionately occur in predominantly minority neighborhoods. *See, e.g.,* Juliana Barbassa, "Report: Minorities Hit By Foreclosures," The Associated Press (March 6, 2008), available at http://www3.nd.edu/~jwarlick/ documents/ MinoritiesHitbyForeclosures.pdf. The concentration and harmful impact of such foreclosures is increased in highly segregated neighborhoods and communities, such as those in Cook County. Written Testimony of South Suburban Housing Center, before The National Commission on Fair Housing and Equal Opportunity Hearing, "Still Separate and Unequal: The State of Fair Housing in America," at 5 (July 15, 2008), available at http://www.prrac.org/projects/ fair_housing_commission/chicago/petruszak.pdf.  Indeed, as reflected in the empirical data and

135

allegations above, defaults and foreclosures on mortgage loans at issue in this complaint for which Wells Fargo is responsible have occurred to a greater extent in Plaintiff's higher minority communities and neighborhoods than compared to Plaintiff's lower and non-minority communities and neighborhoods.

367.     The HMDA data from 2004 through 2007 reveals that the Chicago metropolitan area had the highest number of high cost loans in the nation for four years in a row.  A 2007 study also found that compared to five other cities in the country, Chicago had the highest share of high cost loans made to African American borrowers; it found that 64.2% of loans made to African Americans in Chicago were high cost.  California Reinvestment Coalition ("CRC") et al., *Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending*, March 2007.

368.     As alleged above, Defendants discriminatorily originated, or funded, purchased or otherwise acquired predatory, non-prime mortgage loans on a discriminatory basis in Plaintiff's communities and neighborhoods, and continue to service, refinance and/or foreclosure on such loans on a predatory and/or discriminatory basis.  Thus, the loan default, home vacancy and foreclosure rates in Plaintiff's communities with increased ethnic and racial minorities are greater than in comparable white communities.  And, because single women generally received a greater share of such loans than male borrowers, and because minorities received them to a greater extent than non-minorities, the loan default, home vacancy and foreclosure rates in Plaintiffs' communities is particularly high among female African American borrowers of Wells Fargo's and Wachovia's predatory mortgage loan products.

369.     Minority neighborhoods suffer severe deleterious effects from increased foreclosures. A Woodstock Institute Study has demonstrated that "foreclosures, particularly in

lower-income neighborhoods, can lead to vacant, boarded-up, or abandoned properties. These properties, in turn, contribute to the stock of 'physical disorder' in a community that can create a haven for criminal activity, discourage social capital formation, and lead to further disinvestment…and lower property values for existing residential homeowners." Dan Immergluck & Geoff Smith, *There Goes the Neighborhood: The Effect of Single-Family Mortgage Foreclosures on Property Values*, Woodstock Institute Study (June 2005) (applying regression analysis to demonstrate effect of foreclosures on surrounding property values and damages).[15]

370. Plaintiff, which is the embodiment of its residents, neighborhoods and communities, suffers from the segregative effects of the increased foreclosures and vacant properties, securing predatory and discriminatory mortgage loans for which Defendants are responsible, through increased blight, urban decay, and the perpetuation and increase in racial slum formation including from "white flight," all of which is concentrated in Plaintiff's neighborhoods and communities with higher percentages of minority homeowners.

371. Plaintiff also suffers from the combined racial and gender segregative effect resulting from an increased number of defaults and foreclosures on "high cost" and non-prime mortgage loans Defendants targeted on female borrowers, particularly African American female borrowers, many of which also are concentrated in Plaintiff's high minority neighborhoods. Plaintiff has a legitimate interest under the FHA in promoting fair and equal housing opportunities on both a racial and a gender neutral basis in its communities.

---

[15] A copy is publicly available at http://www.nw.org/foreclosuresolutions/reports/documents/ TGTN_Report.pdf.

372.     Plaintiffs are harmed even if Defendants' non-prime mortgage loans don't result in foreclosure.     Defendants' equity stripping mortgage loans increase minority borrower borrowing costs, reduce or limit impacted minority borrower's ability to accumulate wealth from the equity in their homes, deplete or eliminate borrower savings, and thereby restrict or reduce an impacted borrower's ability or desire to maintain and/or improve their property. This further leads to deterioration of such property and surrounding property values and results in increased vacancy rates as borrowers with negative home equity are more likely to simply abandon their homes.

