# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| WELLS FARGO & CO., WELLS FARGO | ) | Case No. 1: 14-cv-09548 |
| FINANCIAL, INC., WELLS FARGO Bank, | ) | |
| N.A., and WELLS FARGO "John Doe" and | ) | Judge Gary Feinerman |
| WELLS FARGO "John Doe" CORPS 1-375, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Robert Y. Sperling
Joseph L. Motto
Christopher J. Letkewicz
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703

John T. Roache
Sara E. Fletchter
K&L GATES LLP
Three First National Plaza
Chicago, IL 60602-4207

Elizabeth P. Papez (admitted *pro hac vice*)
WINSTON & STRAWN LLP
1700 K Street NW
Washington, DC 20006
Phone: (202) 282-5678

Paul F. Hancock (*pro hac vice* application
pending)
K&L GATES LLP
200 South Biscayne Blvd., Suite 3900
Miami, FL 33131-2399

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF GROUNDS FOR DISMISSAL...................................1

BACKGROUND ...................................................................................................................4

RELEVANT LEGAL STANDARDS ........................................................................................7

ARGUMENT.........................................................................................................................8

I.  RES JUDICATA BARS THE COUNTY FROM CHALLENGING MOST OF THE
    LENDING PRACTICES ALLEGED IN THE COMPLAINT. ..........................................8

    A.  This Suit Arises Out of the Same Subprime Lending Activities the State of
        Illinois Fully Addressed in Its 2012 Consent Decree with Wells Fargo. ................8

    B.  The 2012 Consent Decree Is a Final Judgment for Res Judicata Purposes ...........10

    C.  The "Identity of Action" Requirement for Res Judicata Is Also Met Because
        This Suit Addresses the Same Lending Conduct as the 2012 Consent
        Decree. ................................................................................................................10

    D.  The State of Illinois Was In Privity with Cook County When the State
        Entered the 2012 Consent Decree with Wells Fargo. ...........................................12

II. TO THE EXTENT THE COUNTY'S CLAIMS SURVIVE RES JUDICATA,
    THEY MUST BE DISMISSED FOR LACK OF STANDING. ........................................14

    A.  The County Lacks Constitutional Standing to Bring This Suit. ............................15

    B.  The County Also Lacks Statutory Standing to Bring This Suit.............................18

III. DISMISSAL IS ALSO WARRANTED BECAUSE THIS SUIT IS UNTIMELY. .........23

    A.  The County Fails to Plead Any FHA Violations Since November 2012. ..............23

    B.  The Continuing Violation Doctrine Cannot Revive This Time Barred Suit. ........24

        1.  The County Does Not Adequately Plead a Continuing Violation. ............24

        2.  Even If "Pattern" of Acts the Complaint Describes Were a
            "Continuing Violation," It Would Not Save the County's Untimely
            Claims. ..................................................................................................26

IV. THE COMPLAINT SUFFERS FROM INCURABLE PLEADING DEFECTS..............28

CONCLUSION....................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*520 South Michigan Ave. Assocs., Ltd. v. Shannon,*
    549 F.3d 1119 (7th Cir. 2008) ..................................................................27

*A.B. ex rel. Kehoe v. Hous. Auth. of South Bend,*
    2011 WL 4005987 (N.D. Ind. Sept. 8, 2011) ..........................................28

*Abner v. Illinois Dept. of Transp.,*
    674 F.3d 716 (7th Cir. 2012) ....................................................................8

*Agolf, LLC v. Vill. of Arlington Heights,*
    946 N.E.2d 1123 (Ill. App. Ct. 2011) ...............................................12, 13

*Alschuler v. Dep't of Hous. & Urban Dev.,*
    686 F.2d 472 (7th Cir. 1982) ..................................................................21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).......................................................................... passim

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983).................................................................................14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...................................................................................8

*Brooks v. Ross,*
    578 F.3d 574 (7th Cir. 2009) ..................................................................30

*Burns v. Mundelein Bldg. Dep't,*
    1999 WL 965855 (N.D. Ill. Sept. 29, 1999) ..........................................17

*City of Birmingham v. Citigroup, Inc.,*
    2009 WL 8652915 (N.D. Ala. Aug. 19, 2009) .................................16, 17

*City of Cleveland v. Ameriquest Mortg. Sec. Inc.,*
    615 F.3d 496 (6th Cir. 2010) ..................................................................22

*City of Los Angeles v. Wells Fargo & Co.,*
    22 F. Supp. 3d 1047 (C.D. Cal. 2014) ..............................................18, 22

*City of Mattoon v. Mentzer,*
    668 N.E.2d 601 (Ill. App. Ct. 1996) .......................................................10

*City of Memphis v. Wells Fargo Bank,*
    2011 WL 1706756 (W.D. Tenn. May 4, 2011) .......................................16

*City of Miami v. Bank of Am. Corp.*,
  2014 WL 3362348 (S.D. Fla. July 9, 2014).) ..............................................................2, 3, 22

*City of Miami v. Wells Fargo & Co.*,
  No. 13-24508, slip op. (S.D. Fla. July 9, 2014) ...................................................................2

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013)..........................................................................................................7

*DeKalb Cnty v. HSBC N. Am. Holdings, Inc.*,
  2013 WL 7874104 (N.D. Ga. Sept. 25, 2013) .....................................................................18

*Denius v. Dunlap*,
  330 F.3d 919 (7th Cir. 2003) ...............................................................................................27

*DH2, Inc. v. SEC*,
  422 F.3d 591 (7th Cir. 2005) ...............................................................................................18

*Doe v. R.R. Donnelley & Sons Co.*,
  42 F.3d 439 (7th Cir. 1994) .................................................................................................24

*DT Apartment Grp., LP v. CWCapital, LLC*,
  2012 WL 6693192 (N.D. Tex. Dec. 26, 2012) ...............................................................19, 21

*Estate of Davis v. Wells Fargo Bank*,
  633 F.3d 529 (7th Cir. 2011) ...............................................................................................24

*Fergus v. Russel*,
  110 N.E. 130 (Ill. 1915).......................................................................................................13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)...............................................................................................................7

*Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*,
  382 F.3d 743 (7th Cir. 2004) ...................................................................................12, 13, 14

*Garry v. Geils*,
  874 F. Supp. 195 (N.D. Ill. 1995) ........................................................................................27

*Gilty v. Vill. of Oak Park*,
  919 F.2d 1247 (7th Cir. 1990) .............................................................................................29

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)..............................................................................................................24

*Hernandez v. Sutter W. Capital*,
  2010 WL 3385046 (N.D. Cal. Aug. 26, 2010) .....................................................................26

*Hope, Inc. v. Cnty. of Du Page*,
  738 F.2d 797 (7th Cir. 1984) ...................................................................16

*Hous. Opportunities Project for Excellence, Inc. v. Wedgewood Condo. Ass'n, Inc.*,
  2012 WL 4193969 (S.D. Fla. Sept. 19, 2012) ..........................................20

*Johnson v. Fairman*,
  1997 WL 137179 (N.D. Ill. March 24, 1997) ..............................................5

*Kaing v. Pultegroup, Inc.*,
  464 F. App'x 630 (9th Cir. 2011) ........................................................16, 18

*Kimbrew v. Fremont Reorganization Corp.*,
  2008 WL 5975083 (C.D. Cal. Nov. 17, 2008)............................................25

*Krieman v. Crystal Lake Apts. Ltd P'ship*,
  2006 WL 1519320 (N.D. Ill. May 31, 2006) .............................................27

*League of United Latin Am. Citizens (Lulac) of Wisconsin v. Deininger*,
  2013 WL 5230795 (E.D. Wis. Sept. 17, 2013)...........................................20

*Ledbetter v. Goodyear Tire & Rubber Co.*,
  550 U.S. 618 (2007)....................................................................................26

*Lewis v. Xerox Corp.*,
  1998 WL 160893 (N.D. Ill. Mar. 31, 1998)................................................25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014)........................................................................ passim

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..........................................................................3, 14, 15

*Mayor of Baltimore v. Wells Fargo Bank, N.A. (Baltimore I)*,
  677 F. Supp. 2d 847 (D. Md. 2010) ...........................................................15

*Mayor of Baltimore v. Wells Fargo Bank, N.A. (Baltimore II)*,
  2010 U.S. Dist. LEXIS 95812 (D. Md. Sept. 14, 2010) .............................18

*Mayor of Baltimore v. Wells Fargo Bank, N.A.. (Baltimore III)*,
  2011 WL 1557759 (D. Md. Apr. 22, 2011) ................................................16

*Moskowitz v. Trustees of Purdue Univ.*,
  5 F.3d 279 (7th Cir. 1993) .........................................................................26

*Nash Cnty. Bd. of Educ. v. Biltmore Co.*,
  640 F.2d 484 (4th Cir. 1981) ...............................................................12, 14

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002)............................................................................25, 26

*Nowak v. St. Rita High Sch.,*
    757 N.E.2d 471 (Ill. 2001) ...........................................................................11

*People ex rel. Barrett v. Finnegan,*
    38 N.E.2d 715 (Ill. 1941) .............................................................................13

