UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COUNTY OF COOK, ILLINIOIS, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 9548 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| WELLS FARGO & CO., WELLS FARGO FINANCIAL, | ) | |
| INC., WELLS FARGO BANK, N.A., and WELLS | ) | |
| FARGO "JOHN DOE" CORPS. 1-375, | ) | |
| | ) | |
| Defendants. | ) | |

## Memorandum Opinion and Order

County of Cook, Illinois, alleges in this lawsuit that Wells Fargo & Co., Wells Fargo

Financial, Inc., Wells Fargo Bank, N.A., and 375 unnamed Wells Fargo entities (collectively,

"Wells Fargo") issued predatory subprime mortgage loans that over the years went into default

and drove the mortgaged properties into foreclosure. According to Cook County, because the

resulting urban blight and reduced property tax base was concentrated in the county's heavily

minority neighborhoods, Wells Fargo's practices violated Title VIII of the Civil Rights Act of

1968, 42 U.S.C. § 3601 *et seq*., more commonly known as the Fair Housing Act ("FHA").

Doc. 1. Wells Fargo has moved to dismiss the complaint under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). Doc. 35. The Rule 12(b)(1) motion is denied, but the Rule 12(b)(6)

motion is granted on the ground that Cook County is not within the FHA's "zone of interests" as

that term is understood by the Supreme Court and the Seventh Circuit.

### Background

Wells Fargo's challenge to Cook County's Article III standing accepts as true the facts

alleged in the complaint, Doc. 36 at 23-26, so that challenge is facial rather than factual. *See*

*Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009). On a facial

challenge to subject matter jurisdiction under Rule 12(b)(1), as on a Rule 12(b)(6) motion to dismiss, the court must accept the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in Cook County's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Cook County's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Cook County as those materials permit. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014).

Wells Fargo is one of the country's largest residential mortgage loan originators and servicers. Doc. 1 at ¶ 20. From 2004 to 2007, Wells Fargo originated more than 61,000 mortgage loans in Cook County, more than 25,000 (41%) of which were made to minorities. *Id.* at ¶ 291. At least 10,000 of the loans were "high cost" loans, of which more than 6,500 (65%) were made to minorities. *Id.* at ¶ 292. And nearly 40,000 of the loans were made to borrowers living within a census tract designated by the Department of Housing and Urban Development as having the highest foreclosure risk—a proxy for the likelihood that the loan was predatory and subprime—more than half of which were made to minorities. *Id.* at ¶¶ 312-315. Yet minorities represented just 22% of Cook County homeowners during this time period. *Id.* at ¶¶ 291-292. Nationwide, from 2004 to 2008, African-American borrowers were nearly three times more likely than similarly situated white borrowers to receive a subprime rather than a prime loan from Wells Fargo. *Id.* at ¶ 306. Steering minorities into more expensive loans, as opposed to simply denying them loans, is called "reverse redlining."

Wells Fargo's profligate issuance of predatory subprime loans, claims Cook County, predictably led to high foreclosure rates, which due to reverse redlining were disproportionately concentrated in the county's heavily minority areas. *Id*. at ¶¶ 329-333. Urban blight followed, forcing the county to divert its limited financial and human resources to caring for abandoned or vacant properties, and resulting in a loss of property tax revenue as the blighted areas dragged down neighboring property values. *Id*. at ¶ 11. Indeed, the "high cost" predatory loans and the eventual foreclosures were all part of what Cook County alleges was Wells Fargo's "equity stripping" scheme—a scheme that targeted and had a disparate impact on minorities. *Id*. at ¶ 7; *see Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. __, 2015 WL 2473449, at *16 (June 25, 2015) (holding "that disparate-impact claims are cognizable under the Fair Housing Act"); *id*. at *24 (Alito, J., dissenting) ("Everyone agrees that the FHA punishes intentional discrimination. … It is obvious that Congress intended the FHA to cover disparate treatment."); *Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009) (en banc) ("Generally, plaintiffs can prove discrimination under § 3604 in two ways. Of course, one method requires proof of discriminatory intent. … In addition, we have held that, in certain circumstances, plaintiffs can sustain a § 3604 claim on a modified disparate impact theory.").

