**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | Case No. 1:14-cv-09548 |
| Plaintiff, | ) | |
| | ) | Hon. Gary Feinerman |
| v. | ) | |
| | ) | Mag. Judge Mary Rowland |
| | ) | |
| WELLS FARGO & CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Sheldon T. Zenner
David C. Bohan
Peter G. Wilson
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Tel: (312) 902-5200
Fax: (312) 902-1061

Paul F. Hancock
K&L GATES LLP
200 South Biscayne Blvd., Suite 3900
Miami, Florida 33131-2399
Tel: (305) 539-3378
Fax: (305) 358-7095

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

APPLICABLE LEGAL STANDARD .............................................................................. 5

I.      THE COUNTY'S ALLEGED INDIRECT FINANCIAL INJURIES ARE TOO REMOTE TO SATISFY THE *CITY OF MIAMI* PROXIMATE-CAUSE STANDARD UNDER ANY AND ALL CIRCUMSTANCES. ...................................... 5

II.     THE COUNTY FAILS TO STATE A CLAIM FOR DISPARATE-IMPACT DISCRIMINATION. ............................................................................................ 13

III.   THE COUNTY'S CLAIMS ARE UNTIMELY.............................................................. 17

IV.   THE COUNTY'S CLAIMS ARE BARRED BY RES JUDICATA............................... 24

CONCLUSION................................................................................................................. 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abner v. Ill. Dep't of Transp.*,
  674 F.3d 716 (7th Cir. 2012) ................................................. 25

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ............................................................. 11

*Aransas Project v. Shaw*,
  775 F.3d 641 (5th Cir. 2014) ................................................. 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................... *passim*

*Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*,
  459 U.S. 519 (1983) ........................................................ 7, 8, 12

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017) ................................................. *passim*

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) ............................................................. 22

*City of Los Angeles v. Bank of Am. Corp.*,
  No. 13-9046, 2015 WL 4880511 (C.D. Cal. May 11, 2015) ................... 20

*City of Los Angeles v. Wells Fargo & Co.*,
  No. 15-56157, 2017 WL 2304375 (9th Cir. May 26, 2017) .................. 15

*City of Miami v. Bank of Am. Corp.*,
  800 F.3d 1262 (11th Cir. 2015) ............................................. 23

*City of Miami v. Wells Fargo & Co.*,
  No. 13-24508, 2016 WL 1156882 (S.D. Fla. Mar. 17, 2016) ........ 15, 20, 22

*Cty. of Cook v. Wells Fargo & Co.*,
  115 F. Supp. 3d 909 (N.D. Ill. 2015) ............................... 6, 17, 22, 24

*Dookeran v. Cty. of Cook*,
  718 F.3d 570 (7th Cir. 2013) ................................................. 25

*Ellis v. City of Minneapolis*,
  860 F.3d 1106 (8th Cir. 2017) ............................................... 15

*Estate of Davis v. Wells Fargo Bank*,
  633 F.3d 529 (7th Cir. 2011) ................................................. 23

*Gross v. F.B.L. Fin. Servs., Inc.*,
    557 U.S. 167 (2009).........................................................................................................18, 19

*Hardie v. NCAA*,
    No. 15-55576, 2017 WL 2766096 (9th Cir. June 27, 2017).....................................................14

*Hayes v. City of Chicago*,
    670 F.3d 810 (7th Cir. 2012) ...................................................................................................25

*Hemi Grp., LLC v. City of N.Y.*,
    559 U.S. 1 (2010)......................................................................................................................11

*Hicks v. Midwest Transit, Inc.*,
    479 F.3d 368 (7th Cir. 2007) ...................................................................................................25

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)........................................................................................................ *passim*

*In re Wells Fargo Residential Mortgage Lending Discrimination*,
    3:08-md-01930 (N.D. Cal. Sept. 6, 2011)...............................................................................16

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977).................................................................................................................14

*Kimbrew v. Fremont Reorg. Corp.*,
    No. 08-03277, 2008 WL 5975083 (C.D. Cal. Nov. 17, 2008) ...............................................23

*Ledbetter v. Goodyear Tire & Rubber Co.*,
    550 U.S. 618 (2007).................................................................................................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014).....................................................................................................6, 8, 10

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999).................................................................................................................19

*Olson v. Bemis Co., Inc.*,
    800 F.3d 296 (7th Cir. 2015) .....................................................................................................5

*The People of the State of Illinois v. Wells Fargo Bank & Co., et al.*,
    No. 09 CH 26434 (Ill. Cir. Ct. July 12, 2012) ..........................................................................2

*Rodriguez v. National City Bank*,
    726 F.3d 372 (3rd Cir. 2013) ...................................................................................................16

*Smoke Shop, LLC v. United States*,
    761 F.3d 779 (7th Cir. 2014) .....................................................................................................5

*Texas Department of Housing & Community Affairs v. The Inclusive Communities Project, Inc.*,
135 S. Ct. 2507 (2015) ................................................................................................... *passim*

*United States v. Bank of America Corp.*,
No. 1:12-00361 (D.D.C. March 12, 2012) ...........................................................................15

*United States v. First Am. Bank*,
No. 1:04-CV-04585 (N.D. Ill. July 13, 2004) .....................................................................22

*United States v. Kubrick*,
444 U.S. 111 (1979) ...........................................................................................................23

*United States v. Wells Fargo Bank, N.A.*,
No. 1:12-cv-01150-JDB (D.D.C. July 12, 2012) ..................................................................2

*Vill. of Bellwood v. Dwivedi*,
895 F.2d 1521 (7th Cir. 1990) ...........................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .......................................................................................................16

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989) ...........................................................................................................14

**Statutes**

775 ILCS 5/1 *et seq* ............................................................................................................24

815 ILCS 505/7(a) ...............................................................................................................24

42 U.S.C. § 2000e-5(e)(3)(A) ..............................................................................................19

42 U.S.C. § 3613(a)(1)(A) ...................................................................................................17

Pub. L. No. 111-2, 123 Stat. 5 (2009) .................................................................................19

**Regulations**

80 Fed. Reg. 66128, 66291 (Oct. 28, 2015) .........................................................................18

## PRELIMINARY STATEMENT

The Supreme Court recently ruled that the City of Miami's parallel Fair Housing Act claims ("FHA") against lenders "allege[d] economic injuries that arguably fall within the FHA's zone of interests." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017). The Court also announced the pleading-stage standard of proximate cause applicable to municipal governments pursuing FHA claims. The Court held that plaintiffs like the County must show that their injuries were proximately caused by discriminatory lending by alleging a "*direct relation* between the injury asserted [*i.e.*, lost property tax revenues and increased municipal spending] and the injurious conduct alleged [*i.e.*, discriminatory loans to residents]," emphasizing the "close connection proximate cause requires" in the FHA context. *Id.* at 1306 (emphasis added).

