**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COUNTY OF COOK,            ) | |
|         ) | |
|       Plaintiff,      ) | |
|         ) | |
| v.                  ) | Case No : 14-cv-9548 |
|         ) | Judge Gary Feinerman |
| WELLS FARGO & CO., et al.,    ) | |
|         ) | |
|       Defendants.     ) | |

<u>**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

**KIMBERLY M. FOXX,
STATE'S ATTORNEY FOR COOK COUNTY**

| | |
|---|---|
| JAMES D. MONTGOMERY, SR. | JAMES M. EVANGELISTA (*pro hac vice*) |
| JOHN K. KENNEDY | DAVID J. WORLEY (*pro hac vice*) |
| **JAMES D. MONTGOMERY &** | **EVANGELISTA WORLEY, LLC** |
| **ASSOCIATES, LTD.** | 8100 A Roswell Road, Suite 100 |
| One North LaSalle Suite 2450 | Atlanta, GA 30350 |
| Chicago, IL 60602 | Phone: (404) 205-8400 |
| Phone: (312) 977-0200 | |

*Special Assistant State's Attorneys*

SANFORD P. DUMAIN (*pro hac vice* application forthcoming)
PEGGY J. WEDGWORTH (*pro hac vice* application forthcoming)
JENNIFER S. CZEISLER (*pro hac vice* application forthcoming)
J. BIRT REYNOLDS (*pro hac vice* application forthcoming)
MELISSA R. CLARK (*pro hac vice* application forthcoming)
**MILBERG LLP**
One Pennsylvania Plaza, 50th Floor
New York, NY 10119
Phone: (212) 594-5300

*Additional Counsel*

## <u>TABLE OF CONTENTS</u>

**Page**

I. PRELIMINARY STATEMENT ................................................................................. 1

II. FACTS ..................................................................................................................... 3

III. STANDARD OF REVIEW ..................................................................................... 5

IV. ARGUMENT ........................................................................................................... 6

    A. Proximate Cause .............................................................................................. 6

        1. The Supreme Court Left it to the Lower Courts to Define the Contours of Proximate Cause Under the FHA ..................................................... 8

        2. Plaintiff's Injuries are Direct ............................................................... 11

        3. Plaintiff's Allegations Establish Proximate Cause .............................. 15

        4. Allowing Municipalities to Recover for FHA Violations is Administratively Possible and Convenient .............................................................. 17

    B. The Second Amended Complaint States a Valid Disparate Impact Claim ............. 19

    C. The County's Claims Are Timely .................................................................. 21

    D. Res Judicata Does Not Bar Plaintiff's Second Amended Complaint .................... 23

V. CONCLUSION ...................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006)...................................................................................................... 11

*Aransas Project v. Shaw*,
   775 F.3d 641 (5th Cir. 2014) ....................................................................................... 9

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)...................................................................................................... 11

*Arnett v. Envtl. Sci. & Eng'g, Inc.*,
   657 N.E.2d 668 (Ill. App. Ct. 1995, 3d Dist.).......................................................... 24

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)................................................................................................. 9, 13

*Baker v. F&F Investment*,
   420 F.2d 1191 (7th Cir. 1970) .................................................................................... 23

*Bank of America Corp. v. City of Miami*,
   137 S. Ct. 1296 (2017)........................................................................................ *passim*

*Barrett v. H&R Block, Inc.*,
   652 F. Supp. 2d 104 (D. Mass. 2009) ....................................................................... 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 555 (2007)................................................................................... 5, 19, 21

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639, 654 (2008)............................................................................................. 9

*Carter v. Berger*,
   777 F.2d 1173 (7th Cir. 1985) ............................................................................... 13-15

*City of L.A. v. Bank of Am.*,
   2014 U.S. Dist. LEXIS 85957 (C.D. Cal. 2014)................................................... 21, 22

*City of L.A. v. Citigroup Inc.*,
   24 F. Supp. 3d 940 (C.D. Cal. 2014) ......................................................................... 21

*City of L.A. v. Wells Fargo & Co.*,
   22 F. Supp. 3d 1047 (C.D. Cal. 2014) ................................................................... 21, 22

*City of Memphis v. Wells Fargo Bank*,
   2011 U.S Dist. LEXIS 48522 (W.D. Tenn. 2011)............................................... 19, 21

*Cnty. of Cook v. HSBC N. Am. Holdings*,
   136 F. Supp. 3d 952 (N.D. Ill. 2015) .................................................................... 19-22

*Cox v. Adm'r U.S. Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994) ................................................................. 12

*CSX Transp., Inc. v. McBride*,
564 U.S. 685 (2011) ................................................................................... 9

*Daveri Dev. Grp., LLC v. Vill. of Wheeling*,
934 F. Supp. 2d 987 (N.D. Ill. 2013) ...................................................... 20

*DeKalb Cnty. v. HSBC N. Am. Holdings*,
2013 U.S Dist. LEXIS 185976 (N.D. Ga. 2013) ....................... 19, 21-22

*Friends of Trumbull v. Chicago Bd. of Educ.*,
123 F. Supp. 3d 990 (N.D. Ill. 2015) ...................................................... 10

*Gladstone v. Bellwood*,
441 U.S. 91 (1979) ..................................................................... 9, 11, 16

*Gorski v. Troy*,
929 F.2d 1183 (7th Cir. 1991) ................................................................ 11

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ........................................................................ *passim*

*Hemi Group, LLC v. City of New York*,
559 U.S. 1 (2010) ...................................................................................... 14

*Hoffman v. Option One Mort. Corp.*,
598 F. Supp. 2d 1009 (N.D. Ill. 2008) ................................................... 20

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992) ........................................................................ *passim*

*Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*,
804 F.3d 826 (7th Cir. 2015) ..................................................................... 5

*In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*,
155 F. Supp. 3d 772 (N.D. Ill. 2016) ....................................................... 6

*Indian Harbor Ins. Co. v. MMT Demolition, Inc.*,
13 N.E.3d 108 (Ill. App. Ct. 2014, 1st Dist.) .................................... 24, 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) ...................................................................... 12, 13

*Luellen v. City of E. Chicago*,
350 F.3d 604 (7th Cir. 2003) ................................................................... 19

*Marr v. Rife*,
503 F.2d 735 (6th Cir. 1974) ..................................................................... 9

*McVay v. Store House Co.*,
2017 U.S. Dist. LEXIS 23688 (S.D. Ind. 2017) ............................................................ 6

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) .............................................................................................. 16, 22

*New West, L.P. v. City of Joliet*,
491 F.3d 717 (7th Cir. 2007) ...................................................................................... 11

*People v. Scharlau*,
141 Ill. 2d 180 (1990) ................................................................................................ 24

*Ramirez v. GreenPoint Mortg. Funding, Inc.*,
633 F. Supp. 2d 922 (N.D. Cal. 2008) ........................................................................ 23

*RWB Servs., LLC v. Hartford Comput. Grp.*,
539 F.3d 681 (7th Cir. 2008) ...................................................................................... 12

*S. Dakota v. Kan. City S. Indus., Inc.*,
880 F.2d 40 (8th Cir. 1989) ........................................................................................ 17

*S. Pac. Co. v. Darnell-Taenzer Lumber Co.*,
245 U.S. 531 (1918) .................................................................................................... 13

*Sidney Hillman Health Ctr. v. Abbott Labs.*,
192 F. Supp. 3d 963 (N.D. Ill. 2016) .......................................................................... 12

*Sills v. Massey-Ferguson, Inc.*,
296 F. Supp. 776 (N.D. Ind. 1969) ................................................................................ 6

*Smith v. City of Jackson*,
544 U.S. 228 (2005) .................................................................................................... 20

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) .................................................................................................... 12

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*,
171 F.3d 912 (3d Cir. 1999) ........................................................................................ 17

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ........................................................................................ 5

*Taylor v. Accredited Home Lenders, Inc.*,
580 F. Supp. 2d 1062 (S.D. Cal. 2008) ........................................................................ 23

*Texas Dep't of Hous. & Cmty. Affairs v. The Inclusive Cmtys. Project, Inc.*,
135 S. Ct. 2507 (2015) ......................................................................................... *passim*

*Trafficante v. Metro Life Insurance Co.*,
409 U.S. 205, 209 (1972) ........................................................................................ 9-11

*United States v. Quicken Loans, Inc.*,
  2017 U.S. Dist. LEXIS 33559 (E.D. Mich. 2017) ........................................................ 6

