UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COUNTY OF COOK, ILLINIOIS, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 9548 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| WELLS FARGO & CO., WELLS FARGO FINANCIAL, | ) | |
| INC., WELLS FARGO BANK, N.A., and WELLS | ) | |
| FARGO "JOHN DOE" CORPS. 1-375, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**Memorandum Opinion and Order**</u>

County of Cook, Illinois, alleges in this suit that Wells Fargo & Co. and related entities

(collectively, "Wells Fargo") issued predatory subprime mortgage loans to Cook County

residents that over the years went into default and drove the mortgaged properties into

foreclosure. According to the County, because the scheme was and remains concentrated in

heavily minority neighborhoods, Wells Fargo has violated Title VIII of the Civil Rights Act of

1968, 42 U.S.C. § 3601 *et seq*., more commonly known as the Fair Housing Act ("FHA"). The

court dismissed the original complaint on the ground that the County, on the facts alleged, did

not fall within the FHA's zone of interests and thus was not an "aggrieved person" entitled to sue

under the Act. Docs. 59-60 (reported at 115 F. Supp. 3d 909 (N.D. Ill. 2015)).

Cook County filed an amended complaint, Doc. 65, and Wells Fargo again moved to

dismiss, Doc. 70. While that motion was pending, the Supreme Court granted certiorari to

review *City of Miami v. Wells Fargo & Co.*, 801 F.3d 1258 (11th Cir. 2015), and *City of Miami

v. Bank of America Corp.*, 800 F.3d 1262 (11th Cir. 2015), suits very similar to this one. In light

of the grant, this court stayed this case pending the Supreme Court's decision. Doc. 96. The

Supreme Court ultimately held that the City of Miami's "financial injuries" from the defendant

banks' alleged predatory lending practices—practices and injuries closely resembling those alleged here by Cook County—"fall within the zone of interests that the FHA protects." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1304 (2017). The Court nevertheless remanded the case for consideration of whether the City had adequately alleged proximate cause, holding that the "Eleventh Circuit erred in holding that foreseeability is sufficient to establish proximate cause under the FHA." *Id*. at 1306.

In light of *City of Miami*—in particular, its discussion of proximate cause—this court offered and the County took the opportunity to file a second amended complaint. Docs. 103-104, 106. Wells Fargo now moves under Civil Rule 12(b)(6) to dismiss that complaint. Doc. 108. The motion is granted in part and denied in part.

## Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Cook County's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013). The facts are set forth as favorably to the County as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Wells Fargo is a large residential mortgage originator and servicer. Doc. 106 at ¶ 26. Beginning in the late 1990s, in an effort to increase profits, Wells Fargo (and Wachovia, which Wells Fargo acquired in 2008, *id.* at ¶ 30) developed a practice known as "equity stripping." *Id.* at ¶¶ 3-7, 77, 92, 105-106, 275. Wells Fargo pooled and securitized the loans it originated while retaining fee-generating mortgage servicing rights, and it maximized its fees by imposing onerous loan terms without regard to borrowers' ability to repay the loans. *Id.* at ¶¶ 79-80, 89, 97, 103, 105, 109, 111, 274. From 2010 to 2013, for instance, Wells Fargo earned over $2.6 billion in late charges and ancillary fees. *Id.* at ¶ 121. Wells Fargo's equity-stripping practice continues through the present day in the form of nonprime lending, mortgage servicing, and loan default and foreclosure-related activities. *Id.* at ¶¶ 93, 120, 272, 276, 292, 385.

Equity stripping begins with the origination of "high cost," "subprime," or other "nonprime" mortgages, which permits Wells Fargo to charge substantially higher origination fees and then substantially higher service fees over the life of the loan. *Id.* at ¶¶ 86, 92, 102, 104. Those mortgages often allow the borrower to pay only the monthly interest accruing on the loan or to make only minimum payments. *Id.* at ¶ 126. Equity stripping continues through loan servicing, as Wells Fargo receives income from both prepayment fees and late payment fees. *Id.* at ¶¶ 7, 91-92, 102. Equity stripping culminates in default and foreclosure, as borrowers pay additional fees and ultimately see their equity eliminated. *Id.* at ¶¶ 7, 9, 91-92, 102.

Wells Fargo's equity-stripping practice targeted minority borrowers in Cook County. *Id.* at ¶¶ 4, 6, 54, 80-81, 166, 187-188, 229, 293-300, 311. Publicly available loan origination data indicates that the percentage of high-cost and other nonprime loans issued by Wells Fargo in Cook County to minority borrowers well exceeded the County's percentage of minority home owners—typically by a factor of two to three. *Id.* at ¶¶ 297-309. Because minority borrowers

"provided the quickest and easiest path … for [Wells Fargo] to originate as many loans as possible as rapidly as possible to borrowers most likely to accept … less favorable terms," *id*. at ¶ 164, Wells Fargo subjected minority borrowers to equity stripping to a greater extent than it did nonminority borrowers with similar credit histories, *id*. at ¶¶ 80, 154. Minority borrowers were particularly susceptible to Wells Fargo's predatory practices because they were more likely than nonminority borrowers to lack access to low-cost credit, relationships with banks and other traditional depository institutions, and adequate comparative financial information. *Id*. at ¶ 162.

As part of its equity-stripping practice, Wells Fargo granted employees discretion to steer prime-eligible minority borrowers into nonprime loans. *Id*. at ¶¶ 5, 81, 150, 183-186, 197-199, 212, 227, 229, 231, 243-244, 435. Wells Fargo employees encouraged minority borrowers otherwise eligible for prime loans to limit the documentation they provided concerning their income and assets, to take out larger loans than they needed, and to avoid making down payments. *Id*. at ¶¶ 246-248. This resulted in minority borrowers paying "materially higher costs, discretionary fees, [and] materially higher monthly mortgage payments … than similarly situated non-minority borrowers." *Id*. at ¶ 266. Wells Fargo employees also failed to advise prime-eligible minority borrowers of their prime-eligible status. *Id*. at ¶ 246.

Wells Fargo compensated employees with bonuses and commissions for offering minority borrowers higher than published loan rates and for approving them for loans for which they were not qualified based on their employment, income, or credit history. *Id*. at ¶¶ 5, 150, 183, 197-199, 205, 227, 229, 243-244. Wells Fargo reserved the right to discipline employees who failed to issue a certain quantity of nonprime loans. *Id*. at ¶ 184. In addition, Wells Fargo incorporated unfavorable terms, excessive fees, and prepayment penalties into mortgage loans to minority borrowers; based loans to minority borrowers on inflated or fraudulent appraisals;

encouraged minority borrowers to inflate their stated income; fraudulently entered income data into the company's underwriting software; repeatedly refinanced loans to minority borrowers; and included loan terms and conditions that made it difficult for minority borrowers to reduce their debt. *Id*. at ¶¶ 152, 255-256, 259-260.

To further its equity-stripping practice, Wells Fargo maintained a "Diverse Segments" unit, whose responsibility was to increase the number of loans made to minority borrowers. *Id*. at ¶¶ 167-182. The unit had access to a wealth of relevant demographic data and typically worked closely with realtors and community organizations to target potential customers. *Id*. at ¶¶ 162-182, 187. The data enabled Wells Fargo to customize its marketing materials to African-Americans. *Id*. at ¶ 188. Wells Fargo paid bonuses to employees in the Diverse Segments unit based on the number of loans they made to minority borrowers. *Id*. at ¶ 183.

