# EXHIBIT E

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
     COUNTY OF COOK,                 )
 4                                   )
                     Plaintiff,      )
 5                                   )
     -vs-                            )  Case No. 14 C 9548
 6                                   )
     WELLS FARGO & CO., WELLS        )
 7   FARGO FINANCIAL, INC.,          )
     WELLS FARGO BANK, N.A., and     )
 8   WELLS FARGO "JOHN DOE"          )
     CORPS. 1-375,                   )  Chicago, Illinois
 9                                   )  September 18, 2018
                     Defendants.     )  9:45 a.m.
10

11                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE GARY FEINERMAN
12

13   APPEARANCES:

14   For the Plaintiff:      EVANGELISTA WORLEY, LLC
                             BY:  MR. JAMES M. EVANGELISTA
15                           8100A Roswell Road
                             Suite 100
16                           Atlanta, Georgia  30350
                             (404) 205-8400
17
                             JAMES D. MONTGOMERY & ASSOCIATES,
18                           LTD.
                             BY:  MR. JOHN K. KENNEDY
19                           One North LaSalle Street
                             Suite 2450
20                           Chicago, Illinois  60602
                             (312) 977-0200
21
     Court Reporter:
22
                      CHARLES R. ZANDI, CSR, RPR, FCRR
23                        Official Court Reporter
                       United States District Court
24            219 South Dearborn Street, Suite 2128
                        Chicago, Illinois  60604
25                    Telephone:  (312) 435-5387
               email:  Charles_zandi@ilnd.uscourts.gov
```

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiff:      MILBERG, LLP
                             BY:   MR. J. BIRT REYNOLDS
 3                           One Pennsylvania Plaza
                             50th Floor
 4                           New York, New York   10119
                             (212) 594-5300
 5

 6   For the Defendants:     K&L GATES, LLP
                             BY:   MR. ABRAM I. MOORE
 7                                 MS. NICOLE C. MUELLER
                             70 West Madison Street
 8                           Suite 3100
                             Chicago, Illinois  60602
 9                           (312) 781-6010

10                           K&L GATES, LLP
                             BY:   MR. PAUL F. HANCOCK
11                           200 South Biscayne Boulevard
                             Suite 3900
12                           Miami, Florida   33131
                             (305) 539-3300
13

14                           KATTEN MUCHIN ROSENMAN, LLP
                             BY:   MR. PETER G. WILSON
15                                 MR. SHELDON T. ZENNER
                             525 West Monroe Street
16                           Chicago, Illinois  60661
                             (312) 902-5649
17

18

19

20

21

22

23

24

25
```

1   (Proceedings heard in open court:)

2       THE CLERK:  14 C 9548, County of Cook versus Wells

3   Fargo.

4   (Bench conference, not reported.)

5       THE COURT:  Okay.  So, who do we have?

6       Sorry.  I thought I was going to get to you at 9:30,

7   and I was off, so sorry for the delay.

8       MR. EVANGELISTA:  Jim Evangelista, Evangelista

9   Worley, for County of Cook.

10       MR. KENNEDY:  Jack Kennedy also for the County.

11       MR. REYNOLDS:  Birt Reynolds also for the County.

12       MR. MOORE:  Good morning, your Honor.  Abe Moore from

13   K&L Gates for Wells Fargo.  I'm here with Paul Hancock from

14   K&L Gates and Nicole Mueller from K&L Gates.

15       MR. WILSON:  Good morning, your Honor.  Peter Wilson

16   from Katten Muchin for Wells Fargo.  I'm here with Sheldon

17   Zenner as well.

18       THE COURT:  Okay.  Good morning.  So, we have a

19   motion for protective order that's fully briefed, and I

20   imagine there's been other stuff going on in the case as well.

21   Could you bring me up to speed on how discovery's progressing,

22   with the exception of the matters that are at issue in the

23   protective order?

