UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COUNTY OF COOK, ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 9548 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| WELLS FARGO & CO., WELLS FARGO | ) | |
| FINANCIAL, INC., WELLS FARGO BANK, N.A., and | ) | |
| WELLS FARGO "JOHN DOE" CORPS. 1-375, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Cook County brought this suit against Wells Fargo & Co. and related entities

(collectively, "Wells Fargo"), alleging violations of Title VIII of the Civil Rights Act of 1968, 42

U.S.C. § 3601 *et seq*., more commonly known as the Fair Housing Act ("FHA"). Doc. 106. As

the suit now stands, the County claims that Wells Fargo discriminated against minority

borrowers in its mortgage loan practices, causing those borrowers to default and the County to

incur increased expenditures associated with foreclosure-related proceedings. Docs. 142-143

(reported at 314 F. Supp. 3d 975 (N.D. Ill. 2018)) (granting in part and denying in part Wells

Fargo's motion to dismiss for failure to state a claim); Docs. 552-553 (reported at 544

F. Supp. 3d 833 (N.D. Ill. 2021)) (denying Wells Fargo's motion to dismiss for lack of Article III

standing). With discovery concluded, Wells Fargo moves under Civil Rule 56 for summary

judgment, Doc. 617, and both Wells Fargo and the County move under Evidence Rule 702 to

exclude the opinion testimony of several expert witnesses, Docs. 599, 606, 609, 612, 629-631.

Wells Fargo's motions to exclude the expert opinion testimony of Dr. Gary Lacefield and (to the

1

extent he addresses liability) Dr. Charles Cowan are granted, as is its summary judgment motion.

Because those rulings dispose of this case, the other motions are denied as moot.

## Background

The following facts are set forth as favorably to the County as the record and Local

Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir.2012). On summary

judgment, the court must assume the truth of those facts, but does not vouch for them. *See Gates*

*v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Wells Fargo is a major residential mortgage originator and servicer. Doc. 619 at ¶¶ 4, 10.

At all relevant times, Wells Fargo sold to government-sponsored entities such as Fannie Mae or

Freddie Mac most of the loans it originated. Doc. 678 at ¶ 4. The government-sponsored entities

securitized those loans and sold them to investors. *Id*. at ¶ 5. Sometimes the investors retained

Wells Fargo as the servicer of those loans. *Id*. at ¶ 10. That is, Wells Fargo sometimes held

servicing rights to loans—which entail, for example, collecting monthly payments and issuing

loan modifications to make loans more affordable—but did not itself own the loans. *Ibid*.;

Doc. 608-6 at ¶¶ 38-40.

In the early 2000s, Wells Fargo viewed African-American and Hispanic home buyers in

markets with substantial minority populations, including Chicago, as an opportunity for growth.

Doc. 666 at ¶¶ 6-8. The company used proxies for race, such as zip code and census tract, to

identify Chicago neighborhoods with high concentrations of minority home buyers. *Id*. at ¶¶ 5-6.

It then attempted to attract those borrowers with marketing campaigns specifically targeted at

minority consumers. *Id*. at ¶¶ 4, 9-10, 12. At the same time, Wells Fargo provided its

employees financial incentives to steer borrowers into higher-priced subprime and nonprime

mortgage loans and to negotiate higher interest rates and overages. *Id*. at ¶¶ 15-16. Two of the

County's expert witnesses, Dr. Lacefield and Dr. Cowan, opine that Wells Fargo's minority borrowers were more likely to receive higher interest rates and less favorable loan terms, such as prepayment penalties and balloon payments. *Id*. at ¶ 27; Doc. 601-1 at ¶¶ 5-7; Doc. 608-1 at ¶¶ 35-39.

The County claims that Wells Fargo's predatory and discriminatory practices continued after a loan's origination into its servicing, including the discriminatory denial of loan modification requests, leading to disproportionately high rates of default and foreclosure for minority borrowers. Doc. 679 at 11-12. In support, Dr. Lacefield opines that Wells Fargo was more likely to deny loan modification requests from minority borrowers than from white borrowers, Doc. 601-1 at ¶ 186; Doc. 666 at ¶ 29, and both Dr. Lacefield and Dr. Cowan opine that the company was more likely to foreclose on minority borrowers' loans than on white borrowers' loans, Doc. 601-1 at ¶¶ 144-151; Doc. 608-1 at ¶¶ 3, 21; Doc. 666 at ¶¶ 32-33.

The County provides the funding for services associated with mortgage foreclosures, including serving process and facilitating evictions through the Cook County Sheriff's Office and processing foreclosure suits through the Circuit Court of Cook County. Doc. 666 at ¶ 51-52; Doc. 679 at 12. (Although the Sheriff's Office and the Circuit Court of Cook County are independent government entities, the County funds the operation of both. Doc. 666 at ¶¶ 51-52.) The County claims that it incurred increased expenditures for those foreclosure-related services as a result of Wells Fargo's discriminatory practices, which it contends caused increased foreclosures for minority borrowers. *Id*. at ¶ 92; Doc. 679 at 12.