373.     As a result, injuries to Plaintiff will continue to occur long after the last wrongful act in the Defendants' scheme – the inevitable, if not intended, vacancy and/or foreclosure on the predatory and discriminatory mortgage loan products Defendants sold to homeowners in Plaintiff's neighborhoods and communities and continued to service when such loans defaulted and through Defendants' foreclosure processes.

374.     Defendants' illegal discriminatory conduct also has caused substantial, measurable damages to Plaintiff's communities and neighborhoods including, but not limited to:

- out-of pocket costs in providing governmental services (e.g. necessary building code inspections and repairs, police and significant administrative, court and legal costs) related to various affected properties and neighborhoods;

- reduced property values on foreclosed properties and surrounding properties;

- lost property tax revenue on vacant or abandoned properties, and on foreclosed and surrounding properties as a result of lower home values;

- lost other tax revenues;

- lost recording fees as a result of the use of MERS to avoid such fees; and

- various other injuries resulting from the deterioration and blight to the hardest hit minority neighborhoods and communities.

138

375.     Such injuries arise from both the effect of the foreclosure process itself (lower home values and tax revenues) and from vacant or abandoned properties that either already have been foreclosed upon or are facing foreclosure (i.e., the shadow inventory of foreclosures) as a result of borrower defaults. Not surprisingly, the brunt of this injury is disproportionately suffered in Plaintiff's communities and neighborhoods with higher concentrations of FHA protected minority borrowers, however the harm has spread throughout Plaintiff's communities.

376.     Relying on data supplied by the Mortgage Bankers Association – a mortgage industry business association - the GAO found in November 2011 that high foreclosure rates correlate to increased numbers of home vacancies. *Vacant Properties, Growing Number Increases Communities' Costs and Challenges*, Report to the Ranking Member, Subcommittee on Regulatory Affairs, Stimulus Oversight, and Government Spending, Committee on Oversight and Government Reform, House of Representatives, GAO-12-34 (Nov. 2011) ("GAO").   For example, the GAO found that Chicago's overall vacancy rate increased from 7.50% in 2000 to 11.60% in 2010.

377.     As the GAO reported at page 20 of its report, "[a] nongovernmental organization in Chicago conducted additional surveys and research on the 18,000 properties in the Chicago Department of Building's list of vacant buildings and found that about 13,000 were associated with a foreclosure between 2006 and the first half of 2010."   The GAO continued at page 36 "that abandoned foreclosures were particularly prevalent on low-value properties and in distressed urban areas," including Chicago, and discussed in note 45 that "the vast majority of abandoned foreclosures were loans that involved . . . private label mortgage backed securities"— the type of mortgage backed securities packaged and sold by Defendants here.   Another study of

vacant properties in Chicago cited by the GAO "found that 69 percent of the over 18,000 vacant properties registered with the city were associated with a foreclosure filed between 2006 and the first half of 2010." GAO 12-34, at 45.

378.    The GAO also found in November 2011 that vacant and/or foreclosed properties have reduced prices of nearby homes between $8,600 to $17,000 per property, specifically citing a study estimating that "on a single block in a Chicago neighborhood, one foreclosed, demolished property may have reduced the values of 13 surrounding properties by $17,000 per property compared with the median house price in Chicago." GAO 12-34, at 45.

379.    Plaintiff has incurred out-of-pocket costs with respect to specific vacant foreclosure and pre-foreclosure properties secured by predatory, non-prime mortgage loans originated and/or acquired by Defendants on a discriminatory basis because, among other things, Plaintiff has been required to provide a variety of governmental services relating to such properties that would not have been necessary if such properties were occupied.

380.    In addition, Plaintiff has been required to shift its already overburdened personnel and operating resources (due to losses of property tax revenue also caused by Defendants' actions) to address problems created by the vacancies and foreclosures on properties that have secured Defendants' predatory and discriminatory loans. Defendants' predatory servicing and foreclosure activity occurring on a discriminatorily disproportionate level in Plaintiffs' minority communities has further exacerbated this.