*People ex rel. Hartigan v. E & E Hauling, Inc.,*
    607 N.E.2d 165 (Ill. 1992) ...........................................................................13

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979).....................................................................................28

*Plotkin v. Ryan,*
    1999 WL 965718 (N.D. Ill. Sept. 29, 1999) ...............................................17

*Pozzie v. U.S. Dep't of Hous. & Urban Dev.,*
    48 F.3d 1026 (7th Cir. 1995) .......................................................................17

*Retired Chicago Police Ass'n v. City of Chicago,*
    76 F.3d 856 (7th Cir. 1996) .........................................................................15

*River Park, Inc. v. City of Highland Park,*
    703 N.E.2d 883 (Ill. 1998)......................................................................10, 11

*Rummery v. Ill. Bell Tel. Co.,*
    2000 WL 343469 (N.D. Ill. Mar. 30, 2000)................................................30

*S.-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors,*
    935 F.2d 868 (7th Cir. 1991) .......................................................................29

*Shaikh v. City of Chicago,*
    2001 WL 123784 (N.D. Ill. Feb. 13, 2001) ................................................21

*Shanoff v. State of Ill. Dep't of Human Servs.,*
    258 F.3d 696 (7th Cir. 2001) .......................................................................26

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976).......................................................................................15

*Sinochem Int'l Co. v. Malay Int'l Shipping Corp.,*
    549 U.S. 422 (2007).......................................................................................7

*Soto v. City of West Chicago,*
    2010 WL 4810612 (N.D. Ill. Nov. 19, 2010) .............................................27

*Stevens v. Hous. Auth. of South Bend*,
   720 F. Supp. 2d 1013 (N.D. Ind. 2010) ...................................................................26

*Stewart v. CPC Int'l, Inc.*,
   679 F.2d 117 (7th Cir. 1982) ....................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).....................................................................................................8

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
   No. 13-1371, 135 S. Ct. 46 ( 2014).............................................................................2

*Thompson v. N. Am. Stainless, LP*,
   131 S. Ct. 863 (2011).................................................................................19, 20, 21, 22

*Tingley v. Beazer Homes Corp.*,
   2008 WL 1902108 (W.D.N.C. Apr. 25, 2008) .......................................................16

*Tomlinson v. Goldman, Sachs & Co.*,
   682 F. Supp. 2d 845 (N.D. Ill. 2009) .......................................................................27

*Trafficante v. Metro. Life Ins. Co.*,
   409 U.S. 205 (1972)...................................................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)..............................................................................................28

*Wards Cove Packing Co. v. Atonio*,
   490 U.S. 642 (1989)...................................................................................................28

*Watkins v. Chi. Hous. Auth.*,
   527 F. App'x 504 (7th Cir. 2013) .............................................................................26

*Whittaker v. St. Lucie Cnty. Sch. Bd.*,
   2011 WL 3424564 (S.D. Fla. Aug. 5, 2011)............................................................20

## STATUTES

775 ILCS 5/10-104 .........................................................................................................13

42 U.S.C. § 3601............................................................................................................12, 21

42 U.S.C. § 3601 *et seq.*................................................................................................ passim

42 U.S.C. § 3602(i)...........................................................................................................19

42 U.S.C. § 3604...............................................................................................................19

42 U.S.C. § 3604(a) ............................................................................................................4

42 U.S.C. § 3605 ........................................................................................................19

42 U.S.C. § 3605(a) ....................................................................................................4

42 U.S.C. § 3610 ......................................................................................................12

42 U.S.C. § 3610(f)(3)(a)..........................................................................................12

42 U.S.C. § 3613(a)(1)(A) ...........................................................................3, 19, 23

Chi. Mun. Code § 13-12-126 ....................................................................................27

Chi. Mun. Code § 13-12-127 ....................................................................................27

**OTHER AUTHORITIES**

Ill. Const. art. 5, § 15 ..............................................................................................12

Ill. Const. art. 7, § 6(i)..............................................................................................13

U.S. Const., art. III .......................................................................................... passim

**INTRODUCTION AND SUMMARY OF GROUNDS FOR DISMISSAL**

Plaintiff Cook County's Complaint recycles over 400 paragraphs of allegations from prior suits challenging decade-old mortgage practices to try to plead a single count of lending discrimination governed by a two-year limitations period. (Dkt. 1 (Compl. (Nov. 28, 2014).) The County claims that since 2002, the three named Wells Fargo defendants and 375 Wells Fargo "John Doe Corps." (together, "Wells Fargo") have violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), by engaging in a host of mortgage loan origination, servicing and investment activities that were either intentionally discriminatory or had a disparate impact on unidentified minority and women borrowers. (*See, e.g.*, Compl. ¶¶ 1-14, 412-23.) The County then asserts that it was the terms of these loans—rather than job loss, the recession, or the myriad other factors that affect loan repayments—that caused mortgage defaults and foreclosures that in turn depressed home values and reduced County revenues. (*E.g.*, *id.* ¶ 280.)

This suit presents unique grounds for dismissal because the Complaint's central claims (which independently fail for the standing, limitations and pleading reasons below) are barred by res judicata. The Complaint's principal support for its sole FHA claim is some 100 pages of generalized, anecdotal data on the disparate impact, (*see, e.g.*, Compl. ¶¶ 28-37, 147, 197-324, 334-67), of precisely the same subprime lending practices the Illinois Attorney General ("AG") challenged in a suit she brought as the representative of the people of Illinois and its political subdivisions in 2009. In 2012, Wells Fargo executed related state and federal consent decrees that fully resolved that suit and all legal claims that were or could have been brought on the challenged lending conduct. The Illinois consent decree resolves the Illinois AG's state law claims and expressly incorporates the remedial portions of the federal decree resolving parallel FHA claims the U.S. Department of Justice ("DOJ") brought against Wells Fargo, and was entered by the Cook County Circuit Court as a final judgment in July 2012. Under Illinois law,

1

that judgment bars the County from bringing duplicative challenges to the same lending conduct here, because allowing such claims for damages and injunctive relief would disregard the consent judgment and the carefully crafted requirements it imposes on Wells Fargo's already heavily-regulated national banking practices.  (*See* Compl. ¶¶ 14, 147, 269.)

Although res judicata at a minimum bars the Complaint's challenges to conduct before July 2009, this suit (or what remains of it) independently warrants dismissal on the three grounds the Southern District of Florida recently cited in dismissing a materially similar case.[1]

*First*, and assuming a pending Supreme Court decision does not place the County's disparate impact allegations beyond the FHA's reach entirely,[2] the connection between the challenged lending practices and the County's claimed injuries is far too attenuated to support constitutional or statutory standing to sue.  According to the County, the 378 Wells Fargo defendants violated the FHA by engaging in so-called "reverse redlining"—the alleged steering of minority or women borrowers into "predatory" loans associated with frequent defaults and ensuing foreclosures or other "equity stripping" remedies (*i.e.*, remedies that allow lenders to use equity in the borrower's property to satisfy the defaulted loan).  (*Id.* ¶¶ 1-14, 70, 287-90.)  The County then asserts that it was the supposedly discriminatory terms of these loans—rather than non-discriminatory high-cost loans or countless other factors that affect mortgage payments—that caused foreclosures that resulted in neighborhood blight and depressed home values that reduced county revenues.  (*See id.*)  This attenuated string of allegations does not plead the kind of "concrete" injury "fairly traceable" to Wells Fargo's conduct required for Article III and

---

[1] *City of Miami v. Wells Fargo & Co.*, No. 13-24508, slip op. at 1-2 (S.D. Fla. July 9, 2014) (attached as Ex. A) ("adopt[ing] and incorporat[ing]" the reasoning set forth in the order dismissing *City of Miami v. Bank of Am. Corp.*, 2014 WL 3362348 (S.D. Fla. July 9, 2014).)

[2] As Defendants explain in the stay motion filed concurrently with this brief, the pending decision in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, No. 13-1371, 135 S. Ct. 46 ( 2014), will decide whether disparate impact claims are cognizable under the FHA at all.

statutory standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As the Florida court correctly held, "proximate causation for standing is not adequately alleged" by such claims because they do not "isolate Defendants' practices as the cause of any alleged lending disparity," much less of alleged foreclosure, tax or other harms that could just as easily result from the "independent acts" of a "multitude of non-parties." *Miami*, 2014 WL 3362348, at *5.