The United States Department of Justice ("DOJ") sued Wells Fargo over precisely these alleged practices under the FHA, as did the Attorney General of Illinois under parallel provisions of the Illinois Human Rights Act, 775 ILCS 5/1 *et seq*.; both cases were resolved in 2012 with consent decrees. *Id*. at ¶¶ 13-14, 147, 182; *see United States v. Wells Fargo Bank, NA*, 891 F. Supp. 2d 143 (D.D.C. 2012) (granting motion to enter a consent order); *United States v. Wells Fargo Bank, NA*, Consent Order (D.D.C. July 12, 2012) (reproduced at Doc. 36-4); *People of the State of Illinois v. Wells Fargo & Co.*, Final Judgment and Consent Order, No. 09 CH 26434

(Cir. Ct. of Cook Cnty. July 12, 2012) (reproduced at Doc. 36-3); U.S. Dep't of Justice, "Wells

Fargo-DOJ Consent Order," www.wellsfargodojconsentorder.com ("The settlement established a

$184.3 million fund to pay African-American and Hispanic borrowers identified as eligible

borrowers by the DOJ.") (visited July 9, 2015). The Illinois case, filed in 2009, was "brought for

and on behalf of the People of the State of Illinois, by Lisa Madigan, Attorney General of the

State of Illinois, acting in the public interest." Doc. 36-3 at 3 (capitalization normalized). Along

with some injunctive relief, the Illinois consent decree required Wells Fargo to distribute at least

$8 million to "allegedly aggrieved persons who lived in Illinois at the time of their loan

origination." *Id*. at 5-6. 2013 U.S. Census data reveals that more than 40% of Illinoisans—and

nearly 65% of African-American and Hispanic Illinoisans—reside in Cook County. *See* United

States Census Bureau, *State and County QuickFacts*, http://quickfacts.census.gov/qfd/states/

17000.html (Illinois data); http://quickfacts.census.gov/qfd/states/17/17031.html (Cook County

data) (visited July 9, 2015). As described in the DOJ consent order, Wells Fargo was also

required to identify all "African-American and/or Hispanic borrowers who received nonprime

Wells Fargo loans … [who] arguably might have qualified for prime loans," to "provide a list of

any such borrowers" to the government, and to "provide cash rebates to such borrowers"—this in

excess of the $8 million fund. Doc. 36-4 at 22-23 (DOJ consent order); Doc. 36-3 at 6 (Illinois

consent order incorporating the same requirement).

Its residents already having been directly compensated for their injuries, Cook County

filed this federal suit in November 2014 seeking compensation only for its own injuries as a

corporate person. Doc. 1.

**Discussion**

Wells Fargo urges dismissal on several grounds: (1) Cook County lacks Article III standing to bring this suit; (2) the county does not fall within the FHA's zone of interests; (3) the county has otherwise failed to plausibly allege a claim under the FHA; (4) the suit is barred by the FHA's statute of limitations; and (5) the suit is barred by claim preclusion. Article III standing is jurisdictional and so must be addressed first. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92 (1998); *Hinrichs v. Speaker of House of Representatives of Ind. Gen. Assembly*, 506 F.3d 584, 590 (7th Cir. 2007).

To establish Article III standing at the pleading stage, Cook County must plausibly allege a "concrete and particularized" "injury in fact" that is "fairly traceable to the challenged action of" Wells Fargo and that will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation and alteration marks omitted); *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. __, 2015 WL 2473452, at *8 (June 29, 2015) (same); *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 660 (7th Cir. 2015) (same). Wells Fargo argues that the county's asserted injuries—blight and a depressed tax base—are neither cognizable injuries nor fairly traceable to Wells Fargo's allegedly discriminatory loan practices. Doc. 36 at 23-26. Wells Fargo is wrong on both counts.