*City of Miami* confirms this Court's concern that the County's allegations of causality— beginning with an alleged injury to residents and implicating a long chain of cause-and-effect-and-effect-and-effect that ignores the impact of independent, intervening variables—is too attenuated to establish proximate cause under the FHA. This Court described the County's theory of causation as "not from Point A to Point B," but "kind of from Point A to Point B to Point C to Point D, perhaps to Point E." *See* Exhibit A, Mot. to Dismiss Hr'g Tr. at 17:17-19, June 19, 2015. Nothing in the Second Amended Complaint ("SAC")[1] cures the critical problem with clearing the directness hurdle. The County remains an indirect victim attempting to recover for an alleged derivative injury to its residents; it did not buy or lease housing from, engage in a real estate-related transaction with, or receive discriminatory information from Wells Fargo, and its alleged property tax and municipal services harms are many steps removed from the business practices it labels discriminatory.

---

[1] A comparison of the Amended Complaint and Second Amended Complaint is attached as Exhibit B for the Court's convenience.

Even if the SAC sufficiently alleged proximate cause (it does not), other independent reasons require dismissal. First, the County fails to meet the "disparate impact" pleading standard for FHA claims announced in *Texas Department of Housing & Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). Second, because the County has not alleged and cannot allege an actionable violation occurring on or after November 28, 2012, the claim is time-barred by the FHA two-year limitations period. Finally, the County's pre-2012 claims must be dismissed because they are barred by res judicata.

## STATEMENT OF FACTS

The County still seeks to recover hundreds of millions of dollars in actual and punitive damages for alleged injuries supposedly caused by Wells Fargo's origination of discriminatory loans to County residents. According to the SAC, these alleged practices eventually caused borrower defaults, which caused foreclosures, which caused vacancies, which caused a decline in property values that caused "lost property tax revenue," and also caused crime and urban blight, which caused the County to "incur[] out-of-pocket costs with respect to specific vacant foreclosure and pre-foreclosure properties secured by non-prime mortgage loans" as it "provide[d] a variety of governmental services relating to such properties." *Id.* ¶¶ 395, 400.[2]

Like the many other local government entities that have brought similar copycat lawsuits against Wells Fargo and other national lenders, the SAC describes a multistep causal chain

---

[2] This case arises against a backdrop of federal and state consent decrees that resolved proceedings that made identical allegations regarding Wells Fargo's lending practices and the alleged impact of those practices on the County's tax base. *See The People of the State of Illinois v. Wells Fargo Bank & Co., et al.*, No. 09 CH 26434 (Ill. Cir. Ct. July 12, 2012) ("completely and fully resolving" the Illinois Attorney General's challenge to allegedly discriminatory lending in Cook County and elsewhere that allegedly resulted in a reduced property tax base caused by loans going into foreclosure); *United States v. Wells Fargo Bank, N.A.*, No. 1:12-cv-01150-JDB (D.D.C. July 12, 2012) (resolving the same claims brought by DOJ). The SAC adds no allegations regarding Wells Fargo's lending practices beyond those addressed by the consent decrees and discussed in the original and first amended complaints.

supposedly linking Wells Fargo to the County's asserted property tax and municipal services injuries. The first step requires discriminatory loans to County residents (though not a single discriminatory loan is identified in the SAC). The next step involves defaults caused by allegedly discriminatory loans to minority borrowers. The County does not allege that defaults on Wells Fargo loans occurred solely because of the payment difference between a discriminatory and a nondiscriminatory loan (or even that defaults actually occurred), but claims instead that originating discriminatory loans "increas[ed] the risk of default." *Id*. ¶ 8. The County also admits equally plausible "intervening causes of the defaults," including "the financial crisis, economic downturn and increased unemployment rates." *Id*. ¶ 73.

The next few steps in the causal chain require "vacancies and foreclosures on residences secured by predatory and discriminatory mortgage loans." *Id*. ¶ 23. The County does not identify any Wells Fargo properties where this actually happened, but speculates about the "*likelihood* of delinquencies, defaults, vacancies and eventual foreclosures by steering borrowers" which "*can* lead to vacant, boarded-up, or abandoned properties." *Id*. ¶¶ 52, 386 (emphasis added). The County's damages allegedly include "cleaning, repairing, securing, acquiring, or demolishing vacant or abandoned properties secured by Defendants' predatory and discriminatory mortgage loans." *Id*. ¶ 23. Again, however, the County fails to allege any specifics about services at specific Wells Fargo properties, and even appears to question whether the injuries occurred at all. *See id*. ¶ 357 (absent Wells Fargo's "actions alleged herein . . . the injuries would not have occurred *to the extent they did occur*") (emphasis added)).

Although the County did not add factual allegations regarding Wells Fargo loans or properties, it did make four sets of changes to its pleading. First, the County repeatedly added the

conclusory word "direct" to describe the connection between Wells Fargo's challenged lending conduct and County's alleged injuries. *Id.* ¶¶ 10-11, 13, 357, 395-96, 404, 435, 438, 458.

Second, the County added conclusory allegations that "minority homeowners have been disproportionately and disparately impacted," signaling its intent to proceed with a claim of "disparate impact" discrimination. *Id.* ¶ 10; *see id.* ¶¶ 345, 435, 437-38, 445-46.

Third, the County added conclusory allegations regarding (1) the roles various county agencies play in the County's "missions and purposes" as a local government entity, and (2) a "reallocation of the County's limited resources." *Id.* ¶ 11. For example, the County complains that the "Sheriff incurs significant costs in securing eviction and foreclosure notices" and that "Plaintiff has had to provide supplemental funding to its judiciary." *Id.* ¶ 404. But the County did not allege any specifics connecting the Sheriff's costs or supplemental judicial funding to particular Wells Fargo properties acquired with allegedly discriminatory Wells Fargo loans.

Finally, the County now purports to bring a claim challenging not only "discriminatory loans," but also "each of Defendants' decisions and practices in the chain of a foreclosure event; namely, whether or not to modify a defaulted or high cost loan at the borrower's request and whether to foreclose on a particular defaulted borrower's home." *Id.* ¶ 272. According to the County, servicing and foreclosure "decisions" supposedly "reflect stand-alone discriminatory housing practices." *Id.* The County alleges no facts whatsoever to support these conclusions—for example, no facts about decisions to deny loan modifications to minorities but grant them to similarly-situated whites, and no facts about decisions to foreclose on loans to minorities but not on loans to similarly-situated whites. Instead, the County identifies different racial outcomes, and makes a conclusory leap to discrimination: "[M]ortgage servicing and foreclosure practices, in

and of themselves, are discriminatory, as reflected by the increasingly disproportionate number of foreclosures on African American and Latino/Hispanic minority homes." *Id*. ¶ 10.