*Wallace v. Chicago Hous. Auth.*,
  321 F. Supp. 2d 968 (N.D. Ill. 2004) ....................................................................... 22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................................... 21

*Wards Cove Packing Co. v. Atonio*,
  490 U.S. 642 (1989) ............................................................................................... 21

*Wigginton v. Bank of America Corp.*,
  770 F.3d 521 (7th Cir. 2014) ..................................................................................... 5

*Williams v. Miller*,
  460 F. Supp. 761 (N.D. Ill. 1978) ............................................................................. 11

*Winfield v. City of New York*,
  2016 U.S. Dist. LEXIS 146919 (S.D.N.Y. 2016) ....................................................... 5

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
  372 F.3d 899 (7th Cir. 2004) ................................................................................... 22

**Statutes**

42 U.S.C. § 3613(a)(1)(A) ............................................................................................ 2

42 U.S.C. §3613(a)(1)(A) ........................................................................................... 22

775 ILCS 5/10-104(A)(1) ........................................................................................... 25

**Other Authorities**

Kerner Commission Report
  114 Cong. Rec. 2993 (1968) ................................................................................ 9, 10

*W. Page Keeton et al.*,
  *Prosser & Keeton on the Law of Torts* ...................................................................... 12

## I. PRELIMINARY STATEMENT

The Supreme Court's decision in *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, ___, 197 L. Ed. 2d 678 (2017) ("*Miami*"), definitively established that Plaintiff has standing to bring its FHA claims against Defendants. *Miami* also held that foreseeability alone was not enough under the FHA to establish causation, and that the longstanding "direct relationship" test for proximate cause remained applicable. *Id.* at 696. But *Miami* did not establish "a pleading-stage standard of proximate cause" in FHA cases as Defendants contend (Defendants' Motion to Dismiss ("Defs.' Br."), ECF No. 109, at 1) and it does not support Defendants' faulty proximate cause analysis. Instead, *Miami* left it to lower courts to define the contours of proximate cause in FHA cases, instructing that, rather than foreseeability alone, "proximate cause under the FHA requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Miami*, 197 L. Ed. 2d at 690 (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).

Defendants wrongly contend that the County is an "indirect victim attempting to recover for an alleged derivative injury to its residents." Defs.' Br. at 1. To do so, Defendants ignore the obviously direct causal relationship between: (A) the County's alleged injuries from foreclosures/vacant properties; and (B) the alleged cause of those foreclosures/vacancies (stand-alone discriminatory servicing and foreclosure practices, or foreclosures and defaults as the intended result of Defendants' discriminatory equity stripping scheme). Defendants misdirect the Court by breaking down and disjoining the various components of equity stripping, improperly treating each component as a distinct step in the causal chain of a foreclosure, focusing on the earliest component (loan origination), and ignoring the core scheme allegation that loan defaults and foreclosures were the intended result of Defendants' equity stripping

scheme.[1] Defs.' Br. at 2-3, 9-10. Unsurprisingly, Defendants do not discuss these allegations or any of the extensive new allegations or Counts in the Second Amended Complaint ("SAC").

Accordingly, Defendants' proximate cause argument cannot succeed because the County's alleged injuries result from Defendants' discriminatory foreclosures, loan defaults and resulting property vacancies. That has always been the key element of the County's alleged injuries, as further emphasized in the County's SAC. Not only do the County's allegations (from the outset of this litigation, and its new Counts) establish a single causal link between its injuries and their cause, but the well-established and binding precedent discussed below makes clear that even multi-link causal chains are appropriate under the FHA. The County, as an aggrieved party, does not need to be directly discriminated against to maintain its FHA claims. As *Miami* recognized, proximate causation is a statute-specific inquiry and the County's damages are precisely the harms the drafters of the FHA sought to prevent and remedy pursuant to that legislation. 197 L. Ed. 2d at 690.

Defendants' statute of limitations argument also lacks merit. The FHA allows claims up to two years after "the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). The County has alleged that Defendants engaged in the discriminatory housing practice of equity stripping and that this practice has not ceased, but continues to this day and will continue until the very last act occurs--the payoff, or the default and foreclosure, of each predatory and discriminatory mortgage loan Defendants have originated, funded, serviced or

---

[1] Defendants note the Court has "described the County's theory of causation as "not from Point A to Point B,' but 'kind of from Point A to Point B to Point C to Point D, perhaps to Point E.'" Defs.' Br. at 1 (citing Defs.' Exhibit A, ECF No. 109-1, Mot. to Dismiss Hr'g Tr. at 17:17-19, June 19, 2015). They describe this as a "concern" and "critical problem" that the Second Amended Complaint ("SAC") does not "cure." *Id.* While the County believes its allegations plainly show a single step in proximate causation between only "Point A to Point B" – i.e., foreclosures/vacancies caused by discriminatory housing practices to the County's damages directly due to such foreclosures and vacancies – Defendants ignore that this Court prefaced its statement by saying: "doesn't the complaint connect the dots between the loan origination and the harm to the County? It explains . . . the reasoning. . . ." Defs.' Exh. A at 18.

foreclosed on. Separately, the County alleged that Defendants engaged in stand-alone, discriminatory, foreclosure and loan servicing practices that continue to occur. Indeed, Defendants already have admitted that such claims for discriminatory servicing or foreclosure practices could be timely brought.[2] Accordingly, Defendants' timeliness argument must be rejected.

Finally, Defendants' *res judicata* argument must also fail because none of the requirements for *res judicata* are met. There is no commonality of the parties or the claims. Indeed, the County was not involved and it did not have any right to any of the proceeds of that settlement--a fact admitted by Wells Fargo during the June 19, 2015 hearing and which the Court indicated should end the matter. Defs.' Exh. A at 13.

## II. FACTS

In addition to the highly detailed allegations of Defendants' discriminatory housing practice of equity stripping already alleged in the prior version of the County's complaint,[3] the

---

[2] "THE COURT: Unless the bank discriminatorily sticks it to similarly-situated minorities at the back end. MR. HANCOCK: Yes, and if they do that, there's a new claim. That's a new claim that they can bring if they discriminatorily stick it to them somehow at the back end, in the foreclosure process or in the servicing process." Defs.' Exh. A at 55.

[3] For example, the Amended Complaint alleges the facially neutral practices and policies, and the intentional components, of Defendants' equity stripping scheme as including: (1) issuing mortgage loans based on the value of the real-estate asset collateralizing the loan and irrespective of the borrower's ability to repay, *see, e.g.,* SAC ¶¶3, 5, 146; (2) steering credit worthy minority borrowers to more costly nonconforming or conforming "high cost," higher cost, "subprime" and nonprime loans (collectively "Non-prime loans") when they qualified for prime loans or loans with better terms, *id.* at ¶¶5, 13, 37, 48, 146, 148, 206, 223; (3) increased numbers of predatory loans being made to minorities (even adjusting for credit scores), *id.* at ¶¶31, 37, 68, 70, 300, 336; (4) discretionary pricing policies under which Defendants encouraged their employees and agents to impose additional fees and costs on their borrowers, *id.* at ¶¶209, 211, 221, 227, 260, 228; (5) imposing on minority borrowers higher interest rates, additional origination fees, finance charges, closing fees, and pre-payment penalties on these Non-prime loans, *id.* at ¶¶82, 98, 146, 213, 222, 228; (6) Defendants' underwriting, appraisal, and override policies that encouraged the issuance of loans to borrowers who might not be able to repay their loans, *id.* at ¶¶ 230-58; (7) the ongoing collection of such increased costs and fees to profit from minority borrowers who were discriminated against as they continue to make monthly loan payments, thereby continuing the equity stripping scheme, *id.* at ¶¶7, 86; and (8) increased the numbers of defaults and foreclosures on minority borrowers and resulting concentrations of loan defaults, vacancies and foreclosures in minority

SAC added: (i) two discrimination counts--including one focused solely on Defendants' discriminatory mortgage servicing and foreclosure practices as a stand-alone FHA claim;[4] (ii) factual allegations concerning those discriminatory foreclosure practices[5]; and (iii) GIS maps pinpointing the timing, location and concentration of Defendants' discriminatory foreclosures in the County's minority communities.[6] The SAC alleges that for every discriminatory foreclosure, Plaintiff incurs substantial injuries: out-of-pocket costs directly related to foreclosure including Sheriff's evictions, judicial and non-judicial foreclosure-related processes, registration of

---

communities, *id.* at ¶¶281, 288, 309-33. Additionally, the County presented statements from former bank employees establishing that the bank intentionally discriminated against minority borrowers. *Id.* at ¶¶161-76, 180-87, 203-06.