Discrimination in administering Wells Fargo's equity-stripping practice continued into the loan-servicing process, including its evaluation and processing of loan modification requests and its handling of defaulted loans through default work-outs and foreclosure proceedings. *Id*. at ¶¶ 272-273, 295. Wells Fargo retained the discretion to modify loans in default and to foreclose on properties with defaulted mortgages and, pursuant to that discretion, "routinely charged marked-up fees to minority borrowers, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures." *Id*. at ¶ 273. Wells Fargo also discriminated against minority borrowers by failing to process requests for loan modifications; failing to notify borrowers of the documentation required to process such requests and of the reasons for denying them; wrongfully denying modification applications; failing to process borrower delinquencies or defaults, including failing to apply payments or maintain accurate account information; providing false information to borrowers during the loan modification

process; and charging improper fees for default-related loan servicing and foreclosure. *Id*. at ¶¶ 276, 279-280. Upon foreclosure, Wells Fargo charged additional fees for post-foreclosure services, including inspection and maintenance of the property, whether or not it actually rendered those services. *Id*. at ¶ 393. Wells Fargo continues to the present day to discriminate against minorities in determining whether to make mortgage modifications and in the foreclosure process. *Id*. at ¶¶ 390-391, 439, 444-449, 462.

In sum, minority borrowers paid more for loans, were disproportionately subjected to prepayment penalties and other fees, and experienced default, vacancy, and foreclosure at higher rates than comparable nonminority borrowers. *Id*. at ¶¶ 80, 88, 234, 266-267. In 2007, for instance, Wells Fargo charged African-American borrowers approximately $2,000 and Hispanic borrowers approximately $1,200 more in fees than similarly situated white borrowers. *Id*. at ¶ 230. Moreover, Wells Fargo "knew … that the mortgage loan products they originated or funded, securitized and serviced, contained predatory terms, were underwritten in a predatory manner, and were targeted to and/or disproportionately impacted FHA protected minority borrowers." *Id*. at ¶¶ 140, 151; *see also id*. at ¶ 231.

Wells Fargo's equity-stripping practice has disproportionately and disparately impacted communities in Cook County with relatively higher concentrations of minority homeowners. *Id*. at ¶¶ 10, 285, 289, 319-320, 339-345, 381, 383, 385, 434, 437. Communities with higher rates of minority homeownership have been and remain more likely than areas with lower rates of minority homeownership to experience foreclosure, and the foreclosure rate in different neighborhoods increases as the percentage of minority homeowners increases. *Id*. at ¶¶ 10, 340-344. From November 2012 to November 2014, almost 70 percent of Wells Fargo's foreclosures in Cook County were in areas with more than 50 percent minority homeownership. *Id*. at

¶¶ 342-343.  From June 2015 to April 2017, that figure fell modestly to approximately 60 percent.  *Id.* at ¶ 344.

Wells Fargo's equity-stripping practice has resulted in certain discrete harms to Cook County.  *Id.* at ¶¶ 11, 269, 395.  Among those harms are the direct costs to the Cook County Sheriff's Office of posting eviction and foreclosure notices; registering, inspecting, and securing foreclosed or abandoned properties; serving foreclosure summonses; and executing evictions.  *Id.* at ¶¶ 11, 23, 395, 404, 420.  The County's harms also include the costs of administering an increased number of foreclosure suits in the Circuit Court of Cook County.  *Id.* at ¶¶ 23, 395, 404.  There were approximately 131,000 more foreclosure filings in Cook County from 2006-2013 than over the prior eight-year period, a 68 percent increase.  *Id.* at ¶ 23.  Additional harms to the County include increased demand for other services, including housing counseling; reduced property tax revenue and property transfer and recording fees; and a broad destabilization of minority communities that has deprived it of its racial balance and stability through the "segregative effects of the increased foreclosures and vacant properties" created by equity stripping.  *Id.* at ¶¶ 11, 23, 376, 381, 386-388, 395, 406-409, 413, 420.  Homeowners in majority-minority communities are more likely than homeowners elsewhere in Cook County to have negative equity.  *Id.* at ¶¶ 381-82.

Those harms were foreseeable, insofar as Wells Fargo steered borrowers toward loans that did not require verification of basic underwriting data, including employment or income, and thus that were "destined to fail."  *Id.* at ¶¶ 52, 435.  In particular, Wells Fargo knew that borrowers targeted under the equity-stripping practice would have difficulty repaying their loans and were, as a result, at greater risk of foreclosure.  *Id.* at ¶ 56.

**Discussion**

The operative complaint brings both disparate impact and disparate treatment claims under the FHA. *Id.* at ¶¶ 433-465. Wells Fargo urges dismissal on several grounds: (1) Cook County's injuries are too remote to satisfy *City of Miami*'s proximate cause standard; (2) the County has failed to plausibly state an FHA disparate impact claim; (3) the suit is barred by the FHA's statute of limitations; and (4) the suit is barred by claim preclusion.

**I.     Proximate Cause**

To proceed with an FHA claim, a plaintiff must fall within the Act's zone of interests and also must allege proximate cause. *See City of Miami*, 137 S. Ct. at 1302-06. As noted, the Supreme Court in *City of Miami* held in materially identical circumstances that a municipality alleging that a bank violated the FHA by engaging in equity stripping falls within the Act's zone of interests. *Id.* at 1302-05. But *City of Miami* makes clear that the zone-of-interest and proximate cause analyses under the FHA are distinct. *Id.* at 1305-06. Thus, the Court held that although Miami's "allege[d] economic injuries … fall within the FHA's zone of interests," the banks' "allegedly discriminatory lending practices" did not necessarily "proximately cause" its injuries. *Ibid.*

"'Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.'" *Id.* at 1305 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)). "In the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires." *Id.* at 1306. "Rather, proximate cause under the FHA requires 'some *direct* relation between the injury asserted and the injurious conduct alleged.'" *Ibid.* (emphasis added) (quoting *Holmes v. Sec. Investor Prot.*

*Corp.*, 503 U.S. 258, 268 (1992)).  In applying the direct relationship requirement to statutes like the FHA that have "common-law foundations, … [t]he general tendency … is not to go beyond the first step." *Ibid.* (citations and internal quotation marks omitted).  "What falls within that first step depends in part on the nature of the statutory cause of action and an assessment of what is administratively possible and convenient." *Ibid.* (citations and internal quotation marks omitted).  *City of Miami* declined to decide whether Miami had adequately alleged proximate cause, remanding to the "lower courts" the question of "how that standard applies to [Miami's] claims for lost property-tax revenue and increased municipal expenses." *Ibid.*

Wells Fargo contends that the causal chain drawn by Cook County—running from discriminatory steering at the loan origination stage, through discriminatory discretionary acts at the servicing and foreclosure stages, and resulting in the increased use of county services, reduced revenue, and diminished racial balance and stability—is too attenuated to create the direct relationship that proximate cause under the FHA requires.  Doc. 109 at 14-15.  Wells Fargo identifies numerous intervening factors that could have contributed to the County's alleged harms, including declines in property values not attributable to Wells Fargo's conduct; life events, such as divorce or illness, that impair borrowers' ability to repay loans; and crime that might have occurred because of general social conditions rather than foreclosures or vacancies specifically. *Ibid.*  The County responds that "the causal chain [here] is one link," running directly from foreclosures to the "property specific out-of-pocket costs" of administering foreclosures through the Sheriff's Office and the court system.  Doc. 112 at 22.