24       Let's start with the plaintiff.

25       MR. EVANGELISTA:  Yes, your Honor.  We've been in the

1    process of filing -- or having served an initial round of
2    discovery requests.  There's going to be some -- a second
3    round of discovery requests.  Defendants have filed, and we
4    responded.
5            So, I mean, I expect that at some point, there's
6    going to be a lot more meet-and-confers, and there may be a
7    few more either protective orders or motions to compel to come
8    out of this process, so --
9            MR. WILSON:  Your Honor, we have at least one
10   discovery issue that we think is now ripe for the Court's
11   resolution.  We discussed during the meet-and-confer process
12   a potential briefing schedule.  I don't want to get ahead of
13   what's to come in this area, but we were discussing a motion
14   to compel by the defendants regarding the names of the
15   supposed confidential witnesses that are mentioned in the
16   complaint, with a brief due a week from today on the 25th, a
17   reply on the 5th -- excuse me, a response brief on the 5th,
18   and then a reply on the 15th.
19           THE COURT:  25th, 5th.
20           MR. WILSON:  And 15.
21           THE COURT:  Okay.
22           MR. WILSON:  With a possibility for a status hearing,
23   if it works for the Court and the parties, later that week.
24           THE COURT:  Is that all right with the plaintiffs?
25           MR. EVANGELISTA:  Yes, your Honor.

1   THE COURT:  Okay.  So, there will be a motion to

2   compel the production of confidential witnesses.  The brief

3   will be -- motion will be filed on the 25th, the response on

4   the 5th, the reply on the 15th.

5   And then, Jackie, why don't we come in later that

6   week.

7   THE CLERK:  Sure.  How about we set you for

8   October 18th, 9:15 a.m.

9   THE COURT:  And our trial is going to disappear that

10   week, is that right?

11   THE CLERK:  I'm thinking.

12   THE COURT:  Okay.  Good.  So, confidential

13   witnesses -- I don't want to get ahead of myself; but I hear

14   confidential witnesses, and I'm thinking at some point, at

15   some point, the veil is going to have to come off.  So, if not

16   now, when?

17   MR. EVANGELISTA:  Well, your Honor, I think the

18   question is whether we would even need to rely on anything

19   from the confidential witnesses at summary judgment or at

20   trial.  Frankly, I believe that the data that the defendants

21   have in their own possession and their e-mails and their

22   efforts to circumvent their policies are going to obviate any

23   need for any confidential witnesses, so --

24   THE COURT:  So, you're going to say you're not going

25   to use them?

1    MR. EVANGELISTA:  I'm not ready to say that just yet.

2    It depends -- I mean, we're assuming -- you know, if we get

3    the data that he we know that they have, I believe we won't

4    need them.  So, the question is whether they really need to be

5    disclosed or not subject to depositions and things like that.

6    It's really going to be a distraction from moving forward with

7    other evidence in the case.  That said, obviously, you know,

8    to the extent they're relevant at this point, if we have to

9    produce them, we will.

10    But we think it's worth briefing because this is a

11   novel kind of issue in the context here.  There's two

12   different lines of cases on this, and we think it's something

13   that really bears shaking out under the law in the circuit.

14    THE COURT:  Okay.  All right.  Well, I look forward

15   to your briefs on that.

16    Did we set a date for them to come in?

17    THE CLERK:  October 15th, 9:15 a.m.

18    THE COURT:  Actually, it can't be the 15th.

19    THE CLERK:  18th.  I'm sorry.

20    THE COURT:  Okay.  So, it's the 18th.

21    All right.  So, anything else either side wants to

22   talk about regarding discovery other than our protective order

23   motion?

24    No?

25    MR. WILSON:  I don't think at this time.

1          MR. EVANGELISTA:  At this moment, no.  I mean, I

2   think we have a lot of work to do still on it, Judge, and

3   there's going to -- we're going to have a lot of

4   back-and-forth.  The data issues are foremost here.

5          THE COURT:  Okay.  So, we have a motion for a

6   protective order.  I've read the briefs.  The defendants were

7   heard -- I'm sorry.  Yeah, the defendants were heard last in

8   writing, so if there's anything in the reply brief that you'd

9   like to orally address, I wanted to give you an opportunity.

10         MR. EVANGELISTA:  Sure.  A couple of points, your

11  Honor.

12         The defendant's motion is actually premised on the

13  concept that we asked for, quote, unquote, all data on all

14  loans.  And tellingly, they don't actually provide the

15  document requests that we asked.  So, I think that's kind of

16  curious, because when you look at the document requests that

17  we gave them, there's six or seven, eight specific to the

18  data.  We actually limited the data in many, many respects and

19  asked for some very specific items.