\* \* \*

This lawsuit followed by several years suits brought by the United States and the State of Illinois—under the FHA and Illinois law, respectively—resting on similar allegations against

Wells Fargo. *See United States v. Wells Fargo Bank, NA*, No. 12-cv-1150-JDB (D.D.C.); *People v. Wells Fargo & Co.*, No. 09 CH 26434 (Ill. Cir. Ct., Cook Cnty.). Unlike this lawsuit, which seeks to redress the economic harm that the County allegedly suffered from Wells Fargo's alleged mortgage lending and servicing practices, those earlier suits sought and obtained financial and injunctive relief for minority borrowers allegedly harmed by Wells Fargo's practices. *See United States v. Wells Fargo Bank, NA*, 891 F. Supp. 2d 143 (D.D.C. 2012) (granting motion to enter a consent order); *United States v. Wells Fargo Bank, NA*, *supra*, Consent Order (D.D.C. July 12, 2012) (reproduced at Doc. 36-4); *People v. Wells Fargo & Co.*, *supra*, Final Judgment and Consent Decree (Ill. Cir. Ct., Cook Cnty. July 12, 2012) (reproduced at Doc. 36-3).

## Discussion

The court first considers Wells Fargo's motions to exclude the expert testimony of Drs. Lacefield and Cowan and then turns to the company's summary judgment motion.

## I.    Motions to Exclude Dr. Lacefield's and Dr. Cowan's Expert Opinion Testimony

Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert," *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted), and "has 'broad latitude' to determine how to evaluate expert testimony," *United States v. Hill*, 818 F.3d 289, 297

(7th Cir. 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).  The

expert's proponent bears the burden of proving by a preponderance of the evidence that the

expert's testimony satisfies Rule 702.  *See United States v. Saunders*, 826 F.3d 363, 368 (7th Cir.

2016); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### A.    Dr. Lacefield

Dr. Lacefield, the founder of a real estate financial compliance consulting company, has

decades of experience in the origination and servicing of residential mortgage loans.  Doc. 601-1

¶¶ 33-48.  He opines that Wells Fargo's mortgage origination and servicing practices caused

minority borrowers to receive riskier and higher priced loan products and for such borrowers to

experience default and foreclosure at rates higher than those received and experienced by white

borrowers.  *Id.* at ¶¶ 5, 16, 144-151, 186, 198.

Dr. Lacefield deploys what he calls a "delimiter" methodology to analyze Wells Fargo's

origination and servicing practices.  *Id.* at ¶ 79.  He explains that delimiters are "red flags" that

raise questions about a loan's reasonableness, and he defines a set of delimiters associated with

origination (for example, loans for amounts greater than 2.5 times the borrower's annual income)

and servicing (for example, the denial of loan modification requests).  *Id.* at ¶¶ 80, 85, 96,

155-156.  As Dr. Lacefield puts it, "[t]he purpose of each delimiter is to identify individual

products, programs, and underwriting characteristics that could lead to default and foreclosure

for single family, owner occupied mortgage loans."  *Id.* at ¶ 79.

After defining a set of delimiters, Dr. Lacefield instructed statisticians at the firm

Analytic Focus to design and conduct statistical testing on Wells Fargo's loan data.  Doc. 601-14

at 13-14, 30-31 (66:23-67:7, 151:17-152:22).  The statisticians chose a bivariate statistical model

(the Fisher's exact test) to test for statistical significance the difference in each delimiter's

prevalence in loans to minority borrowers versus white borrowers.  *Id.* at 9, 12 (43:4-18,

57:5-18); Doc. 601-1 at ¶ 136. As the County concedes, Doc. 622 at 20-21, the bivariate analysis does not account for any borrower characteristic—such as income, wealth, or credit score—except race.

Wells Fargo contends that Dr. Lacefield's opinions are inadmissible because he lacks the expertise necessary to determine whether the underlying statistical technique was appropriately chosen and applied. Doc. 600 at 37-38. Dr. Lacefield admitted at his deposition that he did not select the statistical tests deployed by the Analytic Focus statisticians or possess the expertise to do so. Doc. 601-14 at 9 (43:11-13) ("I couldn't run those statistics because I'm not a statistician, nor do I claim to be."); *id*. at 10 (44:16-18) ("I relied on [Analytic Focus's] expertise as far as running the statistics."). Instead, Dr. Lacefield provided the statisticians with the "parameters" of his hypothesis, *id*. at 9 (43:9-11), and he instructed them to produce an analysis that would be "clear and simple enough for a jury," *id*. at 12 (57:9-18).

As the County correctly observes, "[a]n expert witness is permitted to use assistants in formulating his expert opinion, and normally [those assistants] need not themselves testify." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002). This observation follows from the "well settled" principle that "expert witnesses may rely on material commonly used by others in the field, even if those materials were prepared by others." *United States v. Smith*, 869 F.2d 348, 355 (7th Cir. 1989); *see also Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) ("Nor do we believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions.").