381.    For example Plaintiff has sustained financial injuries for providing governmental services to such vacant homes that have not been cared for, have been vandalized and/or have provided a location for illegal activities, all leading to violations of Plaintiff's building code, including the creation of physically unsafe structures that threaten public safety. This, in turn,

140

has led to substantial personnel time and out-of-pocket costs incurred by Plaintiff's building code enforcement and legal functions having to inspect, investigate and respond to violations at such vacant properties that threaten public safety or address public health concerns; and taking legal action to investigate and prosecute building code violations at the vacant properties.

382.    The task of Plaintiff's legal function in identifying responsible parties in order to take legal action has been made all the more difficult, causing greater financial injury to Plaintiff, as a direct result of the difficulty in determining the identity of the correct owner of such non-prime mortgage loans.  This is because transfers and assignments of the loans were not properly recorded by Defendants, including its transferees, assignees, agents and/or trustees of the pools of loans that issued MBS secured by such non-prime loans.

383.    As another example, Plaintiff's police department has had to send personnel and equipment to such vacant properties to respond to public health and safety threats that arise at these properties because the properties are vacant.

384.    Using foreclosure property addresses, and Defendants' loan application registry, loan servicing and loan default and foreclosure information obtained from Defendants in discovery, Plaintiff can isolate out-of-pocket and lost revenue damages attributable to each individual property secured by a predatory non-prime loan issued by Defendants on the discriminatory bases alleged herein.

385.    A major source of Plaintiff's revenue is taxes on real property, particularly residential real estate. Such tax revenue depends on the valuation of the residential real estate in Plaintiff's jurisdiction.   The fair market value of the residential real estate in Plaintiff's jurisdiction has been adversely impacted by home vacancies and foreclosures on predatory and

discriminatory mortgage loans, particularly including those loans originated, funded, and/or purchased by Defendants at issue here.

386.     As a result of the predatory loan terms, higher loan costs, and reduced home equity resulting from Defendants' discretionary policies and practices, Plaintiff's communities and neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults and home foreclosures on the loans Defendants were responsible for.  This in turn caused a downward spiral of additional mortgage delinquencies, defaults, and home foreclosures in Plaintiff's communities and neighborhoods both with higher percentages of FHA protected minority borrowers as well surrounding areas that have lower percentages of FHA protected minority borrowers.

387.     As a primary result of Defendants' (and other industry participants') predatory lending and discriminatory equity stripping activities, Plaintiff's tax digests – representing the value of all property subject to tax – have declined by a total of approximately $52 billion from their high point in 2009.  Cook County's equalized assessed valuation of all real estate subject to tax was approximately $177.8 billion in 2009 and was last reported, as of the 2013 tax year, at approximately $125.6 billion.

388.     Much of this decline is due to the decline in the value of the residential real estate located in Plaintiff's communities as a result of the foreclosure crisis caused by Defendants' (and other industry participants') predatory lending activities.  The decline in Plaintiff's tax digests reflects a corresponding reduction in Plaintiff's tax receipts, budgets, and related reductions in Plaintiff's ability to provide critical services within Plaintiff's communities or an offsetting tax increase incurred throughout Plaintiff's communities at large.

389.     Routinely maintained property tax and other financial data allow precise calculation of the property tax revenues Plaintiff has lost as a direct result of Defendants' discriminatory equity stripping activities and the resulting property vacancies and foreclosures.

390.     Using well-established GPS mapping techniques that locate specific properties within census tracks, property addresses and mortgage lien and foreclosure data, and well-established statistical regression techniques, Plaintiff's damages attributable to lost property tax revenue (as a result of the drop in home value) on properties surrounding foreclosed properties relating to Defendants' discriminatory and predatory lending practices also can be calculated.