*Second*, this suit is time-barred because the Complaint fails to plead any FHA violation within the Act's two-year limitations period, 42 U.S.C. § 3613(a)(1)(A), and the County's reliance on the "continuing violation" doctrine fails under controlling law. Beyond a handful of generic references to "Wells Fargo's mortgage lending in 2012 and 2013," (*e.g.*, Compl. ¶ 308), the Complaint's allegations of recent discrimination boil down to the conclusory assertion that between "January 2012 and December 2013, Wells Fargo, Wachovia and their affiliates originated at least 10,507 'high cost' and HFA [High Foreclosure Area] loans in Cook County in which they reported minority status." (*Id.* ¶ 326 (emphasis added).) But the same paragraph concedes that 99% of these loans were made on prime or otherwise non-predatory terms. (*Id.*) This recent HFA data thus undercuts the County's otherwise "threadbare" assertions of discriminatory lending since 2012. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Complaint attempts to avoid this fatal flaw by asserting that the "continuing violation" doctrine allows the County to bootstrap its current claims onto the subprime lending allegations it recycles from prior suits, including the consent decrees that preclude this action. (*See, e.g.*, Compl. ¶¶ 14, 71, 96, 148, 151, 244, 245, 269-274, 277, 328, 418.) This claim fails because neither the continued servicing of pre-2012 loans nor Defendants' current (federally-regulated and approved) lending programs "continue" allegedly unlawful subprime practices. It is well settled that an FHA claim involving a loan accrues when the loan closes and that any

FHA challenge to that loan must be filed within two years of closing. The County's unsupported servicing theory would improperly convert this two-year limitations period into a period of decades (the life of the loan). And the County's unsupported assertion that Wells Fargo is using current programs to engage in unlawful subprime lending by another name, under the noses of a host of state and federal regulators, is the definition of "implausible." *Iqbal*, 556 U.S. at 679.

*Finally*, dismissal is warranted because the Complaint suffers from incurable pleading defects. To the extent they are not barred on the grounds above, the County's disparate impact claims do not allege the requisite causal connection between specific Wells Fargo programs, disparate impact on protected communities, and harm to the County. The County's intentional discrimination claims fare no better. The paragraphs on race-conscious marketing reflect outreach expressly contemplated under the Community Reinvestment Act. And the allegations of "reverse redlining," (Compl. ¶¶ 288-303), do not plead facts showing that Defendants targeted minority or women borrowers "because of" their race or gender. 42 U.S.C. §§ 3604(a), 3605(a). At most, they identify statistical data equally consistent with lending on the basis of socio-economic factors (like credit worthiness) that legitimately relate to loan qualifications. Loans made "because of" such factors, or what the Complaint derisively describes as Wells Fargo's "profit motives," are not evidence of intentional race or gender discrimination.

For any or all of the foregoing reasons, the Court should dismiss this suit.

## BACKGROUND

*Prior Actions and Consent Decrees.* The FHA (disparate treatment and disparate impact) claims the County asserts in this case are grounded in subprime lending and other

4

purportedly "predatory" practices that have been addressed in a host of prior civil actions[3] including the federal and Illinois suits and ensuing consent decrees that bar the County's duplicative claims here. *See Illinois v. Wells Fargo Bank & Co., et al.*, 09 CH 26434 (Ill. Cir. Ct., July 12, 2012) ("completely and fully resolving" the Illinois AG's challenge to Wells Fargo's allegedly discriminatory lending practices in Cook County and elsewhere) ("Ill. Consent Decree") (attached as Ex. B); *United States v. Wells Fargo Bank, N.A.*, No. 1:12-cv-01150-JDB (D.D.C., July 12, 2012) (resolving FHA allegations challenging the same purportedly discriminatory conduct the Illinois AG resolved in the Illinois Circuit Court suit) (attached as Ex. C); *United States v. Bank of Am. Corp. et al.*, No. 1:12-cv-00361-RMC (D.D.C. Apr. 4, 2012) (resolving deceptive practices claims arising out of allegedly unfair lending practices and allegedly false certification of HUD-eligible loans) (attached as Ex. D).[4] Although the Complaint relies heavily on the allegations resolved in the foregoing federal decrees, (*e.g.,* Compl. ¶¶ 269-77),[5] it barely mentions the 2012 Illinois consent decree that operates as res judicata on the duplicative claims here. *See* Part I *infra*; (Compl. ¶ 182) (vaguely alluding to a "complaint filed in a separate action brought by the Illinois Attorney General against Wells Fargo in Illinois state court").

    ***The County's Current Suit.*** As noted, the County's sole claim is that Wells Fargo

---

[3] *See City of Miami*, slip op. at 1-2 (dismissed with prejudice), *on appeal,* No. 14-14544 (11th Cir. Oct. 20, 2014); *City of Miami Gardens v. Wells Fargo & Co.*, 14-cv-22203 (S.D. Fla.) (dismissed with leave to amend but stayed pending appeal in *City of Miami* (11th Cir.)); *City of Los Angeles v. Wells Fargo & Co.*, No. 2:13-CV-9007 (C.D. Cal.) (in discovery); *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857-STA (W.D. Tenn. 2011) (settled); *Mayor of Baltimore v. Wells Fargo Bank, N.A.*, No. JFM-08-62 (D. Md.) (settled after initial dismissals); *DeKalb Cnty. v. HSBC N. Am. Holdings, Inc.*, No. 1:12-CV-03640-SCJ, (N.D. Ga.) (in discovery).

[4] The Court may take judicial notice of these consent decrees. *See, e.g.*, *Johnson v. Fairman*, 1997 WL 137179, at *4 (N.D. Ill. March 24, 1997).

[5] The Complaint here also echoes the complaints in two other FHA suits the County has recently filed in this District. *See Cnty. of Cook v. HSBC N. Am Holdings, Inc et al.*, No. 1:14-CV-02031 (N.D. Ill. March 31, 2014) (Lee, J.) (motion to dismiss pending); *Cnty. of Cook v. Bank of Am. Corp. et al.*, 1:14-CV-02280 (N.D. Ill. March 31, 2014) (Bucklo, J.) (motions to stay and dismiss pending).

engaged in a host of race and gender discriminatory residential mortgage origination, servicing and investment activities in violation of the FHA. (Compl. ¶¶ 412-24.) The allegations are directed principally at the mortgage origination practices of 378 Wells Fargo entities, 375 of which are unnamed "Doe Corporations." The County alleges that Wells Fargo violated the FHA in two ways. First, it alleges that Wells Fargo's lending practices involved disparate treatment of (*i.e.*, intentional discrimination against) women and minority borrowers. (*Id.* ¶¶ 75, 146, 417.) Second, the Complaint alleges that Wells Fargo's profit-driven "predatory" lending practices had a disparate impact on these borrowers. (*See id.* ¶¶ 4, 7, 287-88, 325, 417.) Specifically, the Complaint alleges that beginning in 2000, and peaking in 2004-2007, Wells Fargo and other industry participants engaged in so-called "reverse redlining" by targeting these borrowers in originating, purchasing or funding "high cost,"[6] "subprime," or "predatory" loans. (*See id.*)

The County does not purport to be a direct victim of these allegedly discriminatory practices. Rather, it asserts "aggrieved person" status under the FHA on the theory that the challenged loans to County residents resulted in defaults and foreclosures that in turn led to property vacancies and neighborhood blight that caused economic injury to the County. (*See, e.g.*, ¶¶ 1-14, 45, 48-49, 56-58, 60, 219, 333, 407.) Specifically, the County asserts that Defendants' reverse redlining of "predatory" or "equity stripping" loans caused a domino effect of defaults, foreclosures, property vacancies and neighborhood deterioration that caused: (1) diminution in county property values and tax assessments; (2) an alleged increase in the cost of governmental services for foreclosed or abandoned properties; and (3) lost recording fees. (*E.g.*,

---

[6] The Complaint appears to use the term "high cost" loan to reference loans that the Federal Reserve in 2004 required lenders to report if "the annual percentage rate cost of borrowing on such loans, including up-front points and fees, exceeded certain threshold percentage points levels above reported yields for U.S. Treasury securities of comparable maturities." (Compl. ¶ 29.) But the Complaint does not cite any federal or other regulations defining these loans as "predatory," much less unlawful.

*id*. ¶¶ 11, 364-403.)[7]  The County concedes that these alleged economic losses are not uniquely traceable to Wells Fargo, (*id.* ¶¶ 70, 387), but contends that Wells Fargo is responsible for the percentage of damages that "equates to [its] percentage share of predatory mortgage lending activity."  (*Id*. ¶ 391.)  In making these claims, the County relies almost entirely on alleged conduct from 2003 to 2009 that is already comprehensively addressed in the Wells Fargo consent decrees described above.  (*See, e.g.*, *id*. ¶¶ 148, 151-52, 291-307.)

## RELEVANT LEGAL STANDARDS

 Article III of the United States Constitution limits "federal-court jurisdiction to actual case or controversies," which exist only where plaintiffs have "standing to sue."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (internal citations and quotations omitted). "[T]o satisfy Article III's standing requirements" the County must show, among other things, "a concrete and particularized . . . injury" that "is fairly traceable to the challenged action of the defendant."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000).  Failure to satisfy these requirements compels dismissal, because "[w]ithout jurisdiction the court cannot proceed at all in any cause."  *Sinochem Int'l Co. v. Malay Int'l Shipping Corp*., 549 U.S. 422, 431 (2007) (internal citations and quotations omitted).