With respect to cognizable injury, the Supreme Court in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979), held that a local municipality alleging the following had suffered a cognizable injury within the meaning of Article III: "A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Id*. at 110-11. As noted above, Cook County alleges that it has suffered "deterioration in its minority communities and urban blight, … out-of-

pocket costs, losses in property lien recording fee revenue, and a reduction in the County's tax base and tax revenues resulting from an underlying decline in property values, ... [and] reallocation of [its] human and financial resources to address the home vacancies and foreclosures." Doc. 47 at 27 n.28 (citing Doc. 1 at ¶¶ 68, 369-372, 374, 379, 381, 384-385, 387, 389-390, 392, 403). Under *Gladstone*, that is sufficient to allege a cognizable injury in fact. *See City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) (holding that, under *Gladstone*, the City of Chicago had Article III standing due to the "increased burden on the City in the form of increased crime and an erosion of the tax base").

With respect to traceability, Wells Fargo argues that there are a whole host of reasons—including the severe recession afflicting the national economy, unemployment rates, and intervening decisions by unrelated third parties—that invariably affected the number of defaults and foreclosures, and that Cook County has "not plead[ed] facts that would rule out non-discriminatory causes of the foreclosure related harms it alleges." Doc. 36 at 24. But "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotation marks and brackets omitted). It is plausible that an unusually high number of predatory loans (due to Wells Fargo's alleged reverse redlining) increased the number of defaults in Cook County, which in turn led to higher foreclosure rates and resulting blight in minority-dominated neighborhoods. And that is enough to establish traceability for Article III purposes at the pleading stage. *See Massachusetts v. EPA*, 549 U.S. 497, 523 (2007) (rejecting the defendant's argument that its actions "contribute[d] so insignificantly to [the States'] injuries" so as to defeat traceability because even "tentative" and "small incremental step[s]" in the chain of causation

are sufficient); *In re C.P. Hall Co.*, 750 F.3d 659, 660 (7th Cir. 2014) ("But often a probabilistic harm suffices for Article III standing even when the probability that the harm will actually occur is small.").

For these reasons, the court joins the vast majority of district courts overseeing materially identical FHA reverse redlining lawsuits brought by local municipal entities against mortgage lenders in holding that Cook County has adequately alleged Article III standing at the pleading stage. *See Cnty. of Cook v. Bank of Am. Corp.*, 2015 WL 1303313, at *3-4 (N.D. Ill. Mar. 19, 2015); *City of Los Angeles v. JPMorgan Chase & Co.*, 2014 WL 6453808, at *3-5 (C.D. Cal. Nov. 14, 2014); *City of Los Angeles v. Bank of Am. Corp.*, 2014 WL 2770083, at *2-3 (C.D. Cal. June 12, 2014); *City of Los Angeles v. Citigroup, Inc.*, 24 F. Supp. 3d 940, 947-51 (C.D. Cal. 2014); *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1053-55 (C.D. Cal. 2014); *DeKalb County v. HSBC N. Am. Holdings, Inc.*, 2013 WL 7874104, at *2-8 (N.D. Ga. Sept. 25, 2013); *City of Memphis v. Wells Fargo Bank, N.A.*, 2011 WL 1706756, at *4-8 (W.D. Tenn. May 4, 2011); *Mayor and City of Baltimore v. Wells Fargo Bank, N.A.*, 631 F. Supp. 2d 702, 703-04 (D. Md. 2009); *but see City of Miami v. Bank of Am. Corp.*, 2014 WL 3362348, at *5 (S.D. Fla. July 9, 2014) ("Against the backdrop of a historic drop in home prices and a global recession, the decisions and actions of third parties, such as loan services, government entities, competing sellers, and uninterested buyers, thwart the City's ability to trace a foreclosure to Defendants' activity."); *City of Birmingham v. Citigroup Inc.*, 2009 WL 8652915, at *4-5 (N.D. Ala. Aug. 19, 2009) (reasoning that "a series of speculative inferences must be drawn to connect the injuries asserted with the alleged wrongful conduct by the Defendants," because "rising unemployment in the region, changes in the housing market, or other economic conditions" could just as easily have caused the City's alleged injuries).