## APPLICABLE LEGAL STANDARD

To decide a motion to dismiss under Rule 12(b)(6), the court must accept the complaint's well-pleaded factual allegations and draw all reasonable inferences in the County's favor, but need not accept its legal conclusions. *Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). A plaintiff cannot meet the "plausibility standard" with "mere conclusory statements" and "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Olson v. Bemis Co., Inc.*, 800 F.3d 296, 305 (7th Cir. 2015) (quoting *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 604 n.2 (7th Cir. 2013)).

## ARGUMENT

**I.      THE COUNTY'S ALLEGED INDIRECT FINANCIAL INJURIES ARE TOO REMOTE TO SATISFY THE *CITY OF MIAMI* PROXIMATE-CAUSE STANDARD UNDER ANY AND ALL CIRCUMSTANCES.**

When the Supreme Court granted certiorari to review the sufficiency of nearly-identical FHA complaints filed by Miami, without objection from either party [*see* ECF No. 95], this Court stayed proceedings because the Supreme Court was "likely to resolve the legal issues" controlling this case [ECF No. 96]. The *City of Miami* decision articulated the standard the County must satisfy to sufficiently plead that alleged property tax and municipal services injuries were "proximately caused" by allegedly discriminatory loans made to their residents. 137 S. Ct. at 1305-06. This threshold analysis must be conducted "in the first instance."[3] *Id*. at 1306.

---

[3] *City of Miami* confirmed that proximate cause is an "element" of an FHA claim. *Id*. at 1306. And "like any other element of a cause of action, it must be adequately alleged at the pleading

This Court may well be the first to apply the Supreme Court's proximate-cause requirement to one of the similar complaints brought by local government entities nationwide.[4] This Court had no need to fully "explore proximate cause" in dismissing the County's original complaint, *Cty. of Cook v. Wells Fargo & Co.*, 115 F. Supp. 3d 909, 921 (N.D. Ill. 2015), but raised a concern at oral argument that the County's causal theory connecting the challenged conduct (allegedly discriminatory loans) to the alleged harm (lost taxes and increased municipal services) "is not from Point A to Point B. It's kind of from Point A to Point B to Point C to Point D, perhaps to Point E." Ex. A at 17. Even assuming that the County plausibly alleged facts establishing that each of the myriad steps in its long causal chain actually occurred (it does not),[5] application of the *City of Miami* pleading standard confirms that the County stands too remote at Point D or Point E, and has failed to establish that any of Wells Fargo's actions proximately caused its indirect injuries. Thus, this lawsuit must come to its end.

The term "proximate cause" refers to the judicial limitation of "a person's responsibility for the consequences of that person's own acts." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258,

---

stage in order for the case to proceed." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (citing *Iqbal*, 556 U.S. at 678–79). "If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed[.]" *Id.*

[4] The Eleventh Circuit's initial review of proximate cause improperly rejected the directness test adopted by the Supreme Court (discussed in detail below) and applied a wider scope, looking only to whether Miami's asserted injury was "foreseeable," and thus "possible." As the Supreme Court made clear in vacating that decision, mere possibility—*i.e.*, foreseeability—is not enough. The Supreme Court remanded *City of Miami* to the Eleventh Circuit (where it is still pending) to decide whether Miami's complaint (which is nearly identical to the SAC) meets the test.

[5] To connect challenged conduct (discriminatory loans) with its alleged injuries (lost property taxes and municipal costs), the County must plausibly allege each step in its causal chain *actually occurred*. Instead, the SAC contains only "possibilities" and "speculations," which are legally insufficient. For example, the County notes "intervening causes of the defaults," including the "economic downturn and increased unemployment rates," SAC ¶ 73, and "as between that 'obvious alternative explanation' for [defaults], and the purposeful, invidious discrimination [the County] asks [the Court] to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (citations omitted).

268 (1992). The "question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* Proximate cause thus "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *City of Miami*, 137 S. Ct. at 1305 (quoting *Lexmark*, 134 S. Ct. at 1390).

In the FHA context, the Supreme Court has emphasized the "close connection that proximate cause requires" between the complained of injury and conduct. *Id.* at 1306. This is not surprising, nor is the requirement unique to the FHA. Indeed, the Supreme Court and circuit courts typically have found *no* liability in federal causes of action for damages that were multiple steps removed—and thus too remote—from the prohibited conduct:

- *Holmes v. Sec. Inv'r Prot. Corp*., 503 U.S. 258 (1992) (plaintiff failed to establish proximate cause in a RICO claim alleging (1) defendants made misrepresentations regarding six companies; (2) which, when revealed, caused stock prices to plummet; (3) which caused broker-dealers' financial troubles; (4) which caused the companies' liquidation; and (5) which led plaintiff to advance $13 million to cover customer claims);

- *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519 (1983) (union failed to establish proximate cause in an antitrust claim alleging (1) defendants coerced third-parties to hire non-union contractors; (2) which caused business to be diverted to non-union contractors; and (3) injured the union's business);

- *Aransas Project v. Shaw*, 775 F.3d 641 (5th Cir. 2014) (failure to establish proximate cause in an Endangered Species Act claim alleging (1) defendants' practices caused third parties to take water from rivers; (2) which caused less freshwater inflows in in the ecosystem; (3) which, along with a drought, caused more salinity; (4) which caused less drinkable water; (5) which caused fewer blue crabs and wolfberries; (6) which caused endangered cranes that eat those species to starve; and (7) caused the cranes to die).

Consistent with such cases, an FHA plaintiff must establish the "close connection" by showing "some direct relation between the injury asserted and the injurious conduct alleged." *City of Miami*, 137 S. Ct. at 1306 (quoting *Holmes*, 503 U.S. at 268). The directness inquiry focuses on evaluating the "chain of causation"—*i.e.*, the nature and number of causal "links" or steps between the challenged conduct and the alleged harm. *Associated Gen. Contractors*, 459

7

U.S. at 540. The "general" rule of directness in an FHA case is that proximate cause does not extend "beyond the first step" in the causal chain. *City of Miami*, 137 S. Ct. at 1306 (citing *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 10 (2010) (Roberts, C.J.)). This comports with common speech—Webster's Third New International Dictionary defines "proximate" as "immediately preceding or following (as in a chain of events, causes or effects)." Def. 1 (1981).

As part of the directness evaluation, a court must also consider whether the alleged harm "may have been produced by independent factors." *Associated Gen. Contractors*, 459 U.S. at 542. The more links between the challenged conduct and the alleged harm, the less direct the injury, and "the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269. A plaintiff fails the directness requirement and cannot establish proximate cause where the alleged injury "is not surely attributable" to the defendant's conduct, "but might instead have resulted from any number of other reasons." *Lexmark*, 134 S. Ct. at 1394 (alterations omitted) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (Kennedy, J.)).