[4] Defendants' discriminatory servicing practices include: (1) continuing to service until default each predatory mortgage that was discriminatorily made and that has not been repaid, and then foreclosing on the home; (2) failing to properly and/or timely respond to, process, and underwrite borrowers' requests to modify or refinance their predatory mortgage loans; (3) wrongfully denying loan modification applications; (4) providing false or misleading information to borrowers during the loan modification application process, while simultaneously initiating foreclosure procedures; and (5) charging marked-up fees. ¶¶272-73, 276, 279, 391.

[5] For example, the SAC alleges that from 2005 to the present, Defendants have discriminatorily foreclosed on tens of thousands of homes owned by minority owners in Cook County. *See* ¶¶ 340-44. The SAC alleges that Defendants' discriminatory behavior with respect to foreclosures includes: (1) charging marked-up fees to minority borrowers, e.g., through repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures (¶273); (2) rejecting mortgage modification requests from borrowers in high minority communities, but routinely granting requests from similarly-situated borrowers in low minority communities (¶¶276, 391); (3) charging excessive or improper fees (¶¶276, 281); (4) initiating "mortgage foreclosure proceedings in minority communities to a far greater extent than non-minority communities" (¶286); and (5) mischaracterizing properties as vacant (¶392); and (6) charging unnecessary and duplicative fees for "services" that are, oftentimes, never rendered (¶393). The SAC also added new allegations about specific discriminatory actions Defendants take when they place a home in foreclosure such as routinely denying mortgage modification requests from high minority census areas, while granting the same requests from low minority census areas, mischaracterizing homes as vacant in predominantly minority neighborhoods, and charging unnecessary and duplicative fees for default/foreclosure related services oftentimes never rendered. ¶¶390-94.

[6] Allegations of the timing, location, concentration and discriminatory nature of Defendants' discriminatory foreclosures are visually depicted in the SAC's GIS maps. *See* ¶¶340-44. These maps and the statistical data that created them reflect that Defendants are up to 8.5 times more likely to foreclose on a homeowner in a largely minority neighborhood compared to a largely non-minority neighborhood. *See id.* This statistical disparity is the direct result of Defendants' stand-alone discriminatory foreclosure practices, as well as their end result of their equity stripping scheme, which they successfully execute through their interrelated mortgage lending and servicing policies, practices and procedures.

foreclosed properties, securing and/or demolishing vacant properties, and increased police patrol services; lost property recording and transfer fees; and the erosion of Plaintiff's tax digest. *See* SAC ¶¶11, 395, 400-04, 408. The County also alleges that these discriminatory acts, policies, and practices are continuing and will continue until the last discriminatory loan that Defendants is repaid and closed and/or is foreclosed upon. *Id.* at ¶¶317, 334-35, 439.

## III. STANDARD OF REVIEW

As the Seventh Circuit stated in *Wigginton v. Bank of America Corp.*, 770 F.3d 521, 522 (7th Cir. 2014), "[i]t does not take much to allege discrimination . . . ." Plaintiff need only allege a "short and plain statement of the claim showing that the pleader is entitled to relief" "giv[ing] the defendant[s] fair notice of what the claim is and the grounds upon which it rests." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 832 (7th Cir. 2015); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The question is whether the allegations "*could* . . . have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis in original); *see also Twombly*, 550 U.S. at 556 (a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the relevant] facts is improbable, and that a recovery is very remote and unlikely." (internal quotation omitted)). The plausibility standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the allegations. *Huri*, 804 F.3d at 833.[7]

---

[7] The Supreme Court did not create a heightened pleading standard in *Texas Dep't of Hous. & Cmty. Affairs v. The Inclusive Cmtys. Project, Inc.* ("*ICP*"), 135 S. Ct. 2507 (2015); the Court only required plaintiff to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection. 135 S. Ct. at 2523. *See Winfield v. City of New York*, 2016 U.S. Dist. LEXIS 146919, at *20 (S.D.N.Y. 2016) ("*ICP* did not alter the plausibility standard for pleading, which requires only the plaintiff plead allegations that plausibly give rise to an inference that the challenged policy causes disparate impact.").

## IV.    ARGUMENT

### A.    Proximate Cause

The question of proximate causation is typically a fact question for the jury and inappropriate for resolution on a motion to dismiss. *In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 815 (N.D. Ill. 2016) (citing *Abbotts v. Campbell*, 551 F.3d 802, 806 (8th Cir. 2008)).[8] The need for resolution by a fact-finder is especially true here, where Defendants' disputes are inherently fact-intensive, and concern their contentions regarding potential intervening factors requiring evidentiary development. *United States v. Quicken Loans, Inc.*, 2017 U.S. Dist. LEXIS 33559, at *62 (E.D. Mich. 2017) (quoting *Tumminello v. Father Ryan High Sch., Inc.*, 678 Fed. App'x 281, 287 (6th Cir. 2017)).

Regardless, the County's allegations establish a direct, single-link causal chain: 1) Defendants' foreclosures were discriminatory in violation of the FHA, SAC at *e.g.,* ¶¶92, 281, 285, 392, and 2) those foreclosures directly cost the County money in the form of foreclosure-related proceedings, maintenance of foreclosed properties, and services to foreclosed-upon homeowners, *inter alia*, *e.g.*, ¶¶11, 23, 395. These allegations should suffice under any proximate cause standard that could be crafted for the FHA, even that contemplated by Defendants. *See Miami*, 197 L. Ed. 2d at 690-91; *Holmes*, 503 U.S. at 268. Tellingly, Defendants ignore these allegations of damages and the alleged direct link to Defendants' discriminatory foreclosure activity. That direct causal link remains the same regardless of whether Defendants' foreclosures arise from stand-alone discriminatory servicing and foreclosure practices or as the final step in Defendants' discriminatory equity stripping scheme.

---

[8] *See also Sills v. Massey-Ferguson, Inc.*, 296 F. Supp. 776, 778 (N.D. Ind. 1969) ("Unless reasonable minds could not differ, the determination is one for the trier of the facts.") (citations omitted); *McVay v. Store House Co.*, No. 1:16-cv-00644-SEB-MJD, 2017 U.S. Dist. LEXIS 23688, at *16 (S.D. Ind. Feb. 21, 2017) ("Questions of . . . proximate cause are questions of fact, requiring factual development by the parties.").

Defendants' proximate cause argument is premised on the false proposition that the County is an "indirect victim attempting to recover for an alleged derivative injury to its residents." Defs.' Br. at 1. This conflates two distinct concepts: (1) who is being discriminated against and (2) who is damaged by that discrimination and how they are damaged. Rather than being derivative of a homeowners' injuries, intervening third party conduct, or an unrelated legal theory, the County's allegations make clear that it is a direct victim of Defendants' discriminatory conduct -- directly incurring the costs associated with Defendants' foreclosure-related proceedings, maintenance of Defendants' foreclosed and vacant properties, and services to Defendants' foreclosed-upon or evicted homeowners, *inter alia*, e.g., ¶¶11, 23, 395, as well as the erosion of Plaintiff's tax digest and other municipal expenses, ¶¶395, 402, 404, 408. Well-established Supreme Court and Seventh Circuit precedent makes clear that the County may recover for these independent, direct injuries under the FHA. *Infra*, at 11-15.

While the County's other asserted damages (e.g., loss of revenue from foreclosed properties, or the erosion of the County's tax digest) were also proximately caused by Defendants' FHA violations, Defendants nevertheless attempt to use these measures of damages—in conjunction with an overly-restrictive view of the Supreme Court's holding in *Miami*—to cloud the straightforward inquiry here. Defendants apparently contend, in contravention of well-established proximate cause precedent, that FHA plaintiffs should only be able to recover for damages if they are the direct target of the discriminatory activity and only for the first link of an otherwise-direct causal chain. These contentions are unsupported by law or policy and should fail. *Infra*, at 15-16.

1. **The Supreme Court Left it to the Lower Courts to Define the Contours of Proximate Cause Under the FHA**

Contrary to Defendants' representations, *Miami* did not articulate the "standard" of proximate cause in FHA cases, although it considered whether "the Banks' allegedly discriminatory lending practices proximately cause[d] the City to lose property-tax revenue and spend more on municipal services." 137 S. Ct. 1296, 197 L. Ed. 2d at 689.[9] Concluding that "foreseeability alone is not sufficient to establish proximate cause under the FHA," the Supreme Court left it to the lower courts to "define, in the first instance, the contours of proximate cause under the FHA and decide how that standard applies to the City's claims for lost property-tax revenue and increased municipal expenses." *Id.* at 691.