"At some point, even those who may claim a factual injury are too far removed from the tortious act to be able to recover." *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 688 (7th Cir. 2008).  As the Court put it in *City of Miami*, although a "violation of the FHA

may … be expected to cause ripples of harm to flow far beyond the defendant's misconduct[, n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel." 137 S. Ct. at 1306 (citation and internal quotation marks omitted). The question, then, is whether the County's causal chain is too attenuated for its FHA claims to proceed. *See Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9-11 (2010) (dismissing, on proximate cause grounds, a civil RICO claim by the City of New York against a New Mexico cigarette e-vendor, which the City alleged did not report its New York State sales to the State of New York, thus preventing the City from determining which of its residents had failed to pay tax on those purchases, reasoning that the vendor's "obligation was to file … reports with the State, not the City, and the City's harm was directly caused by the customers," not the vendor); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-59 (2006) (dismissing, on proximate cause grounds, a civil RICO claim by a company alleging that a competitor "harmed it by defrauding the New York tax authority and using the proceeds from the fraud to offer lower prices designed to attract more customers," reasoning that the lower prices could have occurred "for any number of reasons unconnected to the asserted pattern of fraud"); *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017) (affirming the dismissal of a civil RICO claim because the plaintiffs' "causal chain … [was] longer than the one *Hemi Group* deemed too long"); *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733 (7th Cir. 2014) (noting that "*Anza* and *Hemi Group* stand for the same general proposition: only persons injured directly by the defendant's misconduct" satisfy RICO's proximate cause requirement). The court will explore that question as to the separate economic harms alleged by Cook County.

### A.     Costs Incurred in Administering and Processing Foreclosures

Cook County's allegation that Wells Fargo's equity-stripping practice meaningfully increased the County's costs of administering and processing foreclosures—through the use of

10

the Cook County Sheriff's Office to post foreclosure and eviction notices, serve summonses, and evict borrowers, and the use of the Cook County Circuit Court to process foreclosure suits, Doc. 106 at ¶¶ 23, 395—falls within the first step of the causal chain and thus is sufficiently direct to satisfy the proximate cause inquiry. The complaint alleges that Wells Fargo exercised discretion over whether to grant loan modification requests to borrowers already behind on their payments and whether to foreclose on borrowers in default. Wells Fargo thus allegedly determined not only the number of homes in Cook County that would end up in default, but also the number that would end up in foreclosure—thereby triggering certain obligations on the County's part, including posting foreclosure and eviction notices, serving foreclosure summonses, executing evictions, and processing foreclosure suits. Those alleged harms, despite running through an "intervening link of injury" to borrowers, are "so integral an aspect of the violation alleged, there can be no question that proximate cause is satisfied." *Lexmark*, 134 S. Ct. at 1394 (citation, alterations, and internal quotation marks omitted).

Examining *Lexmark* helps to explain why this is so. Static Control—the manufacturer of components necessary to refurbish and resell brand-name printer cartridges—sued Lexmark, a brand-name cartridge manufacturer, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for misleading cartridge refurbishers into believing that they were legally prohibited from refurbishing Lexmark's cartridges with Static Control's products, and for misleading customers into thinking that they were obligated to return their used printer cartridges directly to Lexmark. *Id*. at 1383-84. Because it did not direct its communications to Static Control, Lexmark argued that Static Control was too removed from its allegedly unlawful conduct to satisfy proximate cause. *Id*. at 1385 (noting that the district court held that "Static Control's injury was 'remote[]' because it was a mere 'byproduct of the supposed manipulation of consumers' relationships with

remanufacturers'; and that Lexmark's 'alleged intent [was] to dry up spent cartridge supplies at the remanufacturing level, rather than at [Static Control]'s supply level, making remanufacturers Lexmark's alleged intended target") (alterations in original).

The Supreme Court disagreed, holding that "Static Control adequately alleged proximate causation by alleging that it designed, manufactured, and sold microchips that both (1) were necessary for, and (2) had no other use than, refurbishing Lexmark toner cartridges." *Id.* at 1394. The Court explained that "[t]aking Static Control's assertions at face value, there is likely to be something very close to a *1:1 relationship* between the number of refurbished … cartridges sold (or not sold) by the remanufacturers and the number of [components] sold (or not sold) by Static Control." *Ibid.* (emphasis added). Under those particular circumstances, *Lexmark* concluded, the usual "discontinuity between the injury to the direct victim and the injury to the indirect victim" was absent: "Static Control's allegations suggest that if the remanufacturers sold 10,000 fewer refurbished cartridges because of Lexmark's false advertising, *then it would follow more or less automatically* that Static Control sold 10,000 fewer microchips for the same reason, without the need for any speculative proceedings or intricate, uncertain inquiries." *Ibid.* (citations, ellipses, and internal quotation marks omitted, emphasis added); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (holding that the RICO plaintiffs satisfied proximate cause, even though the defendants' alleged misrepresentations were directed to a non-party, where the plaintiff's "alleged injury … is the direct result of [the defendants'] fraud[,] … there are no independent factors that account for [the plaintiffs'] injury, there is no risk of duplicative recoveries[,] … and no more immediate victim is better situated to sue").

As in *Lexmark*, the fact that Cook County's increased costs for administering and managing mortgage foreclosures runs through a separate injury to its residents—victims of Wells

Fargo's equity-stripping practice who had their property foreclosed—does not by itself require dismissal on proximate cause grounds. *See Lexmark*, 134 S. Ct. at 1394 (acknowledging that the relevant causal chain leading to Static Control's injuries "includes the intervening link of injury to the remanufacturers"); *Hillman*, 873 F.3d at 576 (noting that proximate cause principles do not necessarily prevent recovery "when a wrong against A directly injures B"); *RWB Servs.*, 539 F.3d at 688 ("The existence of multiple victims with different injuries does not foreclose a finding of proximate cause."). The financial harms arising from the County's administering and managing mortgage foreclosures flow inexorably from Wells Fargo's alleged conduct, and thus are sufficiently "direct" for purposes of the proximate cause inquiry. Borrowers who request loan modifications are already in dire financial straits. To the extent that Wells Fargo discriminates against minority borrowers in denying their loan modification requests or refusing requests for default work-outs or other alternatives to foreclosure, that conduct no less automatically than the conduct in *Lexmark* leads to foreclosures, which, in turn, necessarily requires the expenditure of County funds for the services of the Cook County Sheriff and the Cook County Circuit Court. For this reason, the discontinuity absent from *Lexmark* is likewise absent here—an increase in the number of foreclosures is "surely attributable" to Wells Fargo's discriminatory conduct, just as an increase in the number of cases in the County's courts or in the number of summonses served by the Sheriff is "surely attributable" to the increased volume of foreclosures. 134 S. Ct. at 1394; *see also Bridge*, 553 U.S. at 658 ("It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens."); *RWB Servs.*, 539 F.3d at 688-89 ("As alleged, the defendants robbed Peter to defraud Paul; the former is as foreseeable a plaintiff as the latter *with as direct an injury*.") (emphasis added).

The alleged financial harms arising from the County's administering and managing foreclosures distinguishes this case from *Hillman*. There, two welfare benefit plans sued the manufacturer of the prescription drug Depakote for its efforts in promoting Depakote's off-label use. 873 F.3d at 575. In affirming dismissal, *Hillman* emphasized the uncertainties underlying the plaintiffs' theory. First, *Hillman* noted, "some off-label uses of Depakote may be beneficial to patients … mak[ing] it hard to treat all off-label prescriptions as injury." *Id.* at 577. If the benefit plans had refused to pay for off-label Depakote prescriptions, they would, at least in some cases, have paid for less effective and more expensive alternatives. *See ibid.* Second, *Hillman* reasoned, "some physicians were apt to write [off-label] prescriptions whether or not [the defendant] promoted off-label uses," while others may simply have been unaffected by the defendant's efforts. *Ibid.* Thus, *Hillman* concluded, "[d]isentangling the effects of the improper promotions from the many other influences on physicians' prescribing practices would be difficult—much more difficult than following the one-step causal link in *Bridge*." *Ibid.*; *see also BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 754 (7th Cir. 2011) ("[H]ere is where the doctrine of proximate cause does its work—too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur … .") (emphasis omitted); *James Cape & Sons Co. v. PPC Constr. Co.*, 453 F.3d 396, 403 (7th Cir. 2006) ("A court could never be certain whether [the plaintiff] would have won any of the contracts that were the subject of the conspiracy for any number of reasons unconnected to the asserted pattern of fraud.") (citation and internal quotation marks omitted).