20         There are a couple of areas in that data where we

21  have asked for all the data, and that's primarily the

22  servicing -- the servicing side and the loan origination side.

23  But in essence, we've asked them for the loan files on loan

24  originations, the servicing data.  That includes default

25  servicing.  It includes modifications, things like that.

1    Why we have been unable to drill down and further
2  narrow any of the fields is because they refuse to tell us
3  the fields that they have.  Now, we know that they have and
4  track thousands and thousands of data points.  It is the data
5  that is within the servicing records that will basically show
6  their discriminatory conduct as to servicing, as to default
7  servicing, as to loan modification behavior, as to original
8  originations of the loans.
9    They have asked for a number of restrictions here
10  that essentially try to circumvent the Court's motions to
11  dismiss, reframe the facts of the case, argue, I think
12  inappropriately, that, you know, somehow the Court eliminated
13  in its motion to dismiss all of the substantive allegations
14  about the different components of the discriminatory conduct.
15    And so by doing this, they're clearly trying to
16  violently narrow down the field of loans to the tiniest
17  possible amount.  That eliminates many of the foreclosures.
18  It eliminates -- by them picking the fields, it eliminates
19  the evidence of their discriminatory conduct.  And it -- it
20  essentially will hamstring us from -- you know, from proving
21  our case, because everything -- well, not everything, but the
22  vast majority of what we need is going to be in that loan
23  data.  We know that.
24    We know that because we have seen data -- they
25  referred to the Bank of America case and what Judge Rowland

1    did there and seemed to rely on that as the, quote, unquote

2    high watermark.  Actually, Judge, it's the low watermark for

3    that case.  And Judge Rowland made clear in some of the

4    hearings that we had -- we had multiple hearings on this.

5    Bank of America provided their data fields.  We had our

6    expert look at them.  We went back and forth.  There were

7    multiple databases.  Some of the data, they gave us all of the

8    descriptors and all of the fields.  Some of the data in some

9    of the databases, they gave us some of the fields.

10           So, there were multiple things that were done.  And

11   to basically say somehow Judge Rowland, you know, said that

12   everything we were asking for was irrelevant just is not the

13   case.

14           And, in fact, the court basically said we may need

15   to come back again after identifying the loans that were,

16   quote, unquote, discriminatory on their face that we felt

17   looking at the loan originating data to get the entire set of

18   servicing data.

19           So, what they've proposed is some -- a few select

20   servicing data fields.  I can go through a list.  There are

21   many, many, many unanswered questions from what they proposed,

22   and there are many, many data fields they have that will show

23   it.

24           One simple example is if you're trying to look at --

25           THE COURT:  Do you know what data fields are not on

1    the list of 81?

2           MR. EVANGELISTA:  Well, they haven't given us the

3    data fields, so we don't know specifically what they call

4    them, what they have, until they show us the list.

5           THE COURT:  Let's put aside the data fields for one

6    second.  I want to know what your position is on the notion

7    of origination or servicing versus origination and servicing.

8           On page 9 of your brief, there's a heading that says,

9    "Defendants should produce data regarding all the loans they

10   originated, serviced, or foreclosed upon" --

11          MR. EVANGELISTA:  Right.

12          THE COURT:  -- "during the relevant time period."

13          MR. EVANGELISTA:  Sure.

14          THE COURT:  But then the second paragraph says

15   something different, which is, "Defendants must produce

16   origination and servicing data for every loan they originated,

17   purchased, or acquired, and either securitized and sold or

18   serviced at any time."

19          So, the heading is all in the disjunctive, and the

20   text is partially in the disjunctive and partially in the

21   conjunctive.

22          MR. EVANGELISTA:  Sure.  So, your Honor, there are --

23   and this goes basically to the business of mortgage lending --

24          THE COURT:  I don't need to know why your position

25   is what it is.  I first need to know what's your position?