A testifying expert's reliance on the work of a non-testifying, underlying expert becomes a problem, however, when the underlying expert's judgment is beyond the expertise of the

testifying expert and "the underlying expert judgment is in issue." *Dura*, 285 F.3d at 613. Put another way, although a testifying expert may rely on the expertise of others in formulating her opinion, *see Walker*, 208 F.3d at 589, she "cannot serve as the mouthpiece for another expert," *Zollicoffer v. Gold Standard Baking, Inc.*, 335 F.R.D. 126, 149 (N.D. Ill. 2020); *see also Dura*, 285 F.3d at 614 ("A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer."); *cf. In re James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992) (holding that an architect who consulted an engineer in forming his expert opinion could not testify to the truth of what the engineer had told him). Otherwise, a party could "circumvent[] the rules of evidence" by shielding the opinions of a non-testifying expert behind a testifying expert who cannot herself speak to or defend those opinions. *James Wilson Assocs.*, 965 F.2d at 173.

*Dura* illustrates the line between an expert's permissible reliance on other experts' work, on the one hand, and improper attempts to circumvent Rule 702, on the other. The plaintiff's expert, a hydrogeologist, relied on mathematical models that were created by others and that he lacked the expertise to evaluate. *See Dura*, 285 F.3d at 611-12. The district court excluded the hydrogeologist's testimony because neither the hydrogeologist himself nor other admissible evidence could establish the reliability of the underlying models. *Id*. at 612. The Seventh Circuit affirmed, explaining that the non-testifying mathematical modeling experts "did not merely collect data" or "apply concededly appropriate techniques in a concededly appropriate manner." *Id*. at 615. Rather, the modeling experts applied their own expertise, and the hydrogeologist "lack[ed] the necessary expertise to determine whether the techniques were appropriately chosen and applied." *Ibid*.

The same result obtains here. The Analytic Focus statisticians did not merely gather data and perform tasks directed by and within the expertise of Dr. Lacefield. They instead exercised their own professional judgment in choosing which statistical technique to employ. Their chosen test—which compared the prevalence of Dr. Lacefield's delimiters between races, without controlling for any potentially confounding factors—is not a plainly appropriate method of analysis, and Dr. Lacefield acknowledges that he cannot confirm that the test was appropriately selected or applied. (Dr. Cowan is a member of Analytic Focus, Doc. 608-1 at ¶ 7, but neither he nor the County indicates that he could testify as to the statistical test underlying Dr. Lacefield's analysis.) Because no evidence from Dr. Lacefield or others establishes the reliability of the methodology chosen by the statisticians, and because that methodology underlies, and thus is central to the reliability of, Dr. Lacefield's delimiter opinions, those opinions are excluded.

Wells Fargo also seeks to exclude Dr. Lacefield's opinions regarding the evidentiary record. Doc. 600 at 38-39. Those opinions are set forth in a 115-page appendix to Dr. Lacefield's report, Doc. 601-4, which he describes as "my observations based upon my review of the extensive evidentiary record developed during the discovery process in this litigation," Doc. 601-1 at ¶ 196. From that review, Dr. Lacefield opines that "there is a mountain of evidentiary material that overwhelmingly supports the substantive allegations in the County's complaint and my opinions and conclusions set forth in [my] report." *Id*. at ¶ 197. Wells Fargo contends that this opinion is improper because it weighs the evidence without providing any expert analysis that will help the jury itself evaluate the evidence. Doc. 600 at 38-39.

The County responds that Dr. Lacefield's opinions regarding the evidentiary record are proper because he "is citing to evidence in the record that confirms the findings from his delimiter methodology." Doc. 622 at 38. This response essentially concedes that Dr. Lacefield

is doing exactly what Wells Fargo suggests: weighing the evidence to conclude that it proves the County's liability case. The opinion therefore is improper, as "[a]n expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) (quoting *United States v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009)); *see also SEC v. Lipson*, 46 F. Supp. 2d 758, 765 (N.D. Ill. 1998) ("Defendant is not entitled to bolster his defense by having [an expert witness] provide under the banner of expert opinion what is, in fact, an extra summation of the evidence that fails to meet Rule 702's standards of reliability and helpfulness."). Dr. Lacefield's opinions based on his review of the record accordingly are excluded under Rule 702.

**B.    Dr. Cowan**

Wells Fargo next seeks to exclude the liability opinions of Dr. Cowan, the County's expert statistician. Doc. 606. As noted, Dr. Cowan opines that Wells Fargo originated loans on less favorable terms to, and was more likely to foreclose on, minority borrowers than white borrowers. Doc. 608-1 at ¶ 39; Doc. 666 at ¶¶ 28, 32. To form his opinions, Dr. Cowan performed regression analyses on a pool of approximately 350,000 loans originated or purchased by Wells Fargo or Wachovia Bank—which Wells Fargo acquired in 2008, Doc. 678 at ¶ 29—in or after 2003. Doc. 608-1 at ¶ 14. (As discussed below, the court considers loans originated or purchased by Wachovia Bank to be loans originated or purchased by Wells Fargo.)