391.     Defendants are responsible for the percentage of Plaintiff's damages that equates to Defendants' percentage share of predatory, discriminatory mortgage lending and foreclosure activity in both its retail and wholesale operations in Plaintiff's communities. That share equates to the number of predatory and discriminatory mortgage loans Defendants are responsible for in Plaintiffs' communities and neighborhoods, and such loans Defendants have foreclosed upon or will foreclose upon in the future.

392.     Plaintiff also has been injured as a result of the frustration of the various purposes and missions of its departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for its residents at large. Plaintiff's authorities and departments also have been injured as a result of having to reallocate its human and financial resources away from their missions and purposes in order to address the foreclosure and home vacancy crisis caused in part by the discriminatory and predatory mortgage lending, servicing and foreclosure practices of Defendants.

143

393.    Plaintiff will continue to incur all of the above types of damages on properties that fall into disrepair, will become vacant and/or will be foreclosed upon that are secured by a non-prime loan for which Defendants are responsible.

394.    Although nationally there have been well over 6 million foreclosures since 2007, the foreclosure cycle relating to the bulk of the non-prime lending activity is far from complete, with millions more foreclosures likely to come nationwide and tens of thousands more foreclosures locally.

395.    In March 2010, CRL estimated that there were still "5.7 million borrowers . . . at imminent risk of foreclosure. . . . African American and Latino borrowers continue to be disproportionately at risk relative to non-Hispanic white borrowers."  D. Gruenstein, Bocian, W. Li and K. Ernst, "*Foreclosures by Race and Ethnicity: The Demographics of a Crisis*" (June 18, 2010) at 10.  CRL's data reflects such disparate impact across all income ranges for African American and Latino borrowers.  *See id.*

396.    Many of these homes are in the "shadow inventory," i.e., are vacant or are occupied with the homeowner seriously delinquent or in default of their mortgage, and foreclosure proceedings have not yet begun.  As reported in a November 2011 *Wall Street Journal* article, "*How Many Homes Are In Trouble?,*" industry estimates of housing units in the shadow inventory range up to 10.3 million (Laurie Goldman, Amherst Securities) with the low end of the range of 1.6 million housing units by CoreLogic (which relies on a lagging indicator of credit score to estimate loan performance and the probability of default).

397.    Nationally, home prices hit a near-decade low in February 2012, declining approximately 23% since 2007.  In mid-2012, Chicago home prices hit their lowest level in nearly 11 years and, despite some recent upward trend, continue to remain far below their high

point in 2006. As of January 2014, however, Standard & Poor's Rating Service estimated that nationally, the level of shadow inventory had increased slightly, with approximately 51 months of shadow inventory housing supply. In November 2013, CoreLogic's shadow inventory analysis revealed that at that time, although levels were the lowest since 2008, there remained 1.7 million properties in the shadow inventory, almost half of which were delinquent but had not yet begun foreclosure proceedings. Additional predatory mortgage loans continue to go into default, and will continue to do so, particularly with respect to adjustable rate mortgage loans.

398. Consequently, numerous additional delinquencies, defaults, and foreclosures on Defendants' equity stripping non-prime mortgage loans likely will occur, and Plaintiff is entitled to injunctive relief and the recovery of damages that are about to occur from Defendants' actions.

399. Academic studies -- prepared prior to the collapse in U.S. housing prices -- of the financial impact of foreclosures on communities such as Chicago reflect up to $34,000 in community wide damages resulting from *each foreclosure*. This includes actual governmental expenditures in the form of additional costs of services (police, fire, code enforcement, trash removal, property boarding up, inspections, etc.), losses of revenue (foregone property taxes and utility taxes) and losses in property value.

400. Based on recent, related academic studies, the average cost to Plaintiff for each foreclosure on a loan made by Defendants is approximately $19,000, with additional damages accruing as a result of deteriorated property values and harm to Plaintiff's communities and neighborhoods. As such, compensatory damages alone in this case may exceed $300 million given that Defendants are responsible – through direct originations or their wholesale channel of brokers and correspondent lenders – for at least approximately 26,000 higher cost predatory and discriminatory mortgage loans made within Plaintiff's communities and neighborhoods to

minorities and approximately 60% of those loans already have or can be expected to become delinquent, default and eventually be foreclosed upon.