 Where a plaintiff seeks relief under a federal statute, the plaintiff must also establish statutory standing because courts must "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  And even where a plaintiff has standing, dismissal is

---

[7] The County also vaguely alludes to "various other injuries resulting from the deterioration and blight" of certain neighborhoods, but provides no details on the nature of those alleged injuries.  (*Id*. ¶ 374.)

warranted where the complaint fails to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (internal quotation omitted), and in deciding a motion to dismiss may consider materials cited in the Complaint or subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

**I.    RES JUDICATA BARS THE COUNTY FROM CHALLENGING MOST OF THE LENDING PRACTICES ALLEGED IN THE COMPLAINT.**

The conduct the County challenges in this (otherwise untimely and inactionable) suit is not merely conduct that it could have challenged years ago;  it is conduct that the Illinois AG actually did challenge and address in a 2012 consent decree with Wells Fargo that bars the duplicative assertion here of any claim that "was raised or could have been raised" in the earlier suit. *E.g.*, *Abner v. Illinois Dept. of Transp.*, 674 F.3d 716, 720 (7th Cir. 2012).

**A.    This Suit Arises Out of the Same Subprime Lending Activities the State of Illinois Fully Addressed in Its 2012 Consent Decree with Wells Fargo.**

In July 2009, the Illinois AG filed an action on behalf of the "People of the State of Illinois" claiming that Wells Fargo violated state anti-discrimination laws by (1) "steering African Americans, Latinos and residents of predominantly African American and Latino neighborhoods into high cost subprime or riskier mortgage loans while White borrowers with similar incomes received lower cost or less risky mortgage loans;" and (2) "targeting minorities or residents of minority neighborhoods for abusive and unfair home mortgages." (*Illinois v. Wells Fargo & Co.*, 09 CH 26434, at 2 (Ill. Cir. Ct., July 31, 2009) ("Ill. AG Compl.") (attached as Ex. E). The AG's factual allegations focused on Wells Fargo's subprime lending practices and their alleged connection to defaults and foreclosures in Cook County. (*See id.* ¶¶ 190-95.)

8

Specifically, the AG alleged that "foreclosure filings in Cook County are concentrated in areas where there was a high percentage of high cost lending," and that "foreclosure filings in Cook County are also concentrated in minority census tracts." (*See id.* ¶¶ 193-94.)

Based on these allegations and statistical data concerning mortgage default and foreclosure rates in Cook County, (*see, e.g.*, *id.* ¶¶ 54-56), the Illinois AG claimed that Wells Fargo engaged in unlawfully discriminatory lending practices that caused precisely the same kind of injuries the County alleges here. (*Compare id.* ¶¶ 52-53 (asserting that the challenged lending practices and associated foreclosures caused Cook County properties to "stand vacant" and contribute to "significant blight" that "result[ed] in further damage to home values in the area") and *id.* ¶ 61 (alleging that "plummeting property values mean a shrinking tax base" that will negatively impact "governmental services" and harm "[l]ocal governmental authorities" during a period of already "staggering budget shortfall[s]") *with* Compl. ¶ 11 (asserting "direct and indirect financial harm" in the form of "erosion of Plaintiff's tax base, the loss of property tax revenue, out-of-pocket costs relating to abandoned or vacant properties, the loss of certain intangible property recording fee income and other financial harm due to urban blight").

The AG's lawsuit against Wells Fargo was resolved in a July 12, 2012 consent decree that was entered in conjunction with (and attached as Exhibit A) a DOJ decree resolving parallel federal FHA claims challenging the same alleged "pattern or practice of discrimination" in mortgage lending and related activities the County challenges here. (*See generally* Ill. Consent Decree.) The dual consent decrees provided monetary relief to Wells Fargo borrowers in Cook County under provisions requiring that "no less than eight million dollars ($8,000,000) will be distributed to allegedly aggrieved persons who lived in Illinois." (*Id.* ¶ 3.) And the Illinois consent decree specifically required Wells Fargo to: (i) "institute a new homebuyer assistance

9

program . . . [that] will include the Chicago-Naperville-Joliet" area, (*id*.); and (ii) provide additional funds that would be "distributed to Illinois consumers in accordance with the terms of . . . the United States Consent Decree" resolving the DOJ's FHA claims. (*Id*.) Wells Fargo and the Illinois AG, acting on behalf of the State and its political subdivisions, agreed that this relief would "*resolve fully and finally* all claims asserted in the complaint." (*Id*. ¶ 6 (emphasis added).)

Under Illinois law, res judicata applies when (1) there is a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of causes of action, and (3) there is an identity of parties or their privies. *See, e.g.*, *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998). All three elements of this test are satisfied here.

### B. The 2012 Consent Decree Is a Final Judgment for Res Judicata Purposes.

The first element of the res judicata inquiry is met because under Illinois law "a consent decree operates to the same extent for res judicata purposes as a judgment entered after contest and is conclusive with respect to the matters which were settled by the judgment or decree." *City of Mattoon v. Mentzer*, 668 N.E.2d 601, 606 (Ill. App. Ct. 1996). The Illinois decree was executed by, and is binding upon, all "People of the State of Illinois" as well as Wells Fargo Bank, N.A., Wells Fargo Home Mortgage, Wells Fargo Financial Illinois, Inc., and "their successors, assigns, predecessors, and any future acquired or created corporations or other business entities." (Ill. Consent Decree at 1.) The decree "resolve[s] fully and finally all claims asserted in the [AG's] Complaint," (*id*. ¶ 6), and was entered by the Cook County Circuit Court as a "final judgment" over which the Court "retain[ed]" enforcement jurisdiction. (*Id*. ¶ 9.)

### C. The "Identity of Action" Requirement for Res Judicata Is Also Met Because This Suit Addresses the Same Lending Conduct as the 2012 Consent Decree.

The second requirement for res judicata is also satisfied because Illinois applies a transactional test for claim identity that focuses on whether the facts supporting the prior and

current actions are similar. *See, e.g.*, *River Park*, 703 N.E.2d at 892. Where that is the case, Illinois's test for claim identity is met. *See Nowak v. St. Rita High Sch.*, 757 N.E.2d 471, 478 (Ill. 2001) (treating different legal theories of relief on same underlying facts as establishing claim identity for preclusion purposes). That is the case here.

As noted, the Illinois AG's complaint alleged that Wells Fargo "engaged in a pattern and practice of discrimination by placing African Americans, Latinos and residents of predominantly African American and Latino neighborhoods into subprime mortgage loans while White borrowers with similar incomes received prime mortgage loans." (Ill. Consent Decree at 2.) The complaint further alleged that "while originating subprime mortgage loans and consumer installment loans" in Illinois (including Cook County), Wells Fargo "engaged in unfair and deceptive business practices by misleading Illinois borrowers about their loan terms, misrepresenting the benefits of refinancing borrowers' loans, and repeatedly refinancing borrowers' loans without any real benefit to those borrowers." (*Id.*) The 2012 Illinois consent decree resolving these claims expressly incorporates the July 2012 DOJ consent decree resolving the parallel federal FHA claims the County extensively quotes in its Complaint:

> This Consent Decree is submitted jointly by the parties for approval of, and entry by, this Court concurrently with the filing of the United States' Complaint in *United States of America v. Wells Fargo Bank NA*, . . . alleging that certain Defendants who are also party to this case engaged in a *pattern and practice of conduct in violation of the Fair Housing Act*, 42 U.S.C. §§ 3601-19. . . .
>
> The United States Consent Order resolves the [FHA] matters alleged by the United States, together with the claims it raised in its Complaint. *The United States' Consent Order is attached [and] provides for relief that effectively encompasses and fully resolves all issues with respect to the relief sought by the Attorney General in this action.*

(*Id.* at 2-3) (emphasis added). The incorporation in the Illinois consent decree of the DOJ remedies "fully" resolving the same federal FHA claims the County raises here, (Compl. ¶¶ 147-

54), confirms the identity of claims in this suit and the 2009 Illinois AG action.

This identity is further evidenced by the fact that the state statute (the Illinois Human Rights Act) governing the 2009 Illinois AG action is virtually identical to the FHA. Pursuant to 42 U.S.C. § 3601, the HUD Secretary has certified the Illinois Human Rights Act as "substantially equivalent" to the FHA. *See id.* § 3610. To obtain such certification, Illinois was required to demonstrate to HUD that the state law protected the same "substantive rights" as the FHA, and allows the same "remedies," including the "availability of judicial relief." *Id.* § 3610(f)(3)(a). For all of these reasons, the claim identity requirement for res judicata is satisfied.

### D. The State of Illinois Was In Privity with Cook County When the State Entered the 2012 Consent Decree with Wells Fargo.

Finally, this case and the Illinois AG action involve an identity of parties or their privies. Although Cook County itself was not a party to the Illinois AG action, the County is a political subdivision that under Illinois law is considered to be in privity with the State in matters where: (1) the AG had authority to bring the earlier action on the County's behalf; (2) the County interests represented in the AG action were similar to the interests raised in the County's later action; and (3) the AG vigorously pursued those interests in litigating the prior action to judgment. *See, e.g.*, *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743 (7th Cir. 2004); *Nash Cnty. Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981); *Agolf, LLC v. Vill. of Arlington Heights*, 946 N.E.2d 1123, 1132 (Ill. App. Ct. 2011). Again, all three elements are satisfied here.