Wells Fargo next argues that Cook County is not within the FHA's "zone of interests"—that is, that the county does not have "statutory standing" because it is not an "aggrieved" person within the FHA's meaning. Doc. 36 at 26-30; *see* 42 U.S.C. § 3602(i)(1) ("'Aggrieved person' includes any person who … claims to have been injured by a discriminatory housing practice."). Cook County retorts that statutory standing under the FHA is coextensive with constitutional standing under Article III. Doc. 47 at 25-33. If the county is right about this, then it has statutory standing because, as just explained, it has Article III standing. To support its submission, Cook County cites *Gladstone*, which remarked that statutory standing under the FHA is "as broad as is permitted by Article III of the Constitution." *Gladstone*, 441 U.S. at 109 (internal quotation and alteration marks omitted) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)). The Supreme Court said that an "aggrieved person" was anyone with Article III standing, not only in *Gladstone* and *Trafficante*, but also in *Bennett v. Spear*, 520 U.S. 154, 165 (1997) (applying *Trafficante* to hold that under the Endangered Species Act's citizen-suit provision, 16 U.S.C. § 1540(g), "standing was expanded to the full extent permitted under Article III"), and *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (taking as a given *Gladstone*'s holding that "the sole requirement for standing to sue under [the FHA] is the Art. III minima of injury in fact").

Yet in *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), the Supreme Court unanimously held that this language from *Trafficante* and *Gladstone* was mere "dictum"—"ill-considered" dictum, at that—and therefore "decline[d] to follow it." *Id*. at 176; *see ibid*. (noting that *Trafficante* actually "said that the 'person aggrieved' of Title VIII was coextensive with Article III '*insofar as tenants of the same housing unit that is charged with discrimination are concerned*.'"). *Thompson* explained that the results of *Trafficante* and its progeny did not

8

actually depend on the proposition that Article III standing is equivalent to statutory standing. *Ibid.* ("Indeed, the *Trafficante* opinion did not adhere to [that dictum] in expressing its Title VIII holding that residents of an apartment complex could sue the owner for his racial discrimination against prospective tenants. … [T]he holdings of [*Bennett* and *Gladstone*] are [also] compatible with the 'zone of interests' limitation that we discuss below."). And *Thompson* "conclude[d] that the term 'aggrieved' *must be* construed more narrowly than the outer boundaries of Article III," and accordingly held that only a "plaintiff with an interest arguably sought to be protected by the statute" may sue. *Id.* at 177-78 (internal quotation marks and brackets omitted, emphasis added).

Although *Thompson* involved Title VII, not Title VIII, it acknowledged that *Trafficante* (a Title VIII case) itself relied on Title VII cases, and that Titles VII and VIII use nearly identical language—as does the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, whose "zone of interests" test the Supreme Court adopted as reflective of the "common usage of the term 'person aggrieved.'" *Id.* at 176, 178; *see Richards v. NLRB*, 702 F.3d 1010, 1014 (7th Cir. 2012) (same); *see generally Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000) ("Courts have recognized that Title VIII is the functional equivalent of Title VII, and so the provisions of these two statutes are given like construction and application."). Indeed, three years after *Thompson*, the Supreme Court in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), clarified that the zone-of-interests test "applies to *all* statutorily created causes of action … unless it is expressly negated." *Id.* at 1388 (emphasis added, internal quotation marks omitted); *see United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 617 (7th Cir. 2015) (applying the zone-of-interests test to the Terrorism Risk Insurance Act of 2002); *Ass'n of Am. Physicians & Surgeons, Inc. v. Koskinen*,

768 F.3d 640, 642-43 (7th Cir. 2014) (same, to the Patient Protection and Affordable Care Act). The FHA contains no express negation of the zone-of-interests test.