The FHA's directness requirement is grounded in the practical reality that the "housing market is interconnected with economic and social life." *City of Miami*, 137 S. Ct. at 1306. The Supreme Court then addressed the same concerns this Court raised at oral argument, noting that an FHA violation may "be expected to cause ripples of harm to flow far beyond the defendant's misconduct" (*i.e.*, well beyond from Point A to Point B) but "[n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel" (*i.e.*, all the way out to Point D and Point E). *Id.* (citations and quotations omitted). Absent the directness requirement, liability in FHA cases could stretch to any of the remote yet imaginable aspects of "economic and social life" in a never-ending causal chain.

8

Significantly, the eight members of the Supreme Court who considered *City of Miami* agreed with the proximate-cause standard announced by the majority. But the concurring Justices—Justices Thomas, Alito, and Kennedy—would have gone beyond merely articulating the standard. The concurrence observed that "the majority opinion leaves little doubt that neither Miami nor any similarly situated plaintiff can satisfy the rigorous standard for proximate cause that the Court adopts." *Id.* at 1311 (Thomas J., concurring). In particular, the concurring justices emphasized that "Miami's own account of causation shows that the link between the alleged FHA violation and its asserted injuries is exceedingly attenuated," and, applying that standard on remand, the lower court "will not need to look far to discern other, independent events that might well have caused the injuries Miami alleges in these cases." *Id.* The concurrence would have held "Miami has failed to sufficiently plead proximate cause under the FHA." *Id.* at 1311-12.

Application of the *City of Miami* proximate-cause requirement to the County's SAC leads to the conclusion the concurrence found unavoidable: the County simply does not—because it cannot—sufficiently plead proximate cause. Indeed, contrary to the "general" rule that proximate cause does not extend "beyond the first step," the County's injuries are not just one step removed, but multiple steps removed from allegedly discriminatory loans made to its residents. *City of Miami*, 137 S. Ct. at 1306. The County's causal chain begins with discriminatory loans to non-party borrowers (*i.e.*, the first step), but then requires a cascade of many additional steps: defaults because of the discriminatory payment differentials (as opposed to some other reason); foreclosures (instead of sales or loan modifications or other foreclosure alternatives) caused by defaults; vacancies of foreclosed properties (instead of occupancy by new owners); declines in property values because of foreclosures (rather than because of general market or neighborhood trends); and finally lower property tax collections because of lower property values. Also, the

9

theory requires blight and crime at foreclosed properties because of vacancies (not simply because of random chance or general social conditions) that caused the County to spend money on services that otherwise would not have been spent. At bottom, the County "complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts," and thus "stand[s] at too remote a distance to recover." *Holmes*, 503 U.S. at 268-69.

Further defeating proximate cause, each link in the County's causal chain involves a host of independent actors and variables: borrowers—whose financial circumstances may have changed due to independent variables such as job loss, sickness, divorce, or mismanagement— who defaulted; loan servicers, who foreclosed; prospective buyers, who gave lower or no offers; assessors, who discerned home values to determine property taxes;[6] squatters, vandals, or other criminals, who congregated in or near the empty homes; and police and fire departments (or policymakers above them), who adjusted the level of municipal services. All of these independent actors and variables entered the scene long after Wells Fargo had originated the allegedly discriminatory loans. There can be no certainty that the County's "damages [are] attributable to the violation, as distinct from other, independent factors." *Holmes*, 503 U.S. at 269; *Lexmark,* 134 S. Ct. at 1394. The County accuses Wells Fargo of causing its damages, but the asserted harms are no different from the harms that any other person or entity might suffer as a result of the overall economic decline visited by the Great Recession.

---

[6] The County's own tax regime provides a case in point: a recent exposé of the County Assessor's office concluded that throughout the same time period covered by the SAC, "the county's property tax system created an unequal burden on residents, handing huge financial breaks to homeowners who are well-off while punishing those who have the least, particularly people living in minority communities." Chicago Tribune, *An Unfair Burden: Cook County Failed To Value Homes Accurately For Years. The Result: A Property Tax System That Harmed The Poor And Helped The Rich* (June 10, 2017).

Chief Justice Roberts's opinion in *Hemi Group*—a case on which the Court relied in *City of Miami*—offers a useful analogy. As here, a city claimed that statutory violations resulted in diminished tax revenues. *See* 559 U.S. at 6. Also as here, that city relied on a multi-step causal theory involving independent actors.[7] Yet, *Hemi Group* concluded the city could not establish proximate cause because its "theory of causation requires us to move well beyond the first step," "is far too indirect," and "rests on the independent actions of third and even fourth parties." *Id.* at 10, 15. The County's theory here requires even more steps and implicates even more independent actors.[8] The result the Supreme Court reached in *Hemi Group* certainly follows.

The Supreme Court has also found "relevant" to the proximate cause inquiry "whether better situated plaintiffs would have an incentive to sue." *Id.* at 11-12; *Anza*, 547 U.S. at 460; *Holmes*, 503 U.S. at 269-70. The need to resolve challenging questions of causation and damages of downstream victims "is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269-70. Just so here—both the United States and the State of Illinois pursued the same claims as the County, and both negotiated substantial relief on behalf of

---

[7] In particular, the defendant had allegedly violated RICO by failing to provide information to the state about customers purchasing cigarettes, the state in turn was unable to provide that information to the city, and the city in turn could not determine which of defendant's customers had failed to pay cigarette taxes, impairing its tax collection activities. *Id*. at 9.

[8] Here, the County would have to establish at least six steps to link the challenged conduct and alleged injuries—and as discussed above, each of these steps involves myriad other possible causes, thus decreasing the mathematical probability that the challenged acts (discriminatory loans) had anything at all to do with the asserted injury (lost tax revenue). A borrower may be able to show a direct injury as a result of a discriminatory loan (100% causation), but the County must show, through six steps of outward ripples, that allegedly discriminatory loans caused the County to lose taxes (to the exclusion of all other causes)—a virtual mathematical impossibility.

11

County residents and other alleged victims of discriminatory lending.[9] The fact that direct victims of alleged discrimination can pursue claims under the FHA, either acting alone or, as here, through federal or state governments, counsels against permitting indirect victims like the County to pursue its more attenuated claims.

Moreover, "[p]artly because it is indirect, and partly because the alleged effects on the [County] may have been produced by independent factors, the [County's] damages claim is also highly speculative." *Associated Gen. Contractors*, 459 U.S. at 542. Ignoring proximate cause and allowing the County's claim "would risk massive and complex damages litigation," far beyond what "is administratively possible and convenient." *City of Miami*, 137 S. Ct. at 1306.