As *Miami* recognized: the "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 690 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)). However, Defendants ignore the statute-specific nature of this inquiry, focusing instead on cases in other legal contexts. Defs.' Br. at 7 (citing *Holmes*, 503 U.S. 258 (RICO claim); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) (antitrust claim); *Aransas Project v. Shaw*, 775 F.3d 641 (5th Cir. 2014) (Endangered Species Act claim)). But proximate cause is not a one-size-fits-all analysis, and differs among different statutes aimed at different harmful

---

[9] Of note, the SAC differs from the *Miami* complaint in its allegations of both harm and injury. The County's SAC focuses on the Defendants' discriminatory *foreclosure* practices and policies as the causal event to the County's damages (whether stand-alone or the integral part and final component of equity stripping). In contrast, Miami's complaint focused on the initial discriminatory lending activity alone as the causal event that ultimately led to Miami's injuries. Unlike Miami, the County also alleges that it incurred out-of-pocket costs related to foreclosure administration and oversight of foreclosed-upon properties, not just the decreased tax revenue and increased municipal costs that stemmed from those foreclosures.

activities.[10]

Though the cases cited by Defendants are distinguishable because they do not address the contours of proximate cause under the FHA, they are nevertheless instructive regarding the considerations for determining an appropriate proximate cause standard. Courts should "focus on the nature of plaintiff's alleged injury" and consider the legislative history, taking into account the scope of injuries that fall within the area of congressional concern. *Associated Gen. Contractors*, 459 U.S. at 537-38 (no proximate cause because the plaintiff was not a person the claim was intended to protect); *Aransas Project*, 775 F.3d 641 (examining statutory language, purpose, and legislative history); *Holmes*, at 269-76 (addressing "considerations of history and policy" and congressional intent).[11]

The County's alleged harm is exactly the kind that the creators of the FHA sought to prevent. The FHA's prohibition on discriminatory housing practices was meant in part to prevent "the ruin brought on by absentee ownership of property" as well as "further deterioration" of "municipal tax bases." Kerner Commission Report 10[12]; 114 Cong. Rec. at 2993 (1968).

---

[10] "At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient." *Holmes*, 503 U.S. at 269 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)). It "does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (quoting *Holmes*, 503 U.S. at 272).

[11] Unlike Defendants' RICO and Clayton Act authority, the Supreme Court has consistently interpreted the FHA broadly. *Compare*, *e.g.*, *Holmes*, 503 U.S. at 266, 269 (RICO "should not get [] an expansive reading") *with Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 380 (1982) (recognizing the "broad remedial intent of Congress embodied in the [FHA]") *and Gladstone*, 441 U.S. at 109 (FHA standing is as broad as permitted by Article III). Where, as here, the statute constitutes a "broad legislative plan to eliminate all traces of discrimination within the housing field," *Marr v. Rife*, 503 F.2d 735, 740 (6th Cir. 1974), and its language "is broad and inclusive," *Trafficante v. Metro Life Insurance Co.*, 409 U.S. 205, 209 (1972), a more liberal proximate cause standard is appropriate. *See*, *e.g.*, *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*, uses a relaxed proximate cause standard in recognition of the importance the statute places on the safety of railroad workers.).

[12] Congress enacted the FHA on recommendation from the National Advisory Commission on Civil Disorders (the "Kerner Commission"). *ICP*, 135 S. Ct. at 2516.

Segregated conditions were "creating a growing crisis of deteriorating facilities and services," and, without "important changes in public policy," the "prospect" included, among other things, "further deterioration of already inadequate municipal tax bases." Kerner Commission Report 5, 10. Those involved in the development of FHA legislation explained that "the whole community" is the victim of discriminatory housing practices. *Trafficante,* 409 U.S. at 211 (quoting 114 Cong. Rec. at 2706 (statement of Sen. Davits)); see 114 Cong. Rec. at 9559 (statement of Rep. Geller) (describing housing discrimination as "deeply corrosive both for the individual and for his community").

Here, the County alleges that Defendants' discriminatory housing practices concentrated foreclosures in minority neighborhoods, directly causing the very effects on the County's resources, tax base, and municipal services that the FHA both proscribes and provides the County with remedies to pursue – indeed, the harms that the FHA's sponsors feared, ¶¶340-45. The County seeks to vindicate a key purpose of the FHA. *See Trafficante*, 409 U.S. at 210 ("proponents of the legislation emphasized that those who were not the direct objects of discrimination had an interest in ensuring fair housing, as they too suffered.").[13] Thus, the direct relationship between the County's alleged injuries and Defendants' injurious conduct, *Holmes* at 268, has a "sufficiently close connection to the conduct the statute prohibits." *See Miami*, 197 L. Ed. 2d at 683-85.[14]

---

[13] Defendants' wrongdoing further proximately caused the County's harm because the County has a palpable interest in fair housing, racial diversity, and non-discrimination that was harmed by Defendants' discriminatory lending, default, and foreclosure policies. *E.g.,* ¶¶13, 20-22, 23(b), 23(c), 23(e), 413. Defendants' misconduct had a direct effect on the County's efforts to assure fair housing. *See id.*

[14] Compare *Friends of Trumbull v. Chicago Bd. of Educ.*, 123 F. Supp. 3d 990 (N.D. Ill., 2015) (Feinerman, J.) (finding that plaintiff-association's interests in claims against board of education under the Rehabilitation Act and Americans with Disabilities Act (***not the FHA***) were only marginally related to the purposes implicit in those statutes and, therefore, not within their zone of interests).

## 2. Plaintiff's Injuries are Direct

Despite Plaintiff's injuries falling soundly within the FHA's protections, Defendants nevertheless attempt to cast them as indirect and derivative of homeowners' injuries. Defs.' Br. at 1, 5-13. However, under the FHA, as recognized by the Supreme Court and Seventh Circuit (among others), a party may be directly harmed, and have an injury that has a direct relationship with the wrongdoing, without being directly discriminated against. *E.g.*, *Gladstone v. Bellwood*, 441 U.S. 91, 109-11 (1979) (permitting the Village of Bellwood to bring an FHA claim even though it was not directly discriminated against); *Havens*, 455 U.S. at 378-79 (permitting a non-profit corporation, which alleged impairment of its organizational mission and a drain on its resources, not direct discrimination, to assert claim under the FHA); *Trafficante*, 409 U.S. at 211 (permitting residents of an apartment complex to assert claims under the FHA based on discrimination against prospective tenants); *ICP*, 135 S. Ct. at 2517.[15]

Proximate cause simply requires a "sufficiently close connection," i.e., "some direct relation" whereby the violation "led directly" to the injury. *Miami*, 197 L. Ed. 2d at 687, 690 (quoting *Holmes*, 503 U.S. at 268 and *Associated Gen. Contractors,* 459 U.S. at 534); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *Holmes*, 503 U.S. at 262 n.2 ("[O]ur use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that

---

[15] *See also New West, L.P. v. City of Joliet,* 491 F.3d 717, 721 (7th Cir. 2007) (FHA allows operator of an apartment complex to sue city for its discriminatory actions to discourage current and prospective tenants from living in the complex); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) (real estate developer denied a zoning variance could sue based on a village's discrimination against minority tenants rather than the developer itself); *ICP*, 135 S. Ct. at 2522 ("private developers" both "vindicate the FHA's objectives" and "protect their property rights" when they sue to stop municipalities from enforcing discriminatory zoning ordinances); *Gorski v. Troy*, 929 F.2d 1183, 1189 (7th Cir. 1991) ("[T]he Supreme Court has explicitly held, that a plaintiff suing pursuant to the FHA need not be a member of the class that was the object of discrimination to satisfy the injury-in-fact requirement.") (citing *Trafficante*, 409 U.S. at 208-09); *Williams v. Miller*, 460 F. Supp. 761, 761 (N.D. Ill. 1978), *aff'd*, 614 F.2d 775 (7th Cir. 1979) (when a seller discriminates against a potential buyer, the realtor may recover for a lost sale without asserting an independent interest in desegregation).