No such uncertainties are present here. For one thing, Wells Fargo's alleged conduct—in particular, making race-based determinations about whether to modify or foreclose nonprime loans—was undoubtedly harmful to minority borrowers. *See City of Miami*, 137 S. Ct. at 1305

(noting that the FHA prohibits conduct that "consists of intentionally lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms"). For another, the complaint alleges that the requested modifications were denied for discriminatory reasons. Doc. 106 at ¶¶ 10, 390-391, 444-450, 458-462. And, as noted, default and foreclosure are the inexorable consequences of Wells Fargo's denial of loan modification requests from already-distressed borrowers. Wells Fargo's conduct thus led to additional expenditures by the County, with the same 1:1 correlation present in *Lexmark*.

Moreover, the County's alleged harms, which arise from its unique role in administering the foreclosure system through the Cook County Sheriff's Office and the Cook County Circuit Court, differ in kind from the harms the borrowers themselves experienced due to Wells Fargo's conduct. *See RWB Servs.*, 539 F.3d at 687-88 (holding that proximate cause was satisfied where the complaint alleged different injuries to different parties from the same scheme to defraud). Accordingly, no other party would be able to recover for the specific harms inflicted on the County by Wells Fargo's conduct. This serves to distinguish *Hemi Group*, *Holmes*, and *Hillman*, which dismissed claims for lack of proximate cause where some other entity or person more directly experienced the harm alleged by the plaintiff. *See Hemi Grp.*, 559 U.S. at 12 (noting that the State of New York "certainly is better situated than the City to seek recovery from Hemi"); *Holmes*, 503 U.S. at 269-70 (noting that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely"); *Hillman*, 873 F.3d at 578 (noting that "[p]ublic prosecution avoids" the problem caused by the plaintiffs' being "several levels removed in the causal sequence"); *see also RWB Servs.*, 539 F.3d at 688 ("The existence of a

'better' plaintiff is most relevant where the plaintiff alleges only an indirect injury. It will not otherwise be grounds for denying a claim to a plaintiff directly injured by one predicate act in the hopes that a different one will emerge.") (citations omitted).

*City of Miami* teaches that the proximate cause inquiry also requires "an assessment of what is administratively possible and convenient." 137 S. Ct. at 1306 (citation and internal quotation marks omitted); *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543 (1983) (noting the role that proximate cause plays in "keeping the scope of complex … trials within judicially manageable limits"). Here, it is true that, at the level of the individual borrower, there is some uncertainty as to whether some change in the circumstances of her life—divorce, for instance, or illness—could have been the intervening cause in that borrower's foreclosure, breaking any causal impact of Wells Fargo's allegedly discriminatory conduct. *See Holmes*, 503 U.S. at 269 (cautioning that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors").

That uncertainty, however, does not defeat proximate cause on the pleadings, for the problem arguably might be solved with aggregate-level data from Wells Fargo, which could help determine the number of bona fide loan modification requests from Cook County borrowers that Wells Fargo rejected for purely discriminatory reasons. In fact, the complaint already alleges that foreclosures in majority-minority neighborhoods were more likely than in neighborhoods with lower percentages of minority residents. Statistical analysis could establish the likelihood that a loan modification denial would lead to foreclosure, and therefore could help a factfinder assess how many unnecessary foreclosures Cook County processed as a result of Wells Fargo's conduct. *See* Patricia A. McCoy, *Barriers to Foreclosure Prevention During the Financial*

*Crisis*, 55 Ariz. L. Rev. 723, 752 (2013) (noting that "[a]t least four multivariate regression studies" have analyzed the conditions under which loan servicers are likely to grant modification requests); Melissa B. Jacoby, Daniel T. McCue, Eric S. Belsky, *In or Out of Mortgage Trouble? A Study of Bankrupt Homeowners*, 85 Am. Bankr. L.J. 291, 299-300 (2011) (using regression analysis to analyze the determinants of foreclosure initiation); Oren Bar-Gill, *The Law, Economics and Psychology of Subprime Mortgage Contracts*, 94 Cornell L. Rev. 1073, 1133-35 (2009) (relying on an array of regression analyses to conclude that certain "contractual design features increase delinquency and foreclosure rates"); *see also* Jacob S. Rugh & Douglas S. Massey, *Racial Segregation and the American Foreclosure Crisis*, 75 Am. Soc. Rev. 629 (2010) (using regression analysis to conclude that greater residential racial segregation leads to higher foreclosure rates). The availability of those analytical tools distinguishes this case from *Hillman*, where the Seventh Circuit cautioned that the plaintiff's proposed regression analysis could not address "what to do about patients whose off-label use of Depakote made them healthier" or how to compute damages in the event that a doctor would have prescribed a less effective, but more expensive, alternative. 873 F.3d at 577.

Finally, Wells Fargo contends that the municipal cost recovery doctrine, under which expenditures for government services are not recoverable in tort, bars the County's claims. Doc. 119 at 14. Wells Fargo forfeited this argument by not raising it until its reply brief. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue."). Even putting aside forfeiture, in light of *City of Miami*'s holding that Miami's "claims

of financial injury," including "extra municipal expenses," are actionable under the FHA, 137 S. Ct. at 1303, this case falls within a recognized exception to the municipal cost recovery doctrine for suits authorized by statute. *See City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983) ("Recovery is permitted where it is authorized by statute or regulation, or required to effect the intent of federal legislation.") (citation omitted); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1145 (Ill. 2004) (same).

In so concluding, the court notes that although Cook County "has *alleged* an adequate basis to proceed … it cannot obtain relief without *evidence* of injury proximately caused" by Wells Fargo's conduct. *Lexmark*, 134 S. Ct. at 1395. Thus, the court holds only that Cook County "is entitled to a chance to prove its case," *ibid*., recognizing that Wells Fargo may attempt on summary judgment and/or at trial to defeat proximate cause on a developed evidentiary record. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1153 (7th Cir. 2010) ("CB Sports will have another opportunity after discovery to raise the proximate cause issue in a motion for summary judgment … at which point Reynolds will have to do more than simply allege proximate cause. Until then, she has done enough to survive a motion to dismiss.").

### B.     Other Costs and Harms Incurred by the County

Cook County alleges several additional harms, including lost property tax revenue, increased demand for county services, and diminished racial balance and stability. Doc. 106 at ¶ 23. Those harms are precisely the "ripples" that *City of Miami* cautions "flow far beyond the defendant's misconduct[,] … risk[ing] massive and complex damages litigation," 137 S. Ct. at 1306 (citation and internal quotation marks omitted), and involving too many "intricate, uncertain inquiries" to establish proximate cause, *Anza*, 547 U.S. at 460. *See id*. at 459 (noting that proximate cause's "motivating principle" is "the difficulty that can arise when a court

attempts to ascertain the damages caused by some remote action"); *Holmes*, 503 U.S. at 269 (noting that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors").