1      MR. EVANGELISTA:  Our position is they need to give
2  us -- if they originated a loan or purchased a loan by funding
3  it through correspondent lenders, it's the same thing.  It
4  doesn't matter whether they originated it in-house or paid
5  somebody else to do it through their own correspondent lenders
6  because --
7      THE COURT:  I get that.  And then you say, "and
8  either securitized and sold or serviced."
9      MR. EVANGELISTA:  Right.
10      THE COURT:  There's a conjunctive there, but in the
11  heading, there's a disjunctive.
12      MR. EVANGELISTA:  Okay.
13      THE COURT:  So, I don't know what your position is.
14      MR. EVANGELISTA:  Okay.  Fair enough.
15      THE COURT:  And because with statutes you look at the
16  text and not the heading, I'm looking at the text at this
17  point.
18      MR. EVANGELISTA:  And ultimately, if they -- the
19  point is to capture --
20      THE COURT:  Just tell me what your position is.
21  I can't understand your argument for your position without
22  first knowing what your position is.  I'm confused about your
23  position.  What is it?  Is it what the heading says, or is it
24  what the text says?
25      MR. EVANGELISTA:  So, it needs to be -- it needs to

1  be they originated and purchased and did one of two other

2  things.  They serviced it at some point or they sold it.  So,

3  it's to capture all of the loans that they touched at any

4  point in time.

5           THE COURT:  Now you're saying two different things

6  because you can touch it either at the origination or at the

7  servicing, but you just told me it has to be origination or

8  purchase plus service or sell.  And that's what the text says.

9           MR. EVANGELISTA:  Right.

10          THE COURT:  The heading says origination or purchase

11  or service.

12          MR. EVANGELISTA:  Okay.  So --

13          THE COURT:  There isn't -- it changes the "or."

14          MR. EVANGELISTA:  I understand.  So, you really --

15  you have to have two components.  What we're trying to --

16  the being involved in the origination process, and at some

17  point servicing it or selling it off.  So -- and service --

18  and the reason being, Judge, we're trying to eliminate, which

19  would not be fair to Wells Fargo at this point, the concept

20  that if they buy a servicing pool and actually act as a

21  sub-servicer for a pool of somebody else's loans, that's loans

22  we're saying that's somebody else's problem.

23          If they bought a whole bunch of Countrywide loans --

24  excuse me, let me rephrase that.

25          If they entered into an agreement to service

1   Countrywide loans that Countrywide had originated under
2   Countrywide's origination practices and behaviors, that's not
3   something Wells Fargo would necessarily -- really should be
4   responsible for unless it acted in a separate discriminatory
5   capacity on those.
6           But that's a small subset, and we're saying we're not
7   going there with those because Countrywide or some other
8   entity that they're acting strictly as a sub-servicer for,
9   they're not responsible or have any responsibility for the
10  underlying origination of the loan.
11          At the same time, we want to capture that if they
12  have a responsibility for the underlying origination of the
13  loan --
14          THE COURT:  Okay.  You're --
15          MR. EVANGELISTA:  Yeah.
16          THE COURT:  I don't care about the why at this point.
17  All I care about is the what.
18          MR. EVANGELISTA:  Okay.
19          THE COURT:  When I'm looking at your brief, do I
20  listen to this, or do I listen to this as your position?
21          MR. EVANGELISTA:  Yes.  Ignore the point heading if
22  it's -- and listen to the argument.
23          THE COURT:  Okay.  So, I then actually think there
24  isn't as much daylight between the plaintiff and the defendant
25  as there might have been, because the defendant is also saying

1   origination plus servicing, but you're just including in
2   origination purchasing, and you're also including in servicing
3   selling.
4           Yes.
5           MR. EVANGELISTA:  If you break up servicing and
6   selling into two separate components, because what happens is
7   they will sell -- they'll originate the loans --
8           THE COURT:  I understand.
9           MR. EVANGELISTA:  -- and then sell the pool of loans
10  to somebody.  They're responsible for that origination -- for
11  that conduct.  They received the profit on the bad loan or the
12  discriminatory loan, and now somebody else has that pool of
13  loans and is continuing to service.
14          So, we would have to go to, let's say, Countrywide,
15  for example, who's servicing it.
16          THE COURT:  Why not just give them the data fields?
17  What's the big deal?
18          MR. MOORE:  Well, your Honor, it's not --
19          THE COURT:  Bank of America gave it in the other
20  case.  Why can't -- just give them the data fields, and if
21  there's 100, there's 100.  If there's 200, there's 200.  The
22  plaintiffs can say, "I want these.  I don't care about those."
23  And then you can fight it out, and if you can't reach an
24  agreement, you can bring it to me.
25          It would just make things so much easier if you just