The County's briefing suggests that Dr. Cowan's analysis also includes loans that Wells Fargo serviced but did not originate or purchase. Doc. 641 at 7 (stating that the data reflected loans that "Wells Fargo originated, purchased, and/or serviced"). But the court's understanding is that Dr. Cowan considered only loans that Wells Fargo originated or purchased, not those for which it merely held the servicing rights. In his expert report, Dr. Cowan explains that he considered loans originated or purchased (not merely serviced) by Wells Fargo, including those

originated or purchased by Wachovia. Doc. 608-1 at ¶ 14; *see also* Doc. 202 at 1 (court order stating: "[T]he loans for which data must be produced are limited to loans that Defendants (1) originated, purchased, or otherwise acquired and (2) securitized, sold, or serviced. That is, for data regarding a loan to be subject to discovery, the loan must satisfy both parameter (1) and parameter (2), recognizing that there is more than one way of satisfying parameter (1) and more than one way of satisfying parameter (2).") (emphasis removed). That is also the understanding more favorable to the County's case. As will become apparent, adding loans for which Wells Fargo merely held servicing rights would introduce further differences among the loans considered in Dr. Cowan's analysis and exacerbate the flaws that, by themselves, render his opinions inadmissible under Rule 702.

Wells Fargo's principal challenge to the analysis underlying Dr. Cowan's opinions is his reliance on a jumbled set of loan data—an amalgamation that Wells Fargo contends (and the County does not dispute) aggregates loans "across multiple lenders, multiple products, and multiple decades." Doc. 607 at 7; Doc. 641 at 7-8. Most problematically in Wells Fargo's view, the analysis combines loans that Wells Fargo originated with those that it purchased from others. Doc. 607 at 7; Doc. 641 at 7-8. That is, Dr. Cowan's analysis considered: loans that Wells Fargo both originated and serviced; loans that other entities originated but that Wells Fargo purchased and then serviced; and loans that Wells Fargo originated and sold and that were serviced (and sometimes foreclosed upon) by others. Doc. 607 at 4, 7; Doc. 641 at 7-8. Wells Fargo maintains that this approach—the analysis of loan products from different lenders to investigate the behavior of a single lender—renders Dr. Cowan's opinions unreliable because it is not a generally accepted methodology for investigating the lending behavior of a particular mortgage lender or servicer. Doc. 607 at 7-10.

"Rule 702 is designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court set forth a non-exhaustive set of criteria to guide this analysis, including: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical, or professional community." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing *Daubert*, 509 U.S. at 593-94); *see also Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he Daubert analysis applies to *all* expert testimony under Rule 702, not just scientific testimony.").

At his deposition, Dr. Cowan was unable to identify another lending study or analysis conducted by an academic that, like his, combined loans originated by an entity with loans purchased by that entity. Doc. 608-9 at 28 (294:12-17). And as Wells Fargo points out, Dr. Cowan's aggregation technique runs afoul of federal guidance providing that examiners analyzing potential disparities in loan terms "should tailor their sample and subsequent analysis to the specific factors that *the institution* considers when determining its pricing, terms, and conditions." Federal Financial Institutions Examination Council, Interagency Fair Lending Examination Procedures 19 (Aug. 2019), available at https://www.ffiec.gov/pdf/fairlend.pdf, (reproduced at Doc. 608-12 at 30) (emphasis added). Failing to follow that guidance, Dr. Cowan

11

aggregates loans across originating and servicing entities even though those entities, as Wells Fargo points out, may base their mortgage lending and servicing decisions on different parameters than Wells Fargo does. Doc. 607 at 9.

The County responds that it was appropriate for Dr. Cowan to consider all loans that Wells Fargo originated and/or purchased because the complaint alleges that the company engaged in discriminatory practices as to all such loans. Doc. 641 at 7. The County characterizes the complaint correctly, but it misses the point. The pertinent question is whether Dr. Cowan employed a reliable methodology for investigating the lending conduct of Wells Fargo in particular. The amalgamation of different categories of loans—(1) those that Wells Fargo originated but sold and did not service, (2) those that Wells Fargo purchased and serviced but did not originate, and (3) those that Wells Fargo both originated and serviced—casts serious doubt on the ability of Dr. Cowan's analysis to reliably determine whether the company engaged in discriminatory practices and, if so, the extent to which those practices impacted loans made to minority borrowers in Cook County. That doubt is amplified by the fact that other analysts and researchers do not aggregate loan data in that manner when investigating discriminatory mortgage lending and servicing behavior. The County, which bears the burden of establishing the admissibility of its expert's testimony, does not respond to Wells Fargo's contention that the analysis is not generally accepted—so, on that ground alone, Dr. Cowan's liability opinions are excluded. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (holding that the district court erred by admitting expert testimony that rested on a theory that was "novel and unsupported by any article, text, study, scientific literature or scientific data produced by others in his field"); *see also Am. Honda Motor Co.*, 600 F.3d at 817-18 (questioning the reliability of

an expert's testimony where there were no indications that anyone other than the expert himself accepted the methodology he employed).