401.    Because the total number of discriminatory, equity stripping, non-prime mortgages originated by Defendants, or for which Defendants are otherwise responsible, as well as the number of foreclosures related to such mortgages have been obfuscated and concealed through the securitization process and the use of MERS, discovery of all of Defendants' loan level data for loans made or purchased in Plaintiff's neighborhoods and communities may be necessary before a precise damages calculation can be made.

402.    Plaintiff's damages, resulting from its out-of pocket costs in providing additional governmental services, and its lost tax and utility revenue, relating to those properties secured by the predatory and discriminatory non-prime mortgage loans, originated, acquired and/or serviced by Defendants can be established from Plaintiff's records once the locations of the homes upon which such loans were made can be identified from discovery of Defendants.

403.    Plaintiff's damages, resulting from lower home values and other economic and non-economic injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities, can be established with statistical evidence and expert testimony.

## VII.    WELLS FARGO IS LIABLE FOR THE ACTS OF WACHOVIA AS A RESULT OF ITS MERGER WITH WACHOVIA

404.    On December 31, 2008, Wachovia merged into Wells Fargo & Company with Wells Fargo surviving the merger.

405.    In the merger, Wells Fargo exchanged 0.1991 shares of its common stock for each outstanding share of Wachovia common stock, issuing a total of 422.7 million shares of Wells

Fargo common stock with a December 31, 2008, value of $12.5 billion to Wachovia shareholders. Shares of each outstanding series of Wachovia preferred stock were converted into shares (or fractional shares) of a corresponding series of Wells Fargo preferred stock having substantially the same rights and preferences.

406.     Based upon its merger with Wachovia, as the surviving entity Wells Fargo is liable for the wrongful acts of Wachovia and its subsidiaries alleged herein, particularly including World Savings Bank, FSB.

407.     By virtue of the steps taken by Wells Fargo to consummate its acquisition of Wachovia, Wells Fargo also became the successor-in-interest to Wachovia and its subsidiaries.

408.     Wachovia ceased ordinary business on its own account soon after the transaction was consummated.

409.     Wells Fargo assumed the liabilities ordinarily necessary for the uninterrupted continuation of Wachovia's business.

410.     Wells Fargo assumed Wachovia's liabilities for violations of the Fair Housing Act, Wachovia's predatory and discriminatory lending, and for any other matter relating to Wachovia's and its predecessors' mortgage lending, securitization and servicing practices.

411.     There has been a continuity of ownership of Wachovia's assets between Wells Fargo and Wachovia and Wachovia's management, personnel, physical location, and general business operations have been continued by Wells Fargo.

## VIII.   CAUSE OF ACTION

412.     Plaintiff repeats and incorporates by reference all allegations contained in paragraphs 1 through 411 as if fully set forth herein.

413.    Defendants' acts, policies, and practices as alleged above constitute intentional discrimination (including through targeting, "reverse redlining" and "steering") on the basis of race, color, national origin and/or sex by intentionally targeting FHA protected minority borrowers (predominantly African-American, Hispanic and female borrowers) in Plaintiff's communities and neighborhoods for non-prime mortgage loans made on terms more unfavorable than similar loans made to non-minority borrowers and/or without regard to such minority borrowers' ability to repay such loans.

414.    Defendants' acts, policies, and practices as alleged above constitute intentional discrimination (including through targeting) on the basis of race, color, national origin and/or sex by intentionally targeting FHA protected minority borrowers (predominantly African-American, Hispanic and female borrowers) in Plaintiff's communities and neighborhoods for foreclosure activity on the non-prime mortgage loans Defendants' made on a discriminatory or predatory basis to minority borrowers.

415.    Defendants' acts, policies, and practices as alleged above also have had an adverse, disproportionate, and/or disparate impact on FHA protected minority borrowers in Plaintiffs' communities and neighborhoods because, among other things, of : (1) the relatively higher numbers and percentage of equity stripping, non-prime mortgage loans made to them; (2) the more unfavorable and higher cost terms of such loans; and/or (3) the resulting increased relative numbers of loan defaults, home vacancies, and foreclosures incurred by them; all as compared to the loans made to similarly situated non-minority borrowers and the numbers of foreclosures on such non-minority borrowers' homes.