As a threshold matter, the Illinois AG specifically and properly alleged injury to the State's political subdivisions, including Cook County, in the 2009 suit against Wells Fargo. The 1970 Illinois Constitution recognizes the AG as the chief legal officer of the State endowed with all "duties and powers that may be prescribed by law." Ill. Const. art. 5, § 15. These powers

12

include all authorities conferred by statute and historically held by the English attorney general at common law. *See, e.g., People ex rel. Barrett v. Finnegan*, 38 N.E.2d 715 (Ill. 1941); *Fergus v. Russel*, 110 N.E. 130 (Ill. 1915). And the Illinois Supreme Court has held that these authorities include the power to bring suit on behalf of any state "political subdivision" even where it "may not have affirmatively authorized suit."[8] *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 170 (Ill. 1992) (internal quotations omitted). The exercise of this authority in the 2009 action was particularly appropriate because the Illinois legislature has empowered the AG to sue whenever the AG "has reasonable cause to believe that any person or groups of persons is engaged in a pattern and practice of discrimination." 775 ILCS 5/10-104. There is thus no question that the AG was authorized to represent the County's interests in challenging Wells Fargo's allegedly discriminatory lending activities.

There is also no question that the County interests the AG represented in the 2009 suit are similar to the interests the County asserts here. In Illinois, the overlapping interest component of the privity inquiry is satisfied where a party to a prior suit asserted and adequately represented the legal interests of a non-party. *See, e.g., Agolf*, 946 N.E.2d at 1132. Accordingly, a State that brings suit to challenge certain conduct on behalf of the public is considered to represent the interests of any subgroup that later challenges the same conduct. *See, e.g., Rivers*, 382 F.3d at 759. In *Rivers*, an environmental group filed a federal complaint challenging the same alleged Clean Water Act violations that the State of Wisconsin challenged in a separate suit. *See id.* at 750. The Seventh Circuit held that the State represented the group's interests and would be considered its privy as long as the State diligently prosecuted its case. *Id.* at 759. So too here.

---

[8] Cook County has the power to authorize suits on its behalf because it is a home rule county that may exercise, concurrently with the State, any power over which the General Assembly does not "limit the concurrent exercise or specifically declare the State's exercise to be exclusive." ILL. CONST. art. 7, § 6(i).

Last but not least, the AG vigorously represented the County's interests in addressing Wells Fargo's challenged lending practices. *See Rivers*, 382 F.3d at 759. That is apparent from the robust damages and injunctive relief set forth in the consent decree, which the DOJ approved in the course of resolving its own federal (and specifically FHA) challenges to the same alleged conduct. This case thus falls squarely within the line of precedents holding that for res judicata purposes, the State is considered in privity with its political subdivisions where the AG previously litigated to final judgment the same general conduct and local interests a political subdivision asserts in a later case. *See, e.g.*, *Biltmore*, 640 F.2d at 494-95 (holding that the North Carolina AG was in privity with individual school boards when the Attorney General filed suit to challenge conduct the boards contested in a later case).

For the foregoing reasons, the 2012 Illinois consent decree bars the County's duplicative claims here under the doctrine of res judicata. And the fact that Wells Fargo's current lending practices are now operating under these and other consent decrees, (*see, e.g.*, Compl. ¶¶ 13-14), as well as under a host of new and aggressive legislative and administrative mandates further confirms that the County should not be allowed to proceed with its stale and otherwise inactionable requests for damages and localized injunction against a broad swath of Wells Fargo's highly-regulated national banking practices.

## II.     TO THE EXTENT THE COUNTY'S CLAIMS SURVIVE RES JUDICATA, THEY MUST BE DISMISSED FOR LACK OF STANDING.

"[T]he judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983). To plead a justiciable dispute, the Constitution requires the County to allege a "concrete" injury "fairly traceable" to Wells Fargo's conduct. *Lujan*, 504 U.S. at 560-61. And the FHA requires the County to plead injuries that are "within the [Act's]

14

zone of interests" and were "proximately caused by" its alleged violation. *Lexmark*, 134 S. Ct. at 1390. This suit fails both of these requirements.

### A.     The County Lacks Constitutional Standing to Bring This Suit.

The County attempts to satisfy its burden of pleading a "concrete and particularized injury" that is "fairly traceable" to Wells Fargo's purported conduct, *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996), by alleging that the challenged lending practices caused harm in the form of "urban blight," "reallocation of Plaintiff's limited financial and human resources," "erosion of Plaintiff's tax base, [and] the loss of property tax revenue." (*E.g.*, Compl. ¶ 11.) These allegations are not sufficient for standing. The County's claims for unspecified lost "tax revenue" and "various other injuries," (*e.g.*, Compl. ¶¶ 374-375, 379-83, 392, 399-403), offer nothing more than the "unadorned speculation" the Supreme Court has held insufficient under Article III. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976). And the County's remaining assertions of reduced property tax revenues and higher municipal costs associated with foreclosed or abandoned properties are not supported by factual allegations that render these injuries "fairly traceable" to Wells Fargo's allegedly discriminatory lending. *Lujan*, 504 U.S. at 560-61; (Compl. ¶¶ 374-75, 385-91 (failing to identify specific vacancies caused by the challenged practices that allegedly harmed the County)).

This lack of specificity is inexcusable because the County possesses tax and other records that should enable it to detail the injuries it allegedly suffered here. *Compare Mayor of Baltimore v. Wells Fargo Bank, N.A. (Baltimore I)*, 677 F. Supp. 2d 847, 850-51 (D. Md. 2010) (dismissing complaint without prejudice for failure to allege "specific damages allegedly

suffered by the City in regard to specific houses that became vacant")[9] *with City of Memphis v. Wells Fargo Bank*, 2011 WL 1706756, at *9 (W.D. Tenn. May 4, 2011) (allowing complaint that identified 50 specific properties affected by the challenged loan practices).

To establish that its injury is "fairly traceable" to Wells Fargo's supposedly discriminatory lending practices, the County must plead that Wells Fargo's reverse redlining and other actions *caused* certain foreclosures to occur *and* that these foreclosures caused the County to suffer particularized injuries. *E.g.*, *Hope, Inc. v. Cnty. of Du Page*, 738 F.2d 797, 807 (7th Cir. 1984) (rejecting FHA claims because plaintiffs did not "allege or subsequently prove the causal connection between the County Board's activity and their asserted injury"). The County's Complaint does not meet this test because it does not plead facts that would rule out non-discriminatory causes of the foreclosure-related harms it alleges.[10]

It is well settled that mortgage defaults and foreclosures can result from "unemployment, health problems, a general weakening in the economy, [] other financial conditions" or "intervening decisions by" third parties that have nothing to do with race or gender discrimination. *See City of Birmingham*, 2009 WL 8652915, at *3; *Tingley v. Beazer Homes Corp.*, 2008 WL 1902108, at *4 (W.D.N.C. Apr. 25, 2008) (same); *accord Kaing v. Pultegroup, Inc.*, 464 F. App'x 630, 631 (9th Cir. 2011). The Complaint admits as much in acknowledging that economic factors like credit worthiness can result in the same "high cost" loan terms and

---

[9] The court allowed the lawsuit to proceed after Plaintiff filed a third amended complaint. *See Mayor of Baltimore v. Wells Fargo Bank, N.A.. (Baltimore III)*, 2011 WL 1557759 (D. Md. Apr. 22, 2011).

[10] These intervening factors issues also undercut the County's assertion that allegedly discriminatory loans were the cause of reduced government services. Reductions in the police and administrative services the County identifies, (*see* Compl. ¶¶ 413-16), are just as likely to result from conditions unrelated to Wells Fargo loans. *See, e.g.*, *City of Birmingham v. Citigroup, Inc.*, 2009 WL 8652915, at *4 (N.D. Ala. Aug. 19, 2009) ("[A]dditional costs for crime and fire prevention . . . could have been caused by any number of factors having nothing to do with the Defendants' alleged 'reverse redlining.'").

foreclosure risk the County associates with alleged race and gender discrimination. (*E.g.*, Compl. ¶ 149-50); *Pozzie v. U.S. Dep't of Hous. & Urban Dev.*, 48 F.3d 1026, 1030 (7th Cir. 1995) (discussing the HUD handbook's identification of borrower-specific reasons for default, including "[d]ecreases in family income caused by unemployment or underemployment; loss, reduction or delay in receipt of [government or private] benefit payments . . . ; loss of support payments; or other loss of income because of divorce, illness or death").[11] Yet the County fails to plead facts showing that its alleged injuries are more plausibly the result of alleged discrimination by Wells Fargo than any of these other factors. (Compl. ¶¶ 1-14, 368-411.)[12]

Accordingly here, as in a previously dismissed case against Citigroup:

> A series of speculative inferences must be drawn to connect the injuries asserted with the alleged wrongful conduct due to the fact that borrowers "could have defaulted on their mortgages for a number of reasons, none of which related to the Defendants' alleged 'reverse redlining.'"
>
> [Specifically it] is quite speculative that the depreciation in value of the neighboring homes in the [relevant locale] was caused by the foreclosures of minority borrowers' properties rather than as a result of a myriad of other factors, [including] . . . rising unemployment in the region, changes in the housing market, or other economic conditions. . . . The loss of tax revenue from property taxes and the increase in spending, like the depreciation in home values, [also] could have been caused by any number of factors having nothing to do with the Defendants' alleged "reverse redlining."