Cook County acknowledges *Thompson* and *Lexmark*, but argues that neither "abrogated the Supreme Court's prior holdings in *Gladstone* … or *Trafficante* requiring an aggrieved municipality to meet only the minimal Article III standing requirements to maintain an FHA claim." Doc. 47 at 30-31. And the county notes that the Supreme Court "has instructed lower courts not to abandon direct precedent … because of other lines of decisions." *Id*. at 31. The latter point is undoubtedly correct. As the Supreme Court has cautioned on numerous occasions: "If a precedent of this Court has direct application in a case, yet *appears to* rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (emphasis added); *see State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("The Court of Appeals was correct in applying th[e] principle [of *stare decisis*] despite disagreement with *Albrecht,* for it is this Court's prerogative alone to overrule one of its precedents."); *United States v. Hatter*, 532 U.S. 557, 567 (2001) ("The Court of Appeals was correct in applying *Evans* to the instant case, given that it is this Court's prerogative alone to overrule one of its precedents.") (internal quotation marks omitted); *see also United States v. Blagojevich*, 612 F.3d 558, 562 (7th Cir. 2010) ("[T]he Supreme Court often reminds other judges that they must follow all of its decisions, even those that seem incompatible with more recent ones, until the Justices themselves deliver the coup de grâce."); *United States v. Duncan*, 413 F.3d 680, 683-84 (7th Cir. 2005) ("Moreover, even if the logic and spirit of those decisions could be interpreted to have eroded the Court's previous rationale for permitting mandatory minimum sentences based on judicial fact-finding, it certainly

is not our role as an intermediate appellate court to overrule a decision of the Supreme Court or even to anticipate such an overruling by the Court.").

But Cook County's first point—that *Thompson* and *Lexmark* left intact the language from *Trafficante* and *Gladstone Realtors* indicating that Article III standing is coextensive with statutory standing under Title VIII—is demonstrably incorrect. At the risk of flogging a dead horse, *Thompson* not only called that language "dictum," but "*ill-considered*" dictum, and expressly "decline[d] to follow it." 562 U.S. at 176. What more could the Supreme Court possibly have said to convey that the "person aggrieved = Article III standing" principle was kaput? This therefore is not a case like *State Oil*, where, despite severe academic and judicial criticism, the Supreme Court's decision in *Albrecht v. Herald Co.*, 390 U.S. 145, 153 (1968), which held that vertical maximum price fixing is a *per se* violation of the Sherman Act, was still good law when the case reached the Seventh Circuit in the mid-1990s. 522 U.S. at 7-9. Recognizing that "despite all its infirmities, its increasingly wobbly, moth-eaten foundations, *Albrecht* has not been *expressly* overruled," the Seventh Circuit dutifully applied *Albrecht*'s *per se* rule to reverse the dismissal of the plaintiff's antitrust claim. *Khan v. State Oil Co.*, 93 F.3d 1358, 1363, 1366 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 3 (1997); *id.* at 1363 ("*Albrecht* was unsound when decided, and is inconsistent with later decisions by the Supreme Court. It should be overruled. Someday, we expect, it will be.").

Rather, this is a case like *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), where the Supreme Court criticized its own statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." 550 U.S. at 561 (internal quotation marks omitted, emphasis added). "[A]fter puzzling

the profession for 50 years," *Twombly* declared, "this famous observation [from *Conley*] has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Id*. at 563. Yet *Twombly* declined to "overrule" *Conley*, because the offending "no set of facts" language was mere dicta: "*Conley*'s 'no set of facts' language … should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief." *Id*. at 562-63. In other words, *Conley* itself was consistent with the *Twombly* rule. *Id*. at 563 ("*Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.").