Looking at the proof that would be required to support a verdict in this case confirms the claim must be dismissed. It would be necessary to hold mini-trials on every single loan, requiring a deep dive into the financial circumstances of borrowers. The County would need to prove, for every loan, that the borrower qualified for certain loan terms but instead received discriminatory loan terms, and defaulted because of the discriminatory payment differential—and not because of a job loss, divorce, or other variables. Such mini-trials would require the unseemly and intrusive examination of the private financial lives of individuals who are not parties to this case and who have not complained about their loans. The next stage would involve another set of mini-trials regarding foreclosure proceedings for each of the properties owned by the borrowers who received discriminatory loans and defaulted because of the terms. These mini-trials would implicate issues individual to each borrower and each property, like borrower decisions regarding foreclosure alternatives (such as sales or loss mitigation), borrower decisions to live in

---

[9] The State's settlement should preclude the County's claims altogether, because the State and the County were in privity at the time of the settlement and the State could have chosen to share the settlement funds with the County for the alleged injuries to its tax base. *See infra* at Section IV.

or abandon homes during foreclosure proceedings, determinations of whether foreclosures were completed, determinations of when, if ever, properties became vacant, and determinations of when new owners moved in. The next stage would require yet another set of mini-trials regarding the valuation of foreclosed properties, including facts about each property's value before and after foreclosure, the methods for conducting valuations, and independent variables impacting property values (such as home improvements, neighborhood trends, and natural disasters). And so on, and so on.

The *City of Miami* proximate-cause requirement simply does not permit the County's allegations of cause-and-effect-and-effect-and-effect. The case must be dismissed.

## II. THE COUNTY FAILS TO STATE A CLAIM FOR DISPARATE-IMPACT DISCRIMINATION.

The County has amended its pleading to now separately allege two counts of "disparate impact," *see* SAC ¶¶ 433-442 (Count I), 443-456 (Count II), and one count of "disparate treatment," *see id.* ¶¶ 457-465 (Count III). One week after the Court heard oral argument on Wells Fargo's motion to dismiss the County's original complaint, the Supreme Court decided *Inclusive Communities*, which articulated the FHA standard for disparate impact and provides the roadmap for evaluating the County's claims. 135 S. Ct. 2507 (2015).

*Inclusive Communities* imposes a gatekeeping role that requires district courts "*at the pleading stage*" to "examine with care whether a plaintiff has made out a prima facie case of disparate impact." *Id*. at 2523-24 (emphasis added). A "plaintiff who fails to allege facts at the pleading stage … cannot make out a prima facie case of disparate impact," and such cases require "prompt resolution." *Id.* at 2523.

*Inclusive Communities* particularly emphasizes that a disparate-impact claim cannot proceed "based solely on a showing of a statistical disparity" because "racial imbalance does not,

without more, establish a prima facie case of disparate impact." *Id.* at 2522-23 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k)). Rather, "a disparate-impact claim that relies on a statistical disparity *must fail* if the plaintiff cannot point to the defendant's policy or policies causing that disparity." *Id.* at 2523 (emphasis added).[10] The specific policy under attack must be "*facially neutral* in the[] treatment of different groups," meaning that the policy itself does not reflect intentional discrimination and is applied by the defendant fairly and uniformly to minorities and non-minorities alike. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (emphasis added). The plaintiff must meet a "robust causality requirement" by showing the specific policy caused the statistical disparity. *Inclusive Communities*, 135 S. Ct. at 2523-24.

The County fails to plausibly allege facts satisfying any of these essential elements of disparate impact under *Inclusive Communities*. The claim is deficient at the first step, because the County nowhere identifies a specific and facially-neutral business policy or practice of Wells Fargo that is the subject of the disparate-impact challenge. The County purports to identify "facially neutral" policies and practices in paragraphs 435 and 449 of the SAC but, as a matter of law, none can possibly support a disparate-impact claim.

First, the County alleges a policy of "incentivizing loan officers, brokers and others responsible for mortgage lending to make and *steer* people into higher cost loans." SAC ¶ 435 (emphasis added). But an alleged practice of "steering" requires consideration of race and is not race neutral; rather, as a district judge concluded in dismissing a nearly-identical complaint, "[t]his is alleged intentional conduct, which is not a basis for a disparate impact FHA claim

---

[10] *See also Wards Cove*, 490 U.S. at 657 (plaintiff must point to "the application of a specific or particular … practice that has created the disparate impact under attack"); *Hardie v. NCAA*, No. 15-55576, 2017 WL 2766096, at *12 (9th Cir. June 27, 2017).

under *Inclusive Communities*." *City of Miami v. Wells Fargo & Co.*, No. 13-24508, 2016 WL 1156882, at *5 (S.D. Fla. Mar. 17, 2016) (citing *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1528 (7th Cir. 1990) (Posner, J.)). This is because "[t]he mental element required in a steering case is the same as that required . . . on a theory of disparate treatment [which] means treating a person differently because of his race." *Dwivedi*, 895 F.2d at 1528. As Judge Posner explained, "[s]ome practices lend themselves to the disparate impact method, others not. We cannot imagine the practice (innocent in intent, discriminatory in impact . . .) on which a disparate impact theory might be based in" a steering case. *Id.* at 1533.

The County describes other alleged practices of "making loans destined to fail" and "engaging in unsound practices with respect to foreclosures and related activities, such as robo-signing." SAC ¶¶ 435, 449. But if such practices were applied uniformly to minority and non-minority borrowers alike—as must be assumed for a disparate-impact claim—the only plausible inference is that "they would affect borrowers equally regardless of race."[11] *City of Los Angeles v. Wells Fargo & Co.*, No. 15-56157, 2017 WL 2304375, at *1 (9th Cir. May 26, 2017). On the other hand, if the County contends that these practices were applied *only* to minority borrowers, then it is alleging intentional discrimination (*i.e.*, that minority borrowers were treated differently than non-minority borrowers). "Inconsistent application of housing standards, of course, may be the basis for a disparate treatment claim under the FHA," but "an FHA disparate-impact claim

---

[11] Elsewhere the SAC says that these "robo-signing" practices were, in fact, applied uniformly to minority and non-minority borrowers alike. In particular, paragraphs 276-284 repeat allegations regarding supposedly deceptive practices in mortgage loan servicing that were set forth in a "Robosigning Complaint" Wells Fargo voluntarily resolved with the Department of Justice. As is relevant here, the Robosigning Complaint *did not include any claim of discrimination*. *See* Complaint at 39, *United States v. Bank of America Corp.*, No. 1:12-00361 (D.D.C. March 12, 2012), ECF No. 1.

may not be used . . . merely because housing standards are inconsistently applied." *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017).