is informed by the concerns set out in the text . . . ."). Defendants acknowledge that "[t]he directness inquiry focuses on evaluating the 'chain of causation'—i.e., the nature and number of casual 'links' or steps between the challenged conduct and the alleged harm." Defs.' Br. at 7 (quoting *Associated Gen. Contractors*, 459 U.S. at 540). However, Defendants seek to eliminate the "chain" of causation altogether, urging instead a standard that would allow only a single causal link. *See* Defs.' Br. at 9-10. Defendants anchor their attempt to prescribe a uniquely and inappropriately narrow scope for proximate cause to the Supreme Court's language in *Miami* that the "general tendency" in "statutes with 'common law-foundations," "in regard to damages at least, is not to go beyond the first step."" *Miami*, 197 L. Ed. 2d at 691 (quoting *Anza*, 547 U.S. at 457, *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 10 (2010)).[16]

Although Plaintiff's allegations meet this restrictive view, neither *Miami*, nor the FHA, nor other relevant precedent support it. *See Miami*, 197 L. Ed. 2d at 683-85; *See supra*, at 8-10.[17] As the Supreme Court acknowledged in *Miami*, "[w]hat falls within that step depends in part on the '**nature of the statutory cause of action** . . .'" and "**the conduct the statute prohibits**." 197

---

[16] Defendants distort this dictum, claiming the "first step" language is a "'general' rule of directness" for proximate cause in FHA cases, Defs.' Br. at 8, rather than a "tendency" related to "common-law" "damages."

[17] *See also Lexmark*, 134 S. Ct. at 1391 (finding "injury flowing directly from the deception" at issue despite injuries that were "not direct, but include the intervening link of injury" to a non-party); *RWB Servs., LLC v. Hartford Comput. Grp.*, 539 F.3d 681, 688 (7th Cir. 2008) ("The existence of multiple victims with different injuries does not foreclose a finding of proximate cause.") (RICO); *Sidney Hillman Health Ctr. v. Abbott Labs.*, 192 F. Supp. 3d 963, 968 (N.D. Ill. 2016) ("one of the hallmarks of a RICO violation is 'the occurrence of distinct injuries' affecting several victims.") (citation omitted); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994) ("A proximate cause is not [] the same thing as a sole cause. Instead, a factor is a proximate cause if it is a substantial factor in the sequence of responsible causation."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004) (proximate cause must only be "substantial enough and close enough to the harm to be recognized by law, [and] a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."); *See also W. Page Keeton et al., Prosser and Keeton on the Law of Torts* § 41, at 268 (5th ed. 1984) ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present.").

L. Ed. 2d at 683-84 (quoting *Lexmark*, 134 S. Ct. at 1386) (emphasis added). The conduct alleged in the SAC, as discussed above, *supra*, at 9-10, falls squarely within the purposes of the FHA.[18]

In *Lexmark*, the Supreme Court recognized proximate cause despite a causal link that was indirect, including an intervening link of injury to another party, and "therefore might not support standing under a strict application" of the "first step" tendency. 134 S. Ct. at 1394 (quoting *Holmes*, 503 U.S. at 271). The Supreme Court stated that the "reason for that general tendency is that there is ordinarily a 'discontinuity' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct) . . . ." *Id.* But here there is no such discontinuity because the County is within the first step, even to the extent unrelated factors may have contributed to the County's injuries. *See infra* at 17-18 (regarding proving disparate impact and the administrative feasibility of doing so; statistical analysis). The harms to foreclosed homeowners are independent of the harms caused to the County.[19]

Plaintiff's allegations are distinguishable from those in *Hemi Group*, cited by Defendants. Defs.' Br. at 11. There, a city alleged that an online vendor failed to report cigarette sales to the state, in violation of RICO, and caused the city to lose tax revenue that it charges its residents for

---

[18] The "first step" principle arose in a different context from the FHA, where the Court permitted recovery of damages for excessive charges even though the charges could be "passed on" to others in a second step (e.g., by increasing resale prices). *S. Pac. Co.* v. *Darnell-Taenzer Lumber Co*., 245 U.S. 531, 533-34 (1918) (the Court looked to the "first step" in which damages occurred, not to later steps that mitigated them). The Court later applied that principle in the antitrust context, reasoning that the initial buyer is the best plaintiff to vindicate the wrong reflected in an overcharge that the initial buyer could pass on in a second step. *See Associated Gen. Contractors*, 459 U.S. 519 at 534-35, 544-45. Then, the principle was applied to RICO's civil-action provision, which was "modeled . . . . on the civil-action provision of the federal antitrust laws." *Holmes*, 503 U.S. at 267.

[19] In contrast for example, if a County taxpayer tried to sue Defendants under the FHA claiming her taxes increased as a result of the County's FHA damages caused by Defendants' conduct, this might constitute an intervening link of injury and the taxpayer could be precluded from recovery. *See, e.g.*, *Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985).

the possession of cigarettes. 559 U.S. 1. Such vendors were required by law to report customer information to the states, and the state had agreed to forward that information to the city. *Id.* at 1. City residents who purchased cigarettes were responsible for paying their taxes, but the data from the state helped the city track down purchasers who did not pay. *Id.*

Unlike in this case, the harm in *Hemi* lacked a sufficiently close connection to the conduct the statute prohibits; RICO was not intended to be a tax collection statute. *Id.* at 29. Moreover, the Court found that the claim was not sufficiently direct because, in the "first step" (the failure of the vendor to report the sales), the harm was felt by the state. *Id.* at 10-11. It was only later, through a second wrongful step (residents' failure to pay required taxes), that the city lost tax revenues. *Id. at* 11 (the city's theory would require RICO be extended to situations where a defendant's fraud made it easier for a fourth party (the taxpayer) to cause harm). The vendor's unlawful conduct caused harm to the state, not the city. The resident's wrongful failure to pay taxes was a separate action, i.e., a second step, which cause harm to the city. *Id.* Here, in contrast, there is no such wrongful conduct by another party responsible for the alleged harm. The harm stemmed directly from the discriminatory foreclosures.

The Seventh Circuit's opinion in *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985), is instructive. In *Carter*, plaintiff taxpayers sought to recover under RICO, alleging that defendant paid money to get lower tax assessments for his client, and seeking damages for the increased taxes that plaintiffs had to pay to the county to make up for the shortfall from the fraudulently-reduced assessments. The Court considered the "first step" paradigm and concluded that "the directly injured party [the county] should receive a complete recovery, no matter what;" e.g., even if it was able to pass on its harm in a second step. *Id.* at 1175-76. "[A]n indirectly injured party [the taxpayers] should look to the recovery of the directly injured party, not to the

wrongdoer, for relief." *Id*. Because the county could recover from defendant for the "whole loss," the taxpayer plaintiff could not. *Id.* at 1176 ("Treble damages, not sextuple damages, are the penalty Congress selected."). In contrast to *Carter*, Plaintiff here cannot "look to the recovery of the directly injured [discriminated-against] party . . . for relief"— the foreclosed homeowners — nor does the relief sought here risk a duplicative recovery because the foreclosed-upon homeowners cannot recover for the County's unique harm independently, let alone "whol[ly]."

### 3. Plaintiff's Allegations Establish Proximate Cause

Because the County's injuries have a direct relationship with Defendants' discriminatory conduct, and there are no intervening forces creating an untenable "discontinuity" between the injury and the conduct (let alone a third party from which Plaintiff may recover) (*see also supra*, at 13-14 and *infra* at 17-18), the County's injuries fall within the "first step" and establish proximate cause.

Contrary to the meaning of the "first step" in the causal chain as expressed in *Miami*, *Lexmark,* and *Holmes*, Defendants instead mischaracterize the "first step" as the first component in the alleged equity stripping scheme – i.e., the making of discriminatory loans – and then argue that this is the only permissible step and one that is too far removed from the County's injuries. Defs.' Br. at 3, 9. Defendants disjoin and exaggerate the causal chain, describing it as follows: 1) discriminatory loans (the "first step"); 2) defaults; 3) foreclosures; 4) vacancies; 5) declines in property values; and 6) lower property tax collections (or, regarding municipal expenses, 5) blight and crime and 6) increased expenses). *Id* at 9-10.