To find proximate cause as to Cook County's lost property tax revenue, a factfinder would have to determine—as to all Cook County borrowers subject to equity stripping—how much property tax the County would have collected but for equity stripping. Much like the analysis deemed too speculative in *Anza* and *Holmes*, that in turn would require estimating at least: (1) the length of time the borrower would have remained in her home if not for Wells Fargo's conduct, accounting for the possibilities that the borrower might not even have purchased the home without the specific loan terms Wells Fargo offered as part of the equity-stripping practice, might have moved out of Cook County (without defaulting) at some point after obtaining a loan from Wells Fargo, or might have defaulted for reasons having nothing to do with equity stripping; and (2) the home's counterfactual valuation for each tax year a borrower subject to equity stripping lived in and maintained the property. *See Anza*, 547 U.S. at 459 (finding no proximate cause where, to calculate the plaintiff's damages from the defendant's fraud, a court would have calculate both the portion of the defendant's price reduction "attributable to the alleged pattern of racketeering activity" and the portion of the plaintiff's "lost sales attributable" to that reduction); *Holmes*, 503 U.S. at 273 (same, noting that, if the plaintiff could stand in the shoes of investors that had not bought manipulated securities but instead were harmed by their broker-dealer's bankruptcy that resulted from the manipulation, a "court would first need to determine the extent to which [the plaintiff's] inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial

markets"); *Hillman*, 873 F.3d at 577-78 (same, emphasizing the difficulty of "[d]isentangling the effects of the [manufacturer's] improper promotions from the many other influences on physicians' prescribing practices"). The "erosion of [Cook County's] tax base due to reduced property values on … *surrounding* properties," Doc. 106 at ¶ 395 (emphasis added), is even further removed from Wells Fargo's conduct and so plainly not within proximate cause's first step. *See Hemi Grp.*, 559 U.S. at 15 (noting the absence of proximate cause where "[m]ultiple steps … separate the alleged fraud from the asserted injury").

The same is true of costs arising from the increased demand for county services such as mortgage or homelessness-related counseling and other programs designed to address "injuries to the fabric of [Cook County's] communities and residents arising from … urban blight." Doc. 106 at ¶¶ 11, 21, 23. Unlike the inevitability of the County's administering and managing mortgage foreclosures once each foreclosure occurred, demand for those county services depends on numerous intervening factors, including borrowers' propensity to avail themselves of the services, whether borrowers choose to remain in or leave the County upon being foreclosed, borrowers' relative awareness of the programs, and the availability of nongovernmental alternatives. *See Hillman*, 873 F.3d at 577 (noting that because the likelihood of prescribing Depakote for off-label uses varied among doctors, it would "not be an easy task" to calculate "the volume of off-label prescriptions that would have occurred in the absence of [the defendant's] unlawful activity"). As a result, it could not be established with the necessary rigor what fraction of the increase (if any) in demand for those county services was attributable to Wells Fargo's equity-stripping practice.

Similar difficulties in attribution arise as to Cook County programs designed to address increases in crime and blight. The alleged relationship between Wells Fargo's equity-stripping

practice, on the one hand, and crime and blight, on the other, runs through too many other factors—from the underlying condition of specific vacant or abandoned properties, to the number of nearby vacant homes, the conduct of criminals and criminal gangs, the underlying characteristics of the neighborhoods in question, and broader economic difficulties stemming from the 2008 financial crisis and the resulting Great Recession—to satisfy proximate cause. *See Hemi Grp.*, 559 U.S. at 15 (holding that proximate cause was not satisfied because the plaintiff's "theory of liability rests on the independent actions of third and even fourth parties").

Finally, it is not clear that Cook County's alleged loss of racial balance and stability due to Wells Fargo's equity-stripping practice, standing alone, is the kind of injury that "fall[s] within the zone of interests that the FHA protects." *City of Miami*, 137 S. Ct. at 1304-05 (holding that the City "alleges *economic injuries* that arguably fall within the FHA's zone of interests," and emphasizing that earlier Supreme Court precedent focused on the decline in property values caused by racial steering) (emphasis added). But even assuming it does, *City of Miami* teaches that falling within the zone of interests does not necessarily equate to proximate cause. *Id.* at 1305-06. For substantially the same reasons already discussed, the alleged "segregative effect of [Wells Fargo's] actions," which had the effect of "reducing the rate of minority homeownership in [Cook County's] communities and neighborhoods and robbing them of their integrated racial character," Doc. 106 at ¶ 13, is a harm too far removed from Wells Fargo's equity-stripping practice to satisfy the proximate cause analysis. The racial character of Cook County neighborhoods depends on numerous variables—including individual preferences for diversity in housing, the history of both governmental and private efforts to maintain (and then to dismantle) residential segregation, and continuing racial disparities in income and wealth. Isolating the effect of Wells Fargo's equity-stripping practice on patterns of racial segregation in

Cook County would require the very kind of "massive and complex damages litigation" against which the Supreme Court has strongly cautioned. *City of Miami*, 137 S. Ct. at 1306 (citation and internal quotation marks omitted).

## II.     Disparate Impact Under the FHA

Wells Fargo next contends that Cook County fails to state a disparate impact claim under the FHA. Doc. 109 at 18. In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), the Supreme Court held that disparate impact claims are cognizable under the FHA. To state such a claim, a plaintiff must allege not only a statistical disparity, but also that the defendant maintained a specific policy that caused the disparity. *Id*. at 2523-24. Wells Fargo maintains that Cook County cannot satisfy this requirement because, while the challenged policy must be "facially neutral," the conduct alleged in the complaint "requires consideration of race and is [therefore] not race neutral." Doc. 109 at 19. This argument misunderstands *Inclusive Communities*.

*Inclusive Communities* concerned the allocation of federal tax credits by the Texas Department of Housing and Community Affairs. The plaintiff, a housing nonprofit, "alleged the Department … caused continued segregated housing patterns by its disproportionate allocation of the tax credits, granting too many credits for housing in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods." 135 S. Ct. at 2514. On the plaintiff's theory, the Department's allocation of the credits had the effect of discouraging "the construction of low-income housing in suburban communities," thereby violating the FHA. *Ibid*.

In holding that disparate impact claims are cognizable under the FHA, the Supreme Court explained that "disparate-impact liability" is "properly limited in key respects": as relevant here, after identifying a statistical disparity, the plaintiff must "point to a defendant's policy or policies

causing that disparity." *Id.* at 2522-23; *see also City of Joliet v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) ("Disparate-impact analysis looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment."). In addition, the Court held, the challenged policy must be "artificial, arbitrary, and unnecessary." *Inclusive Cmtys.*, 135 S. Ct. at 2524 (citation and internal quotation marks omitted); *see also City of Joliet*, 825 F.3d at 830 (noting that *Inclusive Communities* "stressed the importance of considering both whether a policy exists and whether it is justified"); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017) ("Under *Inclusive Communities*, a plaintiff must, at the very least, point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity."). The Court added that a "robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Inclusive Cmtys.*, 135 S. Ct. at 2523 (citation, alterations, and internal quotation marks omitted). Thus, "[a] plaintiff who fails to allege facts at the pleading stage … demonstrating a causal connection" between the identified disparity and the complained-of policy "cannot make out a prima facie case of disparate impact." *Ibid*.

In the two years since *Inclusive Communities* was decided, several circuits have applied its framework. In *City of Joliet*, the Seventh Circuit upheld the district court's determination— after a bench trial—that a municipality's decision to condemn two buildings within a particular housing complex did not violate the FHA. 825 F.3d at 828-29. The plaintiffs challenging the condemnation argued that because "95% of [the complex's] residents are black … its closure *must* have a disparate impact." *Id.* at 829-30. The Seventh Circuit rejected this argument for two reasons. First, the challengers could not show a disparate impact; the condemnation was not "injurious" because, "given the district court's findings about the dilapidated and crime-ridden

nature" of the condemned buildings, residents would be "better off" in the alternative housing arrangements the city provided. *Id*. at 830. Second, the "district court's findings show[ed] that the condemnation … is a specific decision, not part of a policy to close minority housing in Joliet." *Ibid*. Accordingly, under *Inclusive Communities*, the condemnation was not subject to a disparate impact claim.