1  told them the data that you have on these loans.  Because

2  otherwise, they say, "give me everything," and you say, "Well,

3  they want everything."  You're putting -- by not giving them

4  the data fields, you're putting them in a Catch 22 because

5  you're saying, "Well, they're asking for everything.  That's

6  too much."  And then they say, "Okay.  Tell us what data

7  fields you have," and then you say, "Well, I'm not going to

8  tell you what data fields we have."  So, how could they narrow

9  it down if they don't know what you have?

10      MR. MOORE:  Your Honor, maybe it's worthwhile to

11  consider what data fields are.  We view these more as search

12  terms.  So, we have a body of data.  In order to extract the

13  relevant data, use these what we're calling data fields, but

14  they're really data points, that you want us to go search for

15  within these different systems.

16      THE COURT:  I'm envisioning an Excel spreadsheet.

17  And if you gave all the data, there would be -- the horizontal

18  line would be each loan, and then the column -- the rows would

19  be the loan, and the columns would be the data fields.  And

20  there could be 100.  There could be 150.  There could be 200.

21  I don't know.

22      Am I envisioning it incorrectly?

23      MR. MOORE:  Well, for a particular system, you will

24  see that.  And the way we see the data is different fields are

25  identified for the loans.  But what we're talking about is

1  dozens and dozen of systems that have been migrated over time.

2      So, what we have -- for example, there's a system

3  now that we use to service first lien home mortgage loans.

4  If you wanted to extract the data fields from that and show

5  the plaintiffs, it might be relatively easy to do.  But that

6  system was created in 2016, and data was migrated from a prior

7  system which had different data fields.  When the loan was

8  moved over, the active loans we were continuing to service, as

9  well as maybe some additional loans that have been closed out.

10 And that prior system was in place only for a certain amount

11 of time, and there's a predecessor system to that as well with

12 different data points.

13     So, if you were to say, "Give them all the data

14 fields you've ever used," that's just one system.  Now we're

15 talking about other systems for home equity loans, systems for

16 originations.  If you want to say all systems -- or all data

17 points we've ever used, it's going to be a Herculean task.  If

18 you said all data fields for the systems that are currently in

19 place, we could do that, but we're not really giving you kind

20 of the relevant information.

21     What we're trying to do is say what you need -- it's

22 like search terms.  "What do you need in order to conduct your

23 analysis?  And we'll go through all of these systems for the

24 loans that are necessary and extract the relevant data that

25 you need."

1          And this has been done already.  So, the parties have

2     gone through this task in the Bank of America case, and they

3     spent 11 months negotiating what the data fields are.  There

4     now exists a list that the parties and the court have come up

5     with and said these are all -- this is a high watermark of

6     data fields that might be relevant to a full-blown

7     equity-stripping case.  And we can --

8          THE COURT:  And maybe -- you give them all the data

9     fields.  You just list all the data fields.  I imagine you

10    have it.  It's Wells Fargo.  You have to have a list of the

11    data fields in whatever systems you have.  If you don't, you

12    probably have a problem with the Controller of Currency if you

13    don't know what data fields you have.  I imagine you have the

14    data fields for whatever system you have.

15         You tell them, "Here are the data fields we have."

16    They say, "We want these 120."  And then you say, "I'm not

17    going to give you the 120."  Then you can argue, "Well, Judge

18    Rowland only made Bank of America give 90, and we shouldn't

19    have to give the other 30."  And then we can actually have a

20    discussion.

21         But by not giving -- by not listing the data fields,

22    you're not even allowing -- you're not allowing the

23    conversation to begin.  You're making them play pin the tail

24    on the donkey, and they're just saying, "Take off the

25    blindfold" -- I'm going to extend this metaphor for as long

1    as I can -- "take off the blindfold and let me see what I'm
2    going for."

3         Why not just -- why -- it seems like you're making
4    things really difficult when it's unnecessary to do so because
5    you're -- we can have the fight about what data fields they
6    get; but they first need to know what data fields are
7    available, don't you think?