Resisting this conclusion, the County suggests that Dr. Cowan's unorthodox approach is appropriate because information missing from the data Wells Fargo produced in discovery made it difficult or impossible to determine which entities originated or serviced about 30,000 of the approximately 350,000 loans analyzed. Doc. 607 at 4; Doc. 608-1 at ¶ 14; Doc. 641 at 8. Wells Fargo reasonably questions why the lack of data for about ten percent of the loan data set should license an analysis that indiscriminately aggregates *all* loans. Doc. 650 at 9. In any event, the court does not understand the County to argue that Wells Fargo's production was somehow deficient under Civil Rule 34 or otherwise. And even if the County believed that Wells Fargo's production was deficient, the appropriate course would have been to raise the issue during discovery—first with Wells Fargo under Local Rule 37.2 and then, if an accord could not be reached, with the court via a motion to compel. Indeed, the County timely moved to compel Wells Fargo to produce missing race and ethnicity data for thousands of loans. Doc. 413; *see* Doc. 417 (noting that the County withdrew the motion after the issue was resolved) The County later complained that the production was missing borrower names for many loans, Doc. 510 at 2, but the court rejected the challenge because it came long after the deadline for raising such disputes, Doc. 532 at 2. But the County did not seek court action to redress any complaint that Wells Fargo's production fell short in a manner that made it difficult or impossible to determine which entities originated or serviced loans.

While the discussion could stop there, it bears mention that Dr. Cowan's analysis is unreliable for the additional (and related) reason that there is a disconnect between the data he analyzed and his conclusions regarding Wells Fargo's allegedly discriminatory conduct. *See*

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (explaining that "[t]he critical inquiry is whether there is a connection between the data employed and the opinion offered"). The court will assume at this point that Wells Fargo can be liable for loans for which it discriminated as to either origination or servicing (or both). But Dr. Cowan's aggregation of loans originated and/or serviced by Wells Fargo with loans originated or serviced by other entities means that his analysis evaluates not just Wells Fargo's conduct, but also the conduct of those other entities. Thus, to the extent Dr. Cowan's analysis supports a finding of discrimination, it does not reliably support such a finding as to Wells Fargo in particular. *See Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (affirming the exclusion of expert testimony regarding the average price of a product where the testimony was based on sales of the product to only a single customer); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144-47 (1997) (affirming the exclusion of expert testimony where the expert did not provide a basis to opine that studies regarding cancer incidence in mice supported testimony regarding cancer incidence in humans). Or, as the undersigned judge's colleague put it when excluding Dr. Cowan's expert testimony in a substantially similar case brought by the County against a different bank: "Dr. Cowan's inclusion of loan data that is not probative of defendants' practices (as opposed to other lenders' practices) in an analysis putatively designed to ascertain the impact of *defendants'* practices on various populations is indeed a methodological flaw." *Cnty. of Cook v. Bank of Am. Corp.*, 584 F. Supp. 3d 562, 584 (N.D. Ill. 2022).

Recognizing this flaw in Dr. Cowan's analysis, the County suggests that Wells Fargo can be held liable for loans purchased from lenders that discriminatorily originated them—even if Wells Fargo itself acted properly in servicing them—based on a successor liability theory. Doc. 641 at 7-8. Authority supports the proposition that Wells Fargo can be liable for loans it

14

obtained when it acquired Wachovia Bank in 2008. *See Cobb Cnty. v. Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1345 (N.D. Ga. 2016) ("Plaintiffs may have a claim for the earlier Countrywide and Merrill Lynch violations through Bank of America's alleged successor liability."); *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1062 (C.D. Cal. 2014) (holding that the plaintiff properly alleged that Wells Fargo was liable, through successor liability, for the loans it acquired through its acquisition of Wachovia and other mortgage lenders). But the County does not cite, and the court is unaware of, any authority for the proposition that Wells Fargo can be liable for loans it purchased from entities other than Wachovia and for which it did not commit any discriminatory acts in servicing. Nor does the County's successor liability theory explain how Wells Fargo might be liable for the alleged discriminatory servicing of loans that it properly originated but later sold and did not service.