416.    Defendants' discriminatory acts, policies, and practices as alleged above cannot be justified by business necessity, and could have been avoided through the use of alternative

business policies, practices or procedures that precluded the discriminatory treatment and discriminatory impact.

417.    The predatory and discriminatory discretionary pricing policies, underwriting practices, and foreclosure activities described herein individually and collectively constitute patterns or practices of discrimination because, as an integral part of the Defendants' equity stripping activities and mortgage banking business models, it was the standard operating procedure of Defendants that constituted the discriminatory treatment of, and/or had a disparate impact on, minority borrowers.

418.    Defendants' discriminatory acts, policies, and practices as alleged above are continuing and will continue until the last discriminatory, equity stripping, non-prime mortgage loan that Defendants originate, fund, purchase, and/or service is repaid and closed and/or is foreclosed upon.

419.    Individually, and/or collectively, Defendants' acts, policies, and practices as alleged above violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604 and 3605, in so far as they have:

- made and/or continue to make housing unavailable on the basis of race, color, national origin or sex in violation of 42 U.S.C. § 3604(a);

- provided and/or continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, color, national origin or sex in violation of 42 U.S.C. § 3604(b); and/or

- provided and/or continue to provide different terms, conditions and privileges on the basis of race, color, national origin or sex in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

420.    Defendants' published policies and statements relating to their acts, policies, and practices as alleged above also violate § 3604(c) of the Fair Housing Act in so far as they have

expressed and/or continue to express a preference on the basis of race, color, national origin or sex.

421.     Plaintiff has been, continues to be, and believes it will be in the future, adversely affected and harmed by Defendants' discriminatory acts, policies, and practices as alleged above.

422.     Plaintiff's injuries are continuing and will increase unless and until Defendants cease their equity stripping activities, including through their continuing mortgage servicing and foreclosure activities.  Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiff.

423.     Defendants' discriminatory acts, policies, and practices as alleged above were, and are, intentional and willful, and/or have been, and are, implemented with reckless disregard for Plaintiff's federally protected rights.

## IX.     DEMAND FOR JURY TRIAL

424.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1) enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 42 U.S.C. §§ 3604 and 3605;

(2) enter a permanent injunction enjoining Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce their illegal, discriminatory conduct described herein through the foreclosure process and directing Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the

effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3) award actual compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its injuries caused by the conduct of Defendants alleged herein;

(4) award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5) award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. §3613(c)(2); and

(6) order such other relief as this Court deems just and equitable.

Dated:  November 28, 2014

<div style="margin-left: 40%;">

ANITA ALVAREZ,
STATE'S ATTORNEY FOR COOK COUNTY

By: /s/ Daniel A. Dailey

James D. Montgomery, Sr.
James D. Montgomery, Jr.
John K. Kennedy
Daniel A. Dailey
Michelle M. Montgomery
JAMES D. MONTGOMERY and ASSOCIATES LTD.
One North LaSalle Street, Suite 2450
Chicago, Illinois, 60602
Phone: (312) 977-0200
Fax: (312) 977-0209
jmontgomery@jdmlaw.com
jamesjr@jdmlaw.com
jkennedy@jdmlaw.com
ddailey@jdmlaw.com
mmm@jdmlaw.com

</div>

James M. Evangelista (pending *pro hac vice*)
Jeffrey R. Harris (pending *pro hac vice*)
Darren W. Penn (pending *pro hac vice*)
David J. Worley (pending *pro hac vice*)
Leslie G. Toran (pending *pro hac vice*)
HARRIS PENN LOWRY LLP
400 Colony Square, Suite 900
1201 Peachtree Street, NE
Atlanta, GA  30361
Phone: (404)961-7650
Fax: (404)961-7651
jim@hpllegal.com
jeff@hpllegal.com
darren@hpllegal.com
david@hpllegal.com
leslie@hpllegal.com

**Special Assistant State's Attorneys**