*City of Birmingham*, 2009 WL 8652915, at *1, 4 (holding that the "alleged injuries to the

---

[11] The speculative assertion that, for example, Defendants' "reverse redlining" will cause "approximately 60%" of "at least 26,000" loans to end up in foreclosure, ( Compl. ¶ 400), does not cure the plausibility problems with the Complaint's standing arguments. *See Plotkin v. Ryan*, 1999 WL 965718, at *4 (N.D. Ill. Sept. 29, 1999); *Burns v. Mundelein Bldg. Dep't*, 1999 WL 965855, at *3 (N.D. Ill. Sept. 29, 1999).

[12] The Complaint's assertion that discriminatory loans and foreclosures caused decreased tax revenues also fails to account for two additional facts: (1) that during the period alleged in the Complaint, "[f]oreclosure sales [we]re not taken into account when calculating fair cash value" of properties for tax assessment purposes, *see A Citizen's Guide to Your Property Tax Bill*, Cook Cnty. Comm'r, at 4 (excerpts attached as Ex. F); and (2) County tax revenues are only loosely based on assessed values because a host of exemptions reduce actual net revenue from property tax bills. *Id*. at 9 (specifying exemptions for long-time, senior, disabled, and other categories of homeowners).

[plaintiff] are too tenuously connected, and so not fairly traceable, to the Defendants' alleged misconduct" to support standing) (internal quotations omitted); *Mayor of Baltimore v. Wells Fargo Bank, N.A. (Baltimore II)*, 2010 U.S. Dist. LEXIS 95812, at *3 (D. Md. Sept. 14, 2010) (to have standing to sue for housing discrimination a government plaintiff must identify specific properties that were "(1) occupied before the sale facilitated by the 'bad' [] loans, and (2) would have remained occupied during the period for which the [government] claims damages."); *Kaing*, 464 F. App'x at 631 (same).[13]

Article III's "traceability" requirement requires that the County's claimed injuries be the result of "the challenged action[s] of the defendant[s], and not . . . th[e] result [of] the independent action of some third party not before the court." *DH2, Inc. v. SEC*, 422 F.3d 591, 597 (7th Cir. 2005) (emphasis added) (internal quotation and citation omitted). Because the Complaint does not plead particularized injuries that meet this test, dismissal is required. *See id.*

### B. The County Also Lacks Statutory Standing to Bring This Suit.

Even if the Complaint alleged a constitutionally cognizable injury (it does not), dismissal would be warranted for lack of statutory standing because here, as in the Florida suit, the asserted government injuries are "wholly derivative" of alleged discrimination against unidentified borrowers and the Complaint does not establish a "proximate causal connection" between the claimed discrimination and the County's harms sufficient to place its injuries within the "zone of interests" the FHA protects. *Lexmark*, 134 S. Ct. at 1388-89.

---

[13] Two courts have recently found standing in similar Fair Housing Act cases. *See City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047 (C.D. Cal. 2014); *DeKalb Cnty. v. HSBC N. Am. Holdings, Inc.*, 2013 WL 7874104 (N.D. Ga. Sept. 25, 2013). Wells Fargo respectfully submits that these decisions were incorrectly decided and are in any event distinguishable for various reasons, including that the courts found the claims timely. The Ninth Circuit has not adopted the Seventh Circuit's view that the continuing violation doctrine does not apply once the plaintiff is on notice of his claims, *see* Part III *infra*; and the *DeKalb* motion to dismiss did not show that the counties had such notice long before they filed suit.

The FHA provisions that govern this suit prohibit, respectively and in relevant part, "refusing to negotiate for the sale or rental of, or otherwise mak[ing] unavailable or deny[ing], a dwelling to any person because of race [or other enumerated characteristics]," and "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ." 42 U.S.C. §§ 3604-05. The County's claims do not arise directly under these provisions, but under the provision allowing "aggrieved persons"—*i.e.*, any person who "claims to have been injured" or "believes . . . will be injured by a discriminatory housing practice," *id.* § 3602(i)—to file suit. *Id.* § 3613(a)(1)(A).

Recent Supreme Court decisions hold that this admittedly broad language is constrained by statutory "zone of interests" and proximate cause principles that do not permit suits by every entity that asserts an Article III injury from a purported statutory violation. In *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 869-70 (2011), the Supreme Court held that the term "aggrieved person[]" in Title VII of the Civil Rights Act of 1964 (governing employment discrimination claims) "must be construed more narrowly than the outer boundaries of Article III." As the Court explained, the provision for suit by "aggrieved persons" was properly construed to "exclud[e] plaintiffs who might technically be injured in an Article III sense but whose interests are . . . so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* As several courts have since recognized, *Thompson*'s reasoning applies with equal force to the scope of statutory ("aggrieved person") standing under the FHA. *See, e.g.*, *DT Apartment Grp., LP v. CWCapital, LLC,* 2012 WL 6693192, at *15 (N.D. Tex. Dec. 26, 2012) ("[G]iven the Court's reasoning in *Thompson*, this Court concludes that it must apply the zone of interests test when addressing

whether FHA plaintiffs have standing."); *Hous. Opportunities Project for Excellence, Inc. v. Wedgewood Condo. Ass'n, Inc.*, 2012 WL 4193969, at *4-5 (S.D. Fla. Sept. 19, 2012) (same); *Thompson*, 131 S. Ct. at 870 (noting similarities between Title VII and the FHA).[14]

The Court elaborated on these points in *Lexmark*, which begins with the "presum[ption] that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" 134 S. Ct. at 1388 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The opinion then relates this inquiry to the settled principle that "the proximate cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct," *id.*, which is "ordinarily the case if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts." *Id.* (quoting *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268-269 (1992)). As the Court explained, the "[p]roximate cause analysis is controlled by the nature of the cause of action," and thus overlaps with the question "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 1390. Accordingly, "a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, [but] the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely *as a result* of the competitor's 'inability to meet [its] financial obligations.'" *Id.* at 1391 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)) (emphasis added).

The County's claimed injuries here fall squarely in the latter category—and thus fail to support statutory standing under *Thompson* and *Lexmark*—because they are at best downstream

---

[14] Courts have also applied *Thompson*'s "aggrieved person" analysis to other statutes containing that phrase. *See, e.g.*, *League of United Latin Am. Citizens (Lulac) of Wisconsin v. Deininger*, 2013 WL 5230795, at *2 (E.D. Wis. Sept. 17, 2013) (Voting Rights Act); *Whittaker v. St. Lucie Cnty. Sch. Bd.*, 2011 WL 3424564 (S.D. Fla. Aug. 5, 2011) (Rehabilitation Act).

"result[s] of" unidentified borrowers' "inability to meet their financial obligations," and as such are only "marginally related" to the FHA's goal of protecting individuals from discrimination and promoting integrated communities. *See* 42 U.S.C. § 3601 (FHA's stated purpose is "to provide, within constitutional limitations, for fair housing throughout the United States."); *Shaikh v. City of Chicago*, 2001 WL 123784, at *4 (N.D. Ill. Feb. 13, 2001) ("The overall purpose of the FHA is to further equal housing opportunity and to eliminate segregated housing") (internal quotations and citation omitted). As one court recently observed, the FHA's "zone of interests" is properly limited to economic injuries "proximately caused" by alleged discrimination, and to "particularized harm from a lack of interracial association." *DT Apartment*, 2012 WL 6693192, at *16 (denying statutory standing absent allegations of such harm).[15] That interpretation accords with *Thompson* and *Lexmark,* and avoids opening the door to an unlimited and crippling number of FHA suits by parties whose alleged injuries are far removed from the zone of (anti-discrimination and integration) interests the Act protects.

That the County's alleged injuries here fall outside this zone is apparent from the "purely derivative" nature of the injuries, *Lexmark* 134 S. Ct. at 1390; (*see* Compl. ¶ 11), the implausible and attenuated causal connections on which they depend,[16] the extent to which they fall outside

---

[15] *Contra Alschuler v. Dep't of Hous. & Urban Dev.*, 686 F.2d 472, 477 (7th Cir. 1982) (standing based on plausible allegations that challenged acts would "tip the racial balance of [plaintiffs'] neighborhood").