Just so here: the Supreme Court's declining in *Thompson* to follow "ill-considered dictum" from *Trafficante* and *Gladstone* without overruling those decisions is indistinguishable from the Court's "retiring" a "famous observation" from *Conley* without overruling it. As the Seventh Circuit often remarks, "[o]urs is a hierarchical judiciary," *Gacy v. Welborn*, 994 F.2d 305, 310 (7th Cir. 1993), and the hierarchical nature of the judiciary precludes this court from accepting Cook County's invitation to apply a principle that the Supreme Court has explicitly and unequivocally—and, not that it matters, unanimously—rejected. In so concluding, this court respectfully disagrees with the contrary views expressed by other district courts in materially identical FHA reverse redlining suits. *See Cnty. of Cook*, 2015 WL 1303313, at *4 ("I have already determined that the County's complaint satisfies Article III's standing requirements, so there is no need to undertake a separate zone of interests analysis. … The Supreme Court has repeatedly declined to upset *Trafficante*'s holding that the term 'aggrieved' in the FHA reaches as far as Article III permits.") (internal quotation marks and brackets omitted) (citing *Thompson*); *City of Los Angeles v. JPMorgan Chase & Co.*, 2014 WL 6453808, at *10 n.3 (same, and

asserting that "the Supreme Court's decision in *Thompson* … expressly declined to limit the FHA's zones of interests" to be narrower than Article III standing); *City of Los Angeles v. Bank of Am. Corp.*, 2014 WL 2770083, at *8 (same, and asserting that "the Supreme Court has not yet applied [the zone-of-interests] requirement to the FHA" on the ground that *Thompson* involved Title VII, not Title VIII); *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d at 1057 (same).

So the zone-of-interests test applies to FHA actions. Under that test, the question is "whether [Cook County] falls within the class of plaintiffs whom Congress has authorized to sue under" the FHA, or, "[i]n other words, … whether [Cook County] has a cause of action under the statute." *Lexmark*, 134 S. Ct. at 1387. Cook County complains of urban blight and re-entrenchment of existing segregation patterns, Doc. 1 at ¶¶ 370-372, and those were certainly motivating factors behind the FHA's passage. *See Inclusive Communities*, 2015 WL 2473449, at *6 (describing the Kerner Commission's findings). But "[w]hether a plaintiff's interest is 'arguably … protected … by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question …, but by reference to the particular provision of law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175-76 (first two ellipses in original) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). In particular, "the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523-24 (1991) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)).

At issue in *Postal Workers* was the validity of a regulation, promulgated under the Private Express Statutes, 18 U.S.C. §§ 1693-1699 and 39 U.S.C. §§ 601-606, allowing private couriers to handle certain international mail delivery, which was thought to have the likely effect of reducing the number of federal postal jobs.  498 U.S. at 519-20.  The postal workers union brought suit under the APA, alleging "that the rulemaking record was inadequate to support" the regulation.  *Id*. at 520.  Applying the zone-of-interests rule, the Supreme Court held that the union did not fall within the zone of interests of the Private Express Statutes and thus could not maintain the suit, reasoning that the "particular language of the statutes … indicate[s] that the congressional concern was not with opportunities for postal workers but with the receipt of necessary revenues for the Postal Service."  *Id*. at 524-26.  So even though the challenged regulation would have the inevitable effect of eliminating postal jobs—obviously of primary concern to a *union*—the union fell outside the statute's zone of interests.  *Ibid*.  Likewise, if Wells Fargo engaged in reverse redlining, the affected minority borrowers would obviously fall within the FHA's zone of interests; but Cook County's alleged injuries, even more so than those of the union in *Postal Workers*, are purely derivative and not the type that the FHA was designed to protect.  The county's claims thus fall outside the zone of interests.