Last, the County purports to challenge a so-called "policy" of "giving substantial discretion" to its employees. SAC ¶ 435. But providing employees with "discretion" is not a policy at all. Just the opposite: as the Supreme Court has held in the Title VII context, discretion is "a policy *against* having uniform employment practices." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011). Indeed, disparate-impact claims challenging loan pricing "discretion" were brought under the FHA years ago (including a multi-district claim against Wells Fargo). All such challenges came to a halt after the Supreme Court decided *Wal-Mart*. *See* Order Denying Pls.' Mot. for Class Cert., *In re Wells Fargo Residential Mortgage Lending Discrimination*, 3:08-md-01930 (N.D. Cal. Sept. 6, 2011), ECF No. 401; *Rodriguez v. National City Bank*, 726 F.3d 372 (3rd Cir. 2013) ("This [FHA] case bears a striking resemblance to *Dukes*. . . . Here, as in *Dukes*, the exercise of broad discretion by an untold number of unique decision-makers in the making of thousands upon thousands of individual decisions undermines the attempt to claim, on the basis of statistics alone, that the decisions are bound together by a common discriminatory mode.").

The reason the County fails to identify the required race-neutral policy is obvious— flouting the Supreme Court's rule, the County seeks to bring a disparate-impact claim "based solely on a showing of a statistical disparity." *Inclusive Communities*, 135 S. Ct. at 2522. Making no attempt to hide this goal, the SAC adds several new paragraphs reporting the numbers of foreclosures that occurred in minority areas and in non-minority areas of the County, and alleging that more foreclosures occurred in minority areas than in non-minority areas. SAC ¶¶ 10, 340-45. On the basis of these different racial outcomes in foreclosures, and nothing more, the

County asks the Court to infer disparate-impact discrimination, alleging that "Defendants have plainly foreclosed on minority homeowners to a far greater and disproportionate extent than non-minority homeowners and their foreclosures have been disproportionately concentrated in higher minority neighborhoods. This empirical and statistical information provides direct and *prima facie* evidence of the disparate impact." SAC ¶ 345. Solely because there are not equal numbers of foreclosures in minority areas and non-minority areas, the County seeks an inference that Wells Fargo—and not "factors other than the defendant's policy"—created the racial disparity and is responsible for discrimination. *Inclusive Communities*, 135 S. Ct. at 2514. That is the sort of "abusive disparate-impact claim[]" that *Inclusive Communities* guards against. *Id.* at 2523.

## III.   THE COUNTY'S CLAIMS ARE UNTIMELY.

This suit was filed on November 28, 2014, and to state a timely claim the County must plausibly allege an actionable violation occurring within the FHA's two-year limitations period—*i.e.*, on or after November 28, 2012. *See* 42 U.S.C. § 3613(a)(1)(A). As with the issue of proximate cause, the Court found no need to decide the statute-of-limitations issue in its ruling on Wells Fargo's motion to dismiss the original complaint, *see Cty. of Cook*, 115 F. Supp. 3d at 921, but the topic was extensively addressed with counsel at oral argument, *see* Ex. A at 33:6-57:4. The SAC adds nothing new to support a timely claim, and the lack of any such new allegations only confirms that the suit must be dismissed as time-barred.

To start, despite the opportunity to replead, the County decided not to add any new facts whatsoever about Wells Fargo's residential mortgage lending in the limitations period.[12] The

---

[12] The sole amended allegation that even references limitations-period lending—paragraph 337— merely highlights the tactic of obfuscating timely conduct to squeak by the limitations bar. The prior pleading referenced "*55,000*" loan originations made between "2000-*2013*." Am. Compl., ECF No. 65 ¶ 328 (emphasis added). The SAC repeats the allegation verbatim, referencing the same "55,000" loans, except it extends the time period to "2000-*2017*." SAC ¶

17

County cannot meet the plausibility test by coupling new conclusory allegations that Wells Fargo "discriminat[ed] on the basis of ethnicity and/or race by intentionally targeting FHA protected [minority] borrowers . . . for predatory, higher cost, subprime, ALT-A and/or other mortgage loans . . . made on terms less favorable than loans made to similarly situated [non-minority] borrowers" with new conclusory allegations that the alleged acts are "continuing." SAC ¶¶ 459, 462. It must "plead sufficient facts to state a claim for purposeful and unlawful discrimination" by "plausibly showing" that Wells Fargo made unfavorable loans to minorities "*because of* their race, religion, or national origin." *Iqbal*, 556 U.S. at 682 (emphasis added). In other words, the County must plausibly allege that race or ethnicity "was the 'but-for' cause of the challenged [lending] decision." *Gross v. F.B.L. Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (interpreting language of the ADEA nearly identical to that of the FHA).[13]

Instead of adding specifics regarding limitations-period lending, the County has doubled-down on attempting to state a timely claim as to "each of Defendants' decisions and practices in the chain of a foreclosure event; namely whether or not to modify a defaulted or high cost loan" and "whether to foreclose on a particular defaulted borrower's home." SAC ¶ 272. At oral argument, the Court expressed skepticism regarding such a claim, and asked the County to identify paragraphs alleging a "discriminatory aspect of how the homes are being foreclosed"

---

337 (emphasis added). The only plausible inference to draw from the amended allegation is that all 55,000 of the referenced loans were originated before 2013, as originally asserted. *Id*. ¶ 337.

[13] And the County is misguided to the extent it believes it can state a plausible claim simply by finding a minority borrower who paid more for a loan than a white borrower. Loan pricing is "inherently complex," Final HMDA Rule, 80 Fed. Reg. 66128, 66291 (Oct. 28, 2015), and under *Iqbal* it is not enough that pricing differences might be *correlated* with race. *See* 556 U.S. at 681 (despite alleging a correlation with race, complaint lacked factual allegations that defendant detained Arab Muslim men because of race, and thus failed to state a plausible discrimination claim). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. at 678.

that is "not just a lingering effect of the original sin" of supposedly discriminatory loans.[14] Ex. A at 36. The County could not point to anything in the "four corners" of its pleading. *Id.*

But now, the County hangs its hat on cosmetic adjustments and more conclusions, without any supporting facts about alleged discrimination in servicing or foreclosure. The SAC now includes Count II, which purports to separately challenge "mortgage servicing and foreclosure practices." SAC ¶¶ 443-56. The County adds next to nothing about servicing, beyond the conclusory statement that Wells Fargo "routinely charged marked-up fees to minority borrowers through various means, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures." *Id.* ¶ 273. *Iqbal* demands more—the County does not, for example, allege that Wells Fargo charged a fee or refused to modify a loan to a minority borrower in the limitations period when it did not charge a fee or agreed to modify a loan for a similarly-situated white borrower. Even if it did, the County fails to tell the Court how it would have even Article III standing to challenge a decision regarding the servicing of a loan to a citizen, which would have no impact on the County under its own theory of injury unless the

---

[14] Of course, the downstream effects of a discriminatory act do not give rise to an actionable claim. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 625-28 (2007) (Title VII claim untimely because limitations period began when the alleged discriminatory act occurred, not when its effects were felt). Congress has since revised the timing for when Title VII claims of discriminatory compensation accrue under Title VII. *See* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5, 5-7 (2009); *see also* 42 U.S.C. § 2000e-5(e)(3)(A). Because similar amendments were not made to the FHA, however, *Ledbetter* continues to control in this lending discrimination case. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 624 n.3 (1999) ("[A] departure from the traditional understanding of discrimination requires congressional action"); *Gross*, 557 U.S. at 174 ("We cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally").