But the County did not simply sue Defendants for making discriminatory loans as the causal event, such that defaults, vacancies and foreclosures were intervening events. The County sued Defendants for their discriminatory equity stripping scheme, and for their stand-alone discriminatory foreclosure practices, both of which are premised on the vacancy/foreclosure as

the ultimate causal event to the County's injuries.[20]  In reality, the causal chain is one link: (1) foreclosures and vacancies (whether due to intentional discriminatory equity stripping or discriminatory foreclosure practices alone) result in (2) property specific out-of-pocket costs (e.g. for the County to administer foreclosures and manage such properties), as well other harms sustained by the County including a reduced tax digest on such properties.

Regardless, the Supreme Court has already ruled that virtually the same causal chain as described by Defendants here was sufficient to confer standing under the FHA. In *Gladstone*, the Village of Bellwood alleged that discriminatory real estate practices caused a decrease in housing prices and a diminution of Bellwood's tax base, "thus threatening its ability to bear the costs of local government and to provide services." 441 U.S. at 110-11 (alleging 1) discriminatory conduct; 2) affecting racial composition; 3) reducing buyers; 4) reducing prices; 5) reducing property values; 6) diminishing tax base). The Supreme Court explained that the village had standing to challenge practices that could lead to "serious economic dislocation" by decreasing property values, "diminishing" the local "tax base," and threatening local "services." 441 U.S. at 110-11 & n.23. As *Gladstone* recognized, a "significant reduction in property values *directly* injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Id.* at 110-11 (emphasis added).[21]

Thus, the purpose behind the FHA, its plain language, and  *Gladstone* also requires this

---

[20] *See, e.g., Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 127 S.Ct. 2162, 2167, 167 L.Ed.2d 982 (2007) (stressing "the need to identify with care the specific [discriminatory] practice that is at issue."); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (recognizing that it is important to look at the nature of the claim); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) (reflecting the importance of properly characterizing the nature of plaintiff's FHA claim for purposes of the FHA statute of limitations analysis).

[21] The Supreme Court again addressed the *Gladstone* chain of causation in *Havens*. *Havens* found that the "distinction [between direct and indirect injuries] is, however, of little significance" in the context of the FHA, and a party may recover where the harm deprived the municipality of "'the social and professional benefits of living in an integrated society' and had caused them 'economic injury.'" 455 U.S. at at 375-76 (quoting *Gladstone,* 441 U.S. at 115 & n.30).

Court to reject Defendants' proximate cause argument. These are matters which the majority in *Miami* implicitly acknowledged in relying on *Gladstone* and holding that the City of Miami had standing to pursue its FHA claims.[22]

### 4. Allowing Municipalities to Recover for FHA Violations is Administratively Possible and Convenient

The Supreme Court in *Miami* noted that the proximate cause evaluation also requires "an assessment 'of what is administratively possible and convenient.'" 197 L. Ed. 2d at 684 (quoting *Holmes*, 503 U.S. at 268). *Holmes* addressed administrative difficulties associated with an insufficiently-direct injury: 1) difficulty in ascertaining "the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors," 2) the idea that courts would be forced "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries, and 3) "the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general . . . ." 503 U.S. at 269-70 (citations omitted). These factors are not dispositive of proximate causation here.

First, independent factors impacting the foreclosure rate and property values do not prevent Plaintiff from attributing its damages to the violation; the Supreme Court has held that an FHA disparate-impact claim may rely on statistical disparity if the plaintiff can point to

---

[22] Indeed, the inquiry regarding proximate cause is not entirely unlike constitutional standing considerations, which require the plaintiff show an "injury in fact" that is "fairly traceable" to the alleged wrongdoing and "that is likely to be redressed by a favorable judicial decision." *Miami,* 197 L. Ed. 2d at 687; *See also S. Dakota v. Kan. City S. Indus., Inc.*, 880 F.2d 40, 46 (8th Cir. 1989) ("As the Supreme Court has observed, the determination of whether there is antitrust standing is similar to the determination of whether there is proximate cause.") (citing *Associated Gen. Contractors*, 459 U.S. at 535-37; *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982)); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 921 (3d Cir. 1999) ("Given the Supreme Court's determination that the . . . standing analysis under these federal [RICO and antitrust] laws is drawn from common-law principles of proximate cause and remoteness of injury, we analyze the key remoteness issue for [proximate cause in] plaintiffs' federal claims under the rubric of standing doctrine.") (citations omitted).

defendant's policy or policies causing that disparity. *See ICP*, 135 S. Ct. at 2512. Indeed, in *Miami*, the Eleventh Circuit found that the respondent adequately alleged that, with statistical analysis, it could separate foreclosures flowing from discriminatory loans from those caused by independent factors. 197 L. Ed. 2d at 690-91. Here, as well, Plaintiff alleges that statistical data will demonstrate discriminatory practices and the resultant harm. *E.g.,* ¶¶ 34, 285, 293-357, 410-412.

Second, there is no risk that courts would be forced to adopt complicated rules to avoid the risk of multiple recoveries, because the County has asserted unique damages claims—out-of-pocket expenses related to foreclosure administration and oversight, a reduced tax digest, and increased strain on municipal services—none of which can be claimed by homeowners.

Finally, unlike in the RICO context present in *Holmes*, more direct victims of FHA violations cannot be "counted on to vindicate the law as private attorneys general." Individual homeowners are ill-equipped to recognize patterns of discrimination that give rise to disparate-impact claims. They do not have the means to undertake the statistical analysis necessary to assert a prima facie claim or resources to engage in such litigation—governmental entities and organizations dedicated to fair housing more often do. Finally, individual homeowner's damages are likely to be small and not worth pursuing relative to the cost of litigation. There simply are no plaintiffs who more directly experience the harm at issue here than the County.

**B.    The Second Amended Complaint States a Valid Disparate Impact Claim[23]**

The SAC contains more than "enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the County's allegations. *Twombly*, 550 U.S. at 556. Contrary to Defendants' contention, the SAC "identif[ied] a neutral policy of Wells Fargo that caused the alleged differences in the number of foreclosures in minority areas as compared to the number of foreclosures in non-minority areas." Defs.' Br. at 18.[24] Specifically, the SAC identifies Defendants' discriminatory mortgage lending, origination, and servicing policies and acts, including the associated documentation. *See, e.g.* ¶5 (mortgage banking operational policies and practices); ¶12 (mortgage lending and servicing practices and policies); ¶14 (mortgage lending and servicing practices and policies); ¶29 (interrelated, interdependent centralized and/ or coordinated functions, practices and policies); ¶77 (corporate policies, practices, processes and/ or procedures); ¶88 (business models and policies); ¶136 ("board-approved policies and procedures"); ¶150 (pricing and underwriting policies and standards); ¶151 (control functions,

---

[23] The County likewise adequately states an FHA claim based on disparate treatment, and Defendants' failure to raise issue with disparate treatment is tantamount to waiving it. *See Luellen v. City of E. Chicago*, 350 F.3d 604, 612 n.4 (7th Cir. 2003). The SAC alleges that each Defendants had discriminatory intent when they targeted minority borrowers for predatory mortgage loans. *See, e.g.*, ¶¶166-214. The SAC explains how Defendants used minority status as a proxy based on the biased assumption that minority borrowers were more vulnerable to Defendants' targeted marketing of predatory and discriminatory loans because of their perception that minorities lack "access to traditional credit," their "limited credit histories, lower credit scores, homes with lower values," and "higher personal debt to income ratios" than other borrowers. ¶¶139, 162-65. Moreover, Defendants' alleged actions also are supported by confidential witnesses, *see, e.g.*, ¶¶167-83, 186-93, 199, 204-212, and empirical data reflecting the intentional nature of Defendants' lending practices. ¶¶293-360. The SAC therefore adequately pleads disparate treatment. *See, e.g., Cnty. of Cook v. HSBC N. Am. Holdings, Inc.*, 136 F. Supp. 3d 952, 966-67 (N.D. Ill. 2015); *DeKalb Cnty. v. HSBC N. Am. Holdings, Inc.*, C.A. No. 1:12-CV-03640-SCJ, 2013 U.S. Dist. LEXIS 185976, at *48-51 (N.D. Ga. Sept. 24, 2013); *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857-STA, 2011 U.S. Dist. LEXIS 48522, at *48-49 (W.D. Tenn. May 4, 2011) (citing cases from courts nationwide supportive of this proposition).