In *Ellis*, the Eighth Circuit addressed an allegation by two "for-profit, low-income rental housing providers" that Minneapolis's "heightened enforcement of housing and rental standards ha[d] a disparate impact on the availability of housing" for minority groups. 860 F.3d at 1107-08. Applying *Inclusive Communities*, the court held that the plaintiffs failed to point to a municipal policy causing the identified housing shortage. *Id*. at 1112-13. To the extent the complaint "boil[ed] down to allegations that the city ha[d] adopted an unannounced policy to disregard explicit City policy," the plaintiffs did not show that those allegations amounted to anything more than "good-faith errors or disagreements" about the application of the City's housing code. *Id*. at 1112 (emphasis omitted). At best, the Eighth Circuit concluded, the plaintiffs were "attempt[ing] to bootstrap numerous 'one-time decision[s]' together in order to allege the existence of a City policy to misapply the housing code." *Id*. at 1112-13 (second alteration in the original) (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2523).

In *Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016), the D.C. Circuit considered a "challenge to the District of Columbia's closure of a homeless shelter." *Id*. at 42-43. Although the closure occurred due to D.C. policy, the court held that the plaintiffs could not "establish" the requisite "causal link" under the FHA "between the challenged action—the closing of [the shelter] … —and any disparate impact on a protected population." *Id*. at 45. The reason, the court explained, was that, as in *City of Joliet*, "the undisputed evidence [on summary judgment]

showed that, because of additional housing provided … there was a net *gain* in available housing for the homeless notwithstanding the closure." *Ibid*.

Finally, in a pair of cases closely resembling this one, the Ninth Circuit held that the City of Los Angeles "failed to show [on summary judgment] a 'robust' causal connection between any disparity and a facially-neutral Wells Fargo policy." *City of L.A. v. Wells Fargo & Co.*, 691 F. App'x 453, 454 (9th Cir. 2017) (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2523); *see also City of L.A. v. Bank of Am. Corp.*, 691 F. App'x 464, 465 (9th Cir. 2017) (same). The court explained:

> The City identified three facially-neutral policies which it alleged resulted in a disparity: (1) Wells Fargo's compensation scheme provided incentives for its loan officers to issue higher-amount loans, (2) Wells Fargo's marketing targeted low-income borrowers, and (3) Wells Fargo failed to adequately monitor its loans for disparities. The City failed to demonstrate how the first two policies were causally connected in a 'robust' way to the racial disparity, as they would affect borrowers equally regardless of race, and the third is not a policy at all.

*City of L.A. v. Wells Fargo*, 691 F. App'x at 454-55; *see also City of L.A. v. Bank of Am. Corp.*, 691 F. App'x at 465.

At the pleading stage of a lawsuit, "[i]t is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) (citation and internal quotation marks omitted); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (holding that the plaintiff need only "give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen"). While recognizing the holdings of the cases discussed above, Cook County's FHA disparate impact claim surmounts the plausibility hurdle.

First, as *Inclusive Communities* requires, the County identifies a set of related statistical disparities, alleging that Wells Fargo issued a disproportionate number of high-cost, subprime, or

other nonprime loans to minority borrowers in Cook County. Doc. 106 at ¶¶ 300-309, 323-333, 336. In so doing, the County alleges a statistical disparity between the baseline percentage of minority homeowners in Cook County, on the one hand, and the percentage of the total number of high-cost, subprime, or other nonprime loans Wells Fargo issued to minority borrowers, on the other. The County also alleges that Wells Fargo was disproportionately likely to foreclose on loans issued to minority borrowers in Cook County. *Id.* at ¶¶ 334-335, 337-345. Unlike the plaintiffs in *City of Joliet* and *Boykin*, the County has thus alleged a bona fide disparity.

Second, as *Inclusive Communities* also requires, and as the plaintiffs in *City of Joliet* and *Ellis* failed to do, the County identifies a policy—Wells Fargo's equity-stripping practice—to which it attributes the alleged statistical disparity. Specifically, the County alleges that equity stripping was a considered, long-term effort to "maximize[] lender profits … in disregard for a borrower's ability to repay" through "interrelated predatory and discriminatory loan making, loan servicing and foreclosure activities that occur over the entire life of each mortgage loan." Doc. 106 at ¶¶ 3, 7. While implicitly conceding equity stripping's "artificial" and "arbitrary" nature by failing to defend it, *Ellis*, 860 F.3d at 1114, Wells Fargo contends that it cannot qualify as a policy within the meaning of *Inclusive Communities* because it relied primarily on employee discretion. Doc. 109 at 21.

In support, Wells Fargo cites *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), but *Dukes* does not advance Wells Fargo's cause. Just the opposite—*Dukes* specifically acknowledges that "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory," even as it held that such discretion could not ground a finding of commonality under Rule 23(a)(2). 564 U.S. at 355; *see also City of Phila. v. Wells Fargo & Co.,* 2018 WL 424451, at *4 (E.D. Pa. Jan. 16, 2018) (citing *Dukes* in holding that "a

policy that gives a defendant's employees discretion *can* be the basis for a disparate impact claim"); *Cnty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 967 (N.D. Ill. 2015) ("*Dukes* did not foreclose the possibility that a discretionary policy could be the basis for a claim of disparate impact; indeed, it recognized as much, noting that 'a common mode of exercising discretion that pervades the entire company' and produces disparate impact effects might be actionable. … [A]s the County points out, *Dukes* was decided in the context of Rule 23(a)(2)'s commonality requirement, making its discussion of limited import here.") (citations omitted). Wells Fargo points to no other precedent, and the court is aware of none, suggesting that a stated policy of rewarding employees for exercising only certain forms of discretion may not ground disparate impact liability under the FHA. Moreover, the complaint alleges nothing to suggest that Wells Fargo employees ever directed minority borrowers into *more* favorable loans where it was possible to direct them into *less* favorable ones. Thus, the ostensible discretion at issue here is alleged to have operated as a one-way ratchet.

Moreover, contrary to Wells Fargo's submission, a disparate impact claim "may be based on any … policy, not just a facially neutral policy." *Adams v. City of Indianapolis*, 742 F.3d 720, 731 (7th Cir. 2014); *see also Inclusive Cmtys.*, 135 S. Ct. at 2523 (requiring only that the plaintiff "point to a defendant's policy or policies causing [the relevant] disparity"). Even so, the complaint goes so far as to plausibly allege that Wells Fargo's equity-stripping practice—the relevant policy here—was facially race-neutral. As Cook County alleges, equity stripping relies primarily on charging borrowers higher fees at all stages of a loan's life cycle, and then preventing borrowers from getting out from underneath these onerous loan terms by denying their modification requests. Doc. 106 at ¶¶ 3, 7, 272-276. The County alleges further that minority borrowers were particularly "susceptible" to equity stripping, insofar as they were more

likely to lack access to low cost credit, strong relationships with banks, and comparative financial information. *Id*. at ¶ 162. Moreover, the complaint alleges that, due to "historical housing patterns and segregation," communities with concentrated minority populations "provided an efficient means for [Wells Fargo] to target potential borrowers." *Id*. at ¶ 163. The complaint concludes that minority borrowers "provided the quickest and easiest path … for [Wells Fargo] to originate as many loans as rapidly as possible to borrowers most likely to accept the less favorable terms of [their] mortgage loan products." *Id*. at ¶ 164.