8         MR. MOORE:  Well, we could provide a list potentially
9    of current data fields that we use for loans, and they could
10   identify which fields they think are relevant from that.  And
11   we could go back and try to determine whether that data is
12   stored in prior systems potentially.

13        But we're recreating the wheel here to go through
14   this negotiation because it's already been done.  There's no
15   difference between the equity-stripping claim they've alleged
16   here and the one they alleged in the Bank of America case.

17        THE COURT:  Right, but -- and we can get there, and
18   you can make your argument; but why are we -- I'm sure Judge
19   Rowland did a fantastic job.  She's wonderful.  But decisions
20   of district courts are not precedential, so maybe I will take
21   a different view of what is relevant.  Maybe I'd take a
22   narrower view of what's appropriate.  Maybe I'd take a broader
23   view.  Maybe I'd agree with her.  But we can't even have this
24   discussion unless they know what the universe is.

25        MR. MOORE:  Well, your Honor, they should know what

1    they need to conduct their analysis.  So, what they're asking
2    us to effectively do is, "List all of your e-mails."  Well,
3    that's not how it works.  "You give us your search terms.
4    You'd like us to run through our data.  We'll find the
5    relevant information, and we'll provide it to you."

6              THE COURT:  Okay.  Anything else that you'd like to
7    discuss about the motion?  I'm going to give you a ruling in
8    writing, not right now.

9              Is there anything else you'd like me to know?

10             MR. EVANGELISTA:  Well, there were a couple of other
11   restrictions on here that they wanted to impose, and that
12   was -- one was just on first lien under reportable loans.  I
13   think our brief makes it pretty clear that they're required to
14   track data on more than just first lien loans.  They're
15   required to track data on home equity lines of credit and
16   other second lien loans if any aspect of that loan is to be
17   used for home improvement, things like that.

18             The information about what aspect is -- you know,
19   of any of those loans are used for that component or for
20   refinancing an existing mortgage, all of that is within the
21   data points.

22             And the other component about the servicing fields
23   is they track and write comments.  Every time a borrower or
24   somebody calls in on the loan, somebody's recording their
25   comments, making comment entries.  And what the borrower is

1   saying as recorded in the comment entries may be different

2   from how they track a reason code for a particular action,

3   denial or granting of a modification.

4           There's dates on modifications.  When did it happen?

5   What were the reasons that they granted or denied it?  What

6   were the reasons they decided to enter into foreclosure or to

7   delay foreclosure?  What were the dates?  Who made the

8   decision?  What was it subject to?  There's tons and tons and

9   tons of information and questions that can be answered just

10  through the production of the data.

11          That's -- so -- and limiting it to just first lien

12  loans cuts out an enormous amount of loans, particularly the

13  HELOC loans.  The second --

14          THE COURT:  What they're saying is there aren't many

15  foreclosures of second lien loans, so the game isn't worth the

16  candle.

17          MR. EVANGELISTA:  Well, Judge, that's -- as a

18  plaintiff, I have to take that representation?  What fact?

19  What affidavit is there?  How many are there?  What does that

20  mean to me?

21          And if they were discriminatory and engaged in bad

22  behavior on the second lien that forced the borrower into

23  foreclosure because he couldn't pay or she couldn't pay the

24  second lien that forced them into foreclosure on the first,

25  what's -- isn't that part and parcel of the same thing if they

1   own both loans?

2           I mean, so I don't really see how that argument, just

3   them saying, "Well, there's really not that many."  Is there

4   none?  If there's one, it's relevant.  So, I think there's

5   going to be a lot more, because a lot of the bad behavior

6   occurred in this HELOC and home equity line of credit

7   behavior.

8           So, that's -- it's not me saying it.  All you have to

9   do is go read the Controller of the Currency website or the

10  DOJ and anybody else and see what these guys basically

11  consented to in their consent decrees, where their bad

12  behavior was.  It's all out there in the public, and they paid

13  billions and billions of dollars because of that.  So, we

14  ought to be able to see what happened in this county on this

15  activity.

16          The second point that I wanted to touch on here is

17  Wachovia.  They've taken the position that they're not going

18  to give us any Wachovia loans.

19          THE COURT:  Doesn't that turn on what the beginning

20  date is?  If the beginning date is '03 or '05, then Wachovia

21  is included.  If the beginning date is 2007 or 2008, maybe

22  not.