The County made two arguments across two hearings that might be construed as defenses of Dr. Cowan's methodology. At the first hearing, Doc. 710, the County suggested that Wells Fargo might have aided and abetted the discriminatory conduct of other lenders. The most favorable conception of the argument (to the County) is that Wells Fargo aided and abetted other lenders' origination of discriminatory loans by repeatedly purchasing those loans, thereby encouraging those lenders to continue originating them. To succeed on that argument, the County would need to show both that Wells Fargo actually engaged in such conduct and that aiding and abetting is a viable liability theory under the FHA. The County offers no authority for the proposition that aiding and abetting is a viable theory of FHA liability, and the authority found by the court is in conflict. *Compare Lefkowitz v. Westlake Master Ass'n, Inc.*, 2019 WL 669806, at *5 (D.N.J. Feb. 19, 2019) ("[T]he FHA does not contain a stand-alone aiding and abetting provision, outside of the substantive prohibitions on discrimination, 42 U.S.C. § 3604,

15

and the prohibition on coercion, intimidation, threats, and interference, § 3617."), *with Greens at Chester LLC v. Town of Chester*, 2020 WL 2306421, at *5 (S.D.N.Y. May 8, 2020) (allowing an FHA claim to go forward on an aiding and abetting theory). *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 166 (1994) (holding that aiding and abetting is not a viable theory of liability in suits brought by private plaintiffs under Section 10(b) of the Securities Exchange Act of 1934). The viability of that liability theory aside, the County fails to adduce evidence permitting the reasonable inference that Wells Fargo in fact engaged in activity amounting to the aiding and abetting of the discriminatory acts of others.

At the second hearing, Doc. 715, the County cited several cases in an attempt to support its view that entities that purchase and properly service loans may be held liable for the discriminatory origination of those loans. *See CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729 (7th Cir. 2015); *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109 (2d Cir. 2013); *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 68 F. Supp. 3d 439 (S.D.N.Y. 2014); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229 (App. Div. 2011). Those cases are inapposite because they are not FHA cases and because they do not concern liability for the discriminatory actions of others. Rather, those cases concern the liability of defendants who made misrepresentations about loans that they had purchased from others. *See CMFG Life Ins.*, 799 F.3d at 747-48; *N.J. Carpenters Health Fund*, 709 F.3d at 743; *Nomura Holding*, 68 F. Supp. 3d at 445-46; *MBIA Ins.*, 928 N.Y.S.2d at 233-34.

In sum, the County provides no legal theory on which Wells Fargo could be liable for loans for which it did not commit any discriminatory acts in either origination or servicing. Thus, Dr. Cowan's opinions cannot reliably assist a jury in determining whether Wells Fargo in particular, as opposed to other entities, engaged in discrimination violative of the FHA for the

origination or servicing of mortgage loans made to minority borrowers in Cook County.

Dr. Cowan's expert opinions are therefore excluded under Rule 702.

## II.    Summary Judgment Motion

With the motions to exclude the expert testimony of Drs. Lacefield and Cowan resolved in Wells Fargo's favor, the court proceeds to consider Wells Fargo's summary judgment motion. The County advances FHA claims based on disparate treatment and disparate impact theories.

### A.    Disparate Treatment

For its disparate treatment claim, the County contends that Wells Fargo's practices amount to a comprehensive "equity stripping" scheme whereby its interrelated loan origination and servicing practices diluted the equity that minority borrowers held in their homes and increased their foreclosure rates. Doc. 679 at 16-17. The higher foreclosure rates, the argument continues, caused the County to incur increased expenditures on the services it funds in connection with foreclosure proceedings. *Id*. at 56-57.

To survive summary judgment on this claim, the County must present evidence that Wells Fargo intentionally discriminated against minority borrowers in violation of the FHA and that such discrimination proximately caused the County's claimed injuries. *See Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017). Wells Fargo contends that there is insufficient evidence to show that it intentionally discriminated against minority borrowers or that any such discrimination proximately caused the County to suffer injury. Doc. 618 at 47.

In *City of Miami*, the Supreme Court explained that "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action." 137 S. Ct. at 1305. "The question [that the proximate cause issue] presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Ibid*. (internal quotation marks omitted). "In the context of the FHA, foreseeability alone does not ensure the close connection that proximate

17

cause requires." *Id.* at 1306. "Rather, proximate cause under the FHA requires 'some *direct* relation between the injury asserted and the injurious conduct alleged.'" *Ibid.* (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)) (emphasis added). In applying the direct relationship requirement to statutes like the FHA that have "common-law foundations, … [t]he general tendency … is not to go beyond the first step." *Ibid.* (citations and internal quotation marks omitted). "What falls within that first step depends in part on the nature of the statutory cause of action and an assessment of what is administratively possible and convenient." *Ibid.* (citations and internal quotation marks omitted).

At the pleading stage, this court held that discriminatory practices during a loan's servicing could establish proximate cause. 314 F. Supp. 3d at 986. As the court explained, default and foreclosure are the "inexorable consequences of Wells Fargo's denial of loan modification requests from already-distressed borrowers." *Ibid.* Thus, when a borrower defaults and a mortgage forecloses as a result of the discriminatory denial of a loan modification request, the County's expenditures on foreclosure-related services are a direct result of that discriminatory conduct. *Ibid.*; *see also Cnty. of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 962 (N.D. Ill. 2018) (reaching the same conclusion in a substantially similar case brought by the County).