[16] To proceed with its claims, the County must plausibly allege and ultimately prove that: (1) the lending practices it challenges were not just "predatory" but unlawfully "discriminatory" in violation of the FHA; (2) the borrowers affected by the discriminatory loans could have obtained loans with better terms from Wells Fargo or other lenders; (3) the affected borrowers defaulted on their Wells Fargo loans *because of* their discriminatory terms rather than from job loss, illness, or any of the other myriad factors that impact loan repayments; (4) their loan servicers foreclosed on their loans because of these defaults; (5) these foreclosures (as opposed to innumerable socio-economic or other factors) caused property vacancies that resulted in neighborhood blight that depressed property values; and (6) this price depression proximately caused the decreased revenues and increased expenses the County claims as damages. As several courts have recognized, the County's claimed damages here could just as easily have resulted from

the Act's limitations period, and the fact that the damages the County seeks would not redress any specific housing discrimination. Indeed, even the injunctive relief the County seeks would at best duplicate, and at worst interfere with, relief that individual borrowers and the federal and Illinois governments have already obtained under consent decrees addressing lending discrimination and—more pointedly since the County's Complaint is focused primarily on "predatory" or "high-cost" practices—consumer protection statutes.[17]

Accordingly, even if the zone-of-interests test were coextensive with Article III limits, it "would not change the deficiencies in [the County's] allegations of proximate cause," and thus its lack of statutory standing under *Lexmark* and *Thompson*. *Miami*, 2014 WL 3362348, at *3 n.2; *see also Lexmark*, 134 S. Ct. at 1391 n.6 (proximate cause "must be adequately alleged at the pleading stage" and if "a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed" even if it alleges injuries that otherwise satisfy Article III's "fairly traceable" requirement for constitutional standing); *City of Cleveland v. Ameriquest Mortg. Sec. Inc.*, 615 F.3d 496, 504 (6th Cir. 2010) (dismissing with prejudice a municipal nuisance suit against a subprime lender because "the cause of the alleged harms is a set of actions (neglect of property, starting fires, looting, and dealing drugs) . . . completely distinct from the asserted misconduct (financing subprime loans)").

---

macroeconomic factors like the recession or intervening acts by third parties (for example, localized criminal activity or a factory closing in a particular reporting area). *See* Part II.A *supra*.

[17] The County will no doubt respond that it has statutory standing under a handful of recent decisions refusing to dismiss local government FHA suits against subprime lenders based on a trilogy of 1970s Supreme Court cases. *See, e.g.*, *City of Los Angeles*, 22 F. Supp. 3d at 1056-57 (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)). But these recent district court decisions are non-binding and distinguishable, *see, e.g.*, *supra* at 18 n.13, and *Thompson* itself described the relevant portions of the prior Supreme Court cases as "ill-considered" "dictum" to which the Court has "not adhere[d]." 131 S. Ct. at 869 (noting that *Trafficante* states only that "Title VIII was coextensive with Article III *insofar as tenants of the same housing unit that is charged with discrimination are concerned*") (emphasis in original).

## III.    DISMISSAL IS ALSO WARRANTED BECAUSE THIS SUIT IS UNTIMELY.

This suit also warrants dismissal under the FHA's two-year limitations provision, 42 U.S.C. § 3613(a)(1)(A), because: (i) the Complaint does not plead any FHA violations since November 2012; (ii) even if it did, these discrete acts would not permit the County to seek relief for alleged violations prior to that date; and (iii) the "pattern" of loan servicing, foreclosure and other lending activities the Complaint describes does not establish a "continuing violation."

### A.    The County Fails to Plead Any FHA Violations Since November 2012.

The gravamen of the County's complaint is that Wells Fargo discriminated against minority and women borrowers in the origination of "high cost" or "predatory" loans that resulted in defaults and foreclosures that purportedly caused economic harm to the County. (*See, e.g.*, Compl. ¶ 114.) But it is undisputed that Wells Fargo stopped originating subprime loans in 2008, and the Complaint does not adequately plead any unlawful originations in the two years preceding this suit. The County's only allegation of discriminatory originations since 2012 is the conclusory assertion that between "January 2012 and December 2013, Wells Fargo, Wachovia and their affiliates originated at least 10,507 'high cost' and HFA [High Foreclosure Area] loans in Cook County in which they reported minority status." (*Id.* ¶ 326 (emphasis added).) But as noted, the very same paragraph of the Complaint concedes that only 149 of these 10,507 loans are "high cost" loans originated to minority borrowers, which means that the remaining 99% are prime or otherwise unchallenged loans in geographic areas of concern to the County. (*Id.*) These allegations undercut the County's assertions of discriminatory loan originations after November 2012, which allegations otherwise lack factual support in the Complaint. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

The Complaint's failure adequately to allege any discriminatory originations within two

23

years of this suit is significant because an FHA claim for discriminatory loan origination accrues and begins to run from the date of closing.  *See, e.g.*, *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 532 (7th Cir. 2011).  Accordingly, the statute of limitations has long expired on all purportedly discriminatory subprime originations before November 28, 2012.  (*See* Compl. ¶¶ 28-37.)  And the Complaint does not allege facts showing that Wells Fargo engaged in race or gender discriminatory servicing or enforcement of any loans distinct from the allegedly discriminatory terms on which they were supposedly originated.  Accordingly, the Complaint does not adequately plead any independent FHA violations within the Act's limitations period.

### B.     The Continuing Violation Doctrine Cannot Revive This Time Barred Suit.

In an attempt to save its case, the County asserts that the time-barred originations that comprise the bulk of the Complaint were part of a "pattern" of discriminatory lending that the County can challenge under the "continuing violation" exception to the FHA's limitations period.  (*E.g.*, Compl. ¶ 9 (asserting that "Defendants' FHA violations continue to this very day and have not terminated because Defendants continue to service and foreclose on the discriminatory loans for which they are responsible").)  This argument fails for several reasons.

#### 1.     The County Does Not Adequately Plead a Continuing Violation.

The continuing violation exception applies only where there is an adequately pled "violation *during the limitation period* that can serve as the anchor for the earlier conduct."  *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982).  The Complaint fails to plead any such violation for the reasons above.  But even if it did, the post-November 2012 conduct it describes would not allow the County to recover for allegedly discriminatory originations before November 2012.  The Supreme Court recognized the continuing violation exception to the FHA's limitations period in *Havens* to save a cause of action for residents who were deprived of the ability to live in an

integrated neighborhood *and* who timely challenged FHA violations that perpetuated that same harm. 455 U.S. at 381. The Court refused to apply the doctrine to claims by other individuals who asserted conduct within the limitations period that did not perpetuate harms associated with discrete earlier violations. *Id*. Thus, under *Havens*, the continuing violation doctrine cannot save acts outside the limitations period that are discrete from recent conduct supporting timely claims for the same harm. *Id*.; *see also Kimbrew v. Fremont Reorganization Corp.*, 2008 WL 5975083, at *3-4 (C.D. Cal. Nov. 17, 2008) (rejecting continuing violation claims under *Havens*).

The Supreme Court reaffirmed this point in the employment discrimination context, observing that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts" that occurred within the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002) ("discrete acts" are those that are "separate[ly] actionable" such as "termination, failure to promote, denial of transfer, or refusal to hire"). This principle requires dismissal here for two reasons. First, the pre-2012 originations that serve as the primary basis for the Complaint are not "related" to the originations it (inadequately) alleges in 2012 and 2013. The pre-2012 originations are "discrete" and "easy to identify" acts that started the two-year clock under the cases above, and the Complaint does not plead any facts supporting its implausible assertion that these time-barred originations are "related" to current loans because Wells Fargo's currently lending programs simply perpetuate allegedly unlawful subprime lending by another name. *See, e.g.*, *Lewis v. Xerox Corp.*, 1998 WL 160893, at *6 (N.D. Ill. Mar. 31, 1998) (no continuing violation because untimely acts related to "earlier time periods, different forms of discrimination, and different [] employees").

Second, *Morgan* and related cases prohibit the County from challenging time-barred, pre-limitations conduct based on its supposed "relationship" to "ongoing" origination, servicing or

foreclosure activities. For the reasons above, pre-November 2012 originations are "discrete" acts that cannot support a continuing violation based on their relationship to current conduct. And the "servicing" or "foreclosure" of purportedly discriminatory pre-limitations loans are at most continuing *effects* of the time-barred originations, and thus are *not* events that can extend the limitations period on a cause of action arising out of earlier claims. *See supra*; *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 625-28 (2007) (finding Title VII claim untimely because limitations period turned on when the alleged discriminatory practice occurred, not when its effects were felt).[18] As the Seventh Circuit recently reaffirmed, "[l]ingering effects of old injuries do not count under [the continuing violation] doctrine." *Watkins v. Chi. Hous. Auth.*, 527 F. App'x 504, 506 (7th Cir. 2013).

### 2. Even If "Pattern" of Acts the Complaint Describes Were a "Continuing Violation," It Would Not Save the County's Untimely Claims.