It also is important to recall the Supreme Court's mandate to focus on the "statutory provision[s] whose violation[s] form[] the legal basis for" the complaint.  *Id*. at 523-24; *see Thompson*, 562 U.S. at 177-78 (holding that when applying the zone-of-interests test, Title VII's enforcement provision must be interpreted in light of its substantive provisions); *Bennett*, 520 U.S. at 175 ("In determining whether the petitioners have standing under the zone-of-interests test to bring their APA claims, we look not to the terms of the ESA's [(the Endangered Species Act's)] citizen-suit provision, but to the substantive provisions of the ESA"); *Todd v. Collecto,*

*Inc.*, 731 F.3d 734, 738 (7th Cir. 2013) (looking to the substantive provision of the Fair Debt

Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692b, to determine who falls within the

statute's zone of interests); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 866 (9th

Cir. 2014) (same, for Title IX); *Air Line Pilots Ass'n Int'l v. Trans States Airlines, LLC*, 638 F.3d

572, 577 (8th Cir. 2011) (same, for the Labor Management Reporting and Disclosure Act, 29

U.S.C. § 401 *et seq.*).  Cook County alleges that Wells Fargo violated 42 U.S.C. §§ 3604(a), (b),

(c), and 3605, Doc. 1 at ¶¶ 419-420, and so the court will focus on those provisions.

Section 3604 is inapposite.  Its title is "Discrimination in the sale or rental of housing and

other prohibited practices," and Wells Fargo does not sell or rent housing.  Subsection (a)

prohibits "mak[ing] unavailable … a dwelling to any person because of race, color, religion, sex,

familial status, or national origin."  42 U.S.C. § 3604(a).  Cook County is not a person to whom a

"dwelling" can be made unavailable, for it does not "dwell" anywhere.  Subsection (b) prohibits

"discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a

dwelling, or in the provision of services or facilities in connection therewith, because of race,

color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  Cook County does

not claim that Wells Fargo discriminated against it because of these protected traits, or even that

it has bought or rented a property using Wells Fargo's services.  Finally, subsection (c) prohibits

"publish[ing] any notice, statement, or advertisement" that is discriminatory.  42 U.S.C.

§ 3604(c).  The complaint does not allege that Wells Fargo published anything discriminatory.

Section 3605 is entitled "Discrimination in residential real estate-related transactions,"

and subsection (b)(1) defines such transactions to include "[t]he making or purchasing of loans

… for purchasing … a dwelling; or secured by residential real estate."  42 U.S.C. § 3605(b)(1).

Mortgage loans obviously qualify under both prongs.  Subsection (a) states in full:

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605(a). Reverse redlining, by definition, is "discriminat[ion] against any person … in the terms or conditions of [a mortgage loan] because of" a protected trait. Wells Fargo's "business includes engaging in residential real estate-related transactions," and therefore its engaging in reverse redlining would, if true, likely violate § 3605. Yet § 3605, by its terms, protects "any person" who was either denied a loan or offered unfavorable loan terms and conditions because of his or her race (or other protected trait). Cook County falls into neither class of plaintiffs, as it alleges neither that it was denied a loan nor offered unfavorable terms— setting aside the obvious point that Cook County is not alleged to have a race or other protected trait. It follows that Cook County is not "within the class of plaintiffs whom Congress has authorized to sue" for a violation of § 3605. *Lexmark*, 134 S. Ct. at 1387.

It bears mention that Cook County has disavowed bringing this suit in a representative capacity, or as a "*parens patriae*," on behalf of its residents. Doc. 47 at 12-16. (It might have disavowed that posture to avoid walking into the claim preclusion trap set by the 2012 DOJ and Illinois Attorney General consent decrees, which compensated Cook County residents for their injuries.) And Cook County's own injuries—urban blight and a reduced property tax base— while perhaps the consequences of reverse redlining or equity stripping writ large, do not bring it within § 3605's zone of interests. *See Postal Workers*, 498 U.S. at 523-24 (holding that the inevitable loss of its members' jobs did not bring a union into the zone of interests of a statutory provision granting rights to private mail carriers); *Todd*, 731 F.3d at 738 (holding that because an FDCPA provision prohibiting a debt collector from disclosing to a third party that a consumer owes a debt "simply is not designed to protect third parties from hearing about another person's

16

debts," the third party is not within the provision's zone of interests).  The only other district court overseeing a similar reverse redlining suit that engaged in a zone-of-interests analysis (as opposed to following *Trafficante*'s "ill-considered dictum" that the FHA's zone of interests is coextensive with Article III standing) reached the same conclusion.  *See City of Miami*, 2014 WL 3362348, at *4.