decision directly leads to foreclosure, vacancy, crime and blight, lower property values, lower tax revenues and increased municipal services.[15]

As to allegedly "discriminatory foreclosures," the County simply recites statistics regarding the numbers of foreclosures in minority neighborhoods as compared to the numbers of foreclosures in non-minority neighborhoods. *See* SAC ¶¶ 341-45. It alleges no facts about *why* the foreclosures in minority neighborhoods constitute discrimination, no facts about any Wells Fargo decision to foreclose on a minority homeowner but not on a similarly-situated white homeowner, and even fails to limit its statistics to the number of *discriminatory* foreclosures.[16] The entire thrust of the claim is that Wells Fargo has "foreclosed on minority homeowners to a far greater and disproportionate extent than non-minority homeowners." *Id.* ¶ 345. In other words, the County infers discrimination *solely* on the basis of unequal racial outcomes in the number of foreclosures—as described in detail above, *see supra* at 13, 16, this the Court cannot do. *See Inclusive Communities*, 135 S. Ct. at 2523 ("serious constitutional questions" arise regarding "use [of] numerical quotas"). And the County urges the Court to ignore plausible, non-discriminatory reasons numbers of foreclosures in minority areas may exceed those in white areas; for example, the County notes the impact of unemployment on foreclosures, *supra* at 3, and "as between that 'obvious alternative explanation' for [defaults and foreclosures], and the

---

[15] Indeed, as a federal judge held in a parallel case filed by Los Angeles against Bank of America, FHA claims must fail unless the County itself "has suffered any damages as a result of Defendants' alleged[] discriminat[ion]." *City of Los Angeles v. Bank of Am. Corp.*, No. 13-9046, 2015 WL 4880511, at *6 (C.D. Cal. May 11, 2015), *aff'd*, No. 15-55897 (9th Cir. May 1, 2017). And as another federal judge held in dismissing the second amended complaint in a parallel case filed by Miami (where litigation proceeded in the district court until the Supreme Court granted certiorari) "[u]nder City's own theory, not all discriminatory [acts] result in harm to the City for which it seeks redress; instead, only those [instances] that both end up in foreclosure and either reduce property tax values or require additional city services cause the City any harm." *City of Miami*, 2016 WL 1156882, at *4.

[16] The County has not alleged, and it is not plausible to infer, that *every single decision* to foreclose a home in a minority neighborhood constitutes discrimination.

purposeful, invidious discrimination [the City] asks [the Court] to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (citations omitted).

With no new facts about "discriminatory" lending, servicing, or foreclosure, the County again rests the timeliness of its claim on a sole allegation contained in paragraph 335 of the SAC, which repeats verbatim the original complaint's paragraph 326. At oral argument, the court focused on this paragraph in addressing the application of the statute of limitations and asked the County: "Where in the complaint, other than paragraph 326, does the County allege loan originations within the statute of limitations period?" Ex. A at 33. The County failed to identify any other allegation of originations in the limitations period.

Viewed in the light most favorable to the County, paragraph 335 merely alleges that—in all of 2012 (though only 33 days of that year fall in the limitations period) and in all of 2013— 99% of the loans originated by Wells Fargo to residents of "High Foreclosure Areas" were *not* "high cost" loans and thus are not challenged by the County in any manner. *See* SAC ¶ 335. "High cost" does not mean "discriminatory," and the only plausible interpretation of paragraph 335 is that Wells Fargo "targeted" High Foreclosure Areas for loans that the County has no basis to challenge. It would be more logical for the County to promote—not challenge—prime-rate lending in High Foreclosure Areas. The County's suggestion that Wells Fargo should refuse to originate loans with unchallenged terms to minority borrowers residing in High Foreclosure Areas[17] would be unlawful and more likely to harm the very minority residents the County says

---

[17] At oral argument, the County argued that Wells Fargo somehow violated the FHA simply by "making loans in high-foreclosure-rate areas to a greater percentage of minorities than there are minorities in the community." *See* Ex. A at 45. To the extent the County seeks an inference of discrimination due to a lack of equal racial outcomes, it fails to plausibly allege a timely violation for the reasons described above. *See supra* at 13, 16.

it protects.[18] At bottom, the County has no plausible basis for challenging lending to minorities in High Foreclosure Areas, and conceded as much stating that "until we get into those loan terms . . . [W]e can't provide any more detail on that." Ex. A. at 45. It is "no answer" to the plausibility requirement to say that a claim falling short of establishing entitlement to relief should not be "weeded out early in the discovery process." *Bell Atlantic* v. *Twombly*, 550 U.S. 544, 559 (2007).

At bottom, the County has not alleged the facts about limitations-period lending required to meet the plausibility standard. *Iqbal*, 556 U.S. at 678-699; *City of Miami*, 2016 WL 1156882, at *3 (dismissing a nearly-identical complaint as time barred because the "sole [] paragraph attempting to identify a timely FHA violation within the two-year limitations period is too conclusory to meet the *Twombly/Iqbal* pleading standard"). The reason, as the Court previously recognized, is that this case is primarily about "subprime mortgage loans." *Cty. of Cook*, 115 F. Supp. 3d at 911. The County's new pleading retains the prior focus on subprime loans, and the detailed allegations about subprime loans stand in stark contrast to the sparse and conclusory allegations about limitations-period loans. *See* SAC ¶¶ 4, 15, 28-29, 36-43, 48-50, 52-53, 55-56, 59-61, 63-65, 68-69, 72-74, 76-77, 82, 97, 102, 104-08, 118, 120, 124-26, 131, 135-38, 153-55, 162, 165, 190, 196-201, 223, 228-30, 238, 243-45, 247-48, 272, 282, 314-15, 318, 320, 336, 434, 458, 459 (allegations addressing "subprime" loans).