[24] Furthermore, Plaintiff's statistical information is the publicly-available data Defendants themselves reported to the government pursuant to the Home Mortgage Disclosure Act. ¶293. That data reveals the precise extent to which Defendants' predatory lending activities were focused on minorities, focused in minority communities, and focused in high-foreclosure-rate, high-minority neighborhoods. ¶¶293-357.

internal control and compliance functions and corporate policies); ¶¶239, 258, 264, 293, 295 (underwriting policies); ¶250 (written policies and procedures), and ¶¶434-438, 444-451, 449, 459, 460 (underwriting and/or loan servicing policies).[25]  Combined with the allegations that these policies and procedures caused disparity and statistical imbalance in the treatment of minority and white borrowers, the County has pleaded a prima facie case of disparate impact. *See*, *e.g.*, *ICP*, 135 S. Ct. at 2523; *Smith v. City of Jackson*, 544 U.S. 228, 241-43 (2005); *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 1002 (N.D. Ill. 2013); *Hoffman v. Option One Mort. Corp.*, 598 F. Supp. 2d 1009 (N.D. Ill. 2008) (collecting cases)[26]; *see also Cnty. of Cook v. HSBC N. Am. Holdings*, 136 F. Supp. 3d 952, 966 (N.D. Ill. 2015) ("The County has also stated a claim for disparate impact; they allege, among other things, that the pricing policies Defendants designed increased the costs for loans made to minority borrowers, thereby reducing their home equity, and caused a 'downward spiral' of mortgage delinquencies and failures amongst minority borrowers").[27]

---

[25] Faced with the reality that disparate impact FHA claims, which are now valid under *ICP*, have a lower hurdle, Defendants now shift their focus away from the facially neutral aspects of their acts, practices, and policies to the consequences resulting from Defendants' intentional equity stripping scheme utilizing them, including: (1) issuing mortgage loans based on the value of the real-estate asset collateralizing the loan and irrespective of the borrower's ability to repay; *see, e.g.,* ¶¶3, 152; (2) steering credit-worthy borrowers to more costly loans (¶¶5, 15, 43, 54, 74, 152, 212, 239); (3) discretionary pricing policies under which Defendants encouraged their employees and agents to impose additional fees and costs on their borrowers (¶¶215, 217, 227, 233, 266, 293, 436); (4) Defendants' underwriting, appraisal, and override policies that encouraged the issuance of loans to borrowers who might not be able to repay their loans (¶¶236-269); and Defendants' mortgage servicing and foreclosure practices designed to profit from borrower defaults and foreclosures (¶¶270-292).

[26] These include: (1) increased numbers of predatory loans being made to minorities (even adjusting for credit scores), ¶¶37, 43, 74, 76, 309, 348; leading to (2) increased concentrations of loan defaults, vacancies and foreclosures in minority communities. ¶¶290, 297, 318-45.

[27] Defendants repeatedly suggest that the SAC's factual allegations are deficient because the County did not identify specific borrowers, their loans, or their properties that were involved in Defendant's equity stripping scheme. *See* Defs.' Br. at 3-4. The County, however, is not required to provide that level of detail at the pleading stage. *See supra* at 5. In any event, each green diamond on the GIS maps (¶¶340, 343-44) represents a specific borrower and property address that Defendants foreclosed on. Defendants undoubtedly have all of the information with respect to each of these borrowers and the

Invoking *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), (Defs.' Br. at 16), Defendants argue that the County referenced only a discretionary pricing policy.[28] Such an argument fails. As Judge Lee recently explained:

> First, *Dukes* did not foreclose the possibility that a discretionary policy could be the basis for a claim of disparate impact; indeed, it recognized as much, noting that "a common mode of exercising discretion that that pervades the entire company" and produces disparate impact effects might be actionable. *See* 131 S. Ct. at 2554-55. Second, as the County points out, Dukes was decided in the context of Rule 23(a)(2)'s commonality requirement, making its discussion of limited import here. *See* id. at 2555-557 (discussing regression analysis and anecdotal evidence in the context of Rule 23(a)(2)).

*HSBC N. Am. Holdings*, 136 F. Supp. 36 at 967. The same rationale applies here. The County alleges "enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting an FHA claim based on a disparate-impact theory. *Twombly*, 550 U.S. at 556. Several courts have recognized as much based on factual allegations very similar to those alleged here. *See, e.g.*, *City of L.A. v. Bank of Am.*, 2014 U.S. Dist. LEXIS 85957 at *10-11 (C.D. Cal. 2014); *City of L.A. v. Citigroup Inc.*, 24 F. Supp. 3d 940, 949-50 (C.D. Cal. 2014); *City of L.A. v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1060 (C.D. Cal. 2014); *DeKalb Cnty. v. HSBC N. Am. Holdings*, 2013 U.S Dist. LEXIS 185976 at *31-32 (N.D. Ga. 2013); *City of Memphis v. Wells Fargo Bank*, 2011 U.S Dist. LEXIS 48522 at *44-52 (W.D. Tenn. 2011).

### C.    The County's Claims Are Timely

Defendants' statute of limitations defense—which is inappropriate on a motion to dismiss

---

properties. As the GIS maps were created from these addresses, Plaintiff can provide them to the Court if it so desires, but in any event will produce them to Defendants in discovery.

[28] Defendants' citation to *Wards Cove Packing Co. v. Atonio*, 490 U.S. at 642, 657 (1989) (cited at Defs.' Br. at 14, n.10) is also inapposite. *Wards Cove* involved a Title VII plaintiff who failed to make out a case of disparate impact simply by stating there was racial imbalance in the workforce.

unless Plaintiff has pled itself out of court[29]—urges this Court to ignore the plain language of the limitations provision in the FHA. Defs.' Br. at 17-23. The FHA, however, unambiguously provides that "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than **2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last."** 42 U.S.C. §3613(a)(1)(A) (emphasis added). The County alleges that Defendants **continue to engage** in a pattern and practice of equity stripping, and, therefore, the FHA's two-year limitations period has not even begun to run, nor can it have expired. *See*, *e.g.*, *Havens*, 455 U.S. at 380-81 ("the complaint is timely when it is filed within [the requisite number of] days of the last asserted occurrence of that practice").[30] As in *Morgan*, 536 U.S. at 115, and consistent with *Havens*, the County's claims are timely because they are plainly "based on the cumulative affect" of Wells Fargo's continuing acts, which had not terminated at the time of filing this suit.[31]

---

[29] *Xechem, Inc. v. Bristol-Myers Squibb Co*., 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)").

[30] Defendants' contention that "pattern-and-practice" cases may only be brought by the federal government and class action plaintiffs, Defs.' Br. at 16, n. 11, grossly mischaracterizes the law. *Havens* expressly rejected this contention. 455 U.S. at 381, n.23. Indeed, other courts have allowed individual governmental plaintiffs to proceed on pattern and practice claims, including against Wells Fargo. *See*, *e.g.*, *HSBC N. Am. Holdings, Inc.*, 136 F. Supp. 3d 952; *Wells Fargo*, 22 F. Supp. 3d 1047; *DeKalb Cnty.*, 2013 U.S Dist. LEXIS 185976; *Bank of Am.*, 2014 U.S. Dist. LEXIS 85957. *See also Wallace v. Chicago Hous. Auth.*, 321 F. Supp. 2d 968 (N.D. Ill. 2004) (citing *Havens* and legislative history, the court stated that: "***claims challenging 'an unlawful practice' under the FHA are timely as long as the 'last asserted occurrence of that practice' falls within the limitations period. . . .***" *Id.* at 972-73 (internal citations omitted) (emphasis added); *HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d at 965 (holding that almost identical claims were not time barred because "the County has alleged that Defendants are still engaged in their discriminatory mortgage lending practices and continue to service the loans in a discriminatory manner.").