Cook County thus presents the following plausible, coherent narrative. As the complaint alleges, Wells Fargo did not "set out to discriminate" against minority borrowers in designing and implementing equity stripping, as would be the case in a disparate treatment claim. *City of Joliet*, 825 F.3d at 829; *see also Inclusive Cmtys.*, 135 S. Ct. 2513 (explaining that a disparate treatment claim requires a plaintiff to "establish that the defendant had a discriminatory intent or motive," while a disparate impact claim "challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale") (citation and internal quotation marks omitted). Rather, to the extent that Wells Fargo sought out minority borrowers as part of the equity-stripping practice, it was pursuant to a facially neutral policy of identifying and targeting vulnerable borrowers—those that would be most likely to accept fee-generating, unfavorable loan terms. That is, minority status served for Wells Fargo, not as an explicit basis for discrimination, but as an easy heuristic to identify those borrowers that could most easily be channeled into the kinds of loans that maximized the fee revenue central to its profit model. In this way, the County plausibly suggests that the weight of the equity-stripping practice "f[e]ll more harshly on one group than another," even if did not arise from a "subjective intent to discriminate." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) (citation and

internal quotation marks omitted); *see also Inclusive Cmtys.*, 135 S. Ct. at 2522 ("Recognition of disparate-impact liability under the FHA … permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment. In this way, disparate-impact liability may prevent segregated housing patterns that might otherwise result from *covert and illicit stereotyping*.") (emphasis added).

It is true that Cook County also alleges that Wells Fargo intentionally targeted minority borrowers. But Civil Rule 8(e) allows plaintiffs to plead alternative theories, provided that they "use a formulation from which it can be reasonably inferred that this is what they were doing." *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000); *see also* 5 Wright & Miller, *Federal Practice and Procedure,* § 1282 (3d ed. 2017) ("Federal Rule 8(e)(2) affords a party considerable flexibility in framing a pleading by expressly permitting claims for relief or defenses to be set forth in an alternative or hypothetical manner."). And here, the County plainly advances two alternative theories of liability under the FHA—disparate treatment and disparate impact. Doc. 106 at ¶¶ 433-456 (alleging disparate impact), ¶¶ 457-465 (alleging that Wells Fargo's conduct was intentional and thus constitutes disparate treatment).

Third, as *Inclusive Communities* also requires, and as explained above, Wells Fargo's equity-stripping practice has the requisite causal connection to the statistical disparity. In particular, Cook County alleges that key aspects of the practice, including Wells Fargo's refusal to grant loan modification requests made by distressed borrowers, pushed borrowers into foreclosure in a manner resulting in statistical disparities. Doc. 106 at ¶¶ 334-345. Put otherwise, the County alleges that minority borrowers were disproportionately more likely, given their baseline rates of homeownership, to be subject to equity stripping than nonminority borrowers. Thus, unlike the plaintiffs in *Boykin* and *City of Los Angeles v. Wells Fargo*, Cook

County has satisfied the robust causation requirement of *Inclusive Communities*. *Compare Nat'l Fair Hous. Alliance v. Travelers Indem. Co.*, 261 F. Supp. 3d 30, 34 (D.D.C. 2017) ("Here, based on a fact-specific inquiry, NFHA has pleaded facts that, if true, would show that Travelers' policy will exacerbate racial and sex-based disparities by having a disproportionate impact on African-American residents and members of women-headed households in the District."); *Alexander v. Edgewood Mgmt. Corp.*, 2016 WL 5957673, at *4 (D.D.C. July 25, 2016) ("[D]efendants are using a selection mechanism outside of their published [policy] that excludes applicants for a wide range of criminal activity, ranging from old overturned convictions to misdemeanors. Given the demographics in the area and historical conviction rates, African Americans are statistically more likely to fall into that category and thus be excluded by defendants' unpublished policy."); *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 125 (D.R.I. 2015) ("Using methodology explained in his report, Dr. Bradford found that the Briarwood policy impacted families with children in a statistically significant and disproportionate way."), *with Anfeldt v. United Parcel Serv., Inc.*, 2017 WL 839486, at *2 (N.D. Ill. Mar. 3, 2017) ("Because plaintiff has not pleaded factual or statistical content to support the allegation that she and other pregnant women were denied light-duty accommodations at a statistically higher rate than non-pregnant employees, her disparate impact claim fails."); *TBS Grp., LLC v. City of Zion*, 2017 WL 319201, at *3 (N.D. Ill. Jan. 23, 2017) (dismissing an FHA disparate impact claim because the plaintiff alleged only "facts about the ethnic makeup of the City and those who rent in the city in general," and thus presented "no allegations" that the policy would have a disparate impact on minority renters); *Merritt v. Countrywide Fin. Corp.*, 2016 WL 6573989, at *12 (N.D. Cal. June 29, 2016) ("Plaintiffs have failed to establish that this

purported policy, rather than Plaintiffs' own financials, led Defendants to offer them subprime loans. This defect is fatal to Plaintiffs' claim.").

### III.     The FHA's Statute of Limitations

Wells Fargo next contends that Cook County's claims are barred by the FHA's statute of limitations. Doc. 109 at 22. "Although the statute of limitations is an affirmative defense, dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate if the complaint contains everything necessary to establish that the claim is untimely." *Collins v. Vill. of Palatine*, 875 F.3d 839, 842 (7th Cir. 2017). Thus, to warrant dismissal on limitations grounds under Rule 12(b)(6), "the plaintiff must affirmatively plead himself out of court; the complaint must 'plainly reveal [ ] that [the] action is untimely under the governing statute of limitations.'" *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014) (alterations in original) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)); *see also Savory v. Cannon*, 2017 WL 5971999, at *1 (N.D. Ill. Dec. 1, 2017) (citing additional cases); *Arce v. Chi. Transit Auth.*, 2015 WL 3504860, at *8 (N.D. Ill. June 2, 2015) (same). Those circumstances are not present here, as Cook County has not pleaded itself out of court.

A civil enforcement action under the FHA must be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice … whichever occurs last … ." 42 U.S.C. § 3613(a)(1)(A). Here, the complaint clearly alleges that Wells Fargo continues to the present day to implement its equity-stripping practice. In particular, the complaint alleges that Wells Fargo is still making decisions about "whether or not to modify a defaulted or high cost loan at the borrower's request and whether to foreclose on a particular defaulted borrower's home." Doc. 106 at ¶¶ 272-273. The complaint also alleges that Wells

Fargo issued loans on a discriminatory basis in 2012 and 2013, less than two years before the County brought this lawsuit. *Id*. at ¶ 335.

This allegedly continuing conduct—issuing loans, deciding whether to grant loan modifications, and making foreclosure determinations—is part and parcel of Wells Fargo's equity-stripping practice. Thus, unlike in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 628 (2007), *superseded by legislative action* (Jan. 29, 2009), Cook County does not allege only "adverse effects resulting from past discrimination" that occurred outside the limitations period. *See United States v. Midwest Generation, LLC*, 720 F.3d 644, 648 (7th Cir. 2013) (noting that, under *Ledbetter*, the "enduring consequences of acts that precede the statute of limitations are not independently wrongful"). Rather, the County alleges a "[c]umulative violation[]" of the FHA. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014) (noting that "[c]umulative violations arise when it is not immediately apparent that the law is being violated"); *Cnty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 520 (N.D. Ill. 2015) (concluding that a similar case could not be dismissed on limitations grounds because the "County alleges that Defendants *continue* to charge minority borrowers discriminatory fees and costs during the servicing of home loans").