23          MR. EVANGELISTA:  Well, they merged with --

24          THE COURT:  No, I know.

25          MR. EVANGELISTA:  So, they're responsible for all

1    of Wachovia's stuff.  A stock merger is, "I'm responsible for
2    your bad behavior."  That's what a stock merger means.  It's
3    not, "I bought the loans and your bad behavior went away."
4    They're responsible for it.

5            And presumably, they continued to service it because
6    that's what they were buying when they bought that stuff when
7    they merged.  They were buying mortgage servicing rights.  So,
8    Wachovia engaged in this bad behavior, and they're continuing
9    to service that product which they're responsible for.

10           That's different from them being a sub-servicer to,
11   like, Countrywide and saying, "By agreement, we're going to
12   sub-service your loans.  We're not responsible.  We didn't
13   touch them.  We didn't own the company that made them.  We're
14   just sub-servicing them for you."

15           The corollary to that is -- and this is why I get
16   into the securitization issue, why we want the loans that were
17   also securitized and sold is because typically they will
18   retain mortgage servicing rights.  They will hire their own
19   sub-servicers.  So, if they hire a sub-servicer that's acting
20   as an agent for them on loans they were responsible for either
21   through origination or purchase or funding or however they
22   became responsible, through merger and acquiring Wachovia,
23   and they're servicing them or they're having an agent
24   sub-service for them, they're responsible for them.  That's
25   what we're saying.

1          THE COURT:  Any thoughts on those?

2          MR. MOORE:  Yes.  I'll start with the home equity

3    lines of credit.  We thought we were in agreement that it's

4    very rare that there's a foreclosure of a second mortgage,

5    like a home equity line of credit.  That was one of our

6    arguments that we raised.

7          But additionally, there's a proximate cause problem

8    in the plaintiff's argument.  Plaintiff has argued that the

9    servicing, discriminatory servicing of a second lien loan

10   somehow causes someone else to foreclose on the first lien

11   loan.  Well, that -- they don't have the one-to-one

12   relationship that's required for the proximate cause in that

13   situation, so the home equity lines of credit are irrelevant.

14         With regard to Wachovia, Wachovia was purchased in

15   2008, and all of the Wachovia conduct ended in 2008.  There's

16   a statute of limitations problem with Wachovia, as well as a

17   problem of if you were -- in order to meet the

18   equity-stripping theory, Wells Fargo has to have originated it

19   and serviced it.  For Wachovia loans, Wells Fargo didn't

20   originate those loans.

21         THE COURT:  But what he's saying is by buying, by

22   having the stock merger, Wells Fargo became responsible for

23   Wachovia's conduct.

24         MR. MOORE:  I understand.  But at the same time, you

25   have to have -- this equity-stripping theory is a life of the

1   loan theory.  So, if we acquired the loan halfway through and

2   then if there's some conduct on the back end, that doesn't fit

3   the life of the loan equity-stripping theory that they've

4   alleged.

5           THE COURT:  I'll give you the last word on that.

6           MR. EVANGELISTA:  So, on that point, we didn't

7   acquire the loan.  We acquired Wachovia that made the loan.

8   That's what they did.  So, there's a huge legal distinction

9   between those two things.

10          Let me just follow up on the second point, though.

11  The second lien very well could be responsible for the first

12  lien.  Why?  How did this work?  Typically, when a mortgage

13  loan is refinanced, companies like Wells Fargo and Countrywide

14  and others of the discriminatory predatory lenders did a

15  double loan.  They did a first lien loan combined with a

16  second lien loan.  The first lien loan has some criteria to

17  it.  The second lien loan has usually much higher interest and

18  higher costs associated with it, so that you end up with a

19  borrower maybe getting 100 -- whatever, 100 percent financing

20  where they're not putting any dollars into it.

21          So, Wells Fargo would do both loans at the same time.

22  That's -- or later on down the road, Wells Fargo would -- as

23  the lender, would go -- that did the original.  The borrower

24  would come back and say, "Hey, I want to refinance.  I want to

25  get money out," so they'll make a second lien on top of the

1  first lien that they originated.