The County does not contend that discriminatory practices at the origination stage alone—as opposed to during servicing—could show proximate cause. Doc. 679 at 57. The County eschews that contention for good reason, as there is no "close connection" between (a) discriminatory steering at a loan's origination and (b) any expenditures that the County might incur if and when the borrower defaults. Unlike the denial of loan modification requests for already distressed borrowers, default and foreclosure are not the inexorable consequence of a

loan's unfavorable origination terms.  As the Ninth Circuit and the undersigned judge's colleague explained in substantially similar FHA cases, too many potentially confounding factors lie between a loan's origination, on the one hand, and any default and foreclosure, on the other.  *See City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1040 (9th Cir. 2021) (en banc) ("The reason for default could be attributable to many independent factors, such as job loss, a medical hardship, a death in the family, a divorce, a fire or other catastrophe, Covid-19, broader economic trends, or any number of other unpredictable causes not present when the loan was made."); *Bank of Am.*, 584 F. Supp. 3d at 585 n.17 (explaining that "origination conduct" cannot, by itself, "be deemed to have proximately caused the challenged foreclosures").

To survive summary judgment, then, the County must adduce evidence that Wells Fargo discriminated against minority borrowers in its servicing practices—such as by denying loan modification requests based on race—causing their loans to default and foreclosures to follow.  To do so, the County points to the testimony of its expert witnesses.  Doc. 679 at 28-30, 57-58.  As noted, Dr. Lacefield opines that Wells Fargo denied loan modification requests from minority borrowers at a higher rate than it did for white borrowers, Doc. 666 at ¶ 29, and both Drs. Lacefield and Cowan opine that Wells Fargo disproportionately foreclosed on loans to minority borrowers, *id*. at ¶¶ 32-33.  Those statistical disparities, the County contends, provide a sufficient basis for a reasonable jury to infer Wells Fargo's intentionally discriminatory actions caused the County to suffer financial injury.  Doc. 679 at 28-30.

The County is correct that statistical disparities may be used to establish disparate treatment, especially where no other explanation for an observed disparity is present.  *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a

pattern or practice of discrimination."); *EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) ("[I]n some cases, statistical disparities alone may prove intent."). The County's problem, however, is that its evidence for these disparities—the expert testimony of Drs. Lacefield and Cowan—has been excluded under Rule 702. And without that evidence, the County has no other evidentiary basis to establish that Wells Fargo engaged in intentionally discriminatory servicing practices that caused minority borrowers to disproportionately suffer default and foreclosure. The County therefore cannot show that Wells Fargo engaged in intentional discrimination against minority borrowers that proximately caused the County's injuries, and its disparate treatment claim accordingly cannot survive summary judgment.

In opposing summary judgment, Doc. 679, the County does not point to a somewhat different expert analysis performed in Dr. Cowan's rebuttal report. In his rebuttal report, Dr. Cowan re-ran a loan servicing analysis conducted by one of Wells Fargo's experts after correcting for what Dr. Cowan claims was statistical error. Doc. 672-26 at ¶ 17. Dr. Cowan's analysis found that African American borrowers were about 27% *more* likely than white borrowers, and Hispanic borrowers about 20% *less* likely than white borrowers, to be denied a loan modification request by Wells Fargo. *Id*. at ¶¶ 17-21. Given the conflicting signals sent by Dr. Cowan's revised analysis regarding the impact of Wells Fargo's practices on those two categories of minority borrowers, the court doubts that the analysis, standing alone, could support a finding that Wells Fargo engaged in intentionally discriminatory conduct that caused the County's claimed injuries. In any event, the County has forfeited any reliance on the data points in Dr. Cowan's revised analysis by failing to address them in its summary judgment opposition brief. *See Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014)

("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

While the discussion could stop there, the court notes that the same result would obtain even if the expert opinions on which the County relies had not been excluded. To survive summary judgment on its disparate treatment claim, the County must adduce evidence that, considered as a whole, would allow a reasonable jury to find that Wells Fargo caused minority borrowers to default and foreclose due to race-based loan servicing decisions. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (explaining, in the Title VII context, that the record evidence "must be considered as a whole" at summary judgment to determine whether the plaintiff suffered an adverse employment action due to a protected characteristic); *Kormoczy v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Briggs*, 53 F.3d 821, 823 (7th Cir. 1995) (explaining that the analysis of FHA discrimination claims mirror that of employment discrimination claims).

One way to raise an inference of discrimination is the use of similarly situated comparators. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.") (internal quotation marks omitted). To raise an inference of discrimination, "statistical comparators must be directly comparable to the plaintiff in all material respects, though they need not be identical in every conceivable way." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 603 (7th Cir. 2020) (internal quotation marks omitted); *see also Williams v. Bd. of Educ. of Chi.*, 982 F.3d 495, 505 (7th Cir. 2020) (explaining that comparators must be "similar enough to eliminate confounding variables"). "In the context of fair lending, borrowers are similarly situated if they have 'similar underwriting and borrower

characteristics.'" *Bank of Am.*, 584 F. Supp. 3d at 580-81 (quoting *City of Oakland*, 14 F.4th at 1033).