The County's attempt to avoid the time bar on its claims also fails under circuit law holding that even where a plaintiff adequately pleads a "continuing violation," the limitations period begins to run as soon the underlying conduct "becomes sufficiently palpable that a reasonable person would realize" he had a claim, because the doctrine does not exist to allow a plaintiffs aware of their claims to "procrastinate" in filing them. *Shanoff v. State of Ill. Dep't of Human Servs.*, 258 F.3d 696, 703 (7th Cir. 2001); *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 282 (7th Cir. 1993) (plaintiff "may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one."). These precedents

---

[18] *See also Stewart v. CPC Int'l, Inc.*, 679 F.2d 117, 122 (7th Cir. 1982) (rejecting application of continuing violation theory because "perpetuating the harm done by a past discriminatory practice" is not itself unlawful); *Stevens v. Hous. Auth. of South Bend*, 720 F. Supp. 2d 1013, 1027 (N.D. Ind. 2010) (same); *Hernandez v. Sutter W. Capital*, 2010 WL 3385046, at *3 (N.D. Cal. Aug. 26, 2010) (servicing of allegedly discriminatory loans was not a continuing violation because "the payments Plaintiff made pursuant to the loans were effects of any violation, not new violations in their own right").

independently preclude the County from pursuing any of the pre-2009 conduct the Complaint describes, because the County was plainly on notice of the conduct by 2008 when the subprime crisis became well publicized and Cook County and other governments began investigating subprime lending and filing civil actions challenging the same Wells Fargo practices the County now improperly and untimely challenges here. *See supra* (describing 2008 suits);[19] *Krieman v. Crystal Lake Apts. Ltd P'ship*, 2006 WL 1519320, at *5 (N.D. Ill. May 31, 2006); *Soto v. City of West Chicago*, 2010 WL 4810612, at *6 (N.D. Ill. Nov. 19, 2010). The County's access to the decade of public HMDA and other data the Complaint cites as purported evidence that Wells Fargo's subprime lending business constituted an FHA violation "on its face," (Compl. ¶¶ 302, 323), further shows that the County's claims were discoverable more than 10 years ago.[20] And regardless, the County undeniably had actual notice of its claims when the Illinois AG filed suit in Cook County in 2009, and again when the County's own circuit court entered the July 2012 consent decree resolving that suit and incorporating the DOJ's resolution of parallel FHA claims.

---

[19] *See also, e.g.*, Cook Cnty. Bd. of Comm'rs Resolution, 08-R-37 (Jan. 9, 2008) (finding that "foreclosure rates of homes in Cook County . . . [are] rapidly increasing" and that Congress has not addressed the "larger issue of fraudulent loans, and loans issued to people who cannot repay loans 'reset' at dramatically higher rates") (attached as Ex. G); Cook Cnty. Bd. of Comm'rs Meeting, Item #4 (Sept. 17, 2008) (proposed resolution finding that the foreclosure crisis should be addressed by the "mortgage lenders, predatory and otherwise, who have contributed to the mortgage and foreclosure crisis . . . .") (attached as Ex. H); Chi. Journal of the Proceedings, at 115962-63 (April 13, 2011) (finding foreclosures are "devastating for neighborhoods because [they] depress home values, weaken the tax base, breed crime, and drive up governmental costs as municipalities bear the burden of securing and maintaining these properties") (attached as Ex. I); Chi. Journal of the Proceedings, at 18220-22 (Dec. 14, 2011) (citing the GAO report findings set forth in paragraphs 410-12 of the Complaint) (attached as Ex. J); Chi. Mun. Code §§ 13-12-126, 13-12-127 (Chicago vacancy ordinance placing additional responsibilities on mortgage servicers) (attached as Ex. K). These documents are judicially noticeable. *See infra* at n.20.

[20] This data is judicially noticeable. *See 520 South Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1137 n.14 (7th Cir. 2008) ("A court may "take judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies . . . ."); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (government website); *Garry v. Geils*, 874 F. Supp. 195, 198 n.5 & n.6 (N.D. Ill. 1995) (public court documents); *Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 846 n.2 (N.D. Ill. 2009) ("news releases and articles").

For all the foregoing reasons, this case should be dismissed as time-barred just as the Southern District of Florida recently dismissed the case in Miami.

## IV.   THE COMPLAINT SUFFERS FROM INCURABLE PLEADING DEFECTS.

Last but not least, the Court should dismiss the Complaint because both its disparate impact and disparate treatment claims are inadequately pled.   As noted, the Complaint's disparate impact allegations may be beyond the FHA's reach entirely.  *See supra* at 2 n.2.  But even if they are cognizable and not otherwise barred, they fail to state a claim as a matter of law because they do not "isolat[e] and identify[] the specific . . . [Wells Fargo] practices that are allegedly responsible for [the] observed statistical disparities."  *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989) (internal quotations and citation omitted), *superseded by statute on other grounds*, *see* Pub. L. No. 102-166, 105 Stat. 1071 (1991).   Allowing the Complaint to proceed absent such allegations would improperly subject Wells Fargo to "being potentially liable for the 'myriad of innocent causes that may lead to statistical imbalance in" residential lending.  *Id*. at 657.   Further, and to the extent the Complaint's disparate impact allegations depend on purported "discretion[]" in loan pricing, (*e.g*., Compl. ¶ 386), the claims disregard the Supreme Court's declaration in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), that allowing such discretion is "a very common and presumptively reasonable way of doing business" that should "itself raise no inference of discriminatory conduct."  *Id*. at 2554.

The County's disparate treatment claims fare no better, because they are not supported by the requisite factual allegations of "discriminatory intent."  *E.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (equating "[d]iscriminatory purpose" with a decision-maker who acts "'because of,' not merely 'in spite of,' [the] adverse effects upon an identifiable group"); *A.B. ex rel. Kehoe v. Hous. Auth. of South Bend*, 2011 WL 4005987, at *4 (N.D. Ind. Sept. 8, 2011) ("Intent to discriminate is an essential element of [plaintiff's] disparate treatment claims under

the FHA . . . .").  To proceed with such claims, the County must plead facts showing that Wells Fargo made the challenged loans "*because of*" the affected borrowers' race or gender as opposed to facially neutral but potentially correlative factors like their credit worthiness.  *E.g.*, *S.-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 883 (7th Cir. 1991).

The Complaint does not come close.  Most of the paragraphs that reference race-conscious (as opposed to economic or "profit-driven") decision-making focus on marketing outreach expressly contemplated by a federal statute.  (Compl. ¶¶ 160-96; *see also id.* ¶¶ 179-80 & n.11 (discussing the relationship between the challenged marketing efforts and the outreach sanctioned by the Community Reinvestment Act, 12 U.S.C. §§ 2901, 2907).)  And only two of the Complaint's 424 paragraphs directly allege intentional discrimination.  (*Id.* ¶¶ 75, 146 (asserting that minority borrowers were deliberately "steered" into "high-cost," foreclosure-prone loans)).  These paragraphs do not meet the County's pleading burden because their conclusory assertions of discriminatory intent are unsupported by factual allegations showing that any specific borrower, "despite being qualified [for a prime loan], was rejected" and placed in a "predatory" loan "*because of*" her race or gender.  *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1251 (7th Cir. 1990) (emphasis added); (*see* Compl. ¶¶ 288-303).  That is not surprising, because the Complaint itself illustrates that the allegedly "predatory" or "equity-stripping" conduct the County challenges was *not* undertaken "because of" borrowers' race or gender.

The County repeatedly asserts that the "predatory" lending it challenges was motivated by Wells Fargo's "intent to maximize corporate profits," and simply declares that this conduct had the foreseeable "result" of concentrating high-cost lending and its consequences among minority and women borrowers.  (*E.g.*, Compl. ¶ 159.)  But as the Complaint concedes, such borrowers "typically" have "less access to traditional credit, limited credit histories, lower

incomes, homes with lower values" and "higher personal debt to income ratios" than other borrowers. (*Id.* ¶ 157); (*see also id.* ¶ 70 (citing studies that describe modern high-cost lending patterns as driven by lenders' profit motives and the "deregulation of markets"—*not* by intentional race or gender discrimination in current loan practices). The Complaint thus does adequately plead any lending decisions made "because of" borrowers' race or gender as distinct from economic factors that may merely correlate with certain demographics. Instead, its intentional discrimination claims rely on precisely the kind of "statistics" circuit law describes as "improper vehicles to prove discrimination in disparate treatment (as opposed to disparate impact) cases." *Rummery v. Ill. Bell Tel. Co.*, 2000 WL 343469, at *13 (N.D. Ill. Mar. 30, 2000) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir. 1997)).[21] Accordingly, both the disparate impact and disparate treatment claims in the Complaint "stop[] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the County's Complaint with prejudice.

---

[21] The County's conclusory assertions of racial "steering" coupled with statistical suggestions that subprime or other "high cost" programs disproportionately affected minority and women borrowers similarly do not state a disparate treatment claim. *See, e.g.*, *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009). The periodic reporting and statistical assessment of ability-to-repay standards is federally mandated, (*see* Compl. ¶ 29), and the Complaint presents no plausible allegation that the challenged loans were made "because of" the borrower's race or gender rather than their qualifications under these standards.

Dated:  January 26, 2015                    Respectfully submitted,

By:  /s/ Robert Y. Sperling

        Robert Y. Sperling
        Joseph L. Motto
        Christopher J. Letkewicz
        WINSTON & STRAWN LLP
        35 West Wacker Dr.
        Chicago, IL 60601-9703
        Phone: (312) 558-5600
        rsperling@winston.com

        Elizabeth P. Papez (admitted *pro hac vice*)
        WINSTON & STRAWN LLP
        1700 K Street NW
        Washington, DC 20006
        Phone: (202) 282-5678

        John T. Roache
        Sara E. Fletcher
        K&L GATES LLP
        Three First National Plaza
        Chicago, IL 60602-4207
        Phone: (312) 372-1121

        Paul F. Hancock (*pro hac vice* application
        pending)
        K&L GATES LLP
        200 South Biscayne Blvd., Suite 3900
        Miami, FL 33131-2399

        *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2015, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.


<u>/s/ Christopher J. Letkewicz</u>
One of the attorneys for Defendants