The analysis could and will stop there, but the court notes parenthetically Wells Fargo's argument that Cook County has not adequately pleaded an FHA claim for the independent reason that it has failed to plausibly allege that its injuries were proximately caused by Wells Fargo's actions.  Doc. 36 at 30; *see Lexmark*, 134 S. Ct. at 1391 n.6 ("Like the zone-of-interests test, … [proximate causation] must be adequately alleged at the pleading stage in order for the case to proceed.").  Proximate causation is a higher bar than Article III standing's "fairly traceable" requirement.  *See Lexmark*, 134 S. Ct. at 1391 n.6.  *Lexmark* noted that under the Lanham Act, "a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, [but] the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's inability to meet its financial obligations."  *Id*. at 1391 (internal quotation marks and brackets omitted).  Just so here, according to Wells Fargo: affected borrowers can sue under the FHA for their losses, but not Cook County, which "suffer[s] merely as a result of the [borrowers'] inability to meet [their] financial obligations" under their mortgage loans.  *Ibid*.

In response, Cook County cites *United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992), which affirmed a jury's award of emotional distress damages to housing "testers" for injuries that "were the 'direct result' of a Fair Housing Act violation."  *Id*. at 933.  If "testers" can recover damages under the FHA even though they are not directly deprived of housing, says Cook

17

County, then so, too, should it. Doc. 47 at 33. But testers have long been allowed to maintain FHA claims *not* as the indirect victims of a denial of housing, but as the direct victims of an informational harm, namely, a defendant's "represent[ing] to any person because of race … that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d); *see Havens*, 455 U.S. at 373-74 ("A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions."); *Matchmaker*, 982 F.2d at 1095 (same). Cook County does not allege that it suffered any such informational harm.

There is no need to further explore proximate cause given the court's holding on the zone-of-interests issue. Nor is it necessary to reach Wells Fargo's other arguments for dismissal, including that the suit is barred by claim preclusion because Cook County was in privity with the Illinois Attorney General and therefore bound by her 2009 suit and 2012 consent decree, and that the suit is defeated by the FHA's two-year limitations period. Doc. 36 at 16-22, 31-36.

### Conclusion

For the foregoing reasons, Wells Fargo's motion to dismiss is granted. In so ruling, the court does not hold or even suggest that Wells Fargo did not violate the FHA, that Wells Fargo did not engage in reverse redlining, or that the direct victims of Wells Fargo's alleged misconduct do not deserve compensation (they have received compensation thanks to the diligent efforts of the DOJ and the Attorney General of Illinois). Rather, the court's ruling rests solely on its conclusion that, on the complaint' allegations, Cook County is not within the FHA's zone of interests. Because Cook County has brought only an FHA claim, the complaint is dismissed. Although the court doubts that Cook County could cure the zone-of-interests defect,

the dismissal is without prejudice, and the county is granted leave to file an amended complaint by August 14, 2015.  *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 518 (7th Cir. 2015) (noting "the presumption in favor of giving plaintiffs at least one opportunity to amend"); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1024 (7th Cir. 2013) ("Under Rule 15(a), fee-paying plaintiffs enjoy leave to amend whenever 'justice so requires' and, as a matter of course, almost always get an opportunity to amend their complaints at least once.").  If Cook County does not replead by that date, thereby electing to stand on its complaint, the suit will be dismissed with prejudice.

July 17, 2015

_____
United States District Judge