Even the County concedes that "Wells Fargo's focus on 'subprime' loan originations and purchases subsided *by the end of 2008*." *Id.* ¶ 120 (emphasis added). Thus the obvious question

---

[18] Indeed, the Justice Department has previously taken legal action against banks that failed to originate such loans in the same Cook County communities at issue in this case, claiming that denying those communities credit violated the FHA. *See, e.g.*, Compl. ¶ 12, *United States v. First Am. Bank*, No. 1:04-CV-04585 (N.D. Ill. July 13, 2004), ECF No. 1 (alleging that First American Bank violated the FHA by "act[ing] to meet the residential, consumer, and business credit needs of predominantly white residential census tracts" throughout the Chicago region while "avoid[ing] serving the lending and credit needs of majority minority tracts").

is how can the County challenge lending that occurred long before the FHA's two-year limitations period began? The answer is: it cannot. Yet the new pleading still asserts that "the statute of limitations on Defendants' scheme has not yet begun to run." *Id.* ¶ 292. At oral argument, the County perplexingly accused "defense counsel [of] assum[ing] that the limitations period [is] a two-year limitations period," and confirmed its position that "the limitations period does not begin to run until the scheme ends"—i.e., "30 years from the date that the loan was made." Ex. A at 47. For good reason, the Court responded: "That can't be." *Id.*

An FHA claim for originating a discriminatory loan begins to run from the date that the loan closes. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 532 (7th Cir. 2011); *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1274 (11th Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 1296 (2017); *Kimbrew v. Fremont Reorg. Corp.*, No. 08-03277, 2008 WL 5975083, at *3 (C.D. Cal. Nov. 17, 2008). The County seeks to evade this clear rule by arguing that "the statute of limitations for an individual borrower on various claims that may or may not arise in an individual lending process just has no bearing on the statute of limitations alleged in this Fair Housing Act complaint." Ex. A at 55. But the County specifically amended its pleading to allege that it "brings this action for its own damages pursuant to the private persons civil enforcement provisions of 42 U.S.C. § 3613"—the very same provisions available to individual borrowers. SAC ¶ 19. As such, the attempted justification holds no water. The County (like all persons) is subject to legislative judgments, including statutes of limitations. *See United States v. Kubrick*, 444 U.S. 111, 117 (1979) ("[s]tatute of limitations . . . represent a pervasive legislative judgment that . . . the right to be free of stale claims in time comes to prevail over the right to prosecute them" and they "afford[] plaintiffs what the legislature deems a reasonable time to present their claims"). The County's claims must be dismissed as time-barred.

23

## IV.     THE COUNTY'S CLAIMS ARE BARRED BY RES JUDICATA.

Finally, the court should dismiss the County's claims regarding pre-2012 conduct for the independent reason that they are barred by res judicata. That doctrine bars the County's claims because the "United States Department of Justice ('DOJ') sued Wells Fargo over precisely these alleged [lending] practices under the FHA, as did the Attorney General of Illinois under parallel provisions of the Illinois Human Rights Act, 775 ILCS 5/1 *et seq.* [and] both cases were resolved in 2012 with consent decrees," with Illinois receiving the remedial benefits of both federal and state law. *Cty. of Cook*, 115 F. Supp. 3d at 912; *see also* Dkt. 36, Ex. A (the "Consent Decree"). The County's claims regarding pre-2012 conduct are therefore precluded.

The IAG's complaint, filed on behalf of "The People of the State of Illinois," effectively sought relief both on behalf of Illinois borrowers and the State and its political subdivisions. While the IAG sought restitution for borrowers under the Illinois Human Rights Act, she also demanded millions of dollars in civil penalties under that statute and the Illinois Consumer Fraud and Deceptive Business Practices Act to be paid to the State. *See* Consent Decree ¶¶ 223-255 (seeking civil penalties of $25,000 per violation of the Illinois Human Rights Act and $50,000 per violation of the Illinois Consumer Fraud and Deceptive Business Practices Act). The IAG filed her complaint in the name of "The People" because the statutes under which she sued required her to do so—*see* 815 ILCS 505/7(a); 775 ILCS 5/10-104(A)(1)—but that does not imply that the penalties she sought could ever have been awarded to residents, rather than the State.

The injuries alleged in the IAG's complaint confirm that the IAG sought relief on behalf of local governments as well as the State. The IAG alleged that "[t]he State of Illinois itself continues to be harmed by Defendants' acts, practices and policies *due to the reduced property tax base* caused by mortgage loans originated by Defendants going into foreclosure and the costs

24

related to foreclosure." *Id.* ¶ 236 (emphasis added); *see also id.* ¶ 246. But property taxes are paid to the State's political subdivisions, not to the State.[19] The only way a reduced property tax base could harm the "State of Illinois itself" is if the term included the political subdivisions of the State that collect property taxes. The IAG herself predicted that "plummeting property values mean a shrinking tax base for funds to support governmental services," and that "[l]ocal governmental authorities will look to the State to make up budget shortfalls for necessary services." *Id.* ¶ 61. Thus, the IAG's Complaint confirms that the IAG was seeking relief on behalf of the State's property-tax-collecting political subdivisions—including Cook County.

That the IAG eventually chose to forego collecting penalties for the government and instead negotiated a settlement that would provide millions of additional dollars directly to County borrowers makes no difference. Res judicata "'precludes the sequential pursuit not only of claims actually litigated, *but of those that could have been litigated.*'" *Dookeran v. Cty. of Cook*, 718 F.3d 570, 576 (7th Cir. 2013) (emphasis added) (quoting *Garcia v. Village of Mt. Prospect*, 360 F.3d 630, 639 (7th Cir. 2004)); *accord Abner v. Ill. Dep't of Transp.*, 674 F.3d 716, 720 (7th Cir. 2012); *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012); *Hicks v. Midwest Transit, Inc.*, 479 F.3d 368, 371-72 (7th Cir. 2007). The relevant question is not whether the IAG fully litigated claims for penalties on behalf of the government, but whether she *could have*. Given the allegations in the IAG's complaint seeking substantial civil penalties on behalf of the government, the answer is unequivocally yes, and that is enough to bar the County's claims. *See, e.g.*, *Dookeran*, 719 F.3d at 576; *Abner*, 674 F.3d at 720.

---

[19] *See, e.g.*, Illinois Department of Revenue, *The Illinois Property Tax System* (Sept. 13, 2015), at 5, http://www.revenue.state.il.us/publications/localgovernment/ptax1004.pdf ("Illinois does not have a state property tax . . . The last year the State of Illinois imposed real estate taxes was 1932. Since then, property taxes have been imposed by local government taxing districts only.").

## <u>CONCLUSION</u>

The Second Amended Complaint should be dismissed. Because the County cannot cure the defects in its complaint through amendment, the dismissal should be with prejudice.

Dated:   Chicago, Illinois          Respectfully submitted,
        July 24, 2017

                                        KATTEN MUCHIN ROSENMAN LLP

                                        BY: <u>/s/ Sheldon T. Zenner</u>

                                        Sheldon T. Zenner
                                        Sheldon.Zenner@kattenlaw.com
                                        David C. Bohan
                                        David.Bohan@kattenlaw.com
                                        Peter G. Wilson
                                          Peter.Wilson1@kattenlaw.com
                                        525 W. Monroe Street
                                        Chicago, Illinois 60661-3693
                                        Tel: (312) 902-5200
                                        Fax: (312) 902-1061

                                        K&L GATES LLP

                                        Paul F. Hancock
                                        200 South Biscayne Blvd., Suite 3900
                                        Miami, Florida 33131-2399

                                        *Attorneys for Defendants*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 24, 2017, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

Dated: July 24, 2017

/s/ Peter G. Wilson
Peter G. Wilson

27