[31] Notwithstanding the explicit language of 42 U.S.C. §3613(a)(1)(A), Defendants argue that beginning the limitations period when the last predatory loan is repaid or foreclosed would create a situation where the statute of limitations "is never triggered." Defs. Br. at 23. This argument is factually and legally incorrect. That the limitations period might not begin to run until the last loan is repaid or foreclosed is the result of the 30-year term of the mortgage loan products and the equity stripping scheme

Further, Defendants' statute of limitations argument is predicated on a mischaracterization of the SAC as limited to mortgage loan origination activities prior to November 28, 2014. The SAC, however, alleges that Defendants' continuing servicing and foreclosure of these loans are and have been discriminatory in and of themselves. *See, e.g.,* ¶¶9-11, 16, 29, 150, 152, 270-94, 443-456) (continuing servicing and foreclosure policies and practices); *see also* ¶272 ("Defendants continue to service the … loans, which enables them to charge loan servicing fees…."); ¶273 ("Defendants maintain control over the loan servicing, loan default and loan foreclosure processes…[and] routinely charged marked-up fees…")).[32]

Moreover, Defendants ignore the Seventh Circuit's decision in *Baker v. F&F Investment*, 420 F.2d 1191, 1200 (7th Cir. 1970) (*cert. denied* 400 U.S. 821 (1970)), which held that "***the statutes of limitations do not commence to run when the contracts were executed but when they terminate.***" And Defendants ignore allegations that the County has affirmatively pled the continuing and renewed discriminatory effect of each payment on each loan (and each loan refinance) Defendants made using their Discriminatory Pricing Policies, which the County alleges will continue. *See, e.g.,* ¶¶214-35, 436-39. *See Barrett v. H&R Block, Inc.,* 652 F. Supp. 2d 104, 110-11 (D. Mass. 2009) (timely FHA disparate impact claims against mortgage lender based on "Discretionary Pricing Policy" used in initial loans and subsequent loan refinances); *Ramirez v. GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2d 922, 929-30 (N.D. Cal. 2008) (same); *Taylor v. Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062, 1065 (S.D. Cal. 2008) (claim timely because defendants' discriminatory mortgage pricing policy inflated each payment

---

alleged, which includes the continued servicing and foreclosure of those loans. The Supreme Court flatly dispensed with the entire basis for such an argument in *Havens. See* 455 U.S. at 380-81.

[32] The SAC's allegation that "***much*** of Defendants predatory, higher cost and nonprime mortgage origination practices at issue . . . subsided after the Financial Crisis . . ." (¶317 (emphasis added)), neither concedes, nor acknowledges that ***all*** of Defendants' wrongful origination practices have ended. In fact, the SAC expressly alleges that "such lending activity did not end." *Id.*

constituting "another violation visited upon [p]laintiff").

### D.    Res Judicata Does Not Bar Plaintiff's Second Amended Complaint

As Wells Fargo conceded and this Court recognized during the June 19, 2015, hearing, the County did not and could not obtain any of the funds from Wells Fargo's settlement with the Illinois Attorney General. *See* Defs.' Exh. A at 11, 13. Nevertheless, Defendants assert a *res judicata* defense. *Res judicata* precludes a subsequent action if it involves the same parties and same claim or demand previously resolved by a final judgment. *Indian Harbor Ins. Co. v. MMT Demolition, Inc.*, 13 N.E.3d 108, 114 (Ill. App. Ct. 2014, 1st Dist.); *see also Arnett v. Envtl. Sci. & Eng'g, Inc.*, 657 N.E.2d 668, 673 (Ill. App. Ct. 1995, 3d Dist.) ("[a] consent judgment is entitled to *res judicata* effect . . . between the same parties or their privies for the same cause of action . . . .").

*First*, **there is no identity of the causes of action**. The AG's complaint addressed only Wells Fargo's mortgage lending activities through 2007 in the context of the Illinois Human Rights Act. *See generally,* AG Complaint.[33] The SAC alleges broad, continuing, intentional discriminatory origination, servicing, and foreclosure activity, in violation of the FHA, and which continues to this day.

Moreover, the issues raised by the County in its SAC could not have been brought by the

---

[33] Furthermore, "[c]onsent decrees entered by courts to effectuate settlement are . . . considered contracts between the parties to the litigation, and accordingly the law of contracts controls their interpretation." *People v. Scharlau,* 141 Ill. 2d 180, 195, 201-02 (1990). Because the Consent Decree limits the agreement to resolve only those civil enforcement claims asserted in the AG Complaint, Consent Decree at ¶6, *res judicata* can only bar re-litigation of some claims—not the County's FHA claim. In fact, the Consent Decree does not release or bar individual claims for actual damages, but instead acknowledged that aggrieved individuals retained their private of action for damages, incorporating the terms of the U.S. Consent decree, which required a release for any person to participate in the settlement fund. Consent Decree, at U.S. Consent Decree pg. 16, 24(a). Thus, the Consent Decree did not release or bar the County's claim because the County never executed a release.

Illinois Attorney General.[34] The County's FHA causes of action do not share an identity with the AG's IHRA civil enforcement cause of action (or other causes of action); they are not adequately related in "time, space, origin, and motivation," do not form "a convenient trial unit" based on the differing nature of the causes of action and the evidence necessary to support those claims, and, most importantly, cannot arise from the same transaction because Wells Fargo's alleged, continuing discriminatory and predatory mortgage loan servicing and foreclosure activities were neither the subject of the AG Complaint and Consent Decree, nor could they have occurred within the same time frame. *Indian Harbor*, 13 N.E.3d at 116.

**Second, there is no common identity of the plaintiffs.** The Consent Decree and the AG Complaint establish that the Illinois Attorney General was "acting in the public interest" and "on behalf of The People of the State of Illinois." Consent Decree at Introduction, General Provisions, and ¶6. Not only is there not an identity of interest between the County and the Attorney General, but the Attorney General could not have adequately represented the County's interest. The Consent Decree covered only the IHRA claims asserted in the AG Complaint, ¶6, and the only remedies available to the Attorney General under the IHRA were limited to "equitable relief" and the imposition of "a civil penalty."[35]

**Third, there is no common identity of defendants**. Only Wells Fargo Bank, N.A., Wells Fargo Home mortgage, and Wells Fargo Financial Illinois, Inc., were signatories to the Consent

---

[34] Defendants' argument to the contrary is a red herring because what claims the Attorney General "could have brought" (Defs.' Br. at 25) is not determinative in the context of an agreed consent judgment and any resulting *res judicata* effect.

[35] *See* Illinois Human Rights Act, 775 ILCS 5/10-104(A)(1) (authorizing the Attorney General to bring a civil enforcement action "in the name of the People of the State, as *parens patriae* on behalf of persons within the State to enforce the provisions of this Act"); AG Complaint, ¶¶ 224, 232-46; AG Complaint Prayer for Relief, Counts I and II. To the extent the Attorney General sought equitable relief of "restitution to all consumers who were affected by" Wells Fargo's discriminatory housing practices, AG Complaint Prayer for Relief, Counts I and II, this is easily distinguishable from the actual damages sought by the County pursuant to the FHA, which as Wells Fargo itself has pointed out, was not a "consumer" of Wells Fargo's mortgage lending practices at issue.

Decree. *See* Consent Decree. In contrast, the SAC involves the alleged conduct of numerous additional Wells Fargo entities, including Wells Fargo & Co., Wells Fargo Financial, Inc., and Wells Fargo "John Doe" Corps 1-375. *See, e.g.,* ¶¶24, 25, 29, 33, 106-108, 149-50, 214, 231, 241, 261, 286, 425. Moreover, the SAC also alleges that defendant Wells Fargo & Co.—who was not a party defendant in the AG action—is liable for the separate discriminatory housing practices of Wachovia Corporation and its various subsidiaries. *See, e.g.,* ¶¶24-33, 425-432. The Wachovia defendants here were not parties to the AG Complaint or Consent Decree.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

**KIMBERLY M. FOXX,**
**STATE'S ATTORNEY FOR COOK COUNTY**

By: /s/ John K. Kennedy
James D. Montgomery, Sr.
james@jdmlaw.com
John K. Kennedy
jkennedy@jdmlaw.com
**JAMES D. MONTGOMERY &**
**ASSOCIATES, LTD.**
One North LaSalle Street, Suite 2450
Chicago, IL  60602
Phone: (312) 977-0200
Fax: (312) 977-0209

James M. Evangelista (*pro hac vice*)
jim@ewlawllc.com
David J. Worley (*pro hac vice*)
david@ewlawllc.com
**EVANGELISTA WORLEY, LLC**
8100 A Roswell Road, Suite 100
Atlanta, GA  30350
Phone: (404) 205-8400

*Special Assistant State's Attorneys*

Sanford P. Dumain (*pro hac vice* application forthcoming)
Peggy J. Wedgworth (*pro hac vice* application forthcoming)
Jennifer S. Czeisler (*pro hac vice* application forthcoming)
J. Birt Reynolds (*pro hac vice* application forthcoming)
Melissa R. Clark (*pro hac vice* application forthcoming)
**MILBERG LLP**
One Pennsylvania Plaza, 50th Floor
New York, NY  10119
Phone: (212) 594-5300

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2017, I electronically filed the foregoing Response in Opposition to Defendants' Motion to Dismiss with the Clerk of Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

<u>/s/ John K. Kennedy</u>
John K. Kennedy, Attorney