As with the hostile work environment allegations found to constitute a continuing violation in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002), equity stripping by its "very nature involves repeated conduct." *Id.* at 115. At least on the pleadings and without the benefit of an evidentiary record, no portion of the equity-stripping practice, taken alone, is necessarily "actionable on its own"; instead, the County's claim is "based on the cumulative effect of individual acts" that, taken together, reveal an allegedly discriminatory pattern. *Ibid.*; *see also Turley v. Rednour*, 729 F.3d 645, 654 (7th Cir. 2013) (Easterbrook, J.,

concurring) ("Deeds that are not themselves violations of law become actionable if they add up. … One or two offensive remarks do not violate Title VII, but a cascade of remarks over the course of months may do so—and *Morgan* holds that the period of limitations for a hostile-environment claim runs from the last remark rather than the first.").  And because the County alleges that Wells Fargo continues to make decisions that are part of that equity-stripping practice, the complaint plausibly pleads that the practice has not yet terminated, *see* 42 U.S.C. § 3613(a)(1)(A), thus rendering timely the County's claims.  *See Cnty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d at 520; *Dekalb Cnty. v. HSBC N. Am. Holdings, Inc.*, 2013 WL 7874104, at *9-12 (N.D. Ga. Sept. 25, 2013).  At minimum, because it is not apparent from the pleadings when Cook County "knew or should have known" that the equity-stripping practice constituted an actionable cumulative violation under the FHA, the motion to dismiss on the ground that the FHA's two-year statute of limitations has run is premature.  *See Cnty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d at 521 ("I cannot determine on the basis of the complaint whether the County knew or should have known between 2004 and 2008 that 95,000 home loans signed by minority borrowers contained discriminatory terms and conditions. … It is plausible that the discriminatory nature of home loans signed by minority borrowers in Cook County became apparent only during the servicing period of each loan as high costs and fees started to add up.").

## IV.    Claim Preclusion (Res Judicata)

Finally, Wells Fargo contends that Cook County's claims could have been asserted in an earlier lawsuit brought by the Attorney General of Illinois under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*., the Illinois Fairness in Lending Act ("IFLA"), 815 ILCS 120/1 *et seq*., the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*., and the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815

ILCS 510/1, *et seq.*, and therefore that the claim preclusion doctrine, also called res judicata, requires dismissal. Doc 109 at 29. As the court discussed in its prior opinion, that earlier lawsuit—filed in parallel with a federal suit brought by the U.S. Department of Justice—was resolved in 2012 with a consent decree. 115 F. Supp. 3d at 912-13. In pressing claim preclusion, Wells Fargo argues that because the Attorney General's complaint was filed on behalf of "The People of the State of Illinois," it "*effectively* sought relief both on behalf of Illinois borrowers and the State and its political subdivisions," including Cook County. Doc. 109 at 29 (emphasis added).

Res judicata "provides for the finality of rulings by barring the relitigation of claims or defenses that had been or *could have been* brought in a prior case." *Smith Trust & Sav. Bank v. Young*, 727 N.E.2d 1042, 1045 (Ill. App. 2000) (emphasis added); *see also Wilson v. Edward Hosp.*, 981 N.E.2d 971, 975 (Ill. 2012); *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 471 (7th Cir. 2007). Because an Illinois state court issued the judgment in the Attorney General's suit, its preclusive effect is governed by Illinois law. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996); *Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006). In Illinois, res judicata applies if: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998); *see also Empress Casino*, 763 F.3d at 727-28.

The parties do not dispute that the state court's consent decree satisfies the test's first prong. Doc. 112 at 30-32; *see City of Mattoon v. Mentzer*, 668 N.E.2d 601, 606 (Ill. App. 1996) ("The Illinois courts are generally in agreement a consent decree operates to the same extent for *res judicata* purposes as a judgment entered after contest and is conclusive with respect to the

matters which were settled by the judgment or decree."). But even assuming that this case and the Attorney General's case "arise from a single group of operative facts" and thus that there is an identity of cause of action between the two cases, *see River Park*, 703 N.E.2d at 893; *see also Vill. of Bartonville v. Lopez*, 77 N.E.3d 639, 650 (Ill. 2017); *Empress Casino*, 763 F.3d at 728, Wells Fargo cannot satisfy the test's third prong, an identity of the parties or their privies.

Wells Fargo concedes that the parties in the two cases are different, Doc. 109 at 29, so the question becomes whether the Attorney General was in privity with Cook County. "In considering whether res judicata applies, privity is said to exist between parties who adequately represent the same legal interests. For purposes of res judicata, it is the identity of interest that controls in determining privity, not the nominal identity of the parties." *Lutkauskas v. Ricker*, 28 N.E.3d 727, 739 (Ill. 2015) (citation, alterations, and internal quotation marks omitted); *see also Chi. Title Land Trust Co. v. Potash Corp. of Saskatchewan Sales Ltd.*, 664 F.3d 1075, 1080 (7th Cir. 2011) (same); *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993) ("Privity is an elusive concept. It is a descriptive term for designating those with a sufficiently close identity of interests."). "There is no generally prevailing definition of 'privity' that the court can apply in all cases; rather, determining privity requires careful consideration of the circumstances of each case." *Oshana v. FCL Builders, Inc.*, 994 N.E.2d 77, 83-84 (Ill. App. 2013) (citation and internal quotation marks omitted).

In bringing a lawsuit seeking restitution for *borrowers* and civil penalties to be paid to the *State*, Doc. 109 at 29-30; Doc. 36-3; Doc. 36-6, the Attorney General was not representing Cook County's unique legal interests in seeking damages for the cost of managing and administering the increased quantity of mortgage foreclosures allegedly caused by Wells Fargo's conduct. In fact, the state case was brought under different statutory authority (IHRA, IFLA, ICFA, and

IUDTPA, not FHA), seeking different relief (restitution and civil penalties, not money damages), under a different legal theory of injury (discrimination against borrowers, causing harm to those individuals directly, and loss of property tax revenue, causing harm to the "State of Illinois itself" due to the need to make up for lower revenues obtained by local governments, rather than the direct costs of running a county sheriff's department and court system). Doc. 36-6 at ¶¶ 232-255; *see Indian Harbor Ins. Co. v. MMT Demolition, Inc.*, 13 N.E.3d 108, 121-23 (Ill. App. 2014) (holding that there was no privity where the parties in the two cases not only "engaged in very types of actions and sought different relief," but also "pursued … distinct and different … rights"); *In re Marriage of Mesecher*, 650 N.E.2d 294, 296 (Ill. App. 1995) (holding that there was no privity where "[s]eparate parties claim separate monies"). It therefore comes as no surprise that the consent decree in the Attorney General's case allocated no funds for Cook County specifically. Doc. 36-3.

To be sure, the State of Illinois and Cook County are both governmental entities, with the latter being a subdivision of the former. But that fact, standing alone, does not mean that the Attorney General was in privity with Cook County in prosecuting the state lawsuit. *See Pedersen v. Vill. of Hoffman Estates*, 8 N.E.3d 1083, 1096 (Ill. App. 2014) ("The fact that both a municipality and a pension board are public entities is not enough to establish they are the same parties or are in privity for the purpose of collateral estoppel."); *Rhoads v. Bd. of Trs. of the City of Calumet City Policemen's Pension Fund*, 689 N.E.2d 266, 270 (Ill. App. 1997) (same, explaining that the "lack of privity between the parties is supported by the distinct identity, constituency, and interest of the Pension Board"); *Hannigan v. Hoffmeister*, 608 N.E.2d 396, 404 (Ill. App. 1992) ("We are not prepared to accept the plaintiff's argument that the parties are the same because they were both State agencies."); *see also United States v. Ledee*, 772 F.3d 21, 30

(1st Cir. 2014) ("[C]ourts have recognized in the preclusion context the folly of treating the government as a single entity in which representation by one government agent is necessarily representation for all segments of the government.").  Moreover, "there is no evidence of any collaboration" between the Attorney General and Cook County officials in prosecuting the Attorney General's suit.  *Rhoads*, 689 N.E.2d at 270.

In sum, because the Attorney General's suit and this suit are not brought by the same parties or their privies, claim preclusion does not apply.

## Conclusion

Wells Fargo's motion to dismiss is granted in part and denied in part.  Cook County may proceed on its FHA claims to the extent they allege that Wells Fargo's equity-stripping practice directly resulted in increased expenditures by the Cook County Sheriff's Office and the Cook County Circuit Court in connection with administering and processing an increased number of foreclosures.  The motion otherwise is granted.  Wells Fargo shall answer the surviving portions of the complaint by April 16, 2018.

March 26, 2018

_____
United States District Judge