2         And it's -- so, it -- the proximate cause isn't just

3  simply, "Oh, there's no proximate cause."  It depends on the

4  circumstances.  That's why we need all the data so we can see:

5  Was the -- was the HELOC a stand-alone to another lender and

6  there was nothing wrong with it?  There was no discrimination

7  in it?  Was it a loan that went to the same borrower that

8  Wells Fargo originally had?  Was it made as part of a

9  refinancing of some other loan and done in conjunction with

10  each other?

11         That's why we also asked, Judge, for the ID numbers

12  on the loans in our discovery requests.  We asked for the ID

13  numbers so we can track it all, match everything up together,

14  because we don't expect they're going to do that for us.  So,

15  we need those ID numbers, and we need the ID numbers to know

16  whether, for example, they took a loan and they put it in a

17  pool and they sent it off to MERS and let MERS or someone else

18  through MERS do the servicing while they kept the servicing

19  rights in some way.

20         So, we tried to ask for a very specific set of data,

21  just one for family loans, just in Cook County, over the time

22  period.  We've agreed with defendants they can start in

23  January of 2003, so that's what Peggy Wedgworth said at the

24  last hearing on this, going forward.  And it should be

25  everything they touched, everything Wachovia touched that

1   they're responsible for in any way the origination, and they

2   either sold it off, securitized it, or they serviced it.

3        It's got to be one or the other because they're not

4   going to just make a loan and then not service it.  That

5   doesn't make any sense.  They wouldn't get any money out of

6   it.  So, they either have to service it, or they have to

7   securitize it and sell it to somebody else, and they may or

8   may not keep the servicing rights.

9        That's why we tried to break it up in that way for

10  the Court.  In other words, there wouldn't be a loan that they

11  just made and did nothing with it.  It's either got to be sold

12  to somebody or they have to service it at some point.

13        MR. MOORE:  Your Honor, can I just, for my last

14  point --

15        THE COURT:  Go ahead.

16        MR. MOORE:  Can I revisit the data field issue?  I

17  just want to make one last point on that.

18        THE COURT:  You are on like the 3-yard line, and you

19  have 97 yards to go.

20        MR. MOORE:  This is a Hail Mary.  No.  We've been

21  representing Wells Fargo in these FHA cases for quite a while,

22  and Paul Hancock can certainly speak to this.  In each of the

23  cases we've represented Wells Fargo in the past, the plaintiff

24  has come forward with, "Here's the data we need," and

25  identified the particular data items they need.

1    We've never been asked -- the client hasn't been
2    asked to go forth and create the list of all the data fields
3    from either the current servicing platforms, much less all
4    servicing platforms.  So, we would -- it would be unusual for
5    us to do that, and the client has represented it would be
6    difficult for them to do.

7    MR. EVANGELISTA:  And those cases that are out there
8    are just plain origination cases where all you need to look at
9    is the loan application registry data.  Okay?  So, this is not
10    that case.

11    And I was wondering if your Honor could give us a
12    preview of the trial so we could figure out how to resolve
13    the case.

14    THE COURT:  I can't do that at this point.  So, why
15    don't -- thank you for the briefs, and thank you for your
16    arguments.  I know that this is an important issue, so I'm
17    going to get to -- I'm going to resolve this motion sooner
18    rather than later.

19    Jackie, let's set this for a status hearing during
20    the week of October 22nd, assuming --

21    THE CLERK:  So, you want to also keep the
22    October 18th date?

23    THE COURT:  Oh, we have an October 18th date already?
24    THE CLERK:  Yeah.
25    THE COURT:  Let's keep that.

1          MR. WILSON:  We just put it on for the motion to
2     compel.
3          THE COURT:  Oh, yeah.  Let's keep that date.
4          THE CLERK:  October 18th, 9:15 a.m.
5          THE COURT:  Thank you.
6          MR. MOORE:  Thank you, your Honor.
7          MR. WILSON:  Thank you.
8          MR. EVANGELISTA:  Thank you.
9       (Which were all the proceedings heard.)
10                       CERTIFICATE
11      I certify that the foregoing is a correct transcript from
12     the record of proceedings in the above-entitled matter.
13
14     /s/Charles R. Zandi                September 20, 2018
       _____        _____
15     Charles R. Zandi                   Date
       Official Court Reporter
16
17
18
19
20
21
22
23
24
25