As explained, Dr. Lacefield's analysis compared the prevalence of certain "delimiters" indicating an increased risk of foreclosure in loans made to minority borrowers versus loans made to white borrowers. The analysis did nothing to control for relevant borrower characteristics—such as income, wealth, or credit score—that might explain differential rates of experiencing certain treatment in servicing or in going into foreclosure. Dr. Lacefield thereby failed to compare similarly situated borrowers, and his analysis cannot prove intentional discrimination by Wells Fargo. *See id.* at 572 (reaching the same conclusion regarding Dr. Lacefield's analysis in a substantially similar FHA suit brought by the County against another bank); *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 941-42 (7th Cir. 1997) (holding inadmissible expert testimony in an age discrimination suit where the analysis did not consider any variable but age). Nor did Dr. Cowan perform an appropriate comparator analysis—as explained, his analysis did not reliably capture the conduct of Wells Fargo in particular as opposed to the conduct of other entities.

The County responds that Dr. Lacefield did conduct an "appropriate similarly situated analysis by comparing similarly situated *communities*, not borrowers at the individual level." Doc. 679 at 43. True enough, the court observed at the pleading stage that causation might be proved with "aggregate-level data" comparing neighborhoods with high and low concentrations of minority borrowers. 314 F. Supp. 3d at 987. But the County is wrong that Dr. Lacefield has in fact compared "similarly situated" communities, as he did nothing to control for relevant, non-racial characteristics—such as income, wealth, or credit score—that might impact foreclosure rates for different communities.

### B.    Disparate Impact

The County advances the same equity-stripping claim under a disparate impact theory, alleging that Wells Fargo's origination and servicing practices, even if facially neutral, disproportionately pushed minority borrowers into default and foreclosure.  Doc. 679 at 39-40. As a separate disparate impact claim, the County alleges that Wells Fargo's servicing practices alone (including its foreclosure decisions), even if facially neutral, disproportionately harmed minority borrowers.  *Id*. at 32.  For both claims, the County's liability theory mirrors that for the disparate treatment claim: Wells Fargo's policies discriminated against minority borrowers, causing them to default and the County to incur increased expenditures on foreclosure-related services provided by the Cook County Sheriff's Office and the Circuit Court of Cook County. *Id*. at 48-49.

To prove liability for an FHA disparate impact claim, a plaintiff must identify a statistical disparity and "point to a defendant's policy or policies causing that disparity." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015); *see also City of Joliet v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) ("Disparate-impact analysis looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment.").  The plaintiff must show that the challenged policy was "artificial, arbitrary, and unnecessary." *Inclusive Cmtys.*, 576 U.S. at 543 (internal quotation marks omitted); *see also City of Joliet*, 825 F.3d at 830 (noting that *Inclusive Communities* "stressed the importance of considering both whether a policy exists and whether it is justified"); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017) ("Under *Inclusive Communities*, a plaintiff must, at the very least, point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity.").  To prove liability, moreover, there must be a "robust causality" between the challenged policy and the resulting disparity—a requirement ensuring that "[r]acial imbalance … does not, without more,

establish a prima facie case of disparate impact." *Inclusive Cmtys.*, 576 U.S. at 542 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). "A plaintiff who fails to … produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id*. at 543.

In attempting to establish disparate impact liability, the County points to the disproportionately high foreclosure rates experienced by minority borrowers, a disparity that it says was caused by Wells Fargo's illegitimate mortgage lending and servicing policies. Doc. 679 at 32, 38-39. To show the robust causality between Wells Fargo's practices and the disparate outcomes, the County relies on the opinions of Drs. Lacefield and Cowan. *Id*. at 34-35, 44. The County's problem, again, is that those opinions have been excluded under Rule 702. Consequently, the County cannot show any robust causality between any Wells Fargo policy and any disparate impact on minority borrowers.

Even if the opinions of Drs. Lacefield and Cowan were considered, Wells Fargo still would be entitled to summary judgment. Dr. Cowan's analysis considers loans for which Wells Fargo cannot be liable—specifically, those that the company had no role in servicing or foreclosing—meaning that any disproportionate effects identified by the analysis cannot properly be attributed to any Wells Fargo policy. Dr. Lacefield's analysis simply compared the prevalence of certain risk factors in loans to minority borrowers versus loans to white borrowers. But his analysis did not account for non-racial borrower characteristics relevant to mortgage lending and servicing decisions, and it therefore cannot show any "robust causality" between a Wells Fargo policy and any disproportionate foreclosure rates of minority borrowers. *See Bank of Am.*, 584 F. Supp. 3d at 581 (holding, in a substantially similar FHA suit brought by the County against another bank, that Dr. Lacefield's analysis could not show a "'robust causal

24

connection' between defendants' practices and the race-based disparate impact the County seeks to prove").

## Conclusion

Wells Fargo's motions to exclude the expert opinions of Dr. Lacefield and the liability expert opinions of Dr. Cowan are granted, as is its summary judgment motion. The remaining motions to exclude expert testimony are denied as moot. Judgment will be entered in favor of Wells Fargo and against the County.

December 19, 2022

_____